## UNITED STATES DISTRICT COURT
## DISTRICT OF COLUMBIA

_____ )
EQUAL RIGHTS CENTER,                )
11 Dupont Circle NW, Suite 400      )
Washington, DC 20036                )
                                    )
AMERICAN ASSOCIATION OF             )
PEOPLE WITH DISABILITIES            )
1629 K Street NW, Suite 503         )
Washington, DC 20006                )
                                    )        Civ. No.: 1:07-cv-01528-JR
MARC FIEDLER                        )
2737 Devonshire Place, NW, #316     )
Washington, DC 20008                )
                                    )
WENDY ELLIOT-VANDIVIER              )
125 Grant Avenue                    )
Philadelphia, PA 19115              )
                                    )
and                                 )
                                    )
MARK JOHNSON                        )
745 Paddock Court                   )
Alpharetta, GA 30004                )
                                    )
                                    )
Plaintiffs,                         )
                                    )
        v.                          )        **JURY TRIAL DEMANDED**
                                    )
HILTON HOTELS CORPORATION           )
9336 Civic Center Drive             )
Beverly Hills, CA 90210             )
                                    )
Defendant                           )
                                    )
Serve: United States Corporation Company )
        1090 Vermont Avenue, NW     )
        Washington, DC 20005        )
                                    )
              Defendant             )
_____ )

# FIRST AMENDED COMPLAINT

## SUMMARY OF ACTION

1.      Hilton Hotels Corporation ("Hilton" or "Defendant") owns one of the largest and most successful hotel operations in the world.  Hilton owns, manages or franchises more than 2,800 hotels in the United States and its annual revenues exceed eight billion dollars.  Hilton advertises that its name is synonymous with a quality hotel experience, and the value of the Hilton brand is that customers believe that the name insures uniform standards.  Hilton's franchise website (www.hiltonfranchise.com) explains:

> So powerful is the brand that in today's popular lexicon, the name 'Hilton' has become synonymous with first-class hospitality… As a result, our guests know that when they choose Hilton – any Hilton hotel- they will receive high quality accommodations.

2.      Accordingly, Hilton exercises significant control over each of its hotels to protect the strength of its brand and ensure that guests receive a uniform experience at each of its hotels. To that end, Hilton sets quality standards that dictate how individual hotels are designed and operated.  Hilton routinely inspects each individual hotel to ensure that it complies with Hilton's standards.

3.      When Hilton identifies problems in particular hotels, or even problems common to all of its hotels,  it requires individual hotels to implement the necessary improvements.  For example, in 2005, Hilton began installing uniform mattresses, linens, and alarm clocks in every hotel room around the world.

4.      Given the quality and consistency associated with the Hilton name, and the resources Hilton devotes to ensuring that each hotel meets their guests' expectations, a

reasonable person would expect Hilton hotels to be compliant with the Americans with Disabilities Act ("ADA") and its Accessibility Guidelines. That is simply not the case.

5.      Instead, virtually every Hilton hotel contains numerous violations of the ADA. Hotels do not have the minimum number of accessible rooms, they do not have the minimum number of rooms equipped with roll-in showers, and they do not distribute accessible rooms among the types of available rooms. Even the few rooms that are designed as "accessible" contain barriers to access. For example:

- Doors in accessible rooms require too much force to open;

- Rooms do not have accessible routes running throughout;

- Light controls require pinching, twisting or grabbing;

- Temperature controls are placed too high on walls; and

- There is an inadequate number of grab bars in restrooms.

6.      The common areas in Hilton hotels contain further barriers to access. For example:

- Front desks do not have accessible sections or equivalent facilitation;

- Signage in common areas is inadequate;

- Public restrooms do not have sufficient clear floor space or adequate grab bars;

- Restaurants do not have accessible tables;

- Retail areas do not have accessible routes; and

- Stair and ramp handrails are inadequate.

7.      Hilton has done nothing to address this dire situation, but rather has compounded the problem by repeatedly promising guests accessible rooms through its central reservation system. Indeed, Hilton accepts reservations for "accessible" rooms, and it provides guests

3

confirmation specifying that they have an "accessible" room, but it fails to ensure that guests are actually provided with such rooms. Rather, at check-in guests regularly are told that no "accessible" rooms are available. Even when guests are provided with so-called "accessible" rooms, the rooms invariably contain accessibility barriers that violate the ADA guidelines. These barriers have barred, and continue to bar, disabled individuals from enjoying accommodations across the county at one of the most desirable hotel destinations.

8.      The plaintiffs in this case have directly encountered such accessibility problems at Hilton hotels. Accordingly, they bring this suit to require Hilton simply to exercise the control it already has over its hotels and to address the widespread ADA violations.

## JURISDICTION AND VENUE

9.      The Court has jurisdiction of this matter under 28 U.S.C. § 1331, § 1343 (a)(4), and § 1367.

10.      Venue is proper in this Judicial District under 28 U.S.C. § 1391(b) and (c).

## PARTIES

11.      The ERC is a national non-profit civil rights membership organization organized under the laws of the District of Columbia with its principal place of business at 11 Dupont Circle, NW, Suite 400, Washington, DC 20036. The ERC's organizational purpose is to identify, challenge, and eliminate discrimination across the country in housing, employment, public accommodations, and government services through education, research, testing, counseling, enforcement, and advocacy. The ERC's goals include eliminating disability-based discrimination, assisting disabled individuals in addressing issues related to their disabilities, and educating the public on the rights of individuals with disabilities. To further its organizational

purpose and accomplish its goals, the ERC participates in a wide range of activities. For example:

(a)    The ERC has been hired by several private companies and municipal entities to inspect their facilities for ADA violations and assist them in removing accessibility barriers. The ERC's clients include a public transportation authority, a county in southern Maryland, and the largest developer of new homes in the mid-Atlantic region;

(b)    The ERC provides a service where individuals with disabilities can report accessibility barriers that they have encountered and seek counseling on how to address these problems;

(c)    The ERC helps people with disabilities advocate on their own behalf when they encounter discrimination. The ERC teaches "know-your-rights" classes and conducts advocacy workshops designed to inform people with disabilities of their rights and their options when they encounter accessibility barriers;

(d)    In conjunction with students at a local university, the ERC has trained students to proactively contact businesses to educate them about the accessibility requirements that apply to those businesses;

(e)    For the past three years, the ERC has worked toward creating the Greater DC Civil Rights Alliance, an umbrella organization composed of civil rights organizations, service providers, religious groups, and advocacy groups in the Washington area created to help members coordinate their activities and increase the effect of their advocacy programs; and

(f)    The ERC regularly consults with federal agencies on issues affecting people with disabilities.

12.    The AAPD is the largest non-profit cross-disability organization in the United States.  It is organized under the laws of the District of Columbia with its principal place of business at 1629 K Street NW, Suite 503, Washington, DC 20006.  The AAPD was formed in 1995 by 550 individuals from all 50 states whose intent was to create a national non-partisan organization to further the productivity, independence, full citizenship, and total integration of people with disabilities into all aspects of society.  The APPD currently has over 100,000 members and members in every state.  To accomplish its goals, the AAPD participates in a wide range of activities.  For example:

(a)    The AAPD lobbies the federal government to promote federal legislation designed to assist people with disabilities.  In the past, the AAPD has directly lobbied the government with respect to the Rehabilitation Act, the ADA, the Telecommunications Act of 1934, the ADA Restoration Act, the Community Choice Act, and the Community Living Services and Support Act;

(b)    The AAPD works to ensure the voting rights of people with disabilities.  Working with organizations in every state, the AAPD ensured that polling places are accessible, that people with disabilities are registered to vote, and that people with disabilities are informed of their rights when they encounter accessibility barriers at polling places;

(c)    The AAPD created a "Coalition of Organizations for Accessible Technology" which coordinates the efforts of 74 national organizations and 103 regional, state and local organizations who work to increase the availability of accessible technology;

(d)    The AAPD runs a disability mentoring program where mentors work with people with disabilities to increase their employment opportunities.  There are currently

300 disability mentors, one in every state.  They  have sponsored job fairs, job

shadowing, and worksite visits;

(e)     The AAPD works in conjunction with two universities to host employment

policy forums which are aimed at educating policy makers and their staff members in

order to improve employment opportunities and economic self-sufficiency for people

with disabilities;

(f)     The AAPD operates several internship programs that provide opportunities for

people with disabilities.  In conjunction with a corporate partner, the AAPD provided

information technology internships with federal agencies to ten people with disabilities.

In conjunction with another corporate partner, the AAPD provided eight internships with

Members of Congress to people with disabilities;

(g)     The AAPD works directly with corporations to increase their social

responsibility.  AAPD officers and employees sit on advisory committees for several

large corporations; and

(h)     The AAPD hosts an annual Leadership Gala where it awards individuals for

their work on behalf of people with disabilities.  The Henry B. Betts Award is presented

to an individual for lifetime work on behalf of people with disabilities, and the Paul G.

Hearne/AAPD Leadership Award is given to an emerging leader who works on behalf

people with disabilities.  The Leadership Gala is intended to honor current leaders and

inspire future leaders.

13.     Mr. Fiedler is disabled by a spinal cord injury which causes him to have a

substantial limitation on the major life activity of walking, and he uses a wheelchair for mobility.

He resides at 2737 Devonshire Place, NW, #316, Washington, DC 20008. Mr. Fiedler is a member of the ERC.

14.     Ms. Elliot-Vandivier is disabled by a spinal cord injury which causes her to have a substantial limitation on the major life activity of walking, and she uses a wheelchair for mobility. She resides at 125 Grant Avenu,e Philadelphia, Pennsylvania 19115. She is a board member of the AAPD.

15.     Mr. Johnson is disabled by a spinal cord injury which causes him to have a substantial limitation on the major life activity of walking, and he uses a motorized wheelchair for mobility. He resides at 745 Paddock Court, Alpharetta, Georgia 30004. Mr. Johnson is a member of the AAPD.

16.     Defendant Hilton is incorporated under the laws of Delaware. Hilton owns and/or operates numerous hotels across the country, including but not limited to the Hilton Washington Embassy Row, 2015 Massachusetts Ave. NW, Washington DC 20036, the Hilton Washington, 1919 Connecticut Avenue NW, Washington, DC 2009, the Capital Hilton, 1001 16th Street NW, Washington DC 20036, and the Hilton Oceanfront Resort, 23 Ocean Lane, Hilton Head Island, South Carolina 29928. Hilton Hotels Corporation owns and/or operates hotels under the following names: Conrad Hotel & Resorts, Doubletree, Embassy Suites, Hampton, Hilton, Hilton Garden Inn, Hilton Grand Vacations, Homewood Suites, and the Waldorf=Astoria Collection (collectively a "Hilton hotel").

## FACTUAL ALLEGATIONS

**A.    Hilton Hotels Across the Nation Contain Numerous Accessibility Barriers.**

17.    Many hotels owned and/or operated by Defendant fail to conform to the accessibility requirements of the ADA.

18.    The Hilton Washington in Washington, DC contains serious barriers to access in rooms designed as accessible, including:

- Using a round bathroom doorknob rather than one that does not require tight grasping, tight pinching, or twisting of the wrist to operate as required by the ADA Standards for Accessible Design, Section 4.13.9;

- Providing no accessible route within the unit to the bed as required by the ADA Standards for Accessible Design, Section 9.2.2.; and

- Failing to provide access to its registration counter in the lobby or equivalent access which could include, for example, providing a folding shelf attached to the main counter on which an individual with disabilities can write, and use of the space on the side of the counter or at the concierge desk for handing materials back and forth as required by ADA Standards for Accessible Design, Section 7.2.

19.    The Capital Hilton in Washington DC contains serious barriers to access in rooms designed as accessible, including:

- Using controls and operating mechanisms for lights and temperature controls that require tight grasping, pinching, and twisting of the wrist to operate, in violation of the ADA Standards for Accessible Design, Section 4.27.4;

- Providing no accessible route within the unit connecting all elements of the room (such as the entrance to the bathroom, the bed, and the desk), as required by the ADA Standards for Accessible Design, Section 9.2.2;

- Failing to provide access to its registration counter in the lobby or equivalent access which could include, for example, providing a folding shelf attached to the main counter on which an individual with disabilities can write, and use of the space on the side of the counter or at the concierge desk for handing materials back and forth as required by ADA Standards for Accessible Design, Section 7.2; and

- Failing to provide any sleeping rooms that include a roll-in shower as required by ADA Standards for Accessible Design, Section 9.1.2, despite the fact that it has more than 50 rooms and has undergone substantial renovations since the enactment of the ADA.

20.     The Hilton Washington Embassy Row in Washington DC fails to provide ADA accessible double rooms, as required by the ADA Standards for Accessible Design, Section 9.1.4.

21.     The Hilton Oceanfront Resort in Hilton Head, South Carolina DC contains serious barriers to access in rooms designed as accessible, including:

- Failing to provide grab bars at the water closet in violation of the ADA Standards for Accessible Design, Section 4.16.4;

- Failing to provide an accessible pathway to the balcony due to a 1.5-inch ledge both inside and outside the sliding door, in violation of the ADA Standards for Accessible Design, Section 9.2.2(6)(d).

22.     The Hilton Oceanfront Resort also contains serious barriers to access in its public areas, including:

- Various public restrooms near its Registration Center, Activity Center, and Conference Area do not have compliant grab bars, in violation of the ADA Standards for Accessible Design, Section 4.17.6;

- The force for opening the door to the Activity Center restroom is too great, in violation of the ADA Standards for Accessible Design, Section 4.13.11;

- The Activity Area and Conference Area restroom sinks do not have the required knee clearances above the floor, in violation of the ADA Standards for Accessible Design, Section 4.19.2; and

- There is no accessible seating for people with disabilities at either of the two hotel bars, in violation of the ADA Standards for Accessible Design Section 5.1.

23.     In response to complaints from its members, the ERC has performed site surveys of a number of other hotels owned and/or operated by Defendant.  These site surveys were intended to identify the extent of Hilton Hotels Corporation's ADA violations, and enable the ERC to better counsel its members who have complained of discrimination.  The ERC found serious ADA violations in these hotels, including: Hilton Oakland Airport, Oakland, California; Hilton San Francisco, San Francisco, California; Hilton San Diego Resort, San Diego, California; Hilton Los Angeles Airport, Los Angeles, California; Hilton Los Angeles North, Los Angeles, California; Hilton Suites Oakbrook, Oakbrook, Illinois; Hilton O'Hare Airport, Chicago, Illinois; The Drake, Chicago, Illinois; Chicago Hilton, Chicago, Illinois; The Palmer House Hilton, Chicago, Illinois; Hilton Boston Back Bay, Boston, Massachusetts; Hilton Boston Logan Airport, Boston, Massachusetts; Hilton Short Hills, Short Hills, New Jersey; Hilton Rye Town, Rye Brook, New York; Hilton New York, New York, New York; The Waldorf-Astoria, New York, New York; Hilton Dallas-Fort Worth Lakes Conference Center, Grapevine, Texas;

Hilton McLean Tyson's Corner, McLean, Virginia; Hilton Alexandria Mark Center, Alexandria, Virginia; and Hilton Seattle Airport, Seattle, Washington.

24.     Violations of the ADA identified by ERC surveys of these hotels include impermissible barriers in virtually every accessible guest room surveyed; no accessible seating in over 90% of these hotel restaurants; inaccessible registration desks; and stairs preventing access to hotel restaurants, conference rooms and business centers.  In addition, reservations for accessible rooms were often not honored, and the guest was often given a room with different features than that reserved.

**B.      Hilton Hotels Across the Nation Fail to Disperse Accessible Rooms Among the Various Classes of Available Sleeping Accommodations.**

25.     Section 9.1.4 of the ADA Accessibility Guidelines also requires hotels to disperse accessible rooms among various classes of available sleeping accommodations.

26.     Numerous Hilton hotels owned and/or operated by Hilton fail to disperse sleeping rooms and suites accessible to persons with disabilities among the various classes of sleeping accommodations available to patrons of the hotel.

27.     According to the Hilton's website (www.hilton.com) approximately 31% of Hilton hotels only offer ADA accessible rooms with one bed.  86% of the Hilton hotels that specifically offer rooms with particular views as a different room category do not have an ADA accessible room with such a view.

28.     The Hilton Washington Embassy Row fails to provide ADA accessible double rooms.

29.     The Hilton Oceanfront Resort in Hilton Head South Carolina fails to provide ADA accessible rooms with ocean views.

C.   **Hilton Exercises Extensive Control over the Daily Operations of Individual Hilton Hotels, but it Chooses to Ignore their Continuing ADA Violations.**

30.    Hilton exercises extensive control over individual hotels.  For example, according to its franchise website (www.hiltonfranchise.com):

(a)    Hilton must approve the design for all new Hilton brand hotels before those hotels can begin construction.  Hilton assigns a Hilton Hotels Corporation Developer to coordinate the design and construction of new hotels;

(b)    An existing hotel that seeks to convert to a Hilton hotel must have all aspects of its property reviewed by Hilton to determine whether they comply with Hilton's standards;

(c)    Hilton sets "strict standards of quality" that each individual hotel must meet;

(d)    Hilton employs "quality assurance specialists" who "regularly" inspect each property to ensure that it complies with Hilton's standards; and

(e)    Hilton's "Continuous Improvement Process" gives it the right to require individual hotels to implement specific changes required by Hilton.

31.    In the past, when Hilton has recognized systemic problems in its hotels, it has implemented the necessary changes to fix those problems in individual hotels.  For example:

(a)    According to a March 29, 2005 press release, Hilton designed a new alarm clock featuring an easy-to-set alarm to address guests' frustration with existing alarm clocks and their fear of oversleeping in the morning.  Hilton phased nearly 250,000 alarm clocks in to existing and newly operated hotels; and

(b)    According to a July 5, 2005 press release Hilton instituted a "new bedding initiative" designed to improve sleeping experiences at its hotels.  Although the details

differed according to the brand, Hilton installed new mattresses and linens in each of its branded hotel rooms throughout the country.

32.    Despite the fact that Hilton sets demanding standards for quality, that it inspects individual hotels on a regular basis, and that it requires those hotels to implement changes necessary to fix existing problems, Hilton hotels continue to operate in blatant violation of the ADA.

**D.    Hilton Uses the Strength of Its Brand to Deliver Customers to Its Hotels.**

33.    Hilton carefully regulates the use of the Hilton brand, which it alleges is "unmatched by any hospitality company in the world, affording all Hilton owners [i.e., franchisees] exceptional leverage in the areas of purchasing, marketing and customer recognition." Hilton spends "many millions of dollars" annually promoting the brand through targeted consumer driven promotions. Hilton's franchise website explains the strength of the Hilton brand:

> So powerful is the brand that in today's popular lexicon, the name 'Hilton' has become synonymous with first-class hospitality… As a result, our guests know that when they choose Hilton – any Hilton hotel- they will receive high quality accommodations.

34.    To capitalize on the strength of the Hilton brand, Hilton operates "customer delivery programs and systems" that are designed to create loyalty and encourage guests to stay at the various Hilton hotels. Hilton operates a "Hilton HHonors program" where individuals are rewarded points for staying at Hilton hotels that can be redeemed for additional free nights. Guests can also make use of a Hilton HHonors Visa card that allows them to earn points redeemable for vacations at Hilton hotels. Hilton's reservation system is a key component of its customer delivery program.

E.    **Hilton Accepts Reservations for Accessible Rooms but Fails to  Honor Those
      Reservations.**

35.    Hilton's reservation system operates a toll-free number (1-800-hiltons), and a

website (www.hilton.com) where individuals can reserve rooms at Hilton hotels.  According to a

March 7, 2006 press release, 15 percent of all reservations for Hilton hotels are booked via

proprietary websites.

36.    The central reservation service allows guests to reserve "accessible" rooms.  The

website also allows guests to select rooms with specific features like bed type and smoking

preference.  Two of the available features are "Accessible" and "Disabled and Traveling with

Service Animal."  After booking an "accessible" room, the reservation system will send the guest

a confirmation that specifies their reservation was indeed for an "accessible" room.

37.    Despite the fact that Hilton accepts reservations for "accessible" rooms, it fails to

follow through to ensure that accessible rooms are actually available.  Rather, when guests

attempt to check-in they are regularly told that no "accessible" rooms are available.

38.    Additionally, Hilton fails to ensure that the rooms it represents are accessible do

not contain violations of the ADA Accessibility Guidelines.


F.    **Hilton's Discrimination has Injured the Plaintiffs.**

      **1.  The ERC**

39.    The ERC first learned of disability barriers at Hilton hotels through the

complaints of multiple members who encountered such barriers.  In counseling these members

and advising them of their rights, the ERC suffered a diversion of its resources from its other

programs.  In response to these complaints, and in order to learn of the full extent of accessibility

barriers that occur at Hilton hotels so that the ERC could better advise its members and more

effectively combat whatever accessibility barriers existed, the ERC began preparing to perform

cite inspections at representative Hilton hotels.

40.    To the ERC's surprise, Hilton then contacted the ERC's Executive Director,

Rabbi Dr. Bruce E. Kahn to discuss potentially hiring the ERC to perform ADA-related

inspections of Hilton's hotels.  Indeed, Hilton discussed hiring the ERC to inspect all of the

"Hilton family hotels" which included franchised hotels as well as Hilton hotels operating under

different brand names such as Doubletree and Hampton Inn.  Rabbi Kahn expressed a

willingness to inspect Hilton hotels and work proactively with Hilton to remove accessibility

barriers.  For reasons unknown to the ERC, Hilton decided not to retain the ERC.

41.    The ERC then followed through on its pre-existing plans to inspect several Hilton

hotels, and the ERC encountered accessibility barriers in every hotel it inspected.

42.    The ERC brings this case on its own behalf because it has suffered the loss or

diversion of resources as a direct result of Hilton's continuing violations of the ADA and the

DCHRA.  Hilton's actions have directly injured the ERC by:

(a)    Forcing the ERC to divert resources from other issues vital to its membership

in order to counsel members complaining of discrimination by Hilton;

(b)    Forcing the ERC to divert resources from other issues vital to its membership

in order to investigate the extent of accessibility barriers that occur in Hilton hotels in

order to better counsel individual members who encounter discrimination by Hilton;

(c)    Frustrating the ERC's organizational purpose of identifying, challenging, and

eliminating discrimination in housing, employment, public accommodations, and

government services, and making more difficult the ERC's activities directed at

achieving this purpose.  Hilton's pattern of discrimination has made it more difficult for

16

people with disabilities to travel, stay in, and enjoy the amenities of hotels in the region and throughout the country. As a direct result, the ERC's activities directed at eliminating discrimination in public accommodations have been made more difficult.

43.    Thus, the ERC has been injured as a direct result of Hilton's continuing ADA and DCHRA violations. The ERC also faces a threat of continuing injury from Hilton's pattern of violations. Indeed, if the violations remain unremedied, the ERC will continue to be forced to divert resources necessary to combat discrimination in Hilton hotels, and its activities will continue to be made more difficult as a direct result of Hilton's conduct.

44.    The ERC also brings this suit as a representative of its members whose rights to travel, stay in, and enjoy the amenities of hotels both in the region and throughout the country have been infringed by the Defendant. ERC members have attempted to stay at Hilton hotels because they believe that the quality associated with the Hilton name suggests that they will be provided with a room that meets the ADA Accessibility Guidelines. ERC members have attempted to book accessible rooms in the various classes of available rooms at Hilton hotels only to be told that the particular hotel does not offer accessible rooms in that class. ERC members have placed reservations for "accessible" rooms with Hilton. These individuals have relied on Hilton's representation that it would provide them an "accessible" room. When they attempted to check-in, however, some of these members have been told that "accessible" rooms were not available. Those members that were provided "accessible rooms" encountered various accessibility barriers in violation of the ADA while staying at Hilton hotels. These individuals have a continuing desire to stay at hotels owned and/or operated by Hilton and would do so but for their knowledge of inaccessible features.

## 2. The AAPD

45.    The AAPD has encountered accessibility barriers at Hilton's hotels on several occasions.   In 2003, the AAPD hosted a conference in conjunction with the National Organization for Women.  The AAPD had originally sought to hold the convention at the Doubletree in Rockville Maryland, located at 1750 Rockville Pike Rockville, Maryland 20852, but after a site inspection revealed numerous accessibility barriers, the AAPD decided to host the event at a different, accessible hotel.  The Doubletree is now operating as the Hilton Washington DC/Rockville Executive Hotel and Meeting Center.

46.    On March 6, 2007, the AAPD hosted its annual Leadership Gala at the Capital Hilton.  During his acceptance speech, Mark Johnson, the Henry B. Betts Award recipient, criticized the Capital Hilton for not providing any rooms with roll-in showers and failing to pledge to add at least one roll-in shower to the hotel.  In 2008, the AAPD hosted its Leadership Gala at the National Building Museum.  The AAPD changed the venue of its Leadership Gala as a direct and proximate result of the accessibility barriers present at the Capital Hilton.

47.    The AAPD brings this case on its own behalf because it has suffered the loss or diversion of resources as a direct result of Hilton's continuing violations of the ADA and the DCHRA.  Hilton's actions have directly injured the AAPD by:

(a) Forcing the AAPD to divert resources from other issues vital to its membership in order to spend time to inspect meeting and hotel facilities to ensure that they are ADA compliant.  The AAPD's experience with ADA violations at Hilton hotels has caused it to expend more resources checking the accessibility of meeting and hotel facilities.  This includes, but is not limited to, the diversion of resources required to find a suitable venue

for its 2003 conference with the National Organization for Women as well the costs of locating a venue for the 2007 Leadership Gala.

(b) Forcing the AAPD to divert resources from other issues vital to its membership in order to spend time increasing its lobbying efforts to promote accessibility and directly combat the effects of Hilton's continuing ADA violations.

(c) Frustrating the AAPD's organizational purpose of furthering the productivity, independence, full citizenship, and total integration of people with disabilities into all aspects of society, and making the AAPD's activities directed at achieving this purpose more difficult. Indeed, Hilton's pattern of discrimination has made it more difficult for people with disabilities to travel, stay in, and enjoy the amenities of hotels both in the region and throughout the country. Accordingly, the AAPD's activities directed at furthering the total integration of people with disabilities into all aspects of society have been made more difficult.

48.    Thus, the AAPD has been injured as a direct result of Hilton's continuing ADA and DCHRA violations. The AAPD faces a threat of continuing injury from Hilton's pattern of violations. Indeed, if the violations remain unremedied, the AAPD will continue to be forced to divert resources necessary to combat discrimination in Hilton hotels, and its activities will continue to be made more difficult as a direct result of Hilton's conduct.

49.    The AAPD also brings this suit as a representative of its members whose rights to travel, stay in, and enjoy the amenities of hotels both in the region and throughout the country have been infringed by the Defendant. AAPD members have attempted to stay at Hilton hotels because they believe that the quality associated with the Hilton name suggests that they will be provided with a room that meets the ADA Accessibility guidelines. AAPD members have

attempted to book accessible rooms in the various classes of available rooms at Hilton hotels

only to be told that the particular hotel does not offer accessible rooms in that class.  AAPD

members have placed reservations for "accessible" rooms with Hilton.  These individuals have

relied on Hilton's representation that it would provide them an "accessible" room.  When they

attempted to check-in, however, some of these members have been told that "accessible" rooms

were not available.  Other members who were provided "accessible rooms" encountered various

accessibility barriers in violation of the ADA while staying at Hilton hotels.  These individuals

have a continuing desire to stay at hotels owned and/or operated by Hilton and would do so but

for their knowledge of inaccessible features.

### 3.  Marc Fiedler

50.     In 2006, plaintiff Marc Fiedler attempted via telephone from his residence in

Washington, DC to book a wheelchair-accessible room at the Hilton Oceanfront Resort in Hilton

Head, South Carolina for a September vacation.  The Hilton Oceanfront Resort has room

categories that offer 1 King Bed or 2 Queen Beds, and either an island view, an ocean view, or a

court yard view.  Mr. Fiedler wished to stay in an accessible room with a view of the ocean, and

he was prepared to pay a premium rate to do so.

51.     Mr. Fiedler was informed by a reservations representative that none of  the rooms

with an ocean view were wheelchair-accessible.  Mr. Fiedler has a continuing desire to vacation

at the Hilton Oceanfront Resort and would do so but for the Hilton Oceanfront Resort's failure to

disperse accessible rooms among the available classes of sleeping accommodations.

### 4. Wendy Elliot-Vandivier

52.    On March 20, 2008, plaintiff Wendy Elliot-Vandivier reserved a king sized, non-smoking, wheelchair accessible room at the Doubletree Guest Suites, Philadelphia West located at 640 West Germantown Pike, Plymouth Meeting, PA 19462 for March 26, 2008.

53.    She placed the reservation with Hilton's central reservation system by telephone. She reserved a king sized accessible room, and on March 20 and March 21 she received emails confirming her reservation of an "accessible" room.

54.    In reliance on Hilton's representation that it would provide an accessible room, Ms. Elliot-Vandivier tried to check-in to the Doubletree Guest Suites at 11:00 pm on March 26. Ms. Elliot-Vandivier was told that all of the Doubletree's accessible rooms were unavailable because they were undergoing renovations.  Hilton accepted and confirmed Ms. Elliot-Vandivier's reservation for an accessible room despite the fact that no accessible rooms were available.

55.    Ms. Elliot-Vandivier was forced to stay in an inaccessible room.  During her stay, she encountered numerous inaccessible features: she could only enter the bathroom after the Doubletree took the door off its hinges; the sink was too low for her to access; there were no grab bars surrounding the bathtub or toilet; and she did not have a clear route throughout her room.  Additionally, her husband had intended only to drive her to the hotel, but due to the inaccessible room, he was forced to stay with her and miss half a day of work.  This experience inconvenienced Ms. Elliot-Vandivier and caused her emotional distress and mental anguish.

56.    Ms. Elliot-Vandivier works in human resources for Loews Corporation. The department has quarterly meetings at hotels and employees are required to stay at the hotels where the meeting is held.  Ms. Elliot-Vandivier has present plans to stay at the various hotels

that her human resources department books for quarterly meetings.  There is an ongoing

possibility that these hotels will be Hilton hotels.  Ms. Elliot-Vandivier faces a threat of future

injury if she is forced to stay in an inaccessible room because her reservation for an accessible

room is not honored.  Ms. Elliot-Vandivier also faces a threat of future injury if she stays in an

"accessible" room that contains violations of the ADA Accessibility guidelines.

### 5. Mark Johnson

57.    On March 6, 2007, Mark Johnson was awarded the Henry B. Betts Award for his

activism and advocacy on behalf of disabled individuals.  The AAPD issues this award annually

during its Leadership Gala.  In 2007, the AAPD hosted its Leadership Gala at the Capital Hilton.

58.    Mr. Johnson requires the use of a roll-in shower.  The Capital Hilton does not

have any rooms that contain roll-in showers, even though it is required by Section 9.12 of the

ADA Standards for Accessible Design to have at least 5 rooms with roll-in showers.

59.    The General Manager of the Capital Hilton offered to assist Mr. Johnson in

finding a room with a roll-in shower at a separate hotel, but Mr. Johnson declined because he

wanted to stay at the hotel where the Leadership Gala was being held.  The General Manager

then suggested that Mr. Johnson use the showers in the men's locker room of the hotel's fitness

center because those showers were not attached to a bathtub, or a door with a ledge.  Mr.

Johnson asked the General Manager to pledge to add at least one roll-in shower to the hotel, but

the General Manager refused.  This experience inconvenienced Mr. Johnson and caused him

emotional distress and mental anguish.

60.    During his acceptance speech, Mr. Johnson criticized the Capital Hilton for not

providing any rooms with roll-in showers and failing to pledge to add at least one roll-in shower

to the hotel.  Numerous AAPD members heard Mr. Johnson's comments and learned of

accessibility barriers at Hilton hotels, and Hilton's refusal to address accessibility barriers.

61.    Mr. Johnson is the Director for Advocacy at the Shepherd Center, a rehabilitation

hospital in Atlanta Georgia.  Mr. Johnson visits Washington DC on a regular basis for work as

part of his advocacy work.  For example, from April 27 through May 1, 2008 Mr. Johnson

intends to attend the 25th anniversary celebration of Adapt, an organization dedicated to helping

people with disabilities live normal lives in their community rather than having to stay in nursing

homes.  This celebration is located in Washington DC.  Mr. Johnson would stay at a Hilton hotel

but for his knowledge of accessibility barriers present in Hilton hotels.

62.    Plaintiffs have no adequate remedy at law.

### COUNT I – VIOLATION OF TITLE III OF THE AMERICANS WITH DISABILITIES ACT

63.    Plaintiffs reallege the allegations in paragraphs 1-62 above as if set forth fully

herein.

64.    Individual Hilton hotels, including but not limited to the Hilton Washington

Embassy Row, Hilton Washington, Capital Hotel, Hilton Oceanfront Resort, and  Doubletree

Guest Suites, Philadelphia West are public accommodations within the meaning of the ADA

because they are private entities whose operations affect commerce and are places of lodging.

65.    Title III of the ADA applies to Hilton because it owns, leases or operates places of

public accommodation.

66.    The ADA prohibits discrimination on the basis of disability.  Pursuant to Title III

of the ADA, Hilton has a statutory responsibility to provide public accommodations that are fully

and equally accessible to individuals with disabilities.  Newly constructed hotels must provide

such accommodations in accordance with the implementing regulations at Title 28 C.F.R. Pt. 36,

App. A ("ADA Standards for Accessible Design"), Section 9.  Newly renovated hotels must

conform to the ADA Standards for Accessible Design to the maximum extent feasible pursuant

to 42 U.S.C. § 12183.  Existing hotels must remove barriers and meet the requirements of the

ADA Standards for Accessible Design to the extent that such efforts are readily achievable

pursuant to 42 U.S.C. § 12182.

67.    Section 9 of the ADA Standards for Accessible Design contains specific

requirements regarding the proper spacing of furniture, the floor plan and layout of hotel guest

rooms, and certain required equipment.  In addition, in order to provide persons with disabilities

a range of options equivalent to those available to other persons served by the facility, Section

9.1.4 requires that sleeping rooms and suites accessible to persons with disabilities must be

dispersed among the various classes of sleeping accommodations available to patrons of the

hotel.

68.    On information and belief, the rooms, suites, and common areas of the Hilton

Oceanfront Resort, Hilton Washington Embassy Row, Hilton Washington, Capital Hilton, and

Doubletree Guest Suites, Philadelphia West as well as most hotels owned and/or operated by

Defendant, are newly renovated within the meaning of the ADA.  Any remaining areas of hotels

are subject to the barrier removal and "readily achievable" requirements of the ADA.

69.    As described above, Defendant has failed to conform to the requirements of the

ADA Standards for Accessible Design, Section 9, failed to remove barriers from altered facilities

to the maximum extent feasible, and failed to remove readily achievable barriers in existing

facilities, in violation of 42 U.S.C. § § 12181-12189.

70.    Defendant is liable for the violations of Plaintiffs' rights that occur at its hotels,

places of public accommodation as defined by the ADA, because at all times relevant hereto

every Hilton hotel is either owned, leased by, leased to, or operated by Defendant.  Moreover,

Hilton exercises significant control over the construction, design and daily operations of all

Hilton hotels including Hilton's franchised hotels through its franchise agreement.  Hilton also

accepts reservations for all of its hotels including its franchised hotels, and confirms that

accessible rooms will be available.  Guests rely on these representations, but are frequently told

when they check-in that no accessible rooms are available.  Defendant's employees and/or agents

were acting (a) with the consent of, (b) under the control or supervision of, and/or (c) within the

authority as employees and/or agents of Defendant.

### COUNT II – VIOLATION OF THE DISTRICT OF COLUMBIA HUMAN RIGHTS ACT

71.	Plaintiffs reallege the allegations in paragraphs 1-70 as if fully set forth herein.

72.	At the times relevant to this action, the District of Columbia Human Rights Act,

D.C. Code § § 2-1401.01 et seq. (DCHRA), was in full force and effect in the District of

Columbia.

73.	The Defendant and each of its hotels in the District of Columbia is a "place of

public accommodation" within the meaning of the DCHRA.

74.	Plaintiffs Fiedler, Elliot-Vandivier and Johnson are persons with disabilities

within the meaning of the DCHRA.

75.	Plaintiff Equal Rights Center is an organization whose mission includes

representing the interests of its members, many of whom are persons with disabilities, within the

meaning of the DCHRA, and eliminating discrimination against persons with disabilities.

76.	Plaintiff AAPD is an organization whose mission includes representing the

interests of its members, many of whom are persons with disabilities, within the meaning of the

DCHRA, and eliminating discrimination against persons with disabilities.

25

77.    The DCHRA prohibits discrimination against persons with disabilities.  D.C. Code § 2-1402.31 provides, in pertinent part:

(a)    General.  It shall be an unlawful discriminatory practice to do any of the following acts, wholly or partially for a discriminatory reason based on the… disability… of any individual:

(b)    To deny, directly or indirectly, any person the full and equal enjoyment of the goods, services, facilities, privileges, advantage and accommodations of any place of public accommodations.

78.    The DCHRA's prohibition of discrimination on the basis of disability applies to the same extent, and with the same effect, as Title III of the ADA.

79.    The barriers identified in the Hilton Washington Embassy Row, Hilton Washington, and Capital Hilton constitute discrimination based on disability in violation of the DCHRA.

80.    In failing to provide access to the identified hotels as required by the DCHRA in the manner described above, Defendant acted with callous disregard for the legally protected rights of Plaintiffs Fiedler, Elliot-Vandivier, Johnson, the ERC, the AAPD and their members.

81.    Defendant is liable for the violations of Plaintiffs' rights under the DCHRA because at all times relevant hereto Defendant's employees and/or agents were acting (a) with the consent of, (b) under the control or supervision of, and/or (c) within the authority as employees and/or agents of Defendant.

**PRAYER FOR RELIEF**

**WHEREFORE**, Plaintiffs pray that the Court:

(i)    Adjudge, order, and declare that Defendant has violated the provisions of the Americans with Disabilities Act, 42 U.S.C. §§ 12181 et seq., and the D.C. Human Rights Act, D.C. Code §§ 2-1401.01 et seq;

(ii)    Award injunctive relief requiring Defendant to require that all Hilton hotels owned and/or operated by Defendant, including franchised hotels, comply with all applicable sections of the ADA Accessibility Guidelines;

(iii)    Award injunctive relief requiring Defendant to guarantee that accessible rooms are available when it provides reservations for accessible rooms;

(iv)    Award injunctive relief requiring Defendant to ensure that the rooms it represents are accessible do not contain violations of the ADA Accessibility Guidelines;

(v)    Enter judgment awarding the individual plaintiffs, Marc Fiedler, Wendy Elliot-Vandivier, and Mark Johnson compensatory damages in an amount appropriate to the proof at trial;

(vi)    Enter judgment awarding the organizational plaintiffs, the ERC and the AAPD compensatory damages in an amount appropriate to the proof at trial for the violations they encounter in their organizational capacity;

(vii)    Award Plaintiffs the full cost of the action, including attorneys' fees; and

(viii)    Grant Plaintiffs such other and further relief as the Court deems appropriate.

## JURY DEMAND

Pursuant to Rule 38 of the Federal Rules of Civil Procedure, Plaintiffs demand a trial by jury.

Dated:  April 10, 2008.

By:    _____/s/_____

August J. Matteis, Jr., DC Bar # 433068
Gilbert Randolph LLP
1100 New York Ave. NW, Suite 700
Washington D.c. 20009
Tel: (202) 772-2200
Fax: (202) 772-3333

Elaine Gardner, DC Bar #271262
Washington Lawyers' Committee For
Civil Rights & Urban Affairs
11 Dupont Circle, NW, Suite 400
Washington, DC 20036
Tel: (202) 319-1000
Fax: (202) 319-1010

*Attorneys for Plaintiffs*

## CERTIFICATE OF SERVICE

I HERBY CERTIFY that a copy of the forgeoing Complaint was sent first class mail, postage prepaid on this 10th day of April to counsel for Defendant:

**Frank Charles Morris, Jr.**
EPSTEIN, BECKER & GREEN, P.C.
1227 25th Street, NW
Suite 700
Washington, DC 20037
(202) 861-1880
Fax: (202) 296-2882
Email: fmorris@ebglaw.com

**Minh N. Vu**
EPSTEIN, BECKER & GREEN, PC
1227 25th Street, NW
Washington, DC 20037
(202) 861-1841
Fax: (202) 861-3541
Email: mvu@ebglaw.com

**Lisa A. Krupicka**
BURCH, PORTER & JOHNSON PLLC
130 North Court Avenue
Memphis, TN 38103
(901) 524-5121
Fax: (901) 524-5024
Email: lkrupicka@bpjlaw.com

_____/s/_____
August J. Matteis Jr.