## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

EQUAL RIGHTS CENTER, et al.,

　　　　　　　　　　　　Plaintiffs,

　　　　*v.*

HILTON HOTELS CORPORATION,

　　　　　　　　　　Defendant.

Civ. Action No. 1:07-cv-01528-JR

## HILTON HOTELS CORPORATION'S MOTION TO DISMISS THE AMENDED COMPLAINT

Pursuant to Federal Rules of Civil Procedure 12(b)(1), 12(b)(6), 12(b)(7) and

Local Civil Rule 7, Defendant Hilton Hotels Corporation ("Hilton") moves to dismiss

with prejudice all of Plaintiffs' claims set forth Amended Complaint. The grounds for this

motion are set forth in the accompanying Memorandum of Points and Authorities in

Support of Hilton's Motion to Dismiss the Amended Complaint and Exhibits.

Dated:  May 9, 2008　　　　　　　　Respectfully submitted,

　　　　　　　　　　　　　　　EPSTEIN BECKER & GREEN, P.C.


　　　　　　　　　　　　　_____/s/____Minh N. Vu__
　　　　　　　　　　　　　Frank C. Morris, Jr. (Bar No. 211482)
　　　　　　　　　　　　　Minh N. Vu (Bar No. 444305)
　　　　　　　　　　　　　1227 25th Street, N.W., Suite 700
　　　　　　　　　　　　　Washington, D.C. 20037
　　　　　　　　　　　　　(202) 861-0900
　　　　　　　　　　　　　(202) 296-2882 (fax)

Lisa A. Krupicka (not admitted in D.C.)
Burch, Porter & Johnson, PLLC
130 N. Court Avenue
Memphis, Tennessee 38103
(901) 524-5121
(901) 524-5024 (fax)

Counsel for Defendant

## CERTIFICATE OF SERVICE

I certify that a true and correct copy of the foregoing Motion to Dismiss the Amended

Complaint was served this 9th day of May 2008, by electronic service, on the following:

Elaine E. Gardner, Esq.
Washington Lawyers' Committee for
Civil Rights & Urban Affairs
11 Dupont Circle, NW, Suite 400
Washington, D.C.  20036

August Matteis, Jr., Esq.
Benjamin Davidson, Esq.
Gilbert Randolph LLP
1100 New York Avenue, NW
Suite 700
Washington, DC 20005

_____/s/_____
Minh N. Vu
D.C. Bar No. 444305

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

EQUAL RIGHTS CENTER, et al.,

                 Plaintiffs,

      *v.*

HILTON HOTELS CORPORATION,

                 Defendant.

Civ. Action No. 1:07-cv-01528-JR

## MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF HILTON HOTELS CORPORATION'S MOTION TO DISMISS THE AMENDED COMPLAINT

Frank C. Morris, Jr. (Bar No. 211482)
Minh N. Vu (Bar No. 444305)
1227 25th Street, N.W.
Suite 700
Washington, D.C. 20037
(202) 861-0900
(202) 296-2882 (fax)

Lisa A. Krupicka (admitted pro hac vice)
Burch, Porter & Johnson, PLLC
130 N. Court Avenue
Memphis, Tennessee 38103
(901) 524-5121
(901) 524-5024 (fax)

DATED:  May 9, 2008                Counsel for Defendant

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ............................................................... iii

I.    INTRODUCTION ................................................................. 1

II.   SUMMARY OF ARGUMENT ................................................ 2

III.  FACTUAL ALLEGATIONS .................................................. 8

IV.   ARGUMENT .......................................................................... 11

    A.   Plaintiffs' Claim For Nationwide Injunctive Relief for all Hilton Family Brand Hotels And Claim Against The Hilton Central Reservation System Must Be Dismissed Under Fed. R. Civ. P. 12(b)(1) Because Plaintiffs Lack Standing Under The ADA And DCHRA ............................................................. 12

        1.   Article III's Standing Requirements. ........................................ 12

        2.   The Individual Plaintiffs Lack Standing To Seek Nationwide Injunctive Relief As To All Hilton Family Brand Hotels ......................... 17

        3.   Mr. Fiedler Lacks Standing To Seek Injunctive Relief As To The Hilton Oceanfront Hotel in South Carolina. ............................... 19

        4.   Mr. Johnson Lacks Standing To Seek Injunctive Relief As To The Hilton Family Brand Hotels in Washington, D.C. ..................................... 21

        5.   The Individual Plaintiffs Do Not Have Standing To Seek Injunctive Relief As To The Hilton Central Reservation System. ............................. 23

        6.   Plaintiff ERC Lacks Organizational Standing To Seek Injunctive Relief As To Any Hilton Family Brand Hotel And The Hilton Central Reservation System. ........................................................ 24

            a.   Prudential And Statutory Limitations Bar ERC's ADA Claim. ... 24

            b.   ERC Lacks Article III Standing To Seek Injunctive Relief Under The ADA And The DCHRA ........................................... 26

        7.   Plaintiff AAPD Lacks Organizational Standing To Seek Injunctive Relief As To Any Hilton Family Brand Hotel And Hilton's Central Reservation System. ........................................................ 31

        8.   Plaintiffs ERC And AAPD Lack Representational Standing To Seek Injunctive Relief As To Any Hilton Family Brand Hotel And The Hilton Central Reservation System. ........................................ 33

    B.   Plaintiffs Lack Standing To Sue For Monetary Damages Under The DCHRA ... 36

**C.**    Plaintiffs' Claim For Injunctive And Monetary Relief Against Franchised Hotels And Managed Hotels That Are Not Owned By Hilton Must Be Dismissed Under Fed. R. Civ. P. 12(b)(7) Because Plaintiffs Have Failed To Join The Owners Of These Hotels Who Are Indispensable Parties. .................. 38

    **1.**    The Owners Of The Franchised Hotels And Managed Hotels Are Necessary Parties Under Fed. R. Civ.P. 19(a). ........................................ 39

        a.    Complete Relief Cannot Be Accorded Without The Franchised Hotel Owners. ............................................................... 40

        b.    The Disposition Of The Case In The Absence Of The Franchised Hotel And Managed Hotel Owners Will Impair Their Ability To Protect Their Legal Interests. ....................................................... 40

    **2.**    The Court Should Exclude The Franchised And Managed Hotels From This Lawsuit Pending Joinder Of Their Owners And Dismiss With Prejudice The Seven Franchised Hotels And Six Managed Hotels Whose Owners Cannot Be Joined. ................................................ 43

**D.**    Plaintiffs' Claim That Hotels Built For First Occupancy Prior To January 26, 1993 Must Have Accessible Rooms Dispersed In Different Room Classes Or Categories Must Be Dismissed Under Fed. R. Civ. P. 12(b)(6). ......................... 47

**V.**    CONCLUSION ............................................................................................ 50

# TABLE OF AUTHORITIES

## CASES

Ass'n for Disabled Ams. v. Claypool Holdings LLC, No. IP 00-0344-C-G/T, 2001 WL 1112109 (S.D. Ind. Aug. 6, 2001)...............................................................................15, 22, 34, 35

Ass'n for Retarded Citizens of Dallas v. Dallas County Mental Health & Mental Retardation Ctr. Bd. of Trs., 19 F.3d 241 (5th Cir. 1994)..............................................................29

Associated Gen. Contractors of Cal., Inc. v. Cal. State Council of Carpenters, 459 U.S. 519 (1983)..............................................................................................................21, 23

Bancoult v. McNamara, 214 F.R.D. 5 (D.D.C. 2003) ...............................................................45

Bell Atl. Corp. v. Twombly, 127 S. Ct. 1955 (2007) ......................................................11, 18, 28

Bourbeau v. The Jonathan Woodner Co., No. CIV. A 07-0164, 2008 WL 1757752 (D.D.C. Apr. 17, 2008) ..........................................................................................26, 32, 38

City of Los Angeles v. Lyons, 461 U.S. 95 (1983) ....................................................13, 24, 26, 32

Clark v. Burger King Corp., 255 F. Supp. 2d 334 (D.N.J. 2003) .......................................(passim)

Clark v. McDonald's Corp., 213 F.R.D. 198 (D.N.J. 2003) ...................................................25, 42

Ctr. for Law & Educ. v. Dep't of Educ., 315 F. Supp. 2d 15 (D.D.C. 2004)................................33

Daimler Chrysler Corp. v. Cuno, 547 U.S. 332 (2006) ...............................................................17

FW/PBS, Inc. v. City of Dallas, 493 U.S. 215 (1990)............................................................16, 32

Fair Employment Council of Greater Wash., Inc. v. BMC Mktg. Corp., 28 F.3d 1268 (D.C. Cir. 1994) .........................................................................................................(passim)

Fair Hous. Council v. Montgomery Newspapers, 141 F.3d 71 (3d Cir. 1998)............................29

Florida Pub. Telecomm. Ass'n, Inc. v. FCC, 54 F.3d 857 (D.C. Cir. 1995).................................26

GTE New Media Servs. Inc. v. BellSouth Corp., 199 F.3d 1343 (D.C. Cir. 2000) .....................44

Gillis v. McDonald's Corp., Civ. A. No. 91-7202, 1992 WL 236891 (E.D. Pa. Sept. 10, 1992) .......................................................................................................................................42

Harris v. Del Taco, Inc., 396 F. Supp. 2d 1107 (C.D. Cal. 2005) .........................14, 19, 24, 32, 34

Havens Realty Corp. v. Coleman, 455 U.S. 363 (1982)..............................................................28

Healy v. Beer Inst., Inc., 491 U.S. 324 (1989)............................................................................37

Hoepfl v. Barlow, 906 F. Supp. 317 (E.D. Va. 1995)..................................................18, 25

Holt v. American City Diner, Inc., No. CIV. 05-1745, 2007 WL 1438489 (D.D.C. May 15, 2007) ........................................................................................14, 19, 24, 32, 34

Hoytt v. Docktor Pet Ctr., Inc., No. 85 C 6850, 1986 WL 11619 (N.D. Ill. Oct. 10, 1986) .........43

Hunt v. Wash. State Apple Adver. Comm'n, 432 U.S. 333 (1977) ................................................34

Interstate Natural Gas Ass'n v. FERC, 285 F.3d 18 (D.C. Cir. 2002) ..........................................27

Kessler Inst. for Rehab., Inc. v. Borough of Essex Fells, 876 F. Supp. 641 (D.N.J. 1995)...........36

Kickapoo Tribe of Indians v. Babbitt, 43 F.3d 1491 (D.C. Cir. 1995).......................39, 40, 42, 43

Kohler v. Shenansky, 914 F. Supp. 1206 (D. Md. 1995)................................................................32

LPA Inc. v. Chao, 211 F. Supp. 2d 160 (D.D.C. 2002)..................................................................33

Lewis v. Casey, 518 U.S. 343 (1996) ...............................................................15, 17,  24, 31, 32

Long Term Care Pharmacy Alliance v. UnitedHealth Group, Inc., 498 F. Supp. 2d 187 (D.D.C. 2007) ...............................................................................................................33

Long v. Howard Univ., 512 F. Supp. 2d 1 (D.D.C. 2007)...............................................................32

Lujan v. Defenders of Wildlife, 504 U.S. 555 (1992) .........................................................(passim)

Maydak v. FCC, No. 98-1383, 1998 WL 938717 (D.C. Cir. Dec. 9, 1998)...................................27

McInnis-Misenor v. Maine Med. Ctr., 319 F.3d 63 (1st Cir. 2003) ........................................18, 25

Molski v. Mandarin Touch Rest., 385 F. Supp. 2d 1042 (C.D. Cal. 2005) ...........14, 19, 24, 32, 34

Moreno v. G&M Oil Co., 88 F. Supp. 2d 1116 (C.D. Cal. 2000) .............16, 17, 18, 24, 25, 31, 32

Naartex Consulting Corp. v. Watt, 722 F.2d 779 (D.C. Cir. 1983) ...............................................42

Nat'l Treasury Employees Union v. United States, 101 F.3d 1423 (D.C. Cir. 1996)........26, 30, 38

Pa. Prot. and Advocacy, Inc. v. Houston, 136 F. Supp. 2d 353 (E.D. Pa. 2001)...........................36

Roberts v. Royal Atl. Corp., 445 F. Supp. 2d 239 (E.D.N.Y. 2006) ..............................................42

Small v. Gen. Nutrition Cos., 388 F. Supp. 2d 83 (E.D.N.Y. 2005) ...................................(passim)

Spann v. Colonial Vill., Inc., 899 F.2d 24 (D.C. Cir. 1990)....................................................28, 29

Steger v. Franco, Inc., 228 F.3d 889 (8th Cir. 2000)..................................................14, 17, 22, 34

Thompson v. Jiffy Lube Int'l, Inc., 505 F. Supp. 2d 907 (D. Kan. 2007)......................................42

Thompson v. Sand Cliffs Owners Ass'n, Inc., No. 3:96 CV 270/RV, 1998 WL 35177067 (N.D. Fla. Mar. 30, 1998) ...............................................................................................................42

Walker v. City of Lakewood, 272 F.3d 1114 (9th Cir. 2001)......................................................29

Warth v. Seldin, 422 U.S. 490 (1975)..............................................................................16, 24, 26

## STATUTES

42 U.S.C. §§ 12117(a) ...............................................................................................................26

42 U.S.C. §§ 12133 ...................................................................................................................26

42 U.S.C. § 12181(9) ............................................................................................................23, 48

42 U.S.C. § 12182(a) ............................................................................................................39, 47

42 U.S.C. § 12182(b)(2)(A)(iv) ...........................................................................................23, 48

42 U.S.C. §§ 12183(a)(1)......................................................................................................47, 48

42 U.S.C. § 12183(a)(2).........................................................................................................47, 48

42 U.S.C. § 12183(b)(2)(A)(iv) ...............................................................................................47

42 U.S.C. § 12188(a) ....................................................................................16, 17, 24, 26, 46

42 U.S.C. § 12188(a)(1)....................................................................................................3, 18, 25

42 U.S.C. § 12188(a)(2)...............................................................................................................46

42 U.S.C. § 1981 ..........................................................................................................................25

28 C.F.R. § 36.304(g) (2007)........................................................................................................50

28 C.F.R. § 36.401 (2007) ............................................................................................................48

28 C.F.R. § 36.402 (2007) ............................................................................................................48

28 C.F.R. § 36.402(a) (2007) ......................................................................................................23

28 C.F.R. § 36.406(a) (2007) ......................................................................................................23

28 C.F.R. Pt. 36, App. A .................................................................................22, 23, 49, 50

28 C.F.R. Pt. 36, App. B ...............................................................................................................48

D.C. Code § 2-1401.01 ................................................................................................................36

D.C. Code § 2-1402.01 ..................................................................................................36

D.C. Code § 2-1403.16(a) ............................................................................................38

D.C. Code § 13-423(a) .............................................................................................44, 45

D.C. Code §13-423(b) ..................................................................................................45

Fed. R. Civ. P. 12(b) .....................................................................................................50

Fed. R. Civ. P. 19 ........................................................................7, 39, 42, 43, 46

Internal Revenue Code § 501(c)(3) .............................................................................33

Internal Revenue Code § 501(c)(h) .............................................................................33

DOJ Technical Assistance Manual Section III-7.7000 ................................................49

## I.    INTRODUCTION

This overreaching lawsuit was initially filed against Hilton Hotels Corporation ("Hilton") by the Equal Rights Center ("ERC") and Mark Fiedler under the Americans With Disabilities Act ("ADA") and the District of Columbia Human Rights Act ("DCHRA").  These two plaintiffs sought nationwide injunctive relief as to 2,869 hotels in the United States that operate under a Hilton Family Brand, 2,356 of which are merely franchised hotels that are neither owned nor operated by Hilton.[1]  ERC and Mr. Fiedler claimed that "many" of these hotels contain structural accessibility barriers and that "numerous" hotels do not have accessible rooms dispersed in different room classes.  In addition, these two plaintiffs also claimed that Hilton's website is inaccessible to the blind.  Mr. Fiedler and ERC also sought monetary damages under the DCHRA.

In response, Hilton filed a Motion to Dismiss the Complaint because ERC and Mr. Fiedler have no standing to bring this lawsuit against any Hilton Family Brand hotel, let alone all 2,869 Hilton Family Brand hotels in the country.  The Motion also argued that ERC and Mr. Fiedler had failed to join the independent owners of the franchised hotels and the hotels which are merely managed by Hilton who are necessary and indispensable parties, and they had failed to state a claim under the ADA and the DCHRA regarding the dispersion of accessible rooms.

Within a week after Hilton filed its Motion to Dismiss, ERC and Mr. Fiedler, along with three new plaintiffs (the American Association of People with Disabilities ("AAPD"), Wendy Elliott-Vandivier, and Mark Johnson) (collectively "Plaintiffs") filed an Amended Complaint

---

[1]  The Hilton Family Brands are Conrad Hotel, Doubletree Hotel, Doubletree Club Hotel, Doubletree Guest Suites, Embassy Suites, Hampton Inn, Hilton Garden Inn, Hilton Grand Vacation Club, Hampton Inn & Suites, Hilton Hotel, Homewood Suites, and Waldorf-Astoria. (Second Raynor Decl. ¶ 2 (Ex. 1).)

which, inter alia, recasts some of ERC's alleged injuries in an unsuccessful effort to improve its standing argument and to add allegations relating to the new plaintiffs.  The Amended Complaint abandons the prior claim that Hilton's website is inaccessible to the blind, and instead claims for the first time that the Hilton central reservation system violates the ADA by allegedly failing to ensure that guests who book accessible rooms actually receive them.  As explained below, although more artfully pled, the Amended Complaint cannot overcome the fundamental flaws of this lawsuit which still require its complete dismissal for lack of standing, failure to join indispensable parties, and failure to state a claim.

## II.    SUMMARY OF ARGUMENT

1.    Plaintiffs lack standing to seek injunctive relief under the ADA and the DCHRA for every Hilton Family Brand hotel in the nation and the central reservation system.  A plaintiff does not have a right to file a lawsuit seeking nationwide injunctive relief at 2,869 architecturally-distinct hotels that were built at different times by simply alleging that there is an ADA violation at several or even all Hilton Family Brand hotels in the country.  Article III's case and controversy provision requires that a plaintiff only has a right to seek injunctive relief for ADA violations that are likely to cause that plaintiff injury in the future.  This fundamental requirement does not change just because multiple plaintiffs come together in one lawsuit, or because one or more of the plaintiffs is an advocacy organization.

a.    The individual plaintiffs.  Each of the individual plaintiffs (Fiedler, Elliott-Vandivier, and Johnson) has only alleged encountered accessibility barriers at one hotel out of the 2,869 hotels for which (s)he seeks injunctive relief.  Even as to this single hotel, each plaintiff fails to allege facts showing that (s)he is likely to encounter the alleged accessibility barriers again, which means that (s)he is not entitled to injunctive relief as to any Hilton Family Brand hotel.  Ms. Elliott-Vandivier, for example, could not stay in an accessible room because

the rooms were under renovation – a problem not likely to recur.  Furthermore, the accessibility barriers claimed by plaintiffs Johnson (lack of an ocean view accessible room) and Fielder (lack of roll-in shower room in a pre-1993 hotel) are (1) not violations of the ADA or DCHRA and; (2) not fairly traceable to any conduct by Hilton or redressable in a lawsuit against Hilton because Hilton does not have responsibility for ADA compliance or authority to make changes at these franchised hotels.  Only one plaintiff (Elliott-Vandivier) has ever had a problem with the Hilton central reservation system, and she does not allege that she will be using this system in future.

>       b.      The organizational plaintiffs.

ERC.  First, prudential limitations on standing completely bar ERC's ADA claim.  Title III of the ADA only confers a cause of action on "any person who is being subjected to discrimination.. . or who has reasonable grounds for believing that such person is about to be subjected to discrimination."  42 U.S.C. § 12188(a)(1).  The Amended Complaint does not allege, nor could it allege, that ERC itself is being subjected to discrimination or is about to be subjected to discrimination by Hilton.

Second, the Amended Complaint contains no alleged facts to demonstrate that, as required by Article III, ERC is likely to be injured by an alleged ADA violation at any Hilton Family Brand hotel in the future, let alone violations at every 2,869 Hilton Family Brand hotels nationwide.  ERC only alleges that, in the past, it has had to counsel unnamed members about unspecified accessibility barriers at unidentified hotels, and that it had to investigate more than 20 Hilton Family Brand hotels in order "to identify the extent of Hilton Hotel Corporation's ADA violations, and enable the ERC to better counsel individual members." (Am. Compl. ¶ 23.) These allegations do not demonstrate a likelihood that ERC will have to counsel members about

or investigate any alleged violations in the future.  This is so because the counseling allegations are neither "concrete" nor "particularized," and the investigatory activities are self-imposed injuries not "fairly traceable" to any conduct by Hilton.  In any event, there is certainly no allegation that ERC has had or will likely have to counsel members about or investigate ADA violations <u>at all 2,869 Hilton Family Brand hotels</u> in the country, and such a conclusion would defy common sense.  Accordingly, ERC has no standing to seek injunctive relief for all such hotels.  However, should the Court decide that ERC (or any other plaintiff) may having standing to seek injunctive relief as to some Hilton Family Brand hotels, the Court should order jurisdictional discovery before allowing this case to proceed on the merits to determine which hotels have alleged accessibility violations that have actually harmed the Plaintiffs in this case.

ERC's allegation that Hilton's actions have injured ERC by "frustrating [its] organizational purpose," in the absence of facts showing that they have perceptibly impaired ERC's activities, does not provide a basis for standing under well-established D.C. Circuit precedent.

ERC has no standing to seek injunctive relief as to Hilton's central reservation system because there is no allegation that ERC has had to counsel anyone about the reservation system or that it had to investigate the system.

Assuming, solely for the sake of argument, that ERC has alleged sufficient facts to establish standing to obtain injunctive relief as to some Hilton Family Brand hotels, ERC still has no Article III standing to seek relief for franchised hotels that are neither owned nor operated by Hilton.  The Amended Complaint contains no allegation that Hilton has any responsibility for removing accessibility barriers at franchised hotels or for ensuring that franchised hotels are ADA compliant.  Without such allegations, the Court cannot conclude that the alleged ADA

violations are "fairly traceable" to any action or inaction by Hilton.  Also, ERC's claimed injury is not likely to be redressed in a lawsuit brought only against Hilton which has no authority to make physical changes at these franchised hotels should the Court deem them necessary.

AAPD.  AAPD also has failed to allege facts to meet its burden of showing that it has standing to seek injunctive relief for every Hilton Family Brand hotel in the country and the Hilton central reservation system.  AAPD only alleges that it was injured in 2003 by accessibility barriers at the Hilton Washington, D.C./Rockville Executive Hotel in Maryland and Meeting Center located in Maryland (the "Rockville Hilton") and the Capital Hilton in Washington, D.C. AAPD's claim regarding the Rockville Hilton is time-barred and must be dismissed.  With regard to the Capital Hilton, the claimed accessibility barrier (lack of roll-in shower rooms) is not a violation of the ADA or the DCHRA when there is no allegation that the hotel was constructed after January 26, 1993, or that the guest rooms were altered after January 26, 1992.  Thus, this claim must also be dismissed.  The Amended Complaint does not allege any other ADA violations encountered by AAPD at any other Hilton Family Brand hotel, nor does it allege that AAPD would like to host future events at the Capital Hilton, the Rockville Hilton, or any other Hilton Family Brand hotel.  Accordingly, AAPD cannot claim that it will, in the future, have to incur significant costs to find other venues for its events because of the alleged ADA violations at these hotels.   There can be no standing to seek injunctive relief for any, let alone every, Hilton Family Brand hotel in the country in the absence of this causal connection.

Neither AAPD nor ERC have representational standing to seek injunctive relief for any Hilton Family Brand hotel or the central reservation system because none of their members has standing to seek such relief.  Plaintiffs Johnson, Elliott-Vandivier, and Fiedler do not have standing for the reasons summarized above.  The Amended Complaint identifies no other

members of ERC or AAPD who allegedly have been harmed or are about to be harmed by supposed ADA violations at any Hilton Family Brand hotel.  Instead, it only alleges that unnamed members of both organizations have encountered unidentified ADA violations at unnamed Hilton Family Brand hotels at unspecified times, and have a "continuing desire" to stay at unnamed Hilton Family Brand hotels sometime in the unspecified future but for their unspecified knowledge of inaccessible features.  The courts have required individual plaintiffs in ADA Title III actions to make very specific allegations to establish their standing to seek injunctive relief, and there is no reason why that requirement should be jettisoned simply because the would-be plaintiff's interests are being represented by an advocacy organization.  ERC and AAPD's vague allegations about their members are not sufficient to establish their representational standing.

      2.      Plaintiffs lack standing to seek monetary damages under the DCHRA.  The DCHRA only applies to discriminatory conduct occurring in the District.  The Amended Complaint fails to allege facts showing that any plaintiff has been injured by an accessibility law violation at a Washington, D.C. hotel.  Plaintiffs Elliott-Vandivier and Fiedler do not allege that they have ever encountered an accessibility law violation at a Washington, D.C. hotel, or that they would stay at a Washington, D.C. hotel but for their knowledge of accessibility barriers at such a hotel.  Although plaintiffs Johnson and AAPD have alleged that they were injured by the lack of a roll-in shower room at the Capital Hilton in Washington, D.C., this situation is not a violation of the DCHRA or the ADA.

      ERC has not alleged that any of its counseling activities concerned accessibility barriers at a Washington, D.C. hotel nor has it alleged that it had to investigate any Washington, D.C. hotels because of any complaints about a Washington, D.C. hotel.  An investigation of

6

Washington, D.C. hotels undertaken for litigation purposes does not establish an injury in fact

that confers standing under D.C. Circuit precedent.

       3.     <u>Failure to name indispensable parties</u>.  Of the 2,869 hotels that operate under a

Hilton Family Brand, 2,356 are owned and operated by third parties under a franchise license

agreement ("Franchised Hotels") and 339 are owned by third parties but operated by Hilton

under management agreements ("Managed Hotels").  The independent owners of the Franchised

and Managed Hotels are necessary parties under Fed. R. Civ. P. 19 because the relief requested,

if granted, would result in (1) the owners having to pay for structural and other modifications at

their hotels; (2) physical changes at their hotels; (3) likely loss of guest rooms and revenue

therefrom; and (4) in the case of the Franchised Hotels, Hilton's subsidiaries' termination of the

owners' valuable franchise agreements should the owners refuse to make the structural

modifications ordered by the Court.  In addition, Plaintiffs seek monetary damages under the

DCHRA.  To the extent that such monetary damages result from accessibility violations at any

Franchised or Managed Hotels, the owners of such hotels would be responsible for paying those

damages under their respective agreements with Hilton's subsidiaries.  In short, the property

rights of the owners are inescapably at stake in this case, and the Court should exclude all

Franchised and Managed Hotels from this case unless and until such time the Plaintiffs properly

join the owners of such hotels as defendants.

       The Court should dismiss with prejudice seven of the Franchised Hotels and six of the

Managed Hotels immediately because Hilton has submitted declarations showing that the Court

does not have personal jurisdiction over the owners of these hotels, and the case against these

hotels cannot proceed in equity and good conscience.

       4.     <u>Failure to state a claim</u>.  Plaintiffs fail to state a claim with regard to Hilton's

alleged failure to disperse accessible rooms across different categories in hotels constructed prior to January 26, 1993. Neither the ADA nor DCHRA contains such a requirement. The dismissal of this claim should also result in the dismissal of plaintiff Fiedler from this case because this was the only alleged accessibility barrier that he says caused him harm. In addition, plaintiffs Johnson and AAPD fail to state a claim with regard to the absence of a roll-in shower at the Capital Hilton, and AAPD fails to state a claim against the Rockville Hilton because its claim is time-barred.

## III. FACTUAL ALLEGATIONS

General allegations. The Amended Complaint alleges that "virtually every Hilton hotel contains numerous violations of the ADA." (Am. Compl. ¶ 5.) Plaintiffs complain that the hotels (1) do not have enough accessible rooms or roll-in showers, (2) do not distribute accessible rooms across the various types of available rooms; and (3) have barriers to access such as inadequate clear floor spaces and accessible routes, a lack of grab bars, no accessible registration counters, misplaced electrical switches and temperature controls, and inadequate stair and ramp handrails. (Id. ¶¶ 5-6.) Plaintiffs do not allege, however, that all 2,869 Hilton Family Brand hotels were built at the same time, or that they have the same design and architectural barriers. Plaintiffs also allege, based on one alleged experience during a renovation, that Hilton accepted reservations through its central reservation system for accessible rooms but failed to ensure that guests are actually provided such rooms. (Id. ¶ 7.)

Based on these allegations, the five Plaintiffs seek (1) injunctive relief to require Hilton to comply with the ADA with regard to 2,869 Hilton Family Brand hotels nationwide, including all Franchised and Managed Hotels; (2) injunctive relief requiring Hilton to guarantee that accessible rooms are available when people book accessible rooms through its central reservation systems; and (3) monetary damages for all Plaintiffs under the DCHRA. (Id. at 27.)

<u>Equal Rights Center and AAPD allegations</u>.  The Amended Complaint alleges that "ERC is a national non-profit civil rights membership organization" located in Washington, D.C. whose goal is to " identify, challenge, and eliminate discrimination."  (<u>Id.</u> ¶ 11.)  The Amended Complaint alleges that Hilton's actions injured ERC by (1) requiring ERC to counsel an unspecified number of unidentified members about Hilton's alleged discrimination at unnamed hotels at unidentified times; (2) requiring ERC to investigate accessibility barriers at more than 20 Hilton Family Brand hotels to "identify the extent of Hilton['s] . . . ADA violations, and enable the ERC to better counsel its members"; (3) and frustrating ERC's organizational purpose.  (<u>Id.</u> ¶¶ 23, 42.)  The Amended Complaint does not allege that ERC's counseling efforts concerned any conditions present at the hotels that it chose to inspect.  Furthermore, ERC does not allege that it had to counsel people about accessibility barriers at all or even a significant percentage of the 2,869 Hilton Family Brand hotels for which it seeks injunctive relief.

The Amended Complaint alleges that AAPD is a nonprofit disability organization with members in all 50 states whose goal is to "further the productivity, independence, full citizenship, and total integration of people with disabilities into all aspect of society."  (<u>Id.</u> ¶ 12.)  The Amended Complaint alleges that in 2003, AAPD considered holding a conference at the Rockville Hilton (at that time a Doubletree hotel), but decided to hold the event elsewhere because of unspecified accessibility barriers at the hotel.  (<u>Id.</u> ¶ 45.)

The Amended Complaint further alleges that in March 2007, AAPD hosted its annual Leadership Gala at the Capital Hilton and that one of its award recipients, Mark Johnson, criticized the hotel for not having accessible rooms with roll in showers.  (<u>Id.</u> ¶ 46.)  The Amended Complaint alleges that AAPD had to find a new venue for its 2008 Leadership Gala because the Capital Hilton does not have accessible rooms with roll-in showers.  (<u>Id.</u> ¶ 46.)

AAPD alleges that it has been injured because (1) it had to expend more resources to check the accessibility of meeting and hotel facilities for its events and had to incur costs to locate a new venue for its 2008 Leadership Gala; (2) it had to increase its "lobbying efforts to promote accessibility and directly combat the effects of Hilton's continuing ADA violations"; and (3) its organizational purpose has been frustrated.  (Id. ¶ 47.)

The Amended Complaint also alleges that unnamed AAPD and ERC members have attempted to book accessible rooms at unspecified Hilton hotels and have been (1) told that no accessible rooms were available in a particular class of room; (2) told that accessible rooms were not available even after they had booked accessible rooms; and/or (3) provided with "accessible" rooms that had accessibility barriers.  (Id. ¶¶ 44, 49.)  The Amended Complaint alleges that these unnamed AAPD and ERC members have a "continuing desire" to stay at unspecified hotels "owned and/or operated by Hilton and would do so but for their knowledge of inaccessible features."  (Id.)

Mark Fiedler.  The Amended Complaint alleges that in 2006, Mr. Fiedler called the Hilton Oceanfront Resort from his residence in Washington, D.C. to book a wheelchair accessible room with a view and was informed that the hotel did not have any such rooms.  (Id. ¶ 50.)  The Amended Complaint alleges that "Mr. Fiedler has a continuing desire to vacation at the Hilton Oceanfront Resort and would do but for the Hilton Oceanfront Resort's failure to disperse accessible rooms among the available classes of sleeping accommodations."  (Id. ¶ 51.) The Amended Complaint alleges that Mr. Fiedler is a member of ERC.  (Id. ¶ 13.)

Wendy Elliot-Vandivier.  The Amended Complaint alleges that Ms. Elliott-Vandivier reserved an accessible room at the Doubletree Guest Suites, Philadelphia West located in Plymouth Meeting, Pennsylvania for March 26, 2008, through the Hilton central reservation

system.  (Id. ¶¶ 52-53.)  Upon her arrival, the hotel allegedly informed her that all of the

accessible rooms were under renovation, and she had to stay in an inaccessible room.  (Id.

¶¶ 54-55.)  The Amended Complaint does not allege that she plans to use the Hilton central

reservation system in the future, that the temporary, renovation-related problem at the Doubletree

Guest Suites, Philadelphia West is likely to recur, or that she is likely to stay at any Hilton

Family Brand hotel in the future.  The Amended Complaint only claims that Ms. Elliott-

Vandivier intends to stay at the various hotels that her employer books for quarterly meetings,

and that "[t]here is on ongoing possibility that these hotels will be Hilton hotels."  (Id. ¶ 56)

(emphasis added).  The Amended Complaint alleges that Ms. Elliott-Vandivier is a member of

the AAPD.  (Id. ¶ 14.)

    Mark Johnson.  The Amended Complaint alleges that in March 2007, Mr. Johnson

booked a room at the Capital Hilton in Washington, D.C. to attend an AAPD Leadership Gala

and had to stay in a room with no roll-in showers.  (Id. ¶¶ 57-59.)  The Amended Complaint

alleges that Mr. Johnson visits Washington, D.C. on a regular basis, and that he "would stay at a

Hilton hotel but for his knowledge of accessibility barriers present in Hilton hotels."  (Id. ¶ 61.)

## IV.    ARGUMENT

    The Supreme Court in 2007 clarified the question of what facts a plaintiff must plead in

order to state a claim under Rule 8 of the Federal Rules of Civil Procedure in Bell Atl. Corp. v

Twombly, 127 S. Ct. 1955, 1964-65 (2007).  The Court stated that "a plaintiff's obligation to

provide the 'grounds' of his 'entitle[ment] to relief' requires more than labels and conclusions,

and a formulaic recitation of the elements of a cause of action will not do."  Id.  Particularly

relevant to this case, the Court further opined that "[f]actual allegations must be enough to raise a

right to relief above the speculative level."  Id. at 1965 (citing 5 Charles Alan Wright & Arthur

R. Miller, Federal Practice and Procedure § 1216 at 235-36 (3d ed. 2004)).  The Court observed

that "the pleading must contain something more. . . than. . . a statement of facts that merely

creates a suspicion [of] a legally cognizable right of action . . . on the assumption that all the

allegations in the complaint are true (even if doubtful in fact)."  Id. (internal citations and

quotations omitted) (emphasis added).

      **A.**      **Plaintiffs' Claim For Nationwide Injunctive Relief for all Hilton Family Brand Hotels And Claim Against The Hilton Central Reservation System Must Be Dismissed Under Fed. R. Civ. P. 12(b)(1) Because Plaintiffs Lack Standing Under The ADA And DCHRA.**

          **1.**      **Article III's Standing Requirements.**

             a.      General requirements.  Article III of the Constitution limits a

federal court's jurisdiction to actual cases and controversies.  Accordingly, a plaintiff's standing

is the threshold question in every federal case, and must be decided before the Court can allow

the litigation to proceed.  Lujan v. Defenders of Wildlife, 504 U.S. 555, 560 (1992).  To establish

standing to sue, a plaintiff must prove the following:

> First, the plaintiff must have suffered an injury in fact — an invasion of a
> legally protected interest which is (a) concrete and particularized, and (b)
> actual or imminent, not conjectural or hypothetical.  Second, there must be
> a causal connection between the injury and the conduct complained of —
> the injury has to be fairly traceable to the challenged action of the
> defendant, and not the result of the independent action of some third party
> not before the court. Third, it must be likely, as opposed to merely
> speculative, that the injury will be redressed by a favorable decision. [2]

Id. at 560-61 (internal citations and quotations omitted).

             b.      The "imminent injury" requirement for injunctive relief.  Because

---

[2]  Plaintiffs have the burden of establishing all of the elements of standing.  See Lujan, 504
U.S. at 560.  In addition, "[s]ince they are not mere pleading requirements but rather an
indispensable part of the plaintiff's case, each element must be supported in the same way as any
other matter on which the plaintiff bears the burden of proof, i.e., with the manner and degree of
evidence required at the successive stages of the litigation."  Id. at 561.

Plaintiffs are seeking injunctive relief in this case, the "injury in fact" requirement of the standing analysis requires them to allege more than just an injury from a past violation. "To pursue an injunction…plaintiffs must allege a likelihood of <u>future violations</u> of their rights… not simply future <u>effects</u> from past violations." <u>Fair Employment Council of Greater Washington, Inc. v. BMC Mktg. Corp.</u>, 28 F.3d 1268, 1273 (D.C. Cir. 1994) (emphasis in original)(emphasis added); <u>see also</u> <u>Lujan</u>, 504 U.S. at 563-64. In <u>Lujan</u>, the organization seeking injunctive relief had submitted affidavits from two members stating that they had been to the locations where the endangered and threatened species live, and that they intended to return to these locations in the future to observe these animals. <u>Id.</u> The Supreme Court held that "[s]uch 'some day' intentions – without any description of concrete plans, or indeed even any specification of <u>when</u> the some day will be – do not support a finding of the 'actual or imminent' injury that our cases require." <u>Id.</u> at 564.

Similarly, in <u>City of Los Angeles v. Lyons</u>, 461 U.S. 95, 105 (1983), the Supreme Court held that a plaintiff had no standing to seek injunctive relief directing the police department to stop using the allegedly illegal chokeholds that had injured him. Despite the allegations of past injury, the Supreme Court held that the plaintiff's standing to seek the injunction "depended on whether he was likely to suffer future injury from the use of the chokeholds by police officers." <u>Id.</u>

Citing <u>Lyons</u>, the D.C. Circuit held in <u>BMC Marketing</u> that the tester plaintiffs had no standing to seek injunctive relief because their complaint only alleged the "possibility," but not the likelihood, that they would have contact "in the reasonably near future" with the defendant who had allegedly discriminated against them in the past. <u>BMC Mktg. Corp.</u>, 28 F.3d at 1273.

Although the D.C. Circuit has not considered Article III standing requirements for

injunctive relief in the context of an ADA Title III claim, the U.S. District Court for the District of Columbia recently decided this issue in <u>Holt v. American City Diner, Inc.</u>, No. CIV. 05-1745, 2007 WL 1438489, at *6 (D.D.C. May 15, 2007).  The plaintiff in that case had alleged that (1) he had unsuccessfully attempted to enter the restaurant in question (<u>id.</u> at *2); (2) he "continues to desire to and intends [sic] visit the Defendant's premises in the future, but continues to be denied full, safe and equal access due to the violations which continue to exist;" (3) "he intends to go back to the restaurant once these barriers are removed;" and (4) that "[h]e travels to this area [of the restaurant] approximately three times per week."  <u>Id.</u>  On these facts, the court concluded that the plaintiff did not have a concrete, specific, nor imminent plan to return to the restaurant, and dismissed the complaint for lack of standing to seek injunctive relief under the ADA.  <u>Id.</u>; <u>see also</u> <u>Harris v. Del Taco, Inc.</u>, 396 F. Supp. 2d 1107, 1124-25 (C.D. Cal. 2005) (plaintiff's claim that he would visit the restaurant again in the future was not plausible where he lived more than 573 miles away); <u>Molski v. Mandarin Touch Rest.</u>, 385 F. Supp. 2d 1042, 1045-46 (C.D. Cal. 2005) (plaintiff failed to demonstrate imminent future injury where the restaurant was located more than 100 miles away and plaintiff had only visited the restaurant once).

In addition, even though an ADA Title III plaintiff need not engage in the futile gesture of visiting a building with known barriers, the courts have made very clear that a plaintiff must show, in that instance, that <u>he had knowledge of actual barriers</u> and that he would have visited the building in the imminent future but for those barriers.  <u>See</u> <u>Steger v. Franco, Inc.</u>, 228 F.3d 889, 892 (8th Cir. 2000) (several plaintiffs had no standing under Title III of the ADA because there was no evidence that they had knowledge of the building's barriers); <u>Small v. Gen. Nutrition Cos.</u>, 388 F. Supp. 2d 83, 88 (E.D.N.Y. 2005) (granting motion to dismiss for lack of

standing and refusing to infer that the plaintiff both knew of the barrier in certain stores and would visit those stores just because he regularly traveled in their immediate vicinity, even if the barriers are easily observed from the street); <u>Ass'n for Disabled Americans v. Claypool Holdings LLC</u>, No. IP 00-0344-C-G/T, 2001 WL 1112109, at *19 (S.D. Ind. Aug. 6, 2001) (granting summary judgment on the complaint for defendant hotel because advocacy organization did not establish representational standing to sue under Title III of the ADA where there was no allegation that any of its members actually had knowledge of barriers at the hotel).

   c. <u>The requirement that a plaintiff can only seek injunctive relief for conditions that caused him, or are likely to cause him, injury</u>.  The Supreme Court's decision in <u>Lewis v. Casey</u>, 518 U.S. 343, 357 (1996), makes clear that a plaintiff only has standing to seek injunctive relief for specific conditions that caused him injury.  In <u>Lewis</u>, the district court -- in response to a class action lawsuit brought by inmates claiming that their law library services were inadequate -- had entered a broad injunction requiring special services or special facilities for non-English speakers, prisoners in lock-down, and the inmate population at large.  <u>Id.</u> at 358. The Supreme Court reversed, concluding that this relief should not have been ordered because it was unrelated to the harm actually suffered by the one and only plaintiff who had standing to bring the case.  <u>Id.</u>

  The principle that a plaintiff only has standing to seek injunctive relief for conditions that caused him injury applies with equal force in Title III ADA cases.  For example, in <u>Clark v. Burger King Corp.</u> ("<u>Burger King</u>"), 255 F. Supp. 2d 334, 343 (D.N.J. 2003), the plaintiff sought injunctive relief for thousands of Burger King restaurants across the country, much like the Plaintiffs in this case.  On a motion to dismiss, the court limited the plaintiff's claim to those restaurants that he had patronized and were located within a reasonable distance from his

residence.  Id.

In Moreno v. G&M Oil Co., 88 F. Supp. 2d 1116, 1117 (C.D. Cal. 2000), the court held

that the plaintiff lacked standing to seek injunctive relief for 82 gas stations that he had never

visited, despite his allegation that he traveled often.  The court held that the plaintiff had not

suffered any injury at any of these sites which he had not visited.  The court also held that

42 U.S.C. § 12188(a) of the ADA "requires that a plaintiff actually be 'subjected to

discrimination' or be 'about to be subjected' to it," and that the plaintiff could not meet this

requirement for these 82 other sites.  Id.

In Small v. General Nutrition Cos., 388 F. Supp. 2d at 88, the plaintiff sought injunctive

relief for seven GNC stores in New York City.  After a detailed analysis of the complaint's

allegations, the court held that the plaintiff only had standing to seek injunctive relief at the one

store in his "immediate neighborhood", and had no standing as to other six stores in

neighborhoods in which he regularly traveled.  Id.

        d.     Plaintiffs' burden to plead sufficient facts to establish standing for

each claim.  For purposes of ruling on a motion to dismiss for lack of standing, a court must

accept as true all material allegations of the complaint, and must construe the complaint in favor

of the plaintiff.  Warth v. Seldin, 422 U.S. 490, 501 (1975).  However, "standing cannot be

inferred argumentatively from averments in the pleadings, but rather must affirmatively appear

in the record… . And it is the burden of the party who seeks the exercise of jurisdiction in his

favor, clearly to allege facts demonstrating that he is a proper party to invoke judicial resolution

of the dispute…  [A plaintiff] must allege … facts essential to show jurisdiction.  If [a plaintiff]

fai[ls] to make the necessary allegations, [it has] no standing."  FW/PBS, Inc. v. City of Dallas,

493 U.S. 215, 231 (1990) (internal quotations omitted).  In addition, "a plaintiff must

demonstrate standing for each claim he seeks to press." <u>Daimler Chrysler Corp. v. Cuno</u>, 547 U.S. 332, 352 (2006).

### 2.    The Individual Plaintiffs Lack Standing To Seek Nationwide Injunctive Relief As To All Hilton Family Brand Hotels

For each of the three individual plaintiffs, the Amended Complaint identifies only <u>one</u> Hilton Family Brand hotel that each has ever visited or actually sought to visit:  The franchised Hilton Oceanfront Hotel in South Carolina for Mr. Fielder (Am. Compl. ¶¶ 50-51); the franchised Doubletree Guest Suites, Philadelphia West in Pennsylvania for Ms. Elliott-Vandivier (<u>id.</u> ¶¶ 52-56); and the Capital Hilton in Washington, D.C. for Mr. Johnson.  (<u>Id.</u> ¶¶ 57-62.) Other than Mr. Johnson who claims that he would stay in an unamed Washington, D.C. hotel but for his unspecified knowledge of accessibility barriers (<u>id.</u> ¶ 61) (this contention is addressed below), the Amended Complaint does not allege facts about any plaintiff's future plans to visit any other Hilton Family Brand hotel in the future, or his or her actual knowledge of any accessibility barriers at any other Hilton Family Brand hotels.   Accordingly, at a minimum, it is clear that the individual plaintiffs have no standing to seek nationwide injunctive relief for all 2,869 Hilton Family Brand hotels because it would be impossible for this Court to conclude, on these facts, that the individual plaintiffs are likely to be injured by conditions at thousands of hotels around the country that they have neither visited nor intend to visit.  <u>See Lewis</u>, 518 U.S. at 357; <u>Burger King</u>, 255 F. Supp. 2d at 343, <u>Moreno</u>, 88 F. Supp. 2d at 1117; <u>Steger</u>, 228 F.3d at 893; <u>Small</u>, 388 F. Supp. 2d at 88; <u>see also</u> § IV.A.1 <u>supra</u> (pp. 12-17).

Furthermore, Section 12188(a) of the ADA states that only a person that has been "subjected to discrimination" or is "about to be subjected to discrimination" may seek injunctive relief.  <u>See</u> 42 U.S.C. § 12188(a).  There is no allegation that any of these individual plaintiffs has been "subjected to discrimination" or is "about to be subjected to discrimination" at the

17

hotels that they have never visited nor attempted to visit.  Courts interpreting Section

12188(a)(1)'s language as applied to an individual Title III plaintiff have concluded that such a

plaintiff may only seek relief if (s)he has been or has reasonable grounds to believe that (s)he is

about to be subjected to discrimination.  See McInnis-Misenor v. Maine Med. Ctr., 319 F.3d 63,

69 (1st Cir. 2003) (Title III of the "ADA does not permit private plaintiffs to bring claims as

private attorneys general to vindicate other people's injuries"); Hoepfl v. Barlow, 906 F. Supp.

317, 323 (E.D. Va. 1995) (Section 12188 barred plaintiff form asserting the rights of others);

Moreno, 88 F. Supp. 2d at 1117 (Section 12188(a)(1) did not permit a plaintiff to assert claims

on behalf of others similarly situated with respect to 82 other gas stations that the plaintiff had

not visited).

      Ms. Elliott-Vandivier's claim that she intends to stay at unknown hotels where her

employer's quarterly meetings are held and that "[t]here is an ongoing possibility that these

hotels will be Hilton hotels" (Am. Compl. ¶ 56) is far too "conjectural" and "hypothetical" to

support standing for nationwide relief because there are more than 47,000 hotels in the United

States where such meetings could take place in the future.[3]  See Lujan, 504 U.S. at 560-61

(defining an "an injury in fact" as "an invasion of a legally protected interest which is

(a) concrete and particularized, and (b) actual or imminent, not conjectural or hypothetical.")

(emphasis added)(internal quotations omitted); Bell Atltantic, 127 S. Ct. at 1965 ("[f]actual

allegations must be enough to raise a right to relief above the speculative level").  Indeed, the

D.C. Circuit specifically rejected the notion that the "possibility" of future injury was enough to

confer standing for injunctive relief in BMC Marketing Corp., 28 F.3d at 1273.  In Lujan, the

_____

   [3]  U.S. Census Bureau 2008 Statistical Abstract, Table 1254 (Lodging Industry Summary: 1990 to 2005).

Supreme Court found that two members of the plaintiff advocacy organization did not have individual standing even though they submitted affidavits stating that they intended to return to specific locations in the future to observe the endangered animals.  Id. at 563-64.  Ms. Elliott-Vandivier's allegations are even more speculative because she does not even claim that she intends to stay at any Hilton Family Brand hotel in the future -- not even the Doubletree Guest Suites, Philadelphia West where she had stayed.  Even if she had made such an allegation about this hotel, there is no likelihood that she would again encounter an accessibility barrier there because the prior unavailability of an accessible room was due to a temporary renovation (Am. Compl. ¶ 54.)

> **3.    Mr. Fiedler Lacks Standing To Seek Injunctive Relief As To The Hilton Oceanfront Hotel in South Carolina.**

First, Mr. Fiedler's sole allegation that he has a continuing desire to stay at the Hilton Oceanfront Resort falls far short of the detailed allegations in Holt which were deemed insufficient by the court to confer standing for injunctive relief, and is nothing more than the sort of "some day" intentions that the Supreme Court held in Lujan were inadequate for such relief. Lujan, 504 U.S. at 564; Holt, 2007 WL 1438409, at *6.  Furthermore, the fact that Mr. Fiedler lives nearly 600 miles away from this hotel makes the possibility of his staying at the Hilton Oceanfront Resort all the more "conjectural."  Lujan, 504 U.S. at 560-61;  see also Harris, 396 F. Supp. 2d at 1124-25 (plaintiff lacked standing because his claim that he would visit a restaurant 573 miles away is not plausible); Molski, 385 F. Supp. 2d at 1045-46 (no imminent future injury exists where the restaurant was located more than 100 miles away and plaintiff had only visited the restaurant once); Burger King, 255 F. Supp. 2d at 343 (plaintiff lacked standing to seek injunctive relief for restaurants not near his residence).

Second, Mr. Fiedler lacks standing to seek injunctive relief relating to the Hilton

Oceanfront Hotel and any of the other 2,356 Franchised Hotels because his alleged injury – the

lack of accessible ocean view room – is not "fairly traceable" to any conduct by Hilton.[4]  Lujan,

504. U.S. at 560-61.  The Amended Complaint does not allege that Hilton has responsibility for

ensuring legal/ADA compliance or architectural barrier removal at any Franchised Hotel.

Indeed, the franchise agreements make clear that compliance with the ADA is the franchisee's

responsibility.  (Second Raynor Decl. ¶ 5 (Ex. 1).)  Paragraphs 6(a)(3) and 6(a)(16) of Hilton's

franchise agreements state that compliance with all laws and applicable regulations is the

franchisee's responsibility.  (Form Franchise Agreement ("FFA") ¶¶ 6(a)(3), 6(a)(16) (Ex.

1(B)).)  Paragraph 15 of the agreement explicitly disavows any agency relationship between the

Hilton subsidiary that is a party to the agreement, and the Franchisee.  (Id. ¶ 15 (Ex. 1(B)).)  In

addition, all four versions of the form Attachment A's that are a part of the franchise agreements

contain provisions explicitly stating that the franchisee has responsibility for ensuring that the

hotels comply with legal accessibility requirements.  Paragraph C of the form Attachment A for

"New Development" and Paragraph D of the Attachment A's for "Change in Ownership", "Re-

licensing", and "Conversion" situations state that "[i]t is solely [the franchisee's] responsibility

to ensure [the] Plans comply with. . . all Legal Requirements," which term is defined as "all

public laws . . . [and] regulations . . . which . . . may apply to the construction, completion,

equipping, and Opening of the Hotel and the operation of the Hotel."  (FFA, Att. A's (New

Development) ¶ C, Att. A's (Change in Ownership,  Conversion Relicensing) ¶ D (Ex. 1(B)).)

The same paragraphs also require that the franchisee provide Hilton's subsidiary with

certifications that the plans and the actual as-built conditions comply with all local and federal

---

[4]  Nor could Mr. Fiedler in good faith allege that most of the 2,869 Hilton Family Brand
hotels have ocean view rooms.

accessibility requirements.  (Id.)

Mr. Fiedler's injury also is not likely to be redressable by the Court in this lawsuit against Hilton.  The Amended Complaint does not allege that Hilton has the authority actually to make structural modifications to any Franchised Hotel, and Hilton has submitted evidence that it does not have such authority.  (Second Raynor Decl. ¶ 4 (Ex. 1); see FFA generally (Ex. 1(B)).)  The only action that Hilton's subsidiaries could take is to request the changes, but there is no guarantee that such changes would be made by the franchisees.  Hilton's subsidiaries' only recourse at that point would be to terminate the franchise agreement.  (Second Raynor Decl. ¶ 4 (Ex. 1).)

Third, the Supreme Court made clear in Lujan that an "injury in fact" requires "an invasion of a legally protected interest."  Lujan, 504 U.S. at 560.  Mr. Fiedler's only alleged injury with regard to the Hilton Oceanfront Hotel is the lack of an accessible ocean view room.  As explained in Section IV.D. infra (pp. 46-50), the ADA does not require hotels built for first occupancy prior to January 26, 1993 to provide accessible rooms in all room classes.

### 4.    Mr. Johnson Lacks Standing To Seek Injunctive Relief As To The Hilton Family Brand Hotels in Washington, D.C.

Mr. Johnson lacks standing to seek injunctive relief with regard to the Hilton Family Brand hotels in Washington, D.C. for several reasons.  First, he has not alleged that he has knowledge of any specific accessibility barriers at any Washington, D.C. hotel other than the Capital Hilton.[5]  To have standing to sue for injunctive relief for a public accommodation that he

_____

[5]  The fact that the Amended Complaint generally alleges that there are accessibility barriers at other Washington, D.C. Hilton Family Brand hotels does not mean that Mr. Johnson has knowledge of such barriers.  Associated Gen. Contractors of Cal., Inc. v. Cal. State Council of Carpenters, 459 U.S. 519, 526 (1983) ("[i]t is not…proper to assume that the [plaintiff] can prove facts that it has not alleged).

has not visited, a plaintiff must show that he had knowledge of the barriers and that he would have visited the building in the imminent future but for those barriers.  See Steger, 228 F.3d at 892; Small, 388 F. Supp. 2d at 88; Ass'n for Disabled Ams., 2001 WL 1112109, at *19. Mr. Johnson has not made any such allegations for any Washington, D.C. hotels other than the Capital Hilton.

      With regard to the Capital Hilton, the Amended Complaint does not allege that Mr. Johnson would likely stay at this hotel in the future but for his knowledge of the lack of a roll-in shower room.  BMC Mktg. Corp., 28 F. 3d. at 406.  Instead, the Amended Complaint only states that he travels regularly to Washington, D.C. and would stay at an unidentified "Hilton hotel" for a May 2008 event in Washington, D.C., but for his knowledge of unspecified "accessibility barriers present in Hilton hotels."   (Am. Compl. ¶ 61.)  Because there are at least two other Hilton Family Brand hotels located in Washington, D.C. alleged in the Complaint (Am. Compl. ¶¶ 18-20), Mr. Johnson's allegation does not establish that he would likely (i.e., a more than a fifty percent chance) stay at the Capital Hilton but for his knowledge of the lack of roll-in shower rooms.  See id., Lujan, 504 U.S. at 560-61 (injury in fact must be "concrete and particularized" and "not conjectural or hypothetical").

      Even if Mr. Johnson could show that he would likely stay at the Capital Hilton in the near future but for the lack of roll-in shower rooms, he has no standing to seek injunctive relief because the absence of such rooms at this hotel does not violate the ADA.  The Amended Complaint cites Section 9.12 of the ADA Standards for Accessible Design ("ADAAG") for the

roll-in shower room requirements (Am. Compl. ¶ 58).[6]  However, the ADAAG only applies to hotels constructed for first occupancy after January 26, 1993, and hotel rooms altered after January 26, 1992.  See 28 C.F. R. § 36.406(a) (ADAAG applies to "new construction and alterations"); § 36.401(a) (defining "new construction" as facilities constructed after January 26, 1993); § 36.402(a) (defining "alterations" as a physical change made to facilities after January 26, 1992); ADAAG § 9.1.5 (specific requirements for hotel room alterations).  The Amended Complaint does not allege that the Capital Hilton was constructed after January 26, 1993 (the hotel was in fact constructed in 1943 (Raynor Decl. ¶ 6)), or that any alterations have been made to the hotel's guest rooms since January 26, 1992.  Because "it is not . . . proper to assume that the [plaintiff] can prove any facts that it has not alleged," the Court cannot assume that the hotel was constructed after January 26, 1993, or that alterations to the guest rooms have taken place since January 26, 1992.  See Associated Gen. Contractors, 459 U.S. at 526.  Accordingly, the only conclusion to be drawn is that Mr. Johnson has not alleged the "invasion of a legally protected right" that would give him standing to sue.[7]  Lujan, 504 U.S. at 560.  Mr. Johnson's claims relating to the Capital Hilton should also be dismissed for failure to state a claim.

### 5.    The Individual Plaintiffs Do Not Have Standing To Seek Injunctive Relief As To The Hilton Central Reservation System.

The Amended Complaint does not allege that Mr. Johnson or Mr. Fielder has ever used

---

[6]  The ADAAG is at Appendix A of the Department of Justice Title III regulations found at 28 C.F.R. Part 36.

[7]  The only requirement that applies to hotels constructed prior to January 26, 1993, is the obligation to "remove architectural barriers. . . where such removal is readily achievable."  42 U.S.C. § 12182(b)(2)(A)(iv).  However, the Amended Complaint does not allege that the creation of roll-in showers at this hotel would be "readily achievable", which the statute defines as "easily accomplishable and able to be carried out without much difficulty or expense."  42 U.S.C.  § 12181(9).

the Hilton central reservation system or were injured by any alleged failure by the system to guarantee an accessible room. Thus, they clearly have no standing to seek relief relating this system. See e.g., Lujan, 504 U.S. at 560-61; Lewis, 518 U.S. at 357, Burger King, 255 F. Supp. 2d at 343; Moreno, 88 F. Supp. 2d at 1117; see also Section IV.A.1 supra. Ms. Elliott-Vandivier is the only person identified in this case to have ever been allegedly injured by the central reservation system, but she too has no standing to seek injunctive relief because she has not alleged that she plans on using the Hilton central reservation system in the future. See id.; Lyons, 461 U.S. at 105, BMC Mktg. Corp., 28 F. 3d at 1273, Holt, 2007 WL 1438489, at *6; Harris, 396 F. Supp. 2d at 1124-25; Molski, 385 F. Supp. 2d at 1045-46. Further, given that her alleged injury related to a temporary renovation situation, there is no likelihood of its recurrence.

### 6. Plaintiff ERC Lacks Organizational Standing To Seek Injunctive Relief As To Any Hilton Family Brand Hotel And The Hilton Central Reservation System.

#### a. Prudential And Statutory Limitations Bar ERC's ADA Claim.

The Supreme Court held in Warth v. Seldin, 422 U.S. at 490, that a "plaintiff generally must assert his own legal rights and interests, and cannot rest his claim to relief on the legal rights or interests of third parties." Id. at 499. This is true even when a plaintiff has alleged injury sufficient to meet the 'case and controversy' requirement of Article III. The Supreme Court explained further that when a plaintiff seeks to vindicate legal rights that exist solely by virtue of a statute, "the [prudential] standing question in such cases is whether the constitutional or statutory provision on which the claim rests properly can be understood as granting persons in the plaintiff's position a right to judicial relief." Id. at 500 (emphasis added).

The only provision in Title III of the ADA that confers on private litigants a cause of action for violations of that Title is 42 U.S.C. § 12188(a). This section limits judicial relief to "any person who is being subjected to discrimination . . . or who has reasonable grounds for

believing that such person is about to be subjected to discrimination." 42 U.S.C. § 12188(a)(1)

(emphasis added). Simply put, ERC has not alleged any facts in the Amended Complaint to

suggest that it is "being subjected to discrimination" or is "about to be subjected to

discrimination." It merely complains that its programs have been affected by alleged

discrimination by Hilton against others.

It appears that every court to have analyzed Section 12188(a)(1)'s language with regard

to an advocacy organization's attempt to bring a ADA Title III lawsuit on its own behalf has

dismissed the claim. In Small, 388 F. Supp. 2d at 92, the district court held that the advocacy

organization did not have standing to sue on its own behalf under the ADA because "[t]he

enforcement provision of Title III clearly envisions that a plaintiff himself must currently be

suffering or be about to suffer discrimination." Similarly, in Clark v. McDonald's Corp., 213

F.R.D. 198, 210-11 (D.N.J. 2003), the district court held that the association representing

disabled members could not sue in its own right under Title III of the ADA because

> the language of the enforcement provision … of the ADA does not evince a
> congressional intent to eliminate a prudential barrier to the standing of an
> organization to sue to remedy injury it suffers as a result of discrimination against
> the disabled, where the organization is not itself being subjected to, nor is itself
> under threat of being subjected to, such discrimination.[8]

ERC will no doubt try to argue that the ADA is a remedial civil rights statute to which no

prudential limitations should apply. To the contrary, the Supreme Court's and the D.C. Circuit's

unwillingness to waive prudential limitations on standing for actions brought by advocacy

organizations under 42 U.S.C. § 1981 (another civil rights statute) shows that there is no

---

[8] Likewise, courts interpreting Section 12188(a)(1)'s language as applied to individual Title
III plaintiffs have concluded that such a plaintiff may not seek relief for third parties who may
have been injured. See McInnis-Misenor, 319 F.3d at 69; Hoepfl, 906 F. Supp. at 323; Moreno,
88 F. Supp. 2d at 1117.

exception to prudential rules for civil rights lawsuits. <u>Warth</u>, 422 U.S. at 512-14; <u>BMC Mktg. Corp.</u>, 28 F.3d at 1281.

It is also noteworthy that no other civil rights statute uses the narrow language of Section 12188(a). Congress chose broader language when it determined who could sue under Titles I and II of the ADA. <u>See</u> 42 U.S.C. §§ 12117(a) and 12133 (conferring causes of action upon "any person <u>alleging discrimination</u> on the basis of disability") (emphasis added). The D.C. Circuit has held that when "Congress uses different language in different sections of a statute, it does so intentionally." <u>Florida Pub. Telecomm. Ass'n, Inc. v. FCC</u>, 54 F.3d 857, 860 (D.C. Cir. 1995). Thus, well-settled prudential limitations on standing and the language of 42 U.S.C. § 12188(a) bar ERC's claim for injunctive relief under the ADA.

### b. ERC Lacks Article III Standing To Seek Injunctive Relief Under The ADA And The DCHRA.

The Article III standing principles discussed <u>supra</u> in Section IV.A.1 apply with equal force to organizations such as ERC. <u>Nat'l Treasury Employees Union v. United States</u>, 101 F.3d 1423, 1427 (D.C. Cir. 1996). Thus, to obtain injunctive relief, ERC must "allege a likelihood of future <u>violations</u> of [its] rights… not simply future <u>effects</u> from past violations." <u>BMC Mktg. Corp.</u>, 28 F.3d at 1273 (citing <u>Lyons</u>, 461 U.S. at 102) (emphasis in original).

As an initial matter, ERC's standing to seek injunctive and monetary relief under the DCHRA cannot be based on injuries sustained between September 9, 2002 and April 25, 2005, when its Articles of Incorporation were revoked. In <u>Bourbeau v. The Jonathan Woodner Co.</u>, No. CIV. A 07-0164, 2008 WL 1757752, at *3 (D.D.C. April 17, 2008), this Court (J. Friedman), held that ERC did not have standing to sue for acts that it had taken or injuries that it had sustained during the period of the revocation because ERC had no legal existence, citing three decisions of the D.C. Superior Court (attached at Exhibit 13) on this issue. <u>Id.</u> at *5.

Turning to the merits, there is not a single allegation in the Amended Complaint that, if true, would establish that ERC's rights under the ADA or the DCHRA will likely be violated by Hilton in the future. ERC's allegations that it has, <u>in the past</u>, counseled unnamed members about unspecified discrimination at unidentified Hilton Family Brand hotels and investigated more than 20 hotels to "identify the extent of Hilton['s] . . . ADA violations, and enable the ERC to better counsel its members" do not confer ERC with standing to seek injunctive relief. (Am. Compl. ¶23.) <u>See</u> <u>Lujan</u>, 504 U.S. at 564 ("Past exposure to illegal conduct does not in itself show a present case or controversy regarding injunctive relief. . . if unaccompanied by any continuing, present adverse effects").

Even if the Court were to conclude that, in some instances, allegations of past harm can support a likelihood of a future injury in fact, none of ERC's allegations of injury can form a basis for such a conclusion here because they do not satisfy the requirements of an injury in fact. ERC's allegation that it has counseled unnamed members about unspecified discrimination at unidentified Hilton Family Brand hotels is, on its face, not "concrete and particularized." <u>Lujan</u>, 504 U.S. at 560; <u>see also</u> <u>Maydak v. FCC</u>, No. 98-1383, 1998 WL 938717 (D.C. Cir. Dec. 9, 1998) (motion to dismiss granted because allegation of harm to plaintiff's financial interest was too "vague and conclusory" to confer Article III standing); <u>Interstate Natural Gas Ass'n v.</u> <u>FERC</u>, 285 F.3d 18, 46 (D.C. Cir. 2002) (dismissing petition for review because owner's allegation that it would incur "significant expense" in implementing new regulatory requirements by having to modify its computer systems was too "vague" to confer standing). If anything, the vagueness of ERC's counseling allegation suggests that the effort was so insubstantial as to not constitute an injury in fact at all. <u>See</u> <u>Small</u>, 388 F. Supp. 2d at 95 (finding unlikely that organization's devotion of one and a half hours to responding to a complaint regarding the

defendant's alleged ADA violation could constitute an injury in fact for standing purposes);

Havens Realty Corp. v. Coleman, 455 U.S. 363, 379 (1982) (requiring an allegation that the

alleged Fair Housing Act discrimination "perceptibly impaired [the organization's] ability to

provide counseling and referral services") (emphasis added).  The Amended Complaint contains

no facts showing that Hilton's actions have "perceptibly impaired" its activities.

Furthermore, the vague allegations here fail to provide any information about which

Hilton Family Brand hotels had accessibility barriers that actually caused ERC to engage in

counseling and investigatory activities – information that is essential to the Court's determination

of which hotels should be subject to injunctive relief.  Without this information, the injury cannot

be said to be "fairly traceable" to any specific conduct by Hilton.[9]  Likewise, the Amended

Complaint does not contain a single allegation that ERC had to counsel anyone about or

investigate the Hilton central reservation system in order to counsel anyone.

ERC's claim that its investigation of more than 20 Hilton Family Brand hotels was

undertaken to "identify the extent of Hilton Hotels Corporation's ADA violations and better

counsel its members" does not give it the right to seek relief for 2,869 Hilton Family Brand

hotels because the D.C. Circuit has held that an advocacy group's diversion of its resources to

---

[9]  The absence of facts demonstrating a causal connection between the 2,869 hotels for which
ERC is seeking relief and ERC's alleged diversion of resources to alleged counseling and
investigatory activities distinguishes this case from the holdings in Havens Realty Corp., 455
U.S. at 363, BMC Mktg. Corp. and Spann on the question of standing.  In all three of these non-
ADA cases, the source of the injury was clearly identified and limited.  Havens, 455 U.S. at 368
(racial steering policy at two apartment complexes); Spann v. Colonial Vill., Inc., 899 F.2d 24,
25-26 (D.C. Cir. 1990) (two entities that ran allegedly discriminatory ads in the Washington Post
for approximately one year); BMC Mktg. Corp., 28 F.3d at 1270) (Washington, D.C.
employment agency allegedly discriminating against identified black testers).  In addition, all of
these cases were decided before the Supreme Court recently clarified pleading standards under
Rule 8 which require "factual allegations" that "raise a right to relief above the speculative
level."  Bell Atl., 127 S. Ct at 1965.

investigate a defendant's alleged violations of the law does not constitute an "injury in fact."

BMC Mktg. Corp., 28 F.3d at 1276-77.  The D.C. Court stated:

> [W]e explicitly reject the Council's suggestion that the mere expense of testing BMC constitutes "injury in fact" fairly traceable to BMC's conduct.  The diversion of resources to testing might well harm the Council's other programs, for money spent on testing is money that is not spent on other things.  But this particular harm is self-inflicted; it results not from any actions taken by BMC, but rather from the Council's own budgetary choices. . . . One can hardly say that BMC has injured the Council merely because the Council has decided that its money would be better spent by testing BMC than by counseling or researching.

Id. (emphasis added).  See also Spann, 899 F.2d at 27 ("An organization cannot, of course, manufacture the injury necessary to maintain a suit from its expenditure of resources on that very suit.  Were the rule otherwise, any litigant could create injury in fact by bringing a case, and Article III would present no real limitation.").[10]  The Amended Complaint contains no allegation that any members complained about any of the specific properties that ERC decided to investigate, making it clear that the investigations were not essential to any counseling efforts, despite ERC's new attempt to link the investigations to its claimed counseling efforts.  (The original Complaint contained no such attempted link.)  (Compare Am. Compl. ¶¶ 23, 39 with Compl. ¶¶ 3, 17.)  The Court need only review the federal docket to see that ERC is, at its core,

---

[10]  This rule is also the law in the Third, Ninth, and Fifth Circuits.  See, e.g., Fair Hous. Council v. Montgomery Newspapers, 141 F.3d 71, 80 (3d Cir. 1998) ("We are convinced that the district court's reliance on the position taken in Spann and BMC Marketing represents the better-reasoned approach.  We hold, therefore, that the pursuit of litigation alone cannot constitute an injury sufficient to establish standing under Article III."); Walker v. City of Lakewood, 272 F.3d 1114, 1124 n.3 (9th Cir. 2001) ("Because we agree that a plaintiff cannot establish standing simply by filing its own lawsuit, we will not consider the time and money the [organization] has expended in prosecuting this suit in deciding if the [organization] has standing to pursue the retaliation claim."); Ass'n for Retarded Citizens of Dallas v. Dallas County Mental Health & Mental Retardation Ctr. Bd. of Trs., 19 F.3d 241, 244 (5th Cir. 1994) ("The mere fact that an organization redirects some of its resources to litigation and legal counseling in response to actions or inactions of another party is insufficient to impart standing upon the organization.").

an organization devoted to investigating civil rights violations and bringing lawsuits based on the results of such investigations.  ERC filed 30 federal lawsuits in the last eight years.  Like the advocacy group in <u>BMC Marketing</u>, the ERC did not have to expend its resources to test the Hilton Family Brand hotels in question.  Its decision to do so was "self-inflicted" harm that is not fairly traceable to Hilton's conduct.

ERC also claims that Hilton's actions have frustrated "ERC's organizational purpose of identifying, challenging, and eliminating discrimination" (Am. Compl. ¶ 42(c)).  If anything, this mission statement underscores the fact that ERC's investigation of the Hilton Family Brand hotels was primarily for, if not completely, for litigation purposes which cannot establish its standing.  In any event, this allegation, standing alone, also does not establish an injury in fact.  The D.C. Circuit held in <u>National Treasury Employees Union</u>, 101 F.3d at 1429, that a

> "conflict between a defendant's conduct and an organization's mission is alone insufficient to establish Article III standing.  Frustration of an organization's objectives is the type of abstract concern that does not impart standing . . . .  Individual persons cannot obtain judicial review of otherwise non-justiciable claims simply by incorporating, drafting a mission statement, and then suing on behalf of the newly formed and extremely interested organization." (Internal citations omitted).

The D.C. Circuit further held that, in addition to a direct conflict between the defendant's conduct and the organizations' mission, the complaint must allege facts showing "that a defendant's conduct has made the organization's <u>activities</u> more difficult."  <u>Id.</u> at 1430 (emphasis in original).  Although the Amended Complaint alleges in a conclusory fashion that Hilton's conduct has made ERC's activities more difficult, it does not provide any facts about how the alleged conduct has actually done so.

Even assuming solely for the sake of argument that ERC's allegations are sufficient to establish that it is likely to suffer an injury in fact in the future as a result of ADA violations at some Hilton Family Brand hotels (the identity of which cannot be determined from the Amended

30

Complaint), ERC still would not have standing to seek relief with regard to all 2,869 Hilton Family Brand hotel in the United States.  The Amended Complaint does not allege that ERC has expended resources, or is likely to expend resources in the future, to counsel members about and/or investigate <u>all</u> or any consequential percentage of the 2,869 Hilton Family Brand hotels or the Hilton central reservation system, and the Court would have to engage in wild speculation to draw such a conclusion.  <u>See</u> <u>Lujan</u>, 504 U.S. at 560 (requiring "causal connection between the injury and the conduct complained of"); <u>Lewis</u>, 518 U.S. at 357 (injunctive relief must be tailored to the harm actually suffered by the only plaintiff who had standing to bring the case); <u>Clark</u>, 255 F. Supp.2d at 343; <u>Moreno</u>, 88 F. Supp. 2d at 1117.

Furthermore, ERC has no standing to seek injunctive relief for accessibility barriers present in Franchised Hotels because, as previously discussed, any alleged ADA violations at those facilities are neither "fairly traceable" to any conduct by Hilton nor redressable in this lawsuit against Hilton.  <u>See</u> <u>supra</u> pp. 19-21.

> **7.     Plaintiff AAPD Lacks Organizational Standing To Seek Injunctive Relief As To Any Hilton Family Brand Hotel And Hilton's Central Reservation System.**

The Amended Complaint only identifies two Hilton Family Brand hotels that have allegedly injured AAPD:  The Rockville Hilton and the Capital Hilton.  (Am. Compl. ¶¶ 45-46.) AAPD claims that it could not hold its events at these hotels because of accessibility barriers and incurred costs in investigating and finding other venues.  AAPD does not allege, however, that it would like to hold its future events at these hotels or any other Hilton Family Brand hotel in the future.  (Am. Compl. ¶¶ 45-48.)  Accordingly, AAPD cannot claim that it will <u>likely</u>, in the future, incur costs to find other venues for its events <u>because of</u> allegedly inaccessible conditions

at any Hilton Family Brand hotel.[11]  These allegations plainly fail to demonstrate that AAPD has standing to sue for injunctive relief for any of the 2,869 Hilton Family Brand hotels nationwide. See Lujan, 504 U.S. at 663-64; Lyons, 461 U.S. at 105, Lewis, 518 U.S. at 357, BMC Mktg. Corp., 28 F.3d at 1273-74; Holt, 2007 WL 1438489, at *6, Harris, 396 F. Supp. 2d at 1124-25; Molski, 385 F. Supp. 2d at 1045-46; Burger King, 255 F. Supp. 2d at 343, Moreno, 88 F. Supp. 2d at 1117; see also FW/PBS, Inc., 493 U.S. at 231 ("[a plaintiff] must allege. . . facts essential to show jurisdiction") (internal quotations omitted).  AAPD also has no standing to seek injunctive relief for the reservation system because it does not allege that it has ever attempted to use Hilton's central reservation system or has an intent to do so in the future.

Moreover, AAPD's alleged injury resulting from unspecified accessibility barriers at the Rockville Hilton is not redressable because this claim is time-barred.  See Bourbeau, 2008 WL 1757752, at *3 n.5. (time-barred claims cannot provide a basis for standing).   AAPD alleges it that could not hold an event at the Rockville Hilton in 2003.  (Am. Compl. ¶ 45.)  The statute of limitations for an ADA Title III action in both Maryland and Washington, D.C. is three years. See Kohler v. Shenansky, 914 F. Supp. 1206, 1211 (D. Md. 1995); Long v. Howard Univ., 512 F. Supp. 2d at 1, 12 (D.D.C. 2007).  Accordingly, AAPD's claim against this hotel must be dismissed for lack of standing and failure to state a claim.

In addition, the Rockville Hilton is a Franchised Hotel.  As explained supra, the presence of any alleged accessibility barriers are not "fairly traceable" to any conduct by Hilton and not redressable in this action because Hilton has no responsibility and authority for ensuring

_____

[11]   Quite frankly, this allegation is completely insubstantial.  Any organization planning an event spends some time "investigating" possible venues for the event and this certainly does not create a legal claim.

accessibility at Franchised Hotels.  See supra pp. 19-21.

Nor can AAPD establish an "injury in fact" with regard to the Capital Hilton because the absence of a roll-in shower room, as explained in Section IV.A.4, does not violate the ADA or the DCHRA when there is no allegation that the hotel was constructed after January 26, 1993, or that the rooms were altered after January 26, 1992.  See supra pp. 22-23.

AAPD's claim that it has had to "spend time increasing its lobbying efforts" (Am. Compl. ¶ 47(b) does not give it standing. [12]  See, e.g. LPA Inc. v. Chao, 211 F. Supp. 2d 160, 165 (D.D.C. 2002) (expenditure of money to lobby against legislation that hindered organization's mission did not constitute an injury in fact; Ctr. for Law & Educ. v. Dep't of Educ., 315 F. Supp. 2d 15, 24-25 (D.D.C. 2004) (organization's expenses in the pursuit of its agenda are self-effectuating and do not constitute an injury in fact); Long Term Care Pharmacy Alliance v. UnitedHealth Group, Inc., 498 F. Supp. 2d 187, 191-92 (D.D.C. 2007) (drain on organization's resources due to its need to counteract defendants' illegal practices does not constitute injury in fact).  Likewise, as discussed, the alleged frustration of AAPD's mission, in the absence of concrete facts showing that AAPD's activities have been harmed, also does not provide a basis for standing.  See p. 30.

><blockquote>

**8.    Plaintiffs ERC And AAPD Lack Representational Standing To Seek Injunctive Relief As To Any Hilton Family Brand Hotel And The Hilton Central Reservation System.**

An association may bring an action on behalf of its members if "(a) its members would otherwise have standing to sue in their own right; (b) the interests it seeks to protect are germane

---

[12]  AAPD's claimed lobbying activities are questionable because, as a § 501(c)(3) tax exempt organization, AAPD may not engage in any substantial lobbying activities.  See Internal Revenue Code § 501(c)(3), 501(c)(h).

to the organization's purpose; and (c) neither the claim asserted nor the relief requested requires the participation of individual members in the lawsuit." Hunt v. Wash. State Apple Adver. Comm'n, 432 U.S. 333, 343 (1977).

The Amended Complaint does not allege facts that would establish that any one of AAPD's or ERC's members has standing to sue. As discussed, plaintiffs Fiedler, Elliott-Vandivier, and Johnson, do not have standing to sue for injunctive relief in their own right for any Hilton Family Brand hotel or the central reservation system. See pp. 17-24. The Amended Complaint identifies no other members of ERC or AAPD who has been harmed or are about to be harmed by ADA violations at any Hilton Family Brand hotels. Instead, the ERC and AAPD allege that various unnamed members have encountered ADA violations at unnamed Hilton Family Brand hotels at unspecified times, and these unnamed members have a "continuing desire" to stay at unnamed Hilton Family Brand hotels in the future but for their asserted knowledge of unspecified accessibility barriers. (Am. Compl. ¶ 44, 49.) The decisions supra, in Burger King, 255 F. Supp. 2d at 344, Holt, 2007 WL 1438489, at *6, Harris, 396 F. Supp. 2d at 1124-25, Molski, 385 F. Supp. 2d at 1045-46, Small, 388 F. Supp. 2d at 88, Steger, 228 F.3d at 892, and Association for Disabled Americans, 2001 WL 1112109, at *19, all make clear that a plaintiff must allege very specific facts establishing a knowledge of the barriers at each location in question, an intent to visit the defendant's premises in the future, and a likelihood of such a visit, in order to have standing to seek injunctive relief.

The standing requirements for an ADA Title III action do not change simply because a plaintiff's interests are represented by an advocacy organization. In Association for Disabled Americans, 2001 WL 1112109, at *19, a disability advocacy organization claimed that it had standing to bring an action under Title III of the ADA against the owners of a hotel on behalf of

two of its members who had specific plans to be in the area of the hotels and wished to stay at the hotel. The court granted summary judgment on the complaint, concluding that these two members, and therefore the organization, did not have standing to sue because there was no allegation that these members had knowledge of any barriers at the hotel. Id. Particularly relevant to this case, the court refused to find standing based on the organization's claim "that other members of the Association would like to stay at the [hotel] while assisting the Indiana chapter [of the organization]." The court noted "[n]o plans or reservations have been made for any such members to visit the hotel, and no date certain for their visit has been announced. As such, the desire of such members to visit the hotel at some unspecified time in the future is insufficient to confer standing on any such members." Id. at *20.

In Small, the disability advocacy organization also claimed that it had standing to sue under Title III of the ADA as a representative of its members. The court disagreed, finding that the complaint's allegations failed to establish that the only person identified in the complaint as a member had standing. The court stated: "Plaintiffs have alleged neither an instance in which [the member] actually encountered access barriers at a single GNC store nor, on a futile gesture theory, that he was actually aware of such barriers at any particular stores and would visit those stores in the imminent future but for the barriers." Small, 388 F. Supp. 2d at 97. The court further noted that if the organization wished to base its standing on the standing of any other members, it would have to amend the Complaint to identify these individuals and to submit affidavits from those members "identifying the stores where they encountered discrimination. . . [whether] the affiant experienced discrimination . . . before [the] lawsuit was filed or [whether] he or she had actual knowledge of an architectural barrier to entry at a GNC store before the suit was filed and would visit that store in the imminent future but for the barrier." Id. at 98.

In Burger King, 255 F. Supp. 2d at 344, the advocacy organization sought injunctive relief under the ADA for all Burger King restaurants in the United States on behalf of its members.  The court rejected this claim because the organization had failed "to identify which members visited which restaurants on which dates and when such members plan to return to these Burger King restaurants."  Id.  The court thus held that the organization only had standing to the extent that its one identified member had standing, and that standing was limited to the restaurants near his residence that he had visited in the past.  Id. at 343-44.  See also Pa. Prot. and Advocacy, Inc. v. Houston, 136 F. Supp. 2d 353, 366 (E.D. Pa. 2001) (organization's allegation that it represented "many" unidentified individuals that it was charged to represent by statute was insufficient to confer representational standing); Kessler Inst. for Rehab., Inc. v. Borough of Essex Fells, 876 F. Supp. 641, 656 (D.N.J. 1995) (organization had no standing to sue on behalf of members where it failed to identify a specific individual member with standing).

**B.      Plaintiffs Lack Standing To Sue For Monetary Damages Under The DCHRA.**

An essential element of an "injury in fact" is "an invasion of a legally protected interest." Lujan, 504 U.S. at 560.  Thus, to have standing to sue under the DCHRA, Plaintiffs must allege facts that establish a violation of their rights under the DCRHA.

Section § 2-1401.01 of the DCHRA states that it was enacted to "secure an end in the District of Columbia to discrimination for any reason other than that of individual merit, including, but not limited to … disability."  D.C. Code § 2-1401.01 (2007) (emphasis added). The first line of subchapter II of the statute which contains all of the non-discrimination provisions states that "[e]very individual shall have an equal opportunity to participate fully in the economic, cultural and intellectual life of the District."  D.C. Code § 2-1402.01 (2007) (emphasis added).  This language makes clear that the DCHRA only governs conduct inside of

Washington, D.C.  Indeed, had it been drafted to reach conduct outside of D.C., the DCHRA would violate the Commerce Clause of the Constitution.  See Healy v. Beer Inst., Inc., 491 U.S. 324, 336-37 (1989) (holding that "the Commerce Clause . . . precludes the application of a state statute to commerce that takes place wholly outside of the State's borders, whether or not the commerce has effects within the State" and striking down a Connecticut statute that had the effect of controlling commercial activity occurring outside the boundary of the state).  Thus ERC cannot sue under the DCHRA as to allegations concerning a Hilton Family Brand hotel outside of Washington, D.C.

Mr. Fiedler and Ms. Vandivier.  Mr. Fiedler and Ms. Vandivier lack standing to bring a claim under the DCHRA because they have not alleged that they encountered an accessibility violation, or have knowledge of a violation, at any Hilton Family Brand hotel located within Washington, D.C.  Neither of them even alleges that (s)he would like to patronize a Hilton Family Brand hotel in Washington, D.C. in the future.  Ms. Vandivier's alleged problem with the Hilton central reservation system had absolutely no connection to Washington, D.C. because Ms. Elliott-Vandivier presumably made the reservation from her home in Pennsylvania and the hotel in question is also located in Pennsylvania.

Mark Johnson.  Mr. Johnson and AAPD lack standing to bring a claim under the DCHRA because they have not alleged a violation of the DCHRA at a Washington, D.C. hotel that caused them injury.  The only alleged accessibility barrier that these plaintiffs claim has injured them is the absence of accessible rooms with roll-in showers at the Capital Hilton in Washington, D.C.  As discussed in Section IV.A.4 (pp. 22-23), this situation does not violate the ADA or DCHRA.

ERC.  ERC has alleged no facts to establish an injury in fact to itself that would give it standing to sue under the DCHRA for money damages.  There is no allegation that ERC has had

to counsel anyone as a result of accessibility barriers at a Washington, D.C. Hilton Family Brand hotel. As previously discussed, ERC's decision to investigate three D.C. hotels "to identify the extent of Hilton['s]…ADA violations" (Am. Compl. ¶ 23) is a self-inflicted injury that was not caused by any conduct by Hilton. BMC Mktg. Corp., 28 F.3d at 1276. ERC's claim that Hilton's actions have frustrated its organizational purpose is, as discussed, not a cognizable injury in the D.C. Circuit in the absence of concrete facts showing that the frustration has made ERC's activities more difficult. See Nat'l Treasury Employees Union, 101 F.3d at 1429; discussion supra p. 30.

ERC's standing to seek relief under the DCHRA also is limited by the statute's one-year statute of limitations. D.C. Code Section 2-1403.16(a) states in relevant part that "[a] private cause of action pursuant to this chapter shall be filed in a court of competent jurisdiction within one year of the unlawful discriminatory act, or the discovery thereof." It is not possible to determine, based on a review of the Amended Complaint, when, if ever, ERC had to allegedly counsel members about accessibility barriers at Washington, D.C. hotels, or when ERC investigated the Hilton Family Brand hotels in Washington D.C. Nonetheless, the Court can conclude, as a matter of law, that ERC has no standing to seek relief for any injuries that were sustained more than a year prior to the filing of the original Complaint because such claims are barred under Section 2-1403.16(a). See Bourbeau, 2008 WL 1757752, at *3 n.5 (ERC did not have standing to seek relief for injuries resulting from defendant's discriminatory conduct taking place outside of Section 2-1403.16(a)'s statute of limitations).

> **C.    Plaintiffs' Claim For Injunctive And Monetary Relief Against Franchised Hotels And Managed Hotels That Are Not Owned By Hilton Must Be Dismissed Under Fed. R. Civ. P. 12(b)(7) Because Plaintiffs Have Failed To Join The Owners Of These Hotels Who Are Indispensable Parties.**

Plaintiffs are seeking injunctive relief for the 2,869 hotels in the United States that

operate under the Hilton Family Brands.  (Raynor Decl. ¶ 2.)  However, only 174 of these 2,869 hotels are owned by Hilton.[13]  Id.  Three hundred and thirty-nine hotels are Managed Hotels owned by third parties but operated by Hilton under management agreements.  Id.  The remaining 2,356 hotels are Franchised Hotels owned and operated by third party franchisees whose only relationship to Hilton is governed by a franchise license agreement with a Hilton subsidiary.[14]  Id.  As explained below, this case cannot proceed with regard to the 2,356 Franchised and/or the 339 Managed Hotels because the owners of these properties are necessary parties who have not been named in this case, and in most cases cannot be named in this case because they are not subject to the Court's personal jurisdiction.

### 1.    The Owners Of The Franchised Hotels And Managed Hotels Are Necessary Parties Under Fed. R. Civ.P. 19(a).

"Under FED.R.CIV.P. 19, whether a party is indispensable for a just adjudication requires a determination regarding whether the absent party is necessary to the litigation; if so, whether the absent party can be joined in the litigation; and if joinder is infeasible, whether the lawsuit can nevertheless proceed 'in equity and good conscience.'"  Kickapoo Tribe of Indians v. Babbitt, 43 F.3d 1491, 1494 (D.C. Cir. 1995) (emphasis added in original).  An absent party is "necessary" to a litigation under Rule 19 if "(1) in [the party's] absence complete relief cannot be

---

[13]  As used in this brief, the term "owned" refers to hotels owned or leased by Hilton, or joint venture hotels.

[14]  Hilton maintains that that it cannot be sued under the ADA or the DCHRA for violations at the Franchised Hotels because it neither owns nor operates these hotels.  See 42 U.S.C. § 12182(a) (ADA only applies to "any person who owns, leases (or leases to), or operates a place of public accommodation").  However, to address the merits of this argument at this time, Hilton would have to introduce into evidence 2,356 franchise license agreements.  This is a very burdensome task that may not be necessary depending on the Court's ruling on this motion.  Hilton reserves its right to make this argument in a motion for summary judgment once the Court determines if there are any hotels for which Plaintiffs have standing to seek relief.

accorded among those already parties, or (2) [the party] claims an interest relating to the subject

of the action and is so situated that the disposition of the action in [the party's] absence may (i)

as a practical matter impair or impede [the party's] ability to protect that interest . . . ." Id. at

1495.  Both of these circumstances are unquestionably present in this case.

> **a.    Complete Relief Cannot Be Accorded Without The Franchised Hotel Owners.**

Plaintiffs seek, inter alia, an injunction from this Court ordering compliance with all

applicable sections of the ADA to include all Franchised Hotels.  (Am. Compl. at p. 27 ¶ (ii).)

Such an injunction would include the removal of alleged structural accessibility barriers and/or

the creation of new accessible rooms in different room categories.  (Id. ¶¶ 5-7.)  As discussed

previously, there is no allegation in the Amended Complaint that Hilton has the authority to

make physical changes to any Franchised Hotel to ensure compliance with the ADA, and Hilton

in fact does not have such authority.  See infra pp. 19-21.  The Court could not directly issue an

order requiring Franchised Hotels to take any action.  Hilton's subsidiaries could only ask that

changes be made.  If the owner of a Franchised Hotel chooses not to comply, however, the

Hilton's subsidiary's only option would be to terminate the franchise agreement, an outcome that

would not result in the removal of alleged accessibility barriers.  Id.

> **b.    The Disposition Of The Case In The Absence Of The Franchised Hotel And Managed Hotel Owners Will Impair Their Ability To Protect Their Legal Interests.**

The owners of the Franchised Hotels and Managed Hotels hold a valuable property

interest in their hotels.  That interest would be impaired by any order from this Court mandating

the removal of alleged accessibility barriers and creation of new accessible rooms in different

room categories.  Physical changes to the hotels as to accessibility would, inter alia (1) change

the appearance and other physical aspects of the hotel; (2) possibly result in a decrease in the

total number of rooms and, therefore, revenue at the hotels;[15] and (3) impose substantial retrofit costs that must be borne solely by these owners (Second Raynor Decl. ¶¶ 3, 5 (Ex. 1); FFA ¶ 6(a)(16) (Ex. 1(B)); Form Management Agreement ("FMA") ¶ 4.07(h), 4.02.4(d)(Ex. 1(A)).)

An order from the Court requiring physical changes to the hotels would also affect a Franchised Hotel owner's legal interest in its franchise agreement with Hilton's subsidiaries.  If the Court were to issue an injunction requiring Hilton to use its subsidiaries' franchise agreements as a tool to force franchisees to make its hotels more accessible, the franchisees would be given a Hobson's choice of either incurring significant compliance costs or losing their valuable contractual rights under their franchise agreements.  (FFA ¶ 14(a)(1) (Ex. 1(B)); Second Raynor Decl. ¶ 4 (Ex. 1).)

Furthermore, the Plaintiffs seek monetary damages which they claim resulted from barriers to access at various hotels.  Under the management agreements and franchise agreements, the owners of Franchised and Managed Hotels are responsible for paying any such damages to the extent the damages resulted from conditions at their hotels.  (Second Raynor Decl. ¶¶ 3, 5 (Ex. 1); FFA ¶ 9 (Ex. 1(B)); FMA ¶ 12.03.1. (Ex. 1(A)).)

Finally, the Franchised Hotel and Managed Hotel owners cannot rely on Hilton to adequately defend their interests because, under both the franchise and management agreements, Hilton has no responsibility for any costs associated with ADA compliance or any other changes to the hotels.  (Second Raynor Decl. ¶¶ 3, 5 (Ex. 1); see also supra pp. 19-21.)  Under these

---

[15]  The dispersion of accessible hotel rooms sought by Plaintiffs could result in the decrease in the overall number of hotel rooms in a facility.  For example, a hotel may not have any rooms that are large enough to accommodate two double beds and meet all accessibility requirements. In such circumstances, the hotel would have to join two existing rooms to create one accessible double room, permanently decreasing the hotel's revenue stream and possibly violating financing covenants.

agreements, Hilton and its subsidiaries also have a right to indemnification for any liability resulting from this lawsuit as well as the costs of defense. (Id. ¶¶ 3, 5 (Ex. 1); FFA ¶ 9 (Ex. 1(B)); FMA ¶ 12.03.1. (Ex. 1(A)).) Hilton also would not suffer the direct consequences of an owner's loss of selling space which could result from having to create accessible rooms in different room classes.

The courts have made clear under similar circumstances that a non-party is a necessary party. See Kickapoo Tribe, 43 F.3d at 1491 (a party to a contractual relationship was a necessary party to litigation that would affect this relationship); Naartex Consulting Corp. v. Watt, 722 F.2d 779, 788 (D.C. Cir. 1983) (parties to a contract that was the subject matter of the lawsuit were necessary parties); Roberts v. Royal Atl. Corp., 445 F. Supp. 2d 239, 247 (E.D.N.Y. 2006) (Court expressing concern that plaintiff's failure to name and serve "proprietary tenants" of resort units would limit the court's ability to grant relief in an ADA Title III action, but deciding the case on a different ground); Thompson v. Sand Cliffs Owners Ass'n, Inc., No. 3:96 CV 270/RV, 1998 WL 35177067, at *2 (N.D. Fla. Mar. 30, 1998) (noting that the court had dismissed under Fed. R. Civ. P. 19 the original ADA Title III complaint seeking changes to individual condominium sleeping units because the owners of such units had not been joined in the action); Clark, 213 F.R.D. at 230 (court's decision not to certify a defendant class and subclass of owners or operators of McDonald's franchisees "has the effect of excluding from [the] litigation restaurants owned or operated by McDonald's franchisees ([except for the one franchisee named in the Complaint]) in the absence of their individual joinder as parties defendant."); Thompson v. Jiffy Lube Int'l, Inc., 505 F. Supp. 2d 907 (D. Kan. 2007) (franchisee was a necessary party in an action against the franchisor based on events taking place at the franchisee's facility); Gillis v. McDonald's Corp., Civ. A. No. 91-7202, 1992 WL 236891, at *1-

2 (E.D. Pa. Sept. 10, 1992) (franchisee was a necessary party in a tort action brought against the franchisor because franchisor had the right to seek indemnification from the franchisee); Hoytt v. Docktor Pet Ctr., Inc., No. 85 C 6850, 1986 WL 11619, at *3-4 (N.D. Ill. Oct. 10, 1986) (franchisee necessary party in a fraud action brought against franchisor because the plaintiff might not be able to obtain relief against the franchisor).

      **2.     The Court Should Exclude The Franchised And Managed Hotels From This Lawsuit Pending Joinder Of Their Owners And Dismiss With Prejudice The Seven Franchised Hotels And Six Managed Hotels Whose Owners Cannot Be Joined.**

In a less unwieldy case, the next step in this analysis would be for the Court to determine whether the joinder of the Franchised and Managed Hotel owners is feasible.  If joinder is infeasible, the court must determine whether the lawsuit can nevertheless proceed "in equity and good conscience."  Kickapoo Tribe, 43 F.3d at 1494; Fed. R. Civ. P. 19(b).  However, because this case could, depending on the Court's rulings on Plaintiffs' standing, require the joinder of as many as 2,809 owners (most of whom are not subject to the personal jurisdiction of the Court), Hilton urges the Court exclude all Franchised and Managed Hotels from this lawsuit at this time. Plaintiffs can amend the Amended Complaint to join any appropriate owners by a deadline set by the Court, and the defendants would then have an opportunity to address the question of whether these owners can, in fact, be joined.

The Court can and should, however, under Rule 19(b), immediately dismiss with prejudice Plaintiffs' claims as they relate to 13 of the 26 hotels named in the Amended Complaint.  Hilton has submitted declarations attesting that the owners of these six Managed Hotels and seven Franchised Hotels cannot be joined in this action because the Court does not have personal jurisdiction over them, and this lawsuit cannot proceed "in equity and good conscience" without them.

None of the owners of the following Managed and Franchised Hotels is organized under the laws of or maintains its principal place of business in Washington, D.C.:  (1) the Hilton Oceanfront Resort in South Carolina (Decl. of David Tigges (Ex. 2) ¶ 3); (2) the Hilton San Diego Resort (Decl. of Michael Barnello (Ex. 3) ¶ 2); (3) The Hilton Boston Back Bay in Massachusetts (Decl. of Farooq Rehmatwala (Ex. 4) ¶ 3); (4) The Hilton Alexandria Mark Center in Virginia (Decl. of Gabe L. Finke (Ex. 5) ¶ 2); (5) the Hilton Dallas-Fort Worth Lakes Conference Center in Texas (Decl. of Julie Lubin (Ex. 10) ¶ 2); (6) the Glendale Hotel located in California (Decl. of Ronald Solotruk (Ex. 6) ¶ 2); (7) the Hilton Los Angeles Airport in California (Decl. of Sandra Murphy (Ex. 7) ¶ 3); (8) the Hilton Suites Oakbrook in Illinois (Decl. of Yvonne Jeziorski (Ex. 8) ¶ 3); (9) the Drake in Illinois (Decl. of Tom Loughlin (Ex. 9) ¶ 6); (10) the Palmer House Hilton in Illinois (Id. ¶ 2); (11) the Hilton Rye Town in New York (Decl. of Farooq Rehmatwala (Ex. 4) ¶ 6); (12) the Rockville Hilton (Decl. of Benjamin Jacobs (Ex. 11) ¶ 2); and (13) the Doubletree Guest Suites, Philadelphia West in Philadelphia (Decl. of Michael George (Ex. 12) ¶ 2.)

"To establish personal jurisdiction over a non-resident, a court must . . . first examine whether jurisdiction is applicable under the state's long-arm statute and then determine whether a finding of jurisdiction satisfies the constitutional requirements of due process." GTE New Media Servs. Inc. v. BellSouth Corp., 199 F.3d 1343, 1347 (D.C. Cir. 2000).   None of these hotel owners fall within the scope of the District of Columbia long-arm statute.  Section 13-423(a) of the long-arm statute lists all of the activities conducted by a person that would subject that person to a D.C. court's jurisdiction, and they are all activities that take place in the District.[16]  Section

---

[16]  Section 13-423(a) states:

13-423(b) of the long-arm statute further states that "[w]hen jurisdiction over a person is based

solely upon [Section 13-423], only a claim for relief arising from acts enumerated in this section

may be asserted against him."  D.C. Code 13-423(b).  Plaintiffs' claims with regard to these

Franchised and Managed Hotel owners would be based on the existence of alleged ADA

violations caused by architectural barriers existing at hotels located <u>outside the District of

Columbia</u>.  Accordingly, the Court cannot exercise personal jurisdiction over these owners under

the D.C. long-arm statute.  <u>See</u>, <u>e.g.</u>, <u>Bancoult v. McNamara</u>, 214 F.R.D. 5, 12 (D.D.C. 2003)

(court had no personal jurisdiction over non-resident defendant because the claims in the lawsuit

did not arise from the defendant's transacting business, contracting to supply services, or causing

tortious injury in the District of Columbia).

Because the owners of six Managed Hotels and seven Franchised Hotels named in this

lawsuit are necessary parties that cannot be joined because of a lack of personal jurisdiction, the

Court must next determine whether the Plaintiffs' claims relating to these hotels should be

dismissed.  The factors to be considered by the court are as follows:  First, to what extent a

judgment rendered in the person's absence might be prejudicial to the person or those already

---

A District of Columbia court may exercise personal jurisdiction over a person. . . as to a claim for relief arising from the person's (1) transacting any business in the District of Columbia; (2) contracting to supply services in the District of Columbia; (3) causing tortious injury in the District of Columbia by an act or omission in the District of Columbia; (4) causing tortious injury in the District of Columbia by an act of or omission outside the District of Columbia if he regularly does or solicits business, engages in any other persistent course of conduct, or derives substantial revenue from goods used or consumed, or services rendered, in the District of Columbia; (5) having an interest in, using, or possessing real property in the District of Columbia; (6) contracting to insure or act as surety for or on any person, property, or risk, contract, obligation, or agreement located, executed, or to be performed within the District of Columbia. . . ; or (7) marital or parent and child relationship in the District of Columbia. . .

D.C. Code § 13-423(a) (2001).

parties.  Second, the extent to which, by protective provisions in the judgment, by the shaping of

relief, or other measures, the prejudice can be lessened or avoided.  Third, whether a judgment

rendered in the person's absence will be adequate.  Fourth, whether the plaintiff will have an

adequate remedy if the action is dismissed for nonjoinder.  See Fed. R. Civ. P. 19(b).  Each of

these factors supports dismissal of Plaintiffs' claims relating to these hotels.

First, the discussion at pp. 40-42 makes clear that judgment would be highly prejudicial

to the owners of the Franchised and Managed Hotels.  Second, the Court cannot structure its

relief to lessen the prejudice to the owners of the Franchised or Managed Hotels because,

assuming solely arguendo that the Court found an ADA violation at one or more of the

properties, the ADA specifically requires that the Court include "an order to alter facilities to

make such facilities readily accessible to and usable by individuals with disabilities" if a

violation is found.  42 U.S.C. § 12188(a)(2).  Third, the relief ordered by the Court in the

absence of the Franchised Hotel owners would not be adequate because it would not necessarily

result in changes at the hotels to improve accessibility.  See supra pp. 19-21.  Fourth, there is no

impediment to the Plaintiffs' pursuit of lawsuits against each owner and the appropriate Hilton

subsidiary in courts that have personal jurisdiction over both of them.

The foregoing analysis makes clear that the Court should dismiss Plaintiffs' claims as to

the six Managed Hotels and the seven Franchised Hotels identified in the Amended Complaint

over whose owners the Court has no personal jurisdiction.  In addition, such dismissal would

encompass Mr. Fiedler's claims regarding the Hilton Oceanfront Resort, Ms. Vandivier's claim

against the Doubletree, Philadelphia West, and AAPD's claim against the Rockville Hilton -- all

Franchised Hotels over whose owners the Court has no personal jurisdiction.

**D.    Plaintiffs' Claim That Hotels Built For First Occupancy Prior To January 26, 1993 Must Have Accessible Rooms Dispersed In Different Room Classes Or Categories Must Be Dismissed Under Fed. R. Civ. P. 12(b)(6).**

Plaintiffs' claim that Hilton has violated the ADA by not dispersing its accessible rooms in different room categories such as double rooms and rooms with views must be dismissed with regard to all hotels built for first occupancy prior to January 26, 1993 ("Pre-1993 Facilities") because neither the ADA nor the DCHRA requires such dispersion.[17]  This legal question should be resolved immediately because it will greatly impact the scope of discovery and the related costs and burdens.[18]

Title III of the ADA begins with a general prohibition against discrimination.  It states: "No individual shall be discriminated against on the basis of disability in the full and equal enjoyment of the goods, services, facilities, privileges, advantages, or accommodations of any place of public accommodation by any person who owns, leases (or leases to), or operates a place of public accommodation."  42 U.S.C. § 12182(a).  Notwithstanding the "full and equal enjoyment" language, Congress well understood that facilities already in existence when the statute was passed should not be held to the same standard as those built after the ADA's passage.  Accordingly, the statute adopts quite different definitions of "discrimination" for facilities based on when they were built.[19]  See 42 U.S.C. §§ 12183(a)(1)-(2), (b)(2)(A)(iv).

---

[17]  Of the 26 hotels named in the Amended Complaint, only four were built for first occupancy after January 26, 1993. (Raynor Decl. (Ex. 1) ¶ 6.)

[18]  Hilton reserves the right to argue and introduce supporting evidence that the dispersion of accessible rooms is not required in specific hotels because of conditions unique to each hotel, assuming solely arguendo that the Court decides that Pre-1993 Facilities have an obligation to disperse accessible rooms under certain circumstances.

[19]  For facilities constructed for first occupancy after January 26, 1993, the statute defines "discrimination" as a failure to design and construct [such facilities] that are "readily accessible to and usable by individuals with disabilities, except where an entity can demonstrate that it is

47

The ADA does not directly address the question of accessible rooms in Pre-1993

Facilities.  However, the Department of Justice's ("DOJ") implementing regulations do and they

treat Pre-1993 Facilities differently than those constructed after January 26, 1993.   The DOJ

explained its approach as follows:

> In striking a balance between guaranteeing access to individuals with disabilities and recognizing <u>the legitimate cost concerns of businesses and other private entities</u>, the ADA establishes different standards for existing facilities and new construction. <u>In existing facilities, which are the subject of Sec. 36.304, where retrofitting may prove costly, a less rigorous degree of accessibility is required than in the case of new construction and alterations (see Sec. 36.401 - 36.406) where accessibility can be more conveniently and economically incorporated in the initial stages of design and construction.</u>

28 C.F.R. pt. 36, App. B at 716 (2007) (emphasis added); also <u>compare</u> 28 C.F.R. § 36.401

(2007) ("New Construction") with § 36.402 (2007) ("Alterations").

Section 9 of the ADAAG contains the accessibility requirements for "Accessible

Transient Lodging."  Section 9.1 contains five subsections, each setting out a specific

requirement.  Section 9.1.1 addresses the public use and common areas for such facilities.

Section 9.1.2 sets out the number of mobility accessible rooms that must be in a lodging facility,

and references Section 9.2 as the section that contains the specific features required in such an

---

<u>structurally impracticable</u> to meet the requirements of such subsection in accordance with standards set forth or incorporated by reference in regulations issued under [the statute]."  42 U.S.C. § 12183(a)(1) (emphasis added).  For facilities constructed prior to January 26, 1993 ("Pre-1993 Facilities"), the statute defines discrimination as a failure "make alterations in such a manner that, <u>to the maximum extent feasible</u>, the altered portions of the facility are readily accessible to and usable by individuals with disabilities, including individuals who use wheelchairs."  42 U.S.C. § 12183(a)(2) (emphasis added).  The statute also defines "discrimination" to include "a failure to remove architectural barriers . . .where such removal is readily achievable."  42 U.S.C. § 12182(b)(2)(A)(iv).  Readily achievable barrier removal is defined by the ADA as "<u>easily accomplishable</u> and able to be carried out <u>without much difficulty or expense</u>," and applies to all facilities regardless of when they were built.  42 U.S.C. § 12181(9) (emphasis added).

accessible room. Section 9.1.3 sets forth the number of rooms that must have features for persons with hearing impairments. <u>Section 9.1.4 sets out the requirement that accessible rooms be dispersed among various classes of accommodations</u>. And Section 9.1.5, entitled, "Alterations to Accessible Units, Sleeping Rooms, and Suites," addresses the requirements that apply when accessible rooms are created through alterations of Pre-1993 Facilities.

Thus, the ADAAG section that governs alterations to Pre-1993 Facilities is Section 9.1.5, and the DOJ Technical Assistance Manual (the "TA Manual") confirms this fact. It states:

> **III-7.7000 Alterations (ADAAG § 4.1.6).** Throughout ADAAG, there are numerous examples of areas <u>where there are less stringent standards for alterations than for new construction</u>. For instance –
> . . .
> 3) There are <u>special less stringent requirements for alterations in</u> many other areas, including sales and service counters (§7.2(1)), check-out aisles (§7.3(1)), <u>hotels (§9.1.5)</u>, and homeless shelters (§9.5.2(2)).

TA Manual § III-7.7000 (emphasis added).

ADAAG Section 9.1.5 states, <u>in its entirety</u>:

> **9.1.5. Alterations to Accessible Units, Sleeping Rooms, and Suites.** <u>When sleeping rooms are being altered in an existing facility, or portion thereof, subject to the requirements of this section, at least one sleeping room or suite that complies with the requirements of 9.2 (Requirements for Accessible Units, Sleeping Rooms, and Suites) shall be provided for each 25 sleeping rooms, or fraction thereof, of rooms being altered until the number of such rooms provided equals the number required to be accessible with 9.1.2.</u> In addition, at least one sleeping room or suite that complies with the requirements of 9.3 (Visual Alarms, Notification Devices, and Telephones) shall be provided for each 25 sleeping rooms, or fraction thereof, of rooms being altered until the number of such rooms equals the number required to be accessible by 9.1.3.

ADAAG § 9.1.5 (emphasis added). Section 9.1.5 only requires that accessible rooms that are created through the alterations process comply with Section 9.2. Nowhere in Section 9.2 is there a requirement that such rooms be dispersed across various room classes, as Plaintiffs erroneously contend. The dispersion requirement is instead in Section 9.1.4 which is <u>not</u> referenced in Section 9.1.5. Accordingly, Plaintiffs cannot point to any legal requirement that Pre-1993

Facilities that create accessible rooms through the alterations process must disperse those rooms across different room classes.[20]

## V.    CONCLUSION

For all the foregoing reasons, Plaintiffs' claims should be dismissed in their entirety for lack of standing under Fed. R. Civ. P. 12(b)(1), failure to state a claim under Fed. R. Civ. P. 12(b)(6), and failure to join an indispensable party under Fed. R. Civ. P. 12(b)(7).  In the alternative, if the Court finds that any plaintiff has standing to seek relief as to some Hilton Family Brand Hotels and the Hilton central reservation system, it should order jurisdictional discovery to take place to determine the appropriate scope of such standing.

Dated:  May 9, 2008                          Respectfully submitted,

BURCH, PORTER & JOHNSON, PLLC         EPSTEIN BECKER & GREEN, P.C.
Lisa A. Krupicka (admitted pro hac vice)
130 N. Court Avenue
Memphis, Tennessee 38103                  _____/s/_____
(901) 524-5121                            Frank C. Morris, Jr. (Bar No. 211482)
(901) 524-5024 (fax)                      Minh N. Vu (Bar No. 444305)
Memphis, Tennessee 38103                  1227 25th Street, N.W., Suite 700
                                          Washington, D.C. 20037
                                          (202) 861-0900
                                          (202) 296-2882 (fax)
                                          Counsel for Defendant

---

[20]  Plaintiffs also cannot argue that Hilton was required to disperse its accessible rooms as part of a continuing obligation to engage in readily achievable barrier removal.  The regulations explicitly state that:  "[t]he requirements for barrier removal . . . shall not be interpreted to exceed the standards for alterations in subpart D of this part."  See 28 C.F.R. § 36.304(g) (2007). As discussed, the alteration standard does not require dispersal of accessible rooms.  See ADAAG § 9.1.5.

<u>CERTIFICATE OF SERVICE</u>

We hereby certify that the foregoing Memorandum of Points and Authorities in Support of Hilton Hotels Corporation's Motion to Dismiss the Amended Complaint was served electronically this 9th day of May, 2008 to Plaintiff's counsel:

> Elaine Gardner, Esq.
> Washington Lawyers' Committee for
> Civil Rights & Urban Affairs
> 11 Dupont Circle, NW, Suite 400
> Washington, D.C.  20036
>
> Benjamin Davidson, Esq.
> August J. Matteis, Jr., Esq.
> 1100 New York Ave., NW, Suite 700
> Washington, D.C. 20005

I further certify that Attachments A and B of the Second Declaration of Ted Raynor (Exhibit 1) submitted in support of the Memorandum of Points and Authorities in Support of Hilton Hotels Corporation's Motion to Dismiss the Amended Complaint which are the subject to a motion to seal filed on this same date, have been served by regular mail on all of the attorneys identified above.

_____/s/_____
Minh N. Vu
D.C. Bar No. 444305

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| EQUAL RIGHTS CENTER et al.,<br><br><br>                    Plaintiffs,<br><br>          *v.*<br><br>HILTON HOTELS CORPORATION,<br>                    Defendant. | Civ. Action No. 1:07-cv-01528-JR |

**PROPOSED ORDER**

AND NOW, this ____ day of _____, 2008, upon consideration Defendant

Hilton Hotels Corporation's ("Hilton") Motion to Dismiss the Amended Complaint, it is

ORDERED, that this motion is hereby granted in its entirety, and the Amended

Complaint is hereby dismissed with prejudice.


Date: _____, 2008


                                        _____

                                        United States District Judge

## CERTIFICATE OF SERVICE

I certify that a true and correct copy of the foregoing Proposed Order was served this 9th[th] day of May 2008, by electronic service, on the following:

Elaine E. Gardner, Esq.
Washington Lawyers' Committee for
Civil Rights & Urban Affairs
11 Dupont Circle, NW, Suite 400
Washington, D.C.  20036


August Matteis, Jr., Esq.
Benjamin Davidson, Esq.
Gilbert Randolph LLP
1100 New York Avenue, NW
Suite 700
Washington, D.C.  20005


_____ /s/ _____
Minh N. Vu
D.C. Bar No. 444305

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

EQUAL RIGHTS CENTER, et al.,

                          Plaintiffs,

*v.*

HILTON HOTELS CORPORATION,

                          Defendant.

Civ. Action No. 1:07-cv-01528-JR

## HILTON HOTELS CORPORATION'S INDEX OF EXHIBITS FILED IN SUPPORT OF ITS MOTION TO DISMISS THE AMENDED COMPLAINT

Frank C. Morris, Jr. (Bar No. 211482)
Minh N. Vu (Bar No. 444305)
1227 25th Street, N.W.
Suite 700
Washington, D.C. 20037
(202) 861-0900
(202) 296-2882 (fax)

Lisa A. Krupicka (admitted pro hac vice)
Burch, Porter & Johnson, PLLC
130 N. Court Avenue
Memphis, Tennessee 38103
(901) 524-5121
(901) 524-5024 (fax)

DATED:  May 9, 2008          Counsel for Defendant

**INDEX OF EXHIBITS**

| EXHIBIT DESCRIPTION | EXHIBIT NUMBER |
|---|---|
| | |
| Second Declaration of Ted C. Raynor dated May 9, 2008 | 1 |
|     Hilton form management agreement (Confidential) **(FILED UNDER SEAL)** | 1(A) |
|     Hilton form franchise license agreement (Confidential) **(FILED UNDER SEAL)** | 1(B) |
| Declaration of David J. Tigges dated April 3, 2008 | 2 |
| Declaration of Michael Barnello dated March 30, 2008 | 3 |
| Declaration of Farooq Rehmatwala dated April 1, 2008 | 4 |
| Declaration of Gabe L. Finke dated March 31, 2008 | 5 |
| Declaration of Ronald Solotruck dated March 31, 2008 | 6 |
| Declaration of Sandra Murphy dated March 27, 2008 | 7 |
| Declaration of Yvonne Jeziorski dated March 28, 2008 | 8 |
| Declaration of Tom Loughlin dated April 3, 2008 | 9 |
| Declaration of Julie Lubin dated April 3, 2008 | 10 |
| Declaration of Benjamin R. Jacobs dated May 8, 2008 | 11 |
| Declaration of Michael George dated May 5, 2008 | 12 |
| Superior Court decisions relating to revocation of ERC's articles of incorporation | 13 |
| Unpublished decisions | 14 |
| <ul><li>Ass'n for Disabled Americans v. Claypool Holdings LLC, No. IP00-0344-C-G/T, 2001 WL 1112109 (S.D. Ind. Aug. 6, 2001)</li><li>Bourbeau v. The Jonathan Woodner Co., No. CIV A 07-0164, 2008 WL 1757752 (D.D.C. Apr. 18, 2008)</li><li>Gillis v. McDonald's Corp., Civ. A. No. 91-7202, 1992 WL 236891 (E.D. Pa. Sept. 10, 1992)</li><li>Holt v. American City Diner, Inc., No. 05-1745, 2007 WL 1438489 (D.D.C. May 15, 2007)</li><li>Hoytt v. Docktor Pet Ctr., Inc., No. 85 C 6850, 1986 WL 11619 (N.D. Ill. Oct. 10, 1986)</li><li>Maydak v. FCC, No. 98-1383, 1998 WL 938717 (D.C. Cir. Dec. 9, 1998)</li><li>Thompson v. Sand Cliffs Owners Ass'n, Inc., No. 3:96 CV 270/RV, 1998 WL 35177067 (N.D. Fla. Mar. 30, 1998)</li></ul> | |

## <u>CERTIFICATE OF SERVICE</u>

I certify that a true and correct copy of Exhibits 1-14 and the Exhibit Index were served this 9th day of May 2008, by electronic service, on the following:

> Elaine E. Gardner, Esq.
> Washington Lawyers' Committee for
> Civil Rights & Urban Affairs
> 11 Dupont Circle, NW, Suite 400
> Washington, D.C.  20036
>
> August Matteis, Jr.
> Benjamin Davidson
> Gilbert Randolph LLP
> 1100 New York Avenue, NW
> Suite 700
> Washington, DC 20005

I further certify that Attachments A and B to the Second Raynor Declaration which are being filed under seal have been served by regular mail on all of the attorneys identified above.

> Attorneys for Plaintiffs


> _____/s/_____
> Minh N. Vu
> D.C. Bar No. 444305

Exhibit 1

xxx

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

EQUAL RIGHTS CENTER, et. al.,

          Plaintiffs,

                                   Civ. Action No. 1:07-cv-01528-JR

      *v.*

HILTON HOTELS CORPORATION,

          Defendant.

## SECOND DECLARATION OF TED C. RAYNOR

I, Ted C. Raynor, hereby declare as follows based on my personal knowledge:

1.    I am the Vice President and Senior Counsel for Hilton Hotels Corporation ("Hilton"). I have knowledge of the information set forth in this declaration in my position at Hilton, and am submitting this declaration on behalf of Hilton in support of its Motion to Dismiss.

2.    There are 2,869 hotels in the United States that operate under a Hilton Family Brand. The Hilton Family Brands are: Conrad Hotel, Doubletree Hotel, Doubletree Club Hotel, Doubletree Guest Suites, Embassy Suites, Hampton Inn, Hilton Garden Inn, Hilton Grand Vacation Club, Hampton Inn & Suites, Hilton Hotel, Homewood Suites, and Waldorf-Astoria. Of these 2,869 hotels, 47 are owned, 83 are leased by Hilton, 44 are a Joint Venture and 339 are owned by independent third party entities and operated by Hilton or one of its subsidiaries (the "Managed Hotels"), and 2,356 are owned and operated by independent third party entities pursuant to franchise license agreements with subsidiaries of Hilton (the "Franchised Hotels").

3.    The owner(s) of each Managed Hotel and Hilton (or a subsidiary) are parties to a management agreement which sets forth the terms of their relationship. Although the terms of each management agreement vary from hotel to hotel, there are certain terms common to every management agreement. First, the hotel owners must pay for all costs relating to any physical alterations to the Managed Hotel. Thus, if changes must be made to a Managed Hotel to improve its accessibility to persons with disabilities, the costs associated with such activities would be borne by the owner. In addition, the owner(s) of the Managed Hotels must indemnify Hilton and its subsidiaries for any claims resulting from the violation of any legal requirements applicable to the hotel, such as those imposed by the ADA. Attachment A is a true and accurate copy of the form management agreement that Hilton has used for most of its Managed Hotels. Attachment A is being filed under seal because it is contains confidential and proprietary business information.

4.    As previously stated, Franchised Hotels are owned and operated by independent third party entities that have a franchise license agreement with certain subsidiaries of Hilton. Among other things, the franchise license agreement gives the hotel owner/franchisee the right to operate the hotel under a Hilton Family brand and obligates it to comply with Hilton's or the respective brand's standards. However, because Hilton does not own, manage or even directly franchise such Franchised Hotels, Hilton has no authority to make physical changes to them. Although Hilton's subsidiaries have the right to request that such changes be made, the franchisor's only recourse if an owner/franchisee chooses not to comply is to terminate the franchise agreement.

5.    Under all of Hilton's subsidiaries' franchise license agreements, the owner/franchisee of a Franchised Hotel is solely responsible for ensuring that the hotel is in compliance with all applicable laws, including the ADA.  Thus, if changes must be made to a Franchised Hotel to improve its accessibility, the costs associated with such activities would be borne by the owner/franchisee. In addition, Hilton and its subsidiaries have the right to indemnification for any liability resulting from any claim that a Franchised Hotel has violated any laws and regulations such as the ADA.  Attachment B is a true and accurate copy of the form franchise license agreement that Hilton's subdiaries have used for most of its Franchised Hotels. Attachment B is being filed under seal because it is contains confidential proprietary business information.

6.    The Amended Complaint references 26 Hilton hotels operating under a Hilton Family Brand.  The following chart identifies each hotel identified in the Amended Complaint, its location, its ownership and management status, and the year in which it was opened:

| HOTEL NAME | ADDRESS | OWNERSHIP AND MANAGEMENT STATUS | DATE OPENED |
|---|---|---|---|
| Hilton San Diego Resort | 1775 East Mission Bay Drive, San Diego, CA | Franchised Hotel | 1965 |
| Hilton Washington Embassy Row | 2015 Massachusetts Avenue, Washington, DC | Franchised Hotel | 1996 |
| Hilton Oceanfront Resort | 23 Ocean Lane Hilton Head Island, SC | Franchised Hotel | 1992 |
| Hilton DFW Lakes Conference Center | 1800 Highway 26 East, Grapevine, TX | Franchised Hotel | 1983 |
| Hilton Alexandria Mark Center | 5000 Seminary Road, Alexandria, VA | Franchised Hotel | 1999 |
| Hilton Los Angeles North/Glendale | 100 West Glenoaks Blvd., Glendale, CA | Franchised Hotel | 1996 |
| Doubletree Guest Suites, Philadelphia | 640 W. Germantown Pike, Plymouth Meeting, | Franchised Hotel | 1987 |

| HOTEL NAME | ADDRESS | OWNERSHIP AND MANAGEMENT STATUS | DATE OPENED |
|---|---|---|---|
| West | PA | | |
| Hilton Washington D.C./Rockville Hotel and Executive Meeting Center | 1750 Rockville Pike, Rockville, MD | Franchised Hotel | 1974 |
| Hilton Los Angeles Airport and Towers | 5711 West Century Blvd., Los Angeles, CA | Managed Hotel | 1983 |
| Hilton Washington | 1919 Connecticut Avenue, NW, Washington, DC | Managed Hotel | 1965 |
| Capitol Hilton | 1001 – 16th Street, NW, Washington, DC | Managed Hotel | 1943 |
| Hilton Suites Oakbrook | 10 Drury Lane, Oakbrook Terrace, IL | Managed Hotel | 1989 |
| The Drake | 140 East Walton, Chicago, IL | Managed Hotel | 1980 |
| The Palmer House Hilton | 17 East Monroe, Chicago, IL | Managed Hotel | 1925 |
| Rye Town Hilton | 699 Westchester Avenue, Rye Brook, NY | Managed Hotel | 1973 |
| Hilton Boston Back Bay | 40 Dalton Street, Boston, MA | Managed Hotel Franchised Hotel | 1982 |
| Hilton Oakland Airport | One Hegenherger Road, Oakland, CA | Hilton Owned | 1970 |
| Hilton San Francisco | 333 O'Farrell Street, San Francisco, CA | Hilton Owned | 1964 |
| Hilton O'Hare Airport | O'Hare International Airport, PO Box 66414, Chicago, IL | Hilton Owned | 1992 |
| Chicago Hilton | 720 South Michigan Avenue, Chicago, IL | Hilton Owned | 1927 |
| Hilton Boston Logan Airport | One Hotel Drive, Boston, MA | Hilton Owned | 1999 |
| Hilton Short Hills | 41 JFK Parkway, Short Hills, NJ | Hilton Owned | 1988 |
| Hilton New York | 1335 Avenue of the Americas, New York, NY | Hilton Owned | 1963 |
| The Waldorf-Astoria | 100 East 50th Street, New York, NY | Hilton Owned | 1931 |
| Hilton McLean Tyson's Corner | 7920 Jones Branch Drive, McLean, VA | Hilton Owned | 1987 |

| HOTEL NAME | ADDRESS | OWNERSHIP AND MANAGEMENT STATUS | DATE OPENED |
|---|---|---|---|
| Hilton Seattle Airport | 17620 Pacific Highway South, Seattle, WA | Hilton Owned | 1961 |

I declare under penalty of perjury that the foregoing is true and correct.

Date:  May 9, 2008

Ted C. Raynor
**Vice President and Senior Counsel**

ATTACHMENT A TO SECOND RAYNOR DECLARATION

(FORM MANAGEMENT AGREEMENT) FILED UNDER SEAL

xxx

ATTACHMENT B TO SECOND RAYNOR DECLARATION

(FORM FRANCHISE LICENSE AGREEMENT) FILED UNDER SEAL

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

EQUAL RIGHTS CENTER

and

MARC FIEDLER,

Plaintiffs,

v.

HILTON HOTELS CORPORATION,

Defendant.

Civ. Action No. 1:07-cv-01528-JR

## DECLARATION OF DAVID J. TIGGES

I, David J. Tigges, declare as follows based on my personal knowledge:

1.    I am legal counsel and the registered agent for Atlantic Resort Managers, Inc. ("Atlantic"). I am submitting this Declaration on behalf of Atlantic solely for the purpose of providing facts relevant to Hilton Hotels Corporation's Motion to Dismiss in the above-captioned case. By submitting this Declaration, neither Atlantic nor I consent to the Court's exercise of personal jurisdiction over us and do not waive any objections that we may have concerning personal or subject matter jurisdiction.

2.    Atlantic is the agent for each of the owners of the 324 individual condominium units that comprise the Hilton Oceanfront Resort located at 23 Ocean Lane, Hilton Head Island, South Carolina 29928. These condominium units are owned by individual owners.

3.    Atlantic is a South Carolina corporation which maintains its principal place of business at 23 Ocean Lane, Hilton Head Island, South Carolina 29928.  Atlantic only conducts business in South Carolina and conducts no business in Washington, D.C.  Atlantic operates the Hilton Oceanfront Resort pursuant to a franchise license agreement with Hilton Inns, Inc., a subsidiary of Hilton Hotels Corporation.

4.    Atlantic, on the one hand, and Hilton Hotels Corporation and Hilton Inns, Inc., on the other hand, are separate entities with no common ownership.


I declare under penalty of perjury that the foregoing is true and correct.


Date: April 3, 2008

_____
David J. Tigges

Hilton Exhibit 3

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

EQUAL RIGHTS CENTER

and

MARC FIEDLER,

Plaintiffs,

v.

HILTON HOTELS CORPORATION,

Defendant.

Civ. Action No. 1:07-cv-01528-JR

## DECLARATION OF MICHAEL D. BARNELLO

I, Michael D. Barnello, declare as follows based on my personal knowledge:

1.      I am the President of LHO Mission Bay Rosie Lessee, Inc. ("LHO"). I am submitting this Declaration on behalf of LHO solely for the purpose of providing facts relevant to Hilton Hotels Corporation's Motion to Dismiss in the above-captioned case. By submitting this Declaration, neither LHO nor I consent to the Court's exercise of personal jurisdiction over us and do not waive any objections that we may have concerning personal or subject matter jurisdiction.

2.      LHO is the lessee of the Hilton San Diego Resort located at 1775 East Mission Bay Drive, San Diego, CA 92109. LHO is a Delaware Corporation which maintains its principal place of business at 3 Bethesda Metro Center, Suite 1200, Bethesda, MD 20814. LHO operates

the Hilton San Diego Resort under a franchise license agreement with HLT Existing Franchise

Holding, LLC as assignee of Hilton Inns, Inc., a subsidiary of Hilton Hotels Corporation.

    3.      LHO, on the one hand, and Hilton Hotels Corporation and Hilton Inns, Inc., on

the other hand, are separate entities with no common ownership.

    I declare under penalty of perjury that the foregoing is true and correct.

Date: March 30, 2008

_____
Michael D. Barnello

Hilton Exhibit 4

### IN THE UNITED STATES DISTRICT COURT
### FOR THE DISTRICT OF COLUMBIA

EQUAL RIGHTS CENTER

and

MARC FIEDLER,

          Plaintiffs,

      *v.*

HILTON HOTELS CORPORATION,

          Defendant.

Civ. Action No. 1:07-cv-01528-JR

## DECLARATION OF FAROOQ REHMATWALA

I, Farooq Rehmatwala, declare as follows:

1.    I am the Area Vice President for Hilton Hotels Corporation ("Hilton") who is responsible for Hilton's relationship with HHC TRS OP LLC. ("HTO") and Rye Town Tenant Corporation ("Rye Town").

2.    HTO is the owner of the Hilton Boston Back Bay hotel located at 40 Dalton Street, Boston, Massachusetts 02115. HTO and a Hilton subsidiary, Hilton Management LLC, are parties to a management agreement pursuant to which Hilton Management LLC manages the Hilton Boston Back Bay for HTO.

3.    HTO is a Delaware Limited Liability Company which maintains its principal place of business at 8405 Greensboro Drive Suite 500, McLean, Virginia 22102. I know this

information because of my responsibilities relating to HTO's hotel. In addition, Hilton has verified the accuracy of this information.

4.    HTO and Hilton are separate entities with no common ownership.

5.    Rye Town is the owner of the Hilton Rye Town hotel located at 699 Westchester Avenue, Rye Brook, New York 10573. Rye Town and a Hilton subsidiary, Hilton Management LLC, are parties to a management agreement pursuant to which Hilton Management LLC manages the Hilton Rye Town for Rye Town.

6.    Rye Town is a Delaware Corporation which maintains its principal place of business at 699 Westchester Avenue, Rye Brook, New York 10573. I know this information because of my responsibilities relating to Hilton Rye Town. In addition, Hilton has verified the accuracy of this information.

7.    Rye Town and Hilton are separate entities with no common ownership.

I declare under penalty of perjury that the foregoing is true and correct.

Date: April ___1___, 2008

Farooq Rehmatwala

Hilton Exhibit 5

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

EQUAL RIGHTS CENTER

and

MARC FIEDLER,

Plaintiffs,

v.

HILTON HOTELS CORPORATION,

Defendant.

Civ. Action No. 1:07-cv-01528-JR

## DECLARATION OF GABE L. FINKE

I, Gabe L. Finke, declare as follows based on my personal knowledge:

1.      I am the Principal Correspondent of Seminary Road Hotel Associates, LLC. ("Seminary").  I am submitting this Declaration on behalf of Seminary solely for the purpose of providing facts relevant to Hilton Hotels Corporation's Motion to Dismiss in the above-captioned case.  By submitting this Declaration, neither Seminary nor I consent to the Court's exercise of personal jurisdiction over us and do not waive any objections that we may have concerning personal or subject matter jurisdiction.

2.      Seminary is the owner of the Hilton Alexandria Mark Center hotel located at 5000 Seminary Road, Alexandria, VA 22301.  Seminary is a Delaware limited liability company which maintains its principal place of business at 1050 17th Street, Suite 1200, Denver, Colorado

80265. Seminary operates the Hilton Alexandria Mark Center hotel pursuant to a franchise license agreement with HLT Existing Franchise Holding, LLC as assignee of Hilton Inns, Inc., a subsidiary of Hilton Hotels Corporation.

3.      Seminary, on the one hand, and Hilton Hotels Corporation and Hilton Inns, Inc., on the other hand, are separate entities with no common ownership.


I declare under penalty of perjury that the foregoing is true and correct.


Date: March 31, 2008      _____

                          Gabe L. Finke

Hilton Exhibit 6

.

# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

EQUAL RIGHTS CENTER

and

MARC FIEDLER,

               Plaintiffs,

   v.

HILTON HOTELS CORPORATION,

              Defendant.

Civ. Action No. 1:07-cv-01528-JR

## DECLARATION OF RONALD J. SOLOTRUK

I, Ronald J. Solotruk, declare as follows based on my personal knowledge:

1.      I am the Principal Correspondent of AP/AIM Glendale Hotels TRS, LLC ("AP/AIM"). I am submitting this Declaration on behalf of AP/AIM solely for the purpose of providing facts relevant to Hilton Hotels Corporation's Motion to Dismiss in the above-captioned case. By submitting this Declaration, neither AP/AIM nor I consent to the Court's exercise of personal jurisdiction over us and do not waive any objections that we may have concerning personal or subject matter jurisdiction.

2.      AP/AIM is the owner of the Hilton Los Angeles North/Glendale Hotel located at 100 West Glenoaks Boulevard, Glendale, California 91202. AP/AIM is a Delaware limited liability company which maintains its principal place of business at 2 Manhattanville Road,

Purchase, New York 10577.  AP/AIM  operates the Hilton Los Angeles North/Glendale Hotel pursuant to a franchise license agreement with HLT Existing Franchise Holding, LLC as assignee of Hilton Inns, Inc., a subsidiary of Hilton Hotels Corporation.

3.    AP/AIM, on the one hand, and Hilton Hotels Corporation and Hilton Inns, Inc., on the other hand, are separate entities with no common ownership.

I declare under penalty of perjury that the foregoing is true and correct.

Date: March 31, 2008

_____
Ronald J. Solotruk

Hilton Exhibit 7

**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

EQUAL RIGHTS CENTER

and

MARC FIEDLER,

           Plaintiffs,

    *v.*

HILTON HOTELS CORPORATION,

           Defendant.

Civ. Action No. 1:07-cv-01528-JR

## DECLARATION OF SANDRA MURPHY

I, Sandra Murphy, declare as follows based on my personal knowledge:

1.    I am the Area Vice President for Hilton Hotels Corporation ("Hilton") who is responsible for Hilton's relationship with Fortuna Enterprises, LP ("Fortuna").

2.    Fortuna is the owner of Hilton Los Angeles Airport hotel located at 5711 West Century Boulevard, Los Angeles, California 90045. Fortuna and a Hilton subsidiary, Hilton Management LLC, are parties to a management agreement pursuant to which the Hilton Management LLC manages the Hilton Los Angeles Airport for Fortuna.

3.    Fortuna is a Delaware Corporation which maintains its principal place of business at 5711 West Century Blvd., Los Angeles, California 90045. I know this information because of

my responsibilities relating to Hilton Los Angeles Airport.  In addition, Hilton has verified the accuracy of this information.

    4.          Fortuna and Hilton are separate entities with no common ownership.

         I declare under penalty of perjury that the foregoing is true and correct.

Date: March ___, 2008

Sandra Murphy

Hilton Exhibit 8

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

EQUAL RIGHTS CENTER

and

MARC FIEDLER,

        Plaintiffs,

     v.

HILTON HOTELS CORPORATION,

        Defendant.

Civ. Action No. 1:07-cv-01528-JR

## DECLARATION OF YVONNE JEZIORSKI

I, Yvonne Jeziorski, declare as follows based on my personal knowledge:

1.    I am the Area Vice President for Hilton Hotels Corporation ("Hilton") who is responsible for Hilton's relationship with Oakbrook Hilton Suites and Garden Inn LLC ("Oakbrook").

2.    Oakbrook is the owner of Hilton Suites Oakbrook Terrace hotel located at 10 Drury Lane, Oakbrook Terrace, Illinois 60181. Oakbrook and a Hilton subsidiary, Hilton Management LLC, are parties to a management agreement pursuant to which the Hilton Management LLC manages the Hilton Suites Oakbrook Terrace hotel for Oakbrook.

3.    Oakbrook is an Illinois Corporation which maintains its principal place of business at 10 Drury Lane, Oakbrook Terrace Illinois 60181. I know this information because of

{000130-017928 M0016353.DOC; 1}

my responsibilities relating to the Hilton Suites Oakbrook Terrace.  In addition, Hilton has verified the accuracy of this information.

I declare under penalty of perjury that the foregoing is true and correct.

Date: March 2̶8̶ , 2008

Yvonne Jeziorski

Hilton Exhibit 9

**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| EQUAL RIGHTS CENTER<br><br>and<br><br>MARC FIEDLER,<br><br>        Plaintiffs,<br><br>    *v.*<br><br>HILTON HOTELS CORPORATION,<br><br>        Defendant. | Civ. Action No. 1:07-cv-01528-JR |

**DECLARATION OF TOM LOUGHLIN**

I, Tom Loughlin, declare as follows based on my personal knowledge:

1.    I am the Area Vice President for Hilton Hotels Corporation ("Hilton") who is responsible for Hilton's relationship with Thor Palmer House Hotel ("TPHH") and WWL DHotel Investors, LLC ("WWL").

2.    TPHH is the owner of The Palmer House Hilton located at 17 E. Monroe Street Chicago, Illinois 60603. TPHH and a Hilton subsidiary, HLT Palmer LLC are parties to a management agreement pursuant to which the HLT Palmer LLC manages The Palmer House Hilton for TPHH.

3.    TPHH is a Delaware Corporation which maintains its principal place of business at 25 W. 39th Street, New York, New York 10018. I know this information because of my

responsibilities relating to TPHH's hotel. In addition, Hilton has verified the accuracy of this information.

4.    TPHH and Hilton are separate entities with no common ownership.

5.    WWL is the owner of The Drake hotel located at 140 East Walton Place, Chicago, Illinois 60610. WWL and a Hilton subsidiary, HLT Drake LLC are parties to a management agreement pursuant to which the HLT Drake LLC manages The Drake for WWL.

6.    WWL is a Delaware Corporation which maintains its principal place of business at 430 West Erie Street, Suite 501 Chicago, Illinois 60610. I know this information because of my responsibilities relating to The Drake hotel. In addition, Hilton has verified the accuracy of this information.

7.    WWL and Hilton are separate entities with no common ownership.


I declare under penalty of perjury that the foregoing is true and correct.


Date: April 3, 2008

Thomas J. Loughlin

**Hilton Exhibit 10**

.

## IN THE UNITED STATES DISTRICT COURT
### FOR THE DISTRICT OF COLUMBIA

EQUAL RIGHTS CENTER

and

MARC FIEDLER,

Plaintiffs,

v.

HILTON HOTELS CORPORATION,

Defendant.

Civ. Action No. 1:07-cv-01528-JR

## DECLARATION OF JULIE LUBIN

I, Julie Lubin, declare as follows based on my personal knowledge:

1.      I am the Principal Correspondent of Perini Grapevine, Inc.  ("Perini").  I am submitting this Declaration on behalf of Perini solely for the purpose of providing facts relevant to Hilton Hotels Corporation's Motion to Dismiss in the above-captioned case.  By submitting this Declaration, neither Perini nor I consent to the Court's exercise of personal jurisdiction over us and do not waive any objections that we may have concerning personal or subject matter jurisdiction.

2.      Perini is the owner of the Hilton DFW Lakes Executive Conference Center hotel located at 1800 Highway 26 East, Grapevine, Texas 76051.  Perini is a Delaware Corporation which maintains its principal place of business at 5383 Hollister Avenue, Suite 240, Santa

Barbara, CA 93111.    Perini operates the Hilton DFW Lakes Executive Conference Center

pursuant to a franchise license agreement with HLT Existing Franchise Holding, LLC as

assignee of Hilton Inns, Inc., a subsidiary of Hilton Hotels Corporation.

     3.    Perini, on the one hand, and Hilton Hotels Corporation and Hilton Inns, Inc., on

the other hand, are separate entities with no common ownership.


     I declare under penalty of perjury that the foregoing is true and correct.


Date:  March 31, 2008                                                                
                                                    Julie Lubin

.

# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

EQUAL RIGHTS CENTER, et al.

                Plaintiffs,

   *v.*

HILTON HOTELS CORPORATION,

            Defendant.

Civ. Action No. 1:07-cv-01528-JR

## DECLARATION OF BENJAMIN R. JACOBS

I, Benjamin R. Jacobs, declare as follows based on my personal knowledge:

1.     I am a Managing Member of JBG/Company Manager II, L.L.C., the Managing Member of JBG/Rockville Hotel, L.L.C. ("JBG/Rockville"). JBG/Rockville is the Managing Member of Rockville Hotel Operator, L.L.C. ("RHO"). I am submitting this Declaration on behalf of JBG/Rockville and RHO solely for the purpose of providing facts relevant to Hilton Hotels Corporation's Motion to Dismiss the Amended Complaint in the above-captioned case. By submitting this Declaration, neither JBG/Rockville nor I consent to the Court's exercise of personal jurisdiction over us and do not waive any objections that we may have concerning personal or subject matter jurisdiction.

2.     JBG/Rockville is the owner of the Hilton Washington DC/Rockville Hotel and Executive Meeting Center located at 1750 Rockville Pike, Rockville MD  20852-1699 (the "Hotel"). JBG/Rockville is a Delaware corporation which maintains its principal place of business at 4445 Willard Avenue, Suite 400, Chevy Chase, MD 20815. JBG/Rockville leases

the hotel to RHO which operates the Hotel pursuant to a franchise license agreement with Hilton Inns, Inc., a subsidiary of Hilton Hotels Corporation.  RHO also is a Delaware corporation with its principal place of business at 4445 Willard Avenue, Suite 400, Chevy Chase, MD 20815.

3.    JBG/Company Manager II, L.L.C., JBG/Rockville, and RHO, on the one hand, and Hilton Hotels Corporation and Hilton Inns, Inc. on the other hand, are separate entities with no common ownership.

I declare under penalty of perjury that the foregoing is true and correct.

Date:  May 6, 2008

BENJAMIN R. JACOBS,
Managing Member of JBG/Company Manager II, L.L.C.

Hilton Exhibit 12

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

EQUAL RIGHTS CENTER et al.

               Plaintiffs,

    *v.*

HILTON HOTELS CORPORATION,

               Defendant.

Civ. Action No. 1:07-cv-01528-JR

## DECLARATION OF MICHAEL GEORGE ON BEHALF OF PLYMOUTH MEETING

## CRESCENT HOTEL, LP

I, **Michael George**, declare as follows based on my personal knowledge:

1.    I am the **President and Assistant Secretary** of Plymouth Meeting Crescent Hotel LP ("PMCH"). I am submitting this Declaration on behalf of PMCH solely for the purpose of providing facts relevant to Hilton Hotels Corporation's Motion to Dismiss the Amended Complaint in the above-captioned case. By submitting this Declaration, neither PMCH nor I consent to the Court's exercise of personal jurisdiction over us and do not waive any objections that we may have concerning personal or subject matter jurisdiction.

2.    PMCH is the owner of the Doubletree Guest Suites Plymouth Meeting located at 640 W. Germantown Pike, Plymouth Meeting, PA 19462-1003 (the "Hotel"). PMCH is a Delaware limited partnership which maintains its principal place of business at 10304 Eaton

Place, Suite 460, Fairfax, Virginia 22030. PMCH operates the Hotel pursuant to a franchise license agreement with Doubletree Hotel Systems, Inc., a subsidiary of Hilton Hotels Corporation.

3.    PMCH, on the one hand, and Hilton Hotels Corporation and Doubletree Hotel Systems, Inc. on the other hand, are separate entities with no common ownership.

4.    PMCH does not regularly do or solicit business, engage in any other persistent course of conduct, or derive any revenue from goods used or consumed, or services rendered, in the District of Columbia.

I declare under penalty of perjury that the foregoing is true and correct.

Date: May 5, 2008

_____
Michael George

Hilton Exhibit 13

## SUPERIOR COURT OF THE DISTRICT OF COLUMBIA

## CIVIL DIVISION

EQUAL RIGHTS CENTER,                          :
            Plaintiff                    :
                             :

       v.                                  :     Civil Action No. 05-7191
                             :     Calendar 14
                             :

HORNING BROTHERS, *et al*.                    :
            Defendants.                    :

## ORDER GRANTING IN PART DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

     This matter is before the court on Defendants' Motion to Dismiss, which the court is considering as a motion for summary judgment, pursuant to Super. Ct. Civ. R. 12(b). Although discovery has not been exchanged, there is no dispute between the parties regarding the facts material to Defendants' motion.

     Plaintiff is a not-for-profit corporation whose mission is to eradicate various forms of discrimination. It alleges in this action that Defendants' discriminated against recipients of so-called section 8 vouchers for subsidized housing by refusing to rent to them. Its primary evidence of the alleged discrimination comes from the experience of "testers" Plaintiff employed in 2004 to pose as section 8 tenants seeking to use their vouchers to rent housing from Defendants.

     There is no dispute that on September 9, 2002, Plaintiff's corporate charter was revoked because of its failure to file certain reports required by law. Plaintiff remained in that status until April 25, 2005, when it filed the delinquent reports and its charter was reinstated. The law is that after the charter was revoked, Plaintiff "ceased to exist" as a corporation except for the limited

12/21/05
Order docketed and copies mailed
from Chambers, First Class Mail, to
parties indicated above on 12/22/05

Case: 2005 CA 007191 R

*B*

purpose of taking steps necessary to wind up its affairs. D.C. Code § 29-301.86(c) and (d).
There is no question that using "testers" to build a case against these Defendants in 2003 and
2004 was prohibited conduct of new corporate business unrelated to winding up. See Accurate
Construction Co. v. Washington, 378 A.2d 681, 684 (D.C. 1977); see also Community Credit
Union Services, Inc., et al. v. American Federation of Community Credit Unions, et al., 534 A.2d
331, 335 (D.C. 1987). Moreover, as a matter of law, Plaintiff could not have suffered any
damages during the period of revocation in terms of diversion of resources from its central
mission, as it has alleged, because, during this period, it was not authorized to continue to pursue
its mission, central or diverted.

The only remaining question is whether the reinstatement of Plaintiff's charter in April of
2005 is to be construed retroactively so as to validate actions taken, and damages allegedly
suffered, during the period of revocation. It is true, as Plaintiff argues, that the certificate of
reinstatement "had the effect of annulling the revocation proceedings," reestablishing the power
of the corporation to act "as if the proclamation had not been issued." D.C. Code § 29-310.90.
Although this statutory language seems plain enough on its face, the argument Plaintiff attempts
to derive from it has been expressly rejected by the District of Columbia Court of Appeals in
Accurate Construction, supra, and several subsequent decisions. Collectively, these decisions
stand for the proposition that the corporation may not take advantage of its revoked status, either
to enjoy a benefit derived from acts taken during the period of revocation or to avoid liability for
corporate debts incurred during that period. Indeed, the only decisions recognizing retroactive
reinstatement of a corporate charter do so to prevent corporations from manipulating the
revocation and reinstatement to escape liability to third parties who justifiably relied on the
existence of the corporation. See, e.g., Truitt v. Miller, 407 A.2d 1073, 1080-81 (D.C. 1979).

Accordingly, this court holds that Plaintiff may not recover damages relating to diversion of resources allegedly incurred during the period its charter was revoked.

When Plaintiff filed its complaint in September of 2005, its charter was reinstated and it was fully authorized to initiate a lawsuit. Although the court has ruled that it may not claim damages allegedly incurred during its statutory "non-existence," it may be able to prove its claims and damages based on events occurring after reinstatement on April 25, 2005.[1] To that extent Defendants' motion to dismiss, treated as a motion for summary judgment, must be denied and Plaintiff is entitled to proceed and to take discovery consistent with this ruling.[2]

For the foregoing reasons, it is this $\mathcal{U}^{st}$ day of December, 2005,

ORDERED that Plaintiff's motion for leave to file memorandum in response to issues arising at the December 16, 2005, Initial Scheduling Conference be, and it hereby is, granted; and it is further

ORDERED that Defendants' motion to dismiss, treated as a motion for summary judgment pursuant to Super. Ct. Civ. R. 12(b) be, and it hereby is, granted in part and denied in part, and Plaintiff may not recover damages based on harm to the corporation allegedly incurred during the period its corporate charter was revoked;[3] and it is further

---

[1] The court rejects Plaintiff's argument that its suit can look backward because the Human Rights Act, pursuant to which it asserts these claims, allows individuals and unincorporated associations to bring actions to vindicate rights secured by the Act. Plaintiff brings this action as a corporation and alleges that Defendants' actions have harmed it as a corporation.

[2] It is at least arguable that the line of cases headed by Accurate Construction would prohibit Plaintiff from using to its advantage evidence derived from ultra vires activities undertaken in 2003 and 2004, when its charter was revoked. Having ruled that Plaintiff is entitled to proceed as to the post April 25, 2005 period, the court declines to decide on this motion the extent to which evidence gathered during the revocation period may be admissible to prove any claims that survive summary judgment.

[3] Plaintiff concedes that its complaint must be dismissed against Lawrence E. Horning, who is deceased. As to Defendants Joseph Horning, Jr., and Heights Commercial, LLP, the motion to dismiss will be denied at this time pending further discovery of the ownership and operation of the properties in question.

ORDERED that this matter is hereby scheduled for a further Initial Scheduling

Conference on January 27, 2006, at 9:30 in Courtroom 220.

JUDGE FREDERICK H. WEISBERG

Copies to:

Isabelle M. Thabault
Washington Lawyers' Committee
For Civil Rights and Urban Affairs
11 Dupont Circle, N.W., Suite 400
Washington, D.C. 20036

John P. Relman
Relman & Associates
1225 Nineteenth Street, #600
Washington, D.C. 20036

Richard W. Luchs
Greenstein DeLorme & Luchs, P.C.
1620 L Street, N.W., Ste. 900
Washington, D.C. 20036-5605

4

**SUPERIOR COURT OF THE DISTRICT OF COLUMBIA**
**Civil Division**

EQUAL RIGHTS CENTER,                )
                                    )
            Plaintiff,              )
                                    )
    v.                              )    **Civil Action No. 05-2761**
                                    )    **Calendar 1 – Judge Fisher**
E & G GROUP, et. al.,               )    **Status: May 3, 2006**
                                    )
            Defendants.             )

**ORDER GRANTING IN PART AND DENYING PART DEFENDANTS' MOTION
FOR SUMMARY JUDGMENT; GRANTING IN PART AND DENYING IN PART
PLAINTIFF'S MOTION FOR PARTIAL SUMMARY JUDGMENT; AND
GRANTING THIRD-PARTY DEFENDANT'S MOTION TO DISMISS**

Before this Court for consideration are Defendants' Motion for Summary

Judgment, Plaintiff's Motion for Partial Summary Judgment, Third-Party

Defendant's Motion to Dismiss, and the responsive pleadings thereto.

For the reasons stated herein and in open court on May 3, 2006, it is this

4th day of May 2006 hereby

**ORDERED** that Defendants' Motion for Summary Judgment is **GRANTED**

**IN PART**, and Plaintiff may not recover for any injuries alleged to have occurred

during the period when its corporate charter was revoked, *i.e.*, from September 9,

2002 until April 25, 2005, *see Accurate Construction Co. v. Washington*, 378

A.2d 681, 684 (D.C. 1977); *Community Credit Union Services, Inc., et al. v.

Community Credit Union Services, Inc., et al.*, 534 A.2d 331, 335 (D.C. 1987);

*Equal Rights Center v. Phifer Realty, Inc., et al.*, Civil Action No. 05-7190

(December 22, 2005  J. Weisberg) (order granting in part defendants' motion for

summary judgment); it is

DOCKETED in Chambers  MAY    4 2006
MAILED From Chambers  MAY    4 2006



1

C

FURTHER ORDERED that the remainder of Defendants' Motion for Summary Judgment is DENIED; it is

FURTHER ORDERED that Plaintiff's Motion for Partial Summary Judgment is GRANTED as to the claim of source of income discrimination; it is

FURTHER ORDERED that Plaintiff's Motion for Partial Summary Judgment is DENIED as to the claim of racial discrimination; it is

FURTHER ORDERED that Third Party Defendant's Motion to Dismiss is GRANTED; and it is

FURTHER ORDERED that Plaintiff and Defendants shall have until June 15, 2006 to complete discovery.


Gerald I. Fisher
Associate Judge


Copies to:

Steven K. Davidson
Michael J. Baratz
Steptoe & Johnson, LLP
1330 Connecticut Avenue, N.W.
Washington, D.C. 20036-1795

Isabelle Thabault
Donald L. Kahl
Washington Lawyers' Committee for Civil Rights and Urban Affairs
11 Dupont Circle, NW, Suite 400
Washington, DC 20036

Richard W. Luchs
Roger D. Luchs
Greenstein Delorme & Luchs, P.C.
1620 L. Street, N.W. Suite 900
Washington, D.C. 20036

2

Hans Froelicher
Office of General Counsel
District of Columbia Housing Authority
1133 North Capitol Street, NE
Washington, DC 20002

Frederick A. Douglas
Douglas Boykin & Oden, PLLC
1401 Eye Street, NW, Suite 310
Washington, DC 20005

# SUPERIOR COURT FOR THE DISTRICT OF COLUMBIA

## Civil Division

EQUAL RIGHTS CENTER,

    Plaintiff,

v.

THE UNNAMED CO-TRUSTEES OF THE
IRREVOCABLE TRUST FOR ESTELLE
GELMAN, A TRUST CREATED BY TRUST
AGREEMENT DATED JANUARY 2, 1959,
et al.,

    Defendants.

Case No.  05-0002766
Calendar No. 2
Judge Michael Rankin

## ORDER

UPON consideration of Defendants' Renewed Motion to Dismiss Complaint,

it is by the Court this _21_ day of ___July___, 2006, hereby

ORDERED, that the Motion is GRANTED; and it is

FURTHER ORDERED, that the Complaint is hereby dismissed, due to its

forfeiture of its corporate charter in 2002, and its failure to reinstate its charter until

April 25, 2005. *The court has read and agrees with the rationale expressed by Judge Weisburg in CA no. 05-7191, Equal Rts Ctr v. Herring Bros. Consequently, I have reconsidered my earlier ruling and now Grant the Renewed motion to dismiss.*

___Michael Rankin___
The Hon. Michael L. Rankin
Judge, Superior Court for the
District of Columbia

MAILED From Chambers   JUL 2 1 2006

DOCKETED In Chambers   JUL 2 1 2006

-1-

Copies to:

Stephen A. Horvath, Esquire
Melissa H. Katz, Esquire
TRICHILO, BANCROFT, MCGAVIN,
 HORVATH & JUDKINS, P.C.
P.O. Box 22
Fairfax, Virginia 22038-0022
*Counsel for Defendants, Gelman Management Company, L.P. and GMC, Inc.*

Leslie M. Turner, Esquire
Michele Roberts, Esquire
Robert P. Delonis, Esquire
AKIN, GUMP, STRAUSS, HAUER & FELD, LLP
1333 New Hampshire Avenue, N.W., Suite 400
Washington, D.C. 20036
*Counsel for Plaintiff, Equal Rights Center*

and to:

Isabelle M. Thabault, Esquire
Robert M. Bruskin, Esquire
11 Dupont Circle, N.W., Suite 400
Washington, D.C. 20036
*Counsel for Plaintiff, Equal Rights Center*

-2-

TOTAL P.03

**EXHIBIT 14**
**Part A**

Westlaw.

Not Reported in F.Supp.2d                                                                    Page 1
Not Reported in F.Supp.2d, 2001 WL 1112109 (S.D.Ind.)
(Cite as: Not Reported in F.Supp.2d, 2001 WL 1112109)

**C**Association For Disabled Americans v. Claypool
Holdings, LLC
S.D.Ind.,2001.
Only the Westlaw citation is currently available.
United States District Court, S.D. Indiana,
Indianapolis Division.
ASSOC FOR DISABLED AMERICANS, INC,
Brennan, Michael H, Plaintiffs,
v.
CLAYPOOL HOLDINGS LLC, Defendant.
**No. IP00-0344-C-T/G.**

Aug. 6, 2001.

ENTRY ON MOTION FOR SUMMARY
JUDGMENT AND RELATED MOTIONS [FN1]

> FN1. Though this Entry is a matter of public
> record and is being made available to the
> public on the court's web site, it is not
> intended for commercial publication either
> electronically or in paper form. The reason
> for this caveat is to avoid adding to the
> research burden faced by litigants and
> courts. Under the law of the case doctrine,
> the ruling or rulings in this Entry will govern
> the case presently before this court. *See, e.g.,*
> *Tr. of* *Pension, Welfare, & Vacation Fringe*
> *Benefit Funds of IBEW Local 701 v.*
> *Pyramid Elec.,* 223 F.3d 459, 468 n. 4 (7th
> Cir.2000); *Avitia v. Metro. Club of Chicago,*
> *Inc.,* 49 F.3d 1219, 1227 (7th Cir.1995).
> However, a district judge's decision has no
> precedential authority and, therefore, is not
> binding on other courts, on other judges in
> this district, or even on other cases before
> the same judge. *See, e.g., Howard v. Wal*
> *Mart Stores, Inc.,* 160 F.3d 358, 359 (7th
> Cir.1998) ("a district court's decision does
> not have precedential authority");
> *Malabarba v. Chicago Tribune Co.,* 149
> F.3d 690, 697 (7th Cir.1998) ( "district court
> opinions are of little or no authoritative
> value"); *United States v. Articles of Drug*
> *Consisting of 203 Paper Bags,* 818 F.2d
> 569, 571 (7th Cir.1987) ("A single district
> court decision ... has little precedential

effect. It is not binding on the circuit, or
even on other district judges in the same
district."). Consequently, though this Entry
correctly disposes of the legal issues
addressed, this court does not consider the
discussion to be sufficiently novel or
instructive to justify commercial publication
of the Entry or the subsequent citation of it
in other proceedings.TINDER, Judge.

**\*1** Plaintiffs, the Association for Disabled
Americans, Inc. and Michael H. Brennan, bring this
action against Defendant, Claypool Holdings, LLC
("Claypool"), under Title III of the Americans with
Disabilities Act, 42 U.S.C. §§ 1210112213, which
prohibits discrimination against individuals with
disabilities in any place of public accommodation.
Plaintiffs allege that they are being discriminated
against because of their disabilities as they have been
denied equal access to the public accommodations
and facilities owned and operated by Defendant.
Plaintiffs seek injunctive relief, attorneys' fees, costs
and expenses. Claypool moves for summary
judgment on the Complaint. Plaintiffs move to strike
portions of the affidavit of Joseph Coursolle,
submitted by Defendant in support of their motion for
summary judgment. Defendant moves to strike
Plaintiffs' expert disclosure and expert report of
Michael H. Brennan. The court rules as follows.

*I. Factual Background*

Defendant, Claypool, owns the subject real property
located at 111 Washington Street, Indianapolis,
Indiana, which is currently operated as the Embassy
Suites-Downtown Indianapolis Hotel ("Embassy
Suites" or "hotel"). The Embassy Suites was
designed and constructed for first occupancy prior to
January 26, 1992.

Plaintiff, Michael H. Brennan, is a quadriplegic. He
cannot lift his arms or use his fingers, and he has
limited use of his hand. He has a reduced lung
capacity which causes strength and endurance
impairments. He is visually impaired but he has
20/20 vision with corrective lenses. Mr. Brennan
resides in Florida, has family living in Indianapolis,
Indiana, and he has been coming to Indianapolis for
years. He prefers to stay in a hotel in downtown

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                                           Page 2
Not Reported in F.Supp.2d, 2001 WL 1112109 (S.D.Ind.)
**(Cite as: Not Reported in F.Supp.2d, 2001 WL 1112109)**

Indianapolis rather than with his parents. He visited the Embassy Suites on November 18, 1999, and January 19, 2000, and had plans to visit the Embassy Suites on February 26, 2001, for purposes of inspecting it as an expert on behalf of Plaintiffs in connection with this lawsuit. The inspection was postponed and ultimately performed on March 6, 2001. Mr. Brennan visited Indianapolis from April 5, 2001 through April 8, 2001 to attend his great aunt's 100th birthday party. He plans on visiting Indianapolis in May 2001 to perform consulting business for the Association. During several of the past years since 1992, Mr. Brennan has visited Indianapolis in July or August to attend family reunions. He also frequently comes to Indianapolis for Thanksgivings and Christmases. Mr. Brennan would stay overnight at the Embassy Suites on future visits to Indianapolis if the hotel were ADA compliant.

Plaintiff, Association for Disabled Americans, Inc. (the "Association"), is a non-profit corporation organized and existing under the laws of the State of Florida. Florida is its primary place of business. The Association has approximately 225 members who have various disabilities including mobility impairments, blindness, deafness, muscular sclerosis, of short stature and paralysis. Mr. Brennan is not a member of the Association. The primary purpose of the Association as stated in the Complaint is:

**\*2** to represent its members ... to assure that public accommodation and commercial premises are accessible to and useable by its members in the future, to assure its members that they will not be excluded from participation in or be denied the benefits of the services, programs or activities of public accommodations, and to assure its members that they are not discriminated against because of their disabilities.

(Compl.¶ 2.) [FN2] The record does not contain any specifics about the activities in which the Association engages to promote its purpose.

> FN2. The omitted language is repetitive of the quoted language, and the court presumes that this redundancy is an error. More troubling, however, is Plaintiffs' failure to substantiate this stated purpose of the Association with any materials of

evidentiary quality. A party opposing summary judgment who bears the burden of proof on an issue cannot withstand summary judgment by merely resting on the pleadings. *See Celotex Corp. v. Catrett,* 477 U.S. 317, 322 (1986). Plaintiffs merely rest on their pleadings in an effort to establish the Association's purpose and activities. Defendant, however, compounds the problem by failing to object to the factual assertion regarding the Association's purpose. Despite the lack of objection, the court is reluctant to find a genuine issue based on the pleadings alone. Moreover, as discussed *infra*, it appears that the Association's purpose and activities as stated in the Complaint do not confer standing in the instant case.

The Association's president is Daniel Ruiz who is a paraplegic. His fiancee, Cheryl Price, is a quadriplegic and is sight impaired. Mr. Ruiz filed a complaint with the Association regarding Embassy Suites when he learned it did not have accessible guest rooms. The Association has incurred costs related to that complaint, including travel, lodging, per diem, filing fees, time off work for Ruiz's deposition, expert witness fees, and attorney's fees. Mr. Ruiz visited the Embassy Suites on January 29, 2001, the day before he was deposed in this lawsuit. This was the only time he had ever visited the hotel. He was unable to use the guest escalator to access the lobby and was instructed to use the service elevator.

Mr. Ruiz and Ms. Price have plans to visit Indianapolis next year to spend Thanksgiving with Mr. Brennan and his family. Mr. Ruiz would like to stay at the Embassy Suites in Indianapolis if the hotel is ADA compliant. He, however, has found a different hotel with which he feels comfortable.

Further background facts will be added as necessary.

*II. Plaintiffs' Motion to Strike*

Plaintiffs move to strike paragraphs 16, 18, 21, 24-30, 32-34, and 45-47 from the affidavit of Joseph Coursolle. They contend that Mr. "Coursolle lacks personal knowledge, or even proper expert opinion, of the factual matters recited in the paragraphs, there is no proper foundation for the opinions expressed in

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                                           Page 3
Not Reported in F.Supp.2d, 2001 WL 1112109 (S.D.Ind.)
**(Cite as: Not Reported in F.Supp.2d, 2001 WL 1112109)**

these paragraphs and that the paragraphs improperly contain conclusions that invade the province of the trier of fact."(Mot. Strike at 1.) In addition, Plaintiffs move to strike paragraphs 42 and 44, contending that the assertions therein are conclusory and lacking in factual support.

Defendant contends Mr. Coursolle has personal knowledge to attest to the statements in the challenged paragraphs based on his position as General Manager of Embassy Suites. Defendant indicates that Mr. Coursolle's statements are not intended to be expert testimony on the ADA's requirements but "speak [ ] only to the structure and accessibility of the Hotel that he manages."(Def.'s Resp. Pls.' Mot. Strike at 2.)

Affidavits submitted in support of a motion for summary judgment must meet Rule 56(e)'s requirements. *See, e.g., Adusumilli v. City of Chicago,* 164 F.3d 353, 359 (7th Cir.1998), *cert. denied,* 528 U.S. 988 (1999). Rule 56(e) mandates that "[s]upporting and opposing affidavits shall be made on personal knowledge, shall set forth such facts as would be admissible in evidence, and shall show affirmatively that the affiant is competent to testify to the matters stated therein."FED.R.CIV.P. 56(e); *see also O'Regan v. Arbitration Forums, Inc.,* 246 F.3d 975, 986 (7th Cir.2001) ("Affidavits must be based on personal knowledge")."[S]tatements outside the affiant's personal knowledge or statements that are the result of speculation or conjecture or merely conclusory do not meet this requirement."*Stagman v. Ryan,* 176 F.3d 986, 995 (7th Cir.), *cert. denied,* 528 U.S. 986 (1999).

**\*3** Paragraphs 16, 18, 21, 24-30, 32-34, and 45-47 of Mr. Coursolle's affidavit state as follows:

16. An Americans with Disabilities Act ("ADA") compliant ramp connects the passenger drop-off and loading areas to the 3rd Floor Main Entrance of the Hotel.

18. An ADA compliant TDD public telephone has been installed at this bank [the bank of three public telephones inside the 3rd Floor Main Entrance] of public telephones.

21. Appropriate signage is in place on the 3rd Floor Main Entrance identifying the service elevator as the

alternate access to the 4th Floor Lobby for mobility-impaired individuals who cannot use the escalators.

24. As part of those improvements [improvements made to the 4th Floor Lobby since January 2000], an ADA compliant Unisex Restroom was built to service the 4th Floor Lobby.

25. The Unisex Restroom contains all ADA compliant signage.

26. The Unisex Restroom dispensers are within the reach parameters prescribed by the ADA.

27. The Unisex Restroom has adequate clearance beneath the sinks in compliance with the ADA.

28. The Unisex Restroom has adequate maneuvering clearance and depth in compliance with the ADA.

29. The Unisex Restroom commode is raised in compliance with the ADA.

30. The Unisex Restroom commode has appropriate grab bars in compliance with the ADA.

32. The reservation desk was re-built with a lowered working surface that is ADA compliant.

33. Additionally, house phones have been lowered to comply with ADA reach parameters.

34. All doors on the 3rd Floor Main Entrance, the 4th Floor Lobby, and other public areas of the Hotel have adequate resistance and delay that is ADA compliant.

45. ADA compliant grab bars have been installed in the Pool Area shower room.

46. An ADA compliant seat has been installed in the Pool Area shower room.

47. An ADA compliant hand-held showerhead has been installed in the Pool Area shower room.

(Coursolle Aff.) (Emphasis in original).

Even assuming that Mr. Coursolle's statements are based on his personal knowledge, these statements

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2001 WL 1112109 (S.D.Ind.)
(Cite as: Not Reported in F.Supp.2d, 2001 WL 1112109)

present another problem: they are legal conclusions. Defendant offers these statements not only to prove that it attempted to comply with the ADA's requirements regarding ramps, signage and these other areas, but also to establish that it did in fact comply with the ADA's requirements in certain areas of the hotel and that Plaintiffs' claims relating to these areas are therefore moot. Yet, the affidavit does not establish any factual foundation upon which Mr. Coursolle can make legal conclusions regarding ADA compliance.

Defendant asserts that "By the nature of his position as General Manager of the Hotel, Mr. Coursolle is aware of the requirements and regulations governing his building, as well as the physical condition of his building and the facilities therein."(Def.'s Resp. Pls.' Mot. Strike at 2.) This assertion is unsupported by any statement in Mr. Coursolle's affidavit. Further, the fact that Mr. Coursolle has "knowledge of the internal workings of the Hotel" and is "custodian of the records of the Hotel" does not support a finding that he has personal knowledge of ADA requirements and regulations. Defendant's unsupported allegation fails to establish that Mr. Coursolle has a foundation for asserting whether any area of the Embassy Suites is in compliance with the ADA. The legal conclusions contained in paragraphs 16, 18, 21, 24-30, 32-34, and 45-47 of Mr. Coursolle's affidavit therefore should be stricken. *See, e.g., Schubert v. Nissan Motor Corp.,* 148 F.3d 25, 30 (1st Cir.1998); *Peck v. Horrocks Eng'rs, Inc.,* 106 F.3d 949, 956 (10th Cir.1997); *T.L. Swint Indus., Inc. v. Premiere Sales Group, Inc.,* 983 F.Supp. 772, 774 (N.D.Ill.1997); *Reno v. Consol. Rail Corp.,* 797 F.Supp. 700, 703 (S.D.Ind.1992).

**\*4** As for paragraphs 42 and 44 of Mr. Coursolle's affidavit, they state:

42. Any structural change to the Pool Area restrooms to increase maneuvering clearance would be expensive and significant, if not impossible.

44. Any structural change to the Pool Area sauna to increase maneuvering clearance would be expensive and significant, if not impossible.

These statements are merely conclusory and, therefore, are inadmissible. Mr. Coursolle makes no attempt to quantify the cost of the structural changes or explain why such changes would be significant, if not impossible. Indeed, Defendant does not directly respond to Plaintiffs' argument that these statements are mere conclusions.[FN3] These statements will therefore be disregarded by the court.

> FN3. Defendant seeks leave to file a sur-reply to Plaintiffs' reply to Defendant's response to Plaintiffs' motion to strike. Defendant states that its sur-reply is limited to alleged mischaracterizations and misrepresentations in Plaintiffs' reply. Plaintiffs' reply brief is very short-only 7 1/2 pages long-and the court is confident that it is capable of finding any mischaracterizations or misrepresentations therein. Therefore, Defendant's motion for leave to file a sur-reply is DENIED as the sur-reply is unnecessary.

Accordingly, Plaintiffs' motion to strike is GRANTED.

*III. Defendant's Motion To Strike Plaintiffs' Expert Disclosure and Expert Report And For Other Just And Equitable Relief*

Defendant contends that Plaintiffs' expert disclosure and expert report of Michael H. Brennan should be stricken for lack of compliance with the deadline for producing same set forth in the Case Management Plan ("CMP"). Defendant argues that the Plaintiffs' failure to timely provide their expert disclosure and report has prejudiced its ability to conduct discovery, including Mr. Brennan's deposition, as well as its ability to formulate Defendant's expert opinion. Defendant claims that Plaintiffs had no intention to disclose Mr. Brennan's report until the last moment before trial. Defendant seeks fees and costs incurred in bringing its motion to strike.

Plaintiffs respond by arguing that its expert disclosure information and a nine-page "extensive report together with 20 photographs" were provided Defendant before the expert disclosure deadline. Plaintiffs blame Defendant for the timing of the "second expert report" (the report upon which Plaintiffs rely in opposing Defendant's summary judgment motion) and claim substantial justification for submitting that report on April 16, 2001. Plaintiffs claim that report was to be based on an

Not Reported in F.Supp.2d                                                                                                      Page 5
Not Reported in F.Supp.2d, 2001 WL 1112109 (S.D.Ind.)
**(Cite as: Not Reported in F.Supp.2d, 2001 WL 1112109)**

inspection of the Embassy Suites and discovery responses provided by Defendant. Plaintiffs further blame Defendant for the timing of the site inspection and attacks the document production by Defendant. Finally, Plaintiffs argue that Defendant has suffered no harm from the timing of the second report.

*A. Background*

Plaintiffs filed their Complaint in this action on February 28, 2000. The parties filed their CMP on June 21, 2000, and the court approved same on July 14, 2000. The CMP provides that: "Plaintiff shall disclose the name, address and vita of all expert witnesses and shall provide the report required by Fed.R.Civ.P. 26(a)(2)(B) on or before November 30, 2000."(CMP at 4 ¶ V.E) (emphasis in original). Defendant's expert disclosure and Rule 26 report were due on or before January 1, 2001. (*Id.* at 4 ¶ V.F.) Discovery was to be completed by January 12, 2001, (*id.* at 4 ¶ V.A), and the deadline for filing dispositive motions was set for January 17, 2001. (*Id.* ¶ VI.B.) Pursuant to the CMP, "[t]he failure of counsel for any party to comply with the requirements of this plan may result in the imposition of sanctions, which could include the dismissal of the complaint or the entry of a default judgment."(*Id.* at 6.) The CMP was signed by counsel for all parties.

*5 On July 12, 2000, Plaintiffs provided their responses to Defendant's First Set of Interrogatories and First Request for Production of Documents to Plaintiff Michael H. Brennan. The answer to Interrogatory Number 9 identified Michael Hugh Brennan as an expert expected to testify on the following subject matter: "[a]ll of the allegations raised."(Pls.' Sur Reply, Ex. 1, Pls.' Resp. Def's First Set Interrog. to Pl. Michael H. Brennan, No. 9 at 11-12.)The answer indicated that the substance of the facts and opinions to which Mr. Brennan is expected to testify were: "[t]he requirements of the guidelines, the degree of non-compliance, and rationale for creating barriers."(*Id.*)"Prima facie evidence and personal experience" were given as the summary of the grounds for his opinions. (*Id.*) Plaintiffs indicated that Mr. Brennan had not prepared a report. (*Id.*)

Plaintiffs also provided Defendant with a nine-page report and two-page pictorial documentation prepared by Mr. Brennan. (*See* Pls.' Sur Reply, Ex. 2.) [FN4] The report lists 33 alleged violations of the ADA by the

Embassy Suites. (*Id.* at 1-2.)It states that the list "is not to be considered all-inclusive. Other components were not assessed such [as] any business center, meeting rooms, restaurants, or other public areas."(*Id.* at 2.) The report also lists various requirements for accessibility under the ADA. (*Id.* at 2-9.)

> FN4. During his subsequent deposition, Mr. Brennan testified that this report was a "preliminary report" not his expert report, and that he would be issuing an expert report which would be "quite detailed and expansive and much more complete than this preliminary report."(Brennan Dep. at 85.) He added, "You need to understand that preliminary report did not deal with all of the specific areas throughout the hotel."(*Id.*)

By letter dated October 11, 2000, Plaintiffs proposed a joint inspection of the premises. The letter states in pertinent part: "If the defendant is willing to discuss settlement, it would be my recommendation that plaintiff meet with defendant's expert for a joint inspection of the premises and a discussion of the different methods available to permit accessibility."(*Id.,* Ex. 3.) By letter dated October 13, 2000, Defendant advised Plaintiffs that "Claypool is not inclined to accept the Plaintiffs' proposal of a voluntary joint inspection of the subject real property."(*Id.,* Ex. 4.)

On or about November 1, 2000, in response to Defendant's Second Set Of Interrogatories to Michael H. Brennan, Interrogatory Number 2, Plaintiffs listed alleged architectural barriers at the Embassy Suites as related to Mr. Brennan's disabilities. (Pls.' Sur Reply, Exs. 5 & 6.)

By letter dated December 4, 2000, Plaintiffs provided Defendant with the names, addresses and qualifications of Plaintiffs' experts, including Michael H. Brennan. (*Id.,* Ex. 7.) [FN5] In response, on December 11, 2000, Defendant indicated that Plaintiffs' expert disclosure did not comply with Rule 26(a)(2) of the Federal Rules of Civil Procedure and requested said compliance on or before December 18, 2000. (*Id.,* Ex. 8 at 1.) Defendant also noted that it had not yet received any Request for Entry Upon Land for Inspection pursuant to Rule 34 and the only requests for inspection had been made informally and

Not Reported in F.Supp.2d                                                                                      Page 6
Not Reported in F.Supp.2d, 2001 WL 1112109 (S.D.Ind.)
(Cite as: Not Reported in F.Supp.2d, 2001 WL 1112109)

in the context of settlement discussions. (*Id.* at 2.)

> FN5. Exhibit 7 to Plaintiffs' Sur Reply is a letter, dated December 4, 2000, from Timothy L. Brennan, counsel for Plaintiffs, to Andrew W. Gruber, counsel for Defendant, which states that the qualifications of Plaintiffs' experts are enclosed. The qualifications are not, however, a part of Exhibit 7. The qualifications apparently were enclosed with the letter sent to defense counsel as his letter to Mr. Brennan, dated December 11, 2000, states "We are in receipt of your December 4, 2000 letters enclosing the qualifications for Plaintiffs' experts...." (Pls.' Sur Reply, Ex. 8 at 1.)

**\*6** On December 19, 2000, Plaintiffs again requested an informal inspection of the Embassy Suites. (Pls.' Sur Reply, Ex. 9.) Defendant responded by letter dated December 22, 2000, stating that it would not agree to an inspection absent formal discovery procedures. (*Id.,* Ex. 10.)

Defendant filed its <u>Rule 26(a)(2)</u> expert disclosure on January 2, 2001. No expert report is included in the filing.

Plaintiffs filed their <u>Rule 26(a)(2)</u> expert disclosure on January 3, 2001. Michael H. Brennan is identified as an expert who will provide an opinion "as to the defendant's violations of [the ADA]," (Pls.' Experts Designation at 1), and "the discriminatory practices of the defendant by failing to engage in readily achievable barrier removal and failure to make reasonable accommodations for individuals with disabilities."(*Id.* at 1-2 .)The designation identifies only generally the documents and materials to be relied upon by Plaintiffs' experts:

The experts will rely upon the following documents and materials in formulating their expert opinions: Plaintiffs' Complaint, Defendant's Answer, any and all exhibits identified on Plaintiffs' and Defendant's Final Exhibit List, any and all documents or materials produced in the course of discovery by either party, any and all interrogatory answers, transcripts of any and all depositions of either party, and/or defendant's proposed expert, and all documents or materials relied upon by the defendant's proposed expert, an on-site inspection of the subject real estate, and all photographs, diagrams, or other documents prepared from the on-site inspection.

(*Id.* at 2.) Mr. Brennan's curriculum vita is attached to the expert designation. (*Id.,* Ex. A.) The vita includes a listing of the cases and depositions in which he has testified as an expert. The vita does not state whether Mr. Brennan has authored any publications. Plaintiffs' expert disclosure does not include an expert report by Mr. Brennan.

On January 12, 2001, Plaintiffs moved for an enlargement of the discovery deadline through and including January 31, 2001, in order to, *inter alia,* file a motion for production of documents and request entry upon land for inspection under Rule 34. Magistrate Judge Godich granted the motion on January 17, 2001.

On January 24, 2001, Plaintiffs' provided Defendant with a Request and Notice for Entry Upon Land for Inspection and Other Purposes. (Pls.' Sur Reply, Ex. 12.) The request and notice were amended, and the inspection of the Embassy Suites was set for February 26, 2001. (*Id.,* Ex. 14.) Due to the illness of Plaintiffs' expert Mr. Brennan, the site inspection was rescheduled for March 6, 2001. (*Id.,* Exs. 20, 21, 22.)

On February 16, 2001, Defendant noticed the deposition of Plaintiffs' proffered expert, Michael H. Brennan, for March 6, 2001. (*Id.,* Ex. 17.) The subpoena commanded him to produce "any and all reports." (*Id.,* Ex. 18.) Mr. Brennan's deposition was rescheduled twice, finally being set for March 19, 2001. (*Id.,* Ex. 22.) The subpoena issued for the March 19th deposition also commanded Mr. Brennan to produce "any and all reports." (*Id.,* Ex. 23.)

**\*7** On March 6, 2001, Mr. Brennan conducted an inspection of the Embassy Suites, pursuant to Plaintiffs' Rule 34 request for entry upon land. (Brennan Aff. ¶ 3.) According to Plaintiffs, he was accompanied by defense counsel as well as Joseph Courselle and other Embassy Suites management personnel, and the inspection included areas in the third floor main entrance, fourth floor lobby, pool and spa area, restaurant, common areas, fifth floor meeting rooms and accessible guest rooms.

Mr. Brennan's deposition ultimately was taken on

Not Reported in F.Supp.2d                                                    Page 7
Not Reported in F.Supp.2d, 2001 WL 1112109 (S.D.Ind.)
**(Cite as: Not Reported in F.Supp.2d, 2001 WL 1112109)**

March 19, 2001. He did not produce his expert report at his deposition, apparently because it had not yet been completed. Counsel inquired at the deposition when Mr. Brennan would complete his expert report:

Q. So when do you expect to have your expert report completed?

A. Oh, probably the day before trial.

Q. When?

A. Probably the day before trial.

(Brennan Dep. at 85.) [FN6]At his deposition, Mr. Brennan produced a document which was referenced as a "preliminary" report. It was the same nine-page report previously provided by Plaintiffs.

> FN6. Defendant also relies on subsequent deposition testimony of Mr. Brennan, but the cited portions of that deposition were not provided to the court. The motion to strike states that Exhibits A through G are attached, but the original filed with the court has no exhibits attached. Page 85 of Mr. Brennan's deposition is, however, attached to Defendant's reply brief as part of Exhibit C. In addition, some of the exhibits relied upon by Defendant are included in the exhibits attached to Plaintiffs' Sur Reply To Defendant's Reply To Plaintiffs' Response To Defendant's Motion For Summary Judgment.

On March 28, 2001, Mr. Brennan began preparing a Preliminary Expert Report concerning the Embassy Suites compliance with Title III of the ADA. (Brennan Aff. ¶ 4.) He provided a first draft of the report to Plaintiffs' counsel on April 5, 2001, and he completed his report and delivered it to Plaintiffs' counsel on April 13, 2001. (*Id.* ¶¶ 9, 10.)

In response to Defendant's motion for summary judgment, Plaintiffs rely in part on a document identified as "Embassy Suites Expert Report-3/28/01."(See Brennan. Aff. ¶¶ 6-7 & Ex. 1.) This report is more than 30 pages long and identifies 177 alleged barriers at the Embassy Suites. Proposed corrections are given for each alleged barriers. For most of the alleged barriers citation to and the requirements of the Americans with Disability Act Access Guidelines ("ADAAG"), Appendix A of 28 C.F.R. § 36 also are provided. The report contains 100 pictures of alleged noncompliance with the ADA. Defendant represents that it did not see this report at any time before the filing of Plaintiffs' response to the summary judgment motion.

*B. Discussion*

Rule 26(a)(2) of the Federal Rules of Civil Procedure, which governs disclosure of expert testimony, provides in pertinent part: "[A] party shall disclose to other parties the identity of any person who may be used at trial to present evidence under Rules 702, 703, or 705 of the Federal Rules of Evidence."FED.R.CIV.P. 26(a)(2)(A). Unless otherwise provided, a Rule 26(a)(2) expert disclosure "shall ... be accompanied by a written report prepared and signed by the witness."FED.R.CIV.P. 26(a)(2)(B). The rule sets forth six requirements for the report:

The report shall contain a complete statement of all opinions to be expressed and the basis and reasons therefor; the data or other information considered by the witness in forming the opinions; any exhibits to be used as a summary of or support for the opinions; the qualifications of the witness, including a list of all publications authored by the witness within the preceding ten years; the compensation to be paid for the study and testimony; and a listing of any other cases in which the witness has testified as an expert at trial or by deposition within the preceding four years.

**\*8**FED.R.CIV.P. 26(a)(2)(B); *see also Sherrod v. Lingle,* 223 F.3d 605, 611 (7th Cir.2000); *Ruhland v. Walter Kidde Portable Equip.,* 179 F.R.D. 246, 249 (W.D.Wis.1998).Rule 26 further provides that "[t]hese disclosures shall be made at the times and in the sequence directed by the court."FED. R. CIV. P. 26(a)(2)(C). The CMP provides that: "Plaintiff ... shall provide the report required by Fed.R.Civ.P. 26(a)(2)(B) on or before November 30, 2000."(CMP at 4 ¶ V.E) (emphasis in CMP)."The expert witness discovery rules are designed to aid the court in its fact-finding mission by allowing both sides to prepare their cases adequately and efficiently and to prevent the tactic of surprise from affecting the

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

outcome of the case."*Sherrod,* 223 F.3d at 613;*see also*FED.R.CIV.P. 26(a)(2) advisory committee's note (stating that the duty to disclose expert testimony is intended to give opposing parties "a reasonable opportunity to prepare for effective cross examination and perhaps arrange for expert testimony from other witnesses").

Rule 37(c)(1) provides an incentive for compliance with the expert disclosure requirements of Rule 26(a). That rule provides:

A party that without substantial justification fails to disclose information required by Rule 26(a) or 26(e)(1), or to amend a prior response to discovery as required by Rule 26(e)(2), is not, unless such failure is harmless, permitted to use as evidence at a trial ... or on a motion any witness or information not so disclosed.

FED.R.CIV.P. 37(c)(1). The rule authorizes the court to require the payment of reasonable expenses including attorney's fees, caused by such failure. *Id.*"The sanction of exclusion is 'automatic and mandatory unless the party to be sanctioned can show that its violation of Rule 26(a) was either justified or harmless.' " *NutraSweet Co. v. X L Eng'g Co.,* 227 F.3d 776, 785-86 (7th Cir.2000) (quoting *Finley v. Marathon Oil Co.,* 75 F .3d 1225, 1230 (7th Cir.1996)); *Miksis v. Howard,* 106 F.3d 754, 760 (7th Cir.1997). A district court's decision to exclude expert witness testimony as a sanction is reviewed for an abuse of discretion. *See Sherrod,* 223 F.3d at 612;*Miksis,* 106 F.3d at 760. However, "where exclusion necessarily entails dismissal of the case, the sanction 'must be one that a reasonable jurist, apprised of all the circumstances, would have chosen as proportionate to the infraction.' " *Sherrod,* 223 F.3d at 612 (quoting *Salgado by Salgado v. Gen. Motors Corp.,* 150 F.3d 735, 740 (7th Cir.1998)).

Plaintiffs argue Defendant's motion to strike should be denied for failure to comply with Local Rule 37.1, which provides:

The Court may deny any discovery motion ... unless counsel for the moving party files with the Court, at the time of filing the motion, a separate statement showing that the attorney making the motion has made a reasonable effort to reach agreement with the opposing attorney(s) on the matter(s) set forth in the

motion.

**\*9** S.D. IND. L.R. 37.1. That Defendant's motion is a discovery motion subject to Rule 37.1 is not without doubt. *See 1st Source Bank v. First Res. Fed. Credit Union,* 167 F.R.D. 61, 64 (N.D.Ind.1996) (concluding that similar local rule was inapplicable to motion in limine to exclude expert testimony where expert's report was not disclosed in compliance with FED.R.CIV.P. 26(a)(2)). Assuming that Local Rule 37.1 applies in the instant situation, however, whether to deny a motion for noncompliance with the rule is within the court's discretion. As the rule itself states, the court "may" deny a discovery motion if unaccompanied by a separate statement; the court is not required to deny such a motion.

Denial of Defendant's motion to strike for noncompliance with Local Rule 37.1 would be inappropriate under the circumstances of this case. Defendant moves to strike the expert report of Mr. Brennan which report was filed and relied upon by Plaintiffs in responding to Defendant's pending summary judgment motion. Defendant had no need to move to strike that report until Plaintiffs attempted to rely on it in opposing the dispositive motion.[FN7] The court is at a loss as to what agreement the parties could make regarding Mr. Brennan's expert report at this stage of the proceedings. Without that report Plaintiffs likely cannot establish a prima facie case of discrimination, thus entitling Defendant to summary judgment. Defendant has every incentive to move to strike the report as untimely and Plaintiffs have no incentive to reach a compromise as they need the report in evidence. Any efforts to reach agreement on this matter would be doomed to failure from the start. Therefore, the court finds that any lack of compliance with Local Rule 37.1 by Defendant should be excused.

> FN7. It is noted that Plaintiffs argue that Defendant failed to timely provide an expert report from its expert, Robert Taylor. That may be so, but Defendant is not attempting to use any expert report as evidence in support of its summary judgment motion. Defendant's noncompliance with the deadlines for expert disclosures is not before the court at this time.

Plaintiffs argue that they complied with Rule 26(a)(2)

Not Reported in F.Supp.2d                                                                                        Page 9
Not Reported in F.Supp.2d, 2001 WL 1112109 (S.D.Ind.)
**(Cite as: Not Reported in F.Supp.2d, 2001 WL 1112109)**

and the CMP by providing the name, address and vita of Expert Brennan as well as his expert report before the November 30 deadline. They point to their July 12, 2000 interrogatory answers, the nine-page preliminary report with 20 pictures, and discovery responses listing alleged access barriers at the Embassy Suites. Neither Rule 26(a)(2) nor the CMP contemplates that a party will be required to cull through various discovery responses and other documents in order to piece together the opposing party's Rule 26(a)(2) expert disclosures. If that were the case, then Rule 26(a)(2)'s disclosure requirements would be totally unnecessary. As another district judge faced with a like argument has observed: "There is no merit to plaintiffs' contention that a jumble of documents sent to an opposing party may be construed together to satisfy these requirements."*Ruhland v. Walter Kidde Portable Equip., 179 F.R.D. 246, 249 (W.D.Wis.1998)*. Furthermore, even when all these documents and things are considered together, they still fail to satisfy Rule 26(a)(2)(B)'s requirements. They do not constitute a complete statement of all opinions to be expressed by Mr. Brennan and the basis and reasons therefor. The nine-page report itself states that it "is not to be considered all-inclusive."Though these documents may list some of the data and information relied upon by Mr. Brennan in reaching his opinions, they do not list all such data or other information. Nor do they list his qualifications, a list of publications authored by him within the last ten years, the compensation to be paid him, or a listing of other cases in which he has testified as an expert at trial or by deposition within the preceding four years.

**\*10** Plaintiffs next argue that their failure of compliance with the expert disclosure deadline, if any, was due to substantial justification, namely, Defendant's lack of cooperation in allowing an inspection by Mr. Brennan and Defendant's alleged tactics in responding to discovery requests. As for the former, Plaintiffs ignore the facts that they are the ones that initiated this lawsuit, that they should have known as early as February 28, 2000, when the Complaint was filed that an expert inspection of the Embassy Suites would be necessary or at least desirable,[FN8] and they certainly were aware of this back on October 11, 2000, when they made their first informal request to inspect the property. Though informal efforts to obtain discovery are commendable-yet it is noted that these efforts were couched in terms of settlement-once Defendant

advised Plaintiffs of its position regarding such an inspection, nothing prevented Plaintiffs from serving a Rule 34 request to permit entry upon land for the purpose of inspection. Defendant promptly (on October 13) advised Plaintiffs of its declination to agree to each informal request for an inspection. Thus, sometime before the November 30 expert disclosure deadline Plaintiffs had to have become aware that they would not be able to meet that deadline as their expert had not yet inspected the Embassy Suites.

> FN8. Plaintiff Mr. Brennan who has testified as an expert in other litigation under the ADA surely could have anticipated the need or at least benefit of having expert testimony on Plaintiffs' behalf.

Yet, Plaintiffs waited over two months before again requesting an informal inspection of the hotel and inexplicably waited until January 24, 2001, to make a Rule 34 request. Nothing prevented them from making a Rule 34 request much earlier in time and long before the November 30 deadline. Another district judge in the Seventh Circuit has rejected a party's attempt to blame the opposing party for the former's noncompliance with an expert disclosure deadline under similar circumstances. *See Ruhland, 179 F.R.D. at 249-50* (rejecting argument that noncompliance with expert report requirements was due to parties' disagreement over necessary testing of fire extinguisher alleged to have been defective, stating that plaintiffs would have realized they could not meet the deadline for expert disclosures before expiration of same and should have moved for an order compelling testing of the fire extinguisher before the deadline expired). The delay in conducting the inspection was not the Defendant's fault.[FN9]Plaintiffs should have made their Rule 34 request for inspection before expiration of the deadline for their expert disclosure. Moreover, even when it became apparent that Plaintiffs would not meet the expert disclosure deadline, Plaintiffs failed to request an extension of that deadline.

> FN9. The court notes that some of the delay during late February and March 2001-after Plaintiffs' finally made a Rule 34 request-was through no one's fault. The initial delay, however, in seeking a Rule 34 inspection falls squarely on Plaintiffs' shoulders.

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

As for the attempt to pass the blame onto Defendant on the basis of discovery tactics, Plaintiffs have made no effort whatsoever to establish that the documents provided by Defendant were not provided as kept in the usual course of business, as expressly permitted under <u>Rule 34 of the Federal Rules of Civil Procedure</u>.[FN10] Nor do Plaintiffs attempt to support their allegation that the documents were provided in a manner so as to obfuscate discovery. Plaintiffs' unsupported allegations do not establish that Defendant is to blame for Plaintiffs' failed compliance with the expert disclosure requirements.

> FN10. <u>Rule 34</u> provides: "A party who produces documents for inspection shall produce them as they are kept in the usual course of business or shall organize and label them to correspond with the categories in the request." <u>FED.R.CIV.P. 34(b)</u>.

**\*11** Plaintiffs offer the explanation that at his deposition Mr. Brennan knew the May 7, 2001, trial setting would be continued to allow sufficient time for briefing and ruling on the summary judgment motion. They argue that when he said he would provide the report on May 6, 2001, he knew it would be provided "well in advance of the new trial date."(Pls.' Resp. Def.'s Mot. Strike Pl .'s Expert Disclosure & Expert Report at 17.) Mr. Brennan must be clairvoyant. Plaintiffs had not even moved to continue the trial date at the time of Mr. Brennan's deposition. Not even the court knew that the trial setting would be continued until after Mr. Brennan's deposition. It was not until April 16, 2001, that Plaintiffs filed their motion to continue that trial setting. The motion was granted April 19, 2001. Mr. Brennan's remarks at his deposition about when he would complete his expert report are particularly troubling because he is not only proffered as an expert but also is a plaintiff in this case.

In a last ditch effort, Plaintiffs contend that Mr. Brennan's report is admissible as lay opinion testimony under <u>Rule 701 of the Federal Rules of Evidence</u>. This is unconvincing. Mr. Brennan's report clearly is based on specialized knowledge within the scope of <u>Rule 702</u>, that is, specialized knowledge of ADA accessibility requirements. *<u>Guzman v. Denny's, Inc.,</u>* <u>40 F.Supp.2d 930, 936 (S.D.Ohio 1999)</u>, cited by Plaintiffs, does not directly address whether expert

testimony is unnecessary to establish a prima facie case of discrimination under Title III of the ADA. *Guzman* is of no benefit to Plaintiffs' arguments here.

Plaintiffs complain that the "second expert report" was completed without the benefit of Defendant's most recent discovery responses, but Plaintiffs make no effort to explain how these recent responses would impact the expert report. And, since the second expert report was completed before Defendant provided the most recent discovery responses, it is hard to imagine how that report was dependent upon any information provided only in those discovery responses. Likewise, it is difficult to comprehend how the timing of the most recent discovery responses and document disclosure caused additional delay in preparing the "second expert report".

Plaintiffs argue that even if they failed to disclose their expert information as required by <u>Rule 26(a)(2)</u>, such failure was harmless. This argument relates to the automatic sanction of <u>Rule 37(c)(1)</u>. Plaintiffs do not address directly the provision in the CMP which allows for the imposition of sanctions upon failure "to comply with the requirements of this plan...." A showing of harm to the opposing party is not a prerequisite for the imposition of sanctions under the CMP. Sanctions may be imposed irrespective of harm to the opposing party in order to encourage compliance with the court's orders and CMPs. *See <u>Ruhland,</u>* <u>179 F.R.D. at 250</u> ("regardless whether defendant was actually harmed by plaintiff's error, a sanction is warranted to encourage adherence to pretrial conference orders"). Even if the automatic sanction under <u>Rule 37(c)(1)</u> were not appropriate here, a sanction for disregard of the CMP's deadlines would be justified under the circumstances.

**\*12** In arguing that their failure to comply with <u>Rule 26(a)(2)</u>'s requirements was harmless, Plaintiffs state that Defendant had Mr. Brennan's nine-page report and photographs based on a November 1999 inspection of the Embassy Suites, "extensive information through discovery responses as to the scope of Michael Brennan's testimony," (Pls.' Resp. Def.'s Mot. Strike Pls.' Expert Disclosure at 15), had conducted Mr. Brennan's deposition, and defense counsel and other representatives of Defendant accompanied Mr. Brennan on his March 2001 inspection. Plaintiffs claim that Defendant chose when to file its motion for summary judgment and

note that when they filed their response to Defendant's motion for summary judgment, they moved to reschedule the trial date, but Defendant objected to continuing the trial and did not seek additional time within which to reply to Plaintiffs' response to the summary judgment motion.

The court disagrees with the claim that Plaintiffs' failure to comply with the expert disclosure requirements was harmless. The setting of the expert disclosure deadline before the dispositive motion deadline was not without a purpose. This is reflected, in part, in Defendant's summary judgment motion which challenges Plaintiffs' ability to prove a prima facie case of discrimination due to the lack of an expert report regarding whether the removal of alleged barriers is "readily achievable". Moreover, Mr. Brennan's nine-page report and photographs from the November 1999 inspection, discovery responses, and other discovery cited by Plaintiffs do not satisfy all the requirements of a <u>Rule 26(a)(2)(B)</u> expert report. If it were true that all the information required by <u>Rule 26(a)(2)</u> was provided in that nine-page report, the two pages of photographs, and other discovery, then the cost to Plaintiffs in complying with the Rule and the CMP was marginal. As Judge Crabb said in a similar case: "It is evidence that with little expense and proper diligence, plaintiffs could have complied ... and avoided what seems to be an otherwise draconian sanction."<u>Ruhland, 179 F.R.D. at 250-51</u>. True, to an extent, Defendant chose when to file its summary judgment motion, but Defendant has a right to ask the court to enforce the requirements of <u>Rule 26(a)(2)</u> and the CMP expert disclosure deadline.

The court finds that Plaintiffs have not shown that its violation of <u>Rule 26(a)(2)</u> was either justified or harmless. Plaintiffs' failure of compliance deprived Defendant of a reasonable opportunity to rebut Mr. Brennan's expert testimony with that of its own expert witness. It appears, from Mr. Brennan's comments, that Plaintiffs had no intention of providing Defendant a reasonable amount of time within which to respond to the expert report. Instead, Plaintiffs flagrantly disregarded the expert disclosure deadline and requirements of <u>Rule 26(a)(2)(B)</u>. Even if the violation were justified or harmless, however, the court would sanction Plaintiffs under the CMP. Accordingly, the court finds that Defendant's motion to strike Plaintiffs' Expert Disclosure and Report

should be GRANTED. Plaintiffs' Expert Disclosure for Michael Brennan is STRICKEN and Plaintiffs are prohibited from using that expert testimony in this matter. Mr. Brennan's expert report filed with the Plaintiffs' response to Defendant's motion for summary judgment is also STRICKEN from the record as inadmissible evidence. This is sanction enough. Defendant's request for attorneys' fees and costs incurred in bringing their motion to strike is DENIED.

*IV. Defendant's Motion for Summary Judgment*

**\*13** Defendant moves for summary judgment, contending that Plaintiffs' lack standing to bring this action; their claims are moot; they are estopped from bringing their claims; and they are unable to establish a prima facie case with respect to the removal of the alleged barriers at the Embassy Suites. Plaintiffs oppose the motion.

*A. Summary Judgment Standard*

Summary judgment is proper only if the record shows "that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law."<u>FED. R. CIV. P . 56(c)</u>; *see* <u>*Celotex Corp. v. Catrett,* 477 U.S. 317, 322 (1986)</u>. The moving party bears the burden of informing the court of the basis for its motion and demonstrating the "absence of evidence on an essential element of the nonmoving party's case,"<u>*Celotex Corp .,* 477 U.S. at 323, 325</u>. To withstand a motion for summary judgment, the non-moving party may not simply rest on the pleadings, but rather must "make a showing sufficient to establish the existence of [the] element[s] essential to that party's case, and on which that party will bear the burden of proof at trial...."<u>*Celotex Corp.,* 477 U.S. at 322</u>. If the non-moving party fails to make this showing, then the moving party is entitled to judgment as a matter of law. <u>*Celotex Corp.,* 477 U.S. at 323</u>.

In determining whether a genuine issue of material fact exists, the court must view the record and all reasonable inferences in the light most favorable to the non-moving party. <u>*Nat'l Soffit & Escutcheons, Inc. v. Superior Sys., Inc.,* 98 F.3d 262, 264 (7th Cir.1996)</u>. No genuine issue exists if the record viewed as a whole could not lead a rational trier of

Not Reported in F.Supp.2d                                                                                     Page 12
Not Reported in F.Supp.2d, 2001 WL 1112109 (S.D.Ind.)
**(Cite as: Not Reported in F.Supp.2d, 2001 WL 1112109)**

fact to find for the nonmoving party. *See Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 587 (1986); *Ritchie v. Glidden Co.,* 242 F.3d 713, 720 (7th Cir.2001).* When ruling on a motion for summary judgment, the court cannot make credibility determinations, weigh the evidence or draw inferences from the evidence. *See Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 255 (1986); *Freeman v. Madison Metro. Sch. Dist.,* 231 F.3d 374, 379 (7th Cir.2000).

*B. Standing*

The court must first consider whether Plaintiffs have standing to bring this action. Defendant contends Plaintiffs lack standing to bring this action under Title III of the ADA and, consequently, their Complaint should be dismissed. Plaintiffs argue they do have standing. The party invoking the court's jurisdiction bears the burden of proving standing. *See Lujan v. Defenders of Wildlife,* 504 U.S. 555, 561 (1992); *Perry v. Village of Arlington Heights,* 186 F.3d 826, 829 (7th Cir.1999).* When standing is challenged on a factual basis, the party asserting standing must demonstrate standing with "competent proof" which requires a showing by a preponderance of the evidence. *See, e.g., Perry,* 186 F.3d at 829. Standing must exist at the time an action is commenced. *See Lujan,* 504 U.S. at 569-70 n.4 ("The existence of federal jurisdiction ordinarily depends on the facts as they exist when the complaint is filed."); *Perry,* 186 F.3d at 830.

*1. The Association*

**\*14** An organization has standing to sue under the ADA if it meets Article III's standing requirements. *See, e.g., Innovative Health Sys., Inc. v. City of White Plains,* 117 F.3d 37, 48 (2nd Cir.1997); *Access Living of Metro. Chicago v. Chicago Transit Auth.,* No. 00-C-0770, 2001 WL 492473, at *2-3 (N.D.Ill. May 9, 2001).* An organization may have standing to sue in its own right (organizational standing) or as a representative of its members (representational standing).*See Access Living,* 2001 WL 492473, at *3.

In *Havens Realty Corporation v. Coleman,* 455 U.S. 363 (1982), the Supreme Court held that an organization has standing to sue based on its own right if the organization has suffered a "concrete and demonstrable injury to the organization's

activities".*Id.* at 379.The plaintiff in *Havens Realty,* a non-profit organization, challenged under the Fair Housing Act the alleged racial steering practices of a realtor. *Id.* at 366-68.The organization's purpose was "to make equal opportunity in housing a reality."*Id.* at 368.It operated a housing counseling service and referral services for low and moderate income homeseekers. *Id.* The organization alleged that it had to devote its resources to fighting the defendant's racially discriminatory practices which frustrated its efforts to provide counseling and referral services. The Court found the organization suffered a "concrete and demonstrable injury to the organization's activities-with the consequent drain on the organization's resources...."*Id.*Thus, under *Havens Realty,* an organization suffers a concrete and demonstrable injury if it diverts its resources such as time and money from its primary activities to legal efforts to fight alleged discrimination by the defendant. *See Gorski v. Troy,* 929 F.2d 1183, 1189 (7th Cir.1991); *Village of Bellwood v. Dwivedi,* 895 F.2d 1521, 1526 (7th Cir.1990); *Access Living,* 2001 WL 492473, at *4 (finding organization had standing where it devoted time to fighting discrimination by defendant which would otherwise have been spent providing services to the disabled).

Plaintiffs claim that the Association has suffered an injury in fact as it had to divert resources from other areas of advocacy to investigate the Embassy Suites and address the needs of disabled individuals in Indiana. But Plaintiffs have not come forward with evidence to support this claim. They do not point to any evidence in the record to establish the Association's purpose or its activities. Nor do they attempt to show how Defendant's alleged discrimination frustrates the Association's achievement of its purpose or pursuit of its activities. Rather, from the Complaint's allegations, it appears that the Association's purpose is to pursue legal action directed against alleged disability discrimination, and the Association's activities are limited to legal activities. There is no suggestion that the Association provides any counseling or referral type services.

**\*15** This case is therefore similar to *Plotkin v. Ryan,* No. 99 C 53, 1999 WL 965718 (N.D.Ill. Sept. 29, 1999), *aff'd,*239 F.3d 882 (7th Cir.2001), in which the district court held that the plaintiff association, the Better Government Association ("BGA"), lacked

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                                                          Page 13
Not Reported in F.Supp.2d, 2001 WL 1112109 (S.D.Ind.)
**(Cite as: Not Reported in F.Supp.2d, 2001 WL 1112109)**

standing to sue in its own right under 42 U.S.C. § 1983. The BGA's stated primary purpose was "to expose and correct election fraud and corruption on the part of government officials." *Id.* at \*5. The BGA had three programs to achieve that purpose, including an investigative program, used to expose government waste and corruption. *Id.* BGA claimed injury from the time and money expended in monitoring and investigating the defendants' conduct, which it claimed impaired its ability to address other public interest issues. In concluding that the BGA lacked standing in its own right, the district court reasoned that though the BGA's investigation into the defendants' conduct may have diverted resources into the investigative program from other programs, it was not alleged that the defendant's conduct impaired BGA's ability to perform its work. *Id.* The court further explained that "BGA cannot convert its ordinary programming costs into an injury in fact ."*Id.* This reasoning is persuasive.

As it appears that the Association's purpose and activities are the pursuit of litigation directed against alleged discrimination in public accommodations, the Association's participation in the instant case does not impair the Association's ability to do its work; rather, it is the very work of the Association to litigate alleged discrimination in violation of the ADA. Therefore, the Association's participation in this action and expenditure of resources is insufficient to constitute a concrete and demonstrable injury to its activities. Plaintiffs have not carried their burden of demonstrating the Association's organizational standing.

As for representational standing, "[a]n association has standing to bring suit on behalf of its members when its members would otherwise have standing to sue in their own right, the interests at stake are germane to the organization's purpose, and neither the claim asserted nor the relief requested requires the participation of individual members in the lawsuit."*Friends of the Earth, Inc. v. Laidlaw Envtl. Servs. (TOC), Inc.,* 528 U.S. 167, 181 (2000) (citation omitted). Defendant contends that none of the Association's members have standing to sue in their own right because none of them have suffered an injury in fact.

To demonstrate Article III standing, a party invoking the court's jurisdiction must prove three elements: (1)

he has suffered an "injury in fact", that is, "an invasion of a legally protected interest which is (a) concrete and particularized; and (b) actual or imminent, not conjectural or hypothetical,"*Lujan v. Defenders of Wildlife,* 504 U.S. 555, 560 (1992) (quotation and citations omitted); *see also Friends of the Earth,* 528 U.S. at 180; (2) a causal connection between the injury and complained of conduct, that is, "the injury has to be fairly ... trace[able] to the challenged action of the defendant, and not ... th[e] result [of] the independent action of some third party not before the court,"*Lujan,* 504 U.S. at 560;*see also Friends of the Earth,* 528 U.S. at 180; and (3) it is likely the injury will be "redressed by a favorable decision." *Lujan,* 504 U.S. at 561 (quotation omitted); *see also Friends of the Earth,* 528 U.S. at 181. The Seventh Circuit has described these Article III standing requirements as "undemanding." *United States v. 5 S 351 Tuthill Rd., Naperville, Ill.,* 233 F.3d 1017, 1022 (7th Cir.2000), *as amended on denial reh'g; Family & Children's Ctr., Inc. v. Sch. City of Mishawaka,* 13 F.3d 1052, 1058 (7th Cir.1994). Defendant challenges Plaintiffs' proof of the first element only and, indeed, only the existence of that element is open to question.

**\*16***Lujan* presented the issue of whether environmental groups had standing to challenge a regulation promulgated under the Endangered Species Act which made the Act applicable only within the United States or on the high seas. 504 U.S. at 557. The Court considered whether the plaintiffs demonstrated an injury in fact. *Lujan,* 504 U.S. at 562-63. They attempted to do so with two affidavits. They first stated the affiant had traveled to Egypt to observe the native habitat of the endangered Nile crocodile and intended to return. They second stated that the affiant had traveled to Sri Lanka to observe the habitat of endangered species and intended to return, but had no current plans to return. *Id.* at 563-64.The Court concluded that the affidavits failed to demonstrate an injury in fact because the intent to return to places visited before was insufficient to establish actual or imminent injury. *Id.* at 564.The Court said: "Such 'some day' intentions-without any description of concrete plans, or indeed even any speculation of *when* the some day will be-do not support a finding of the 'actual or imminent' injury that our cases require."*Id.* (Emphasis in original). In his concurrence, Justice Kennedy specifically references the purchase of an airline ticket *or* announcement of a "date certain upon which [the

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                                                           Page 14
Not Reported in F.Supp.2d, 2001 WL 1112109 (S.D.Ind.)
**(Cite as: Not Reported in F.Supp.2d, 2001 WL 1112109)**

affiants] will return" as evidence sufficient to establish standing. *Lujan,* 504 U.S. at 579 (Kennedy, J., concurring). Thus, announcement of a date certain for return seems to be on par with the purchase of an airline ticket or reservation in terms of establishing a concrete plan to return.

Furthermore, when a plaintiff seeks prospective injunctive relief, as Plaintiffs do here,[FN11] he or she must show a "real and immediate threat" of injury. *See City of Los Angeles v. Lyons,* 461 U.S. 95, 103-04 (1983); *Sierakowski v. Ryan,* 223 F.3d 440, 443-44 (7th Cir.2000). In other words, such a plaintiff "must show a significant likelihood and immediacy of sustaining some direct injury."*Sierakowski,* 223 F.3d at 443 (citations omitted); *see Lyons,* 461 U.S. at 101. Past wrongs may be evidence of a real and immediate threat of injury, but "[p]ast exposure to illegal conduct does not in itself show a present case or controversy regarding injunctive relief, however, if unaccompanied by any continuing, present adverse effects."*O'Shea v. Littleton,* 414 U.S. 488, 495-96 (1974); *see Lyons,* 461 U.S. at 102;*Sierakowski,* 223 F.3d at 445.

> FN11. The only remedy available to a private plaintiff suing under Title III of the ADA is injunctive relief. 42 U.S.C. § 12188(a)(1); 28 C.F.R. § 36.501; 28 C.F.R. § 36.504. Plaintiffs seek permanent injunctive relief in addition to an award of attorney's fees, costs and expenses pursuant to 42 U.S.C. § 12205.

Relying on *Steger v. Franco, Inc.,* 228 F.3d 889 (8th Cir.2000), Defendant argues the Association must prove that one of its members has present plans to visit the Embassy Suites in the imminent future, but that the Association has no such evidence. In *Steger,* the plaintiffs, disabled individuals, sued the defendant under Title III of the ADA to bring one of its buildings into compliance with the ADA. The building contained office space for health care providers and other retail and service establishments, including a retail brokerage firm and coffee shop. The district court dismissed their claims for lack of standing. *See*228 F.3d at 891. In considering the standing issue, the Eighth Circuit explained that ADA plaintiffs "need not engage in the 'futile gesture' of visiting a building containing known barriers that the owner has no intention of

remedying...."*Id.* at 892 (citing 42 U.S.C. § 12188(a)(1)).[FN12] The court concluded that proof of an intent to return to the place of injury "some day" is insufficient to establish standing, *id.* at 893; rather, a plaintiff must prove "knowledge of the barriers" and that he or she "would visit the building in the imminent future but for those barriers."*Steger,* 228 F.3d at 892 (citing *Friends of the Earth, Inc. v. Laidlaw Envtl. Servs., Inc.,* 528 U.S. 167, [181-83], 120 S.Ct. 693, 704-06 (2000)). The Eighth Circuit held that the plaintiffs lacked standing to sue under the ADA because there was no evidence of their knowledge of the building's barriers or their likelihood to visit the building in the imminent future. *Steger,* 228 F.3d at 893. That they "may" enter the building in the future was insufficient. *Id.* The Eighth Circuit is the only circuit of which this court is aware to have addressed in a published opinion the standing requirement in the ADA's Title III context.[FN13]

> FN12. This "futile gesture" provision states: "Nothing in this section shall require a person with a disability to engage in a futile gesture if such person has actual notice that a person or organization covered by this subchapter does not intend to comply with its provisions."42 U.S.C. § 12118(a)(1).

> FN13. The Second Circuit addressed the issue in an unpublished opinion in *Freydel v. New York Hospital,* No. 00-7108, 242 F.3d 365, 2000 WL 1836755 (2nd Cir. Dec. 13, 2000), holding that the plaintiff lacked standing to sue as she failed to demonstrate the likelihood that she would suffer future injury. *Id.* at *6.

**\*17** Plaintiffs maintain that to establish standing under Title III of the ADA, a plaintiff must show that the facility at issue violates the ADA and that it is likely he or she will visit the facility in the relatively near future if the violation is corrected, citing *Parr v. L & L Drive-Inn Restaurant,* 96 F.Supp.2d 1065 (D.Haw.2000); *Independent Living Resources v. Oregon Arena Corp.,* 982 F.Supp. 698 (D.Or.1997), supplemented by1 F.Supp.2d 1159 (D.Or.1998), and *Johanson v. Huizenga Holdings, Inc.,* 963 F.Supp. 1175 (S.D.Fla.1997). Plaintiffs urge that they need not establish concrete plans to use a facility or a date certain they intend to use the facility, again citing *Parr, Independent Living Resources* and *Johnson.*

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                                              Page 15
Not Reported in F.Supp.2d, 2001 WL 1112109 (S.D.Ind.)
**(Cite as: Not Reported in F.Supp.2d, 2001 WL 1112109)**

In *Independent Living Resources,* the plaintiffs, a disabled individual and a non-profit organization organized to promote the rights and needs of the disabled, sued a company that built, owned and operated an indoor arena. 982 F.Supp. at 706. One of the claims alleged related to accessibility of the arena's executive suites under Title III of the ADA. The defendant challenged the plaintiffs' standing to raise this claim. *Id.* at 758.In a footnote, and without analyzing whether plaintiffs established an injury-in-fact, the judge expressed his satisfaction that the plaintiffs wished to return to the arena.*Id.* at 707 n.4. The district court concluded that "that under the unique circumstances of this case" the non-profit organization had representational standing to seek injunctive relief to remedy alleged violations in the suites and the rest of the arena. *Id.* at 763.Again, the court did not conduct an injury-in-fact analysis. *See id.* at 761-63.The undersigned is hesitant to accept the *Independent Living Resources* court's bare conclusions absent legal reasoning or factual discussion as to the injury-in-fact requirement.

In *Johanson,* the plaintiffs, a disabled minor, his father, and another disabled minor, filed suit seeking declaratory and injunctive relief, alleging that a planned future arena, to be the home of the Florida Panther professional hockey team, would violate Title III of the ADA. Plaintiffs were Panthers fans and occasionally purchased tickets to games. 963 F.Supp. at 1176. Defendants challenged plaintiffs' standing on ripeness grounds. In finding that plaintiffs sufficiently alleged their standing, the court reasoned that Title III of the ADA conveys standing to parties who have " 'reasonable grounds for believing that [they are] about to be subjected to discrimination in violation of [the new construction provision of Title III of the ADA].' " *Id.* at 1177 (quoting 42 U.S.C. § 12188(a)(1)). The court found that plaintiffs' allegations satisfied this standard. *Id. Johanson* is distinguishable on its facts as that case involved a planned arena that had not yet been built. Consequently, the plaintiffs could not have made concrete plans to attend the arena. In contrast, the Embassy Suites has been built and Plaintiffs could have made reservations or other concrete plans to visit it.

**\*18***Parr* is also factually distinct from the instant case. There, the plaintiff alleged he was denied

access to the defendant's fast-food restaurant because of architectural barriers. 96 F.Supp.2d at 1079. The court acknowledged that other courts had required concrete plans to return such as a reservation or ticket, but distinguished such cases as they involved hotels or professional offices where a reservation or ticket would be required. *Id.* The court explained that "[v]isiting a fast food restaurant ... is not the sort of event that requires advance planning or the need for a reservation.... Therefore, ... specification as to a date and time of returning to this public accommodation is impossible due to the nature of the event."*Id.* The court held the plaintiff had standing to sue the fast-food chain for injunctive relief based on his past visits to the fast-food restaurants, his intent to return and in light of the private enforcement provisions of the ADA. *Id.* at 1080.The Embassy Suites is less like a fast food restaurant and more like the public accommodations in the cases distinguished by the *Parr* court such as other hotels and professional offices that require advance planning or reservations.

But *Parr, Independent Living Resources* and *Johanson* do not stand alone. Other district courts have considered whether plaintiffs had standing to sue under Title III of the ADA and have concluded that a plaintiff has standing if he or she has an intent to return to the building or facility in the near future. None apparently requires "concrete plans" such as a reservation, ticket or appointment. *See Deck v. Am. Hawaii Cruises, Inc.,* 121 F.Supp.2d 1292, 1299 (D.Haw.2000) (concluding plaintiff lacked standing because she did not allege any plans to use the defendant's ship in the future and her statement in her declaration that she would "look into" another cruise on the defendant's ships when her mother's health situation improves was too speculative and conditional); *Stan v. Wal-Mart Stores, Inc.,* 111 F.Supp.2d 119, 125 (N.D.N.Y.2000) (holding plaintiff lacked standing to sue under ADA where she had no intention to return to any of defendant's stores); *Midgett v. Tri-County Metro. Trans. Dist.,* 74 F.Supp.2d 1008, 1013 (D.Or.1999) (concluding plaintiff had standing where he presented evidence he routinely rode the defendant's bus service to and from work and that he and others had experienced bus lift failures), *aff'd,*--- F.3d ----, No. 99-36222, 2001 WL 709214 (9th Cir. June 26, 2001); *Proctor v. Prince George's Hosp. Ctr.,* 32 F.Supp.2d 830, 832-33 (D.Md.1998) (holding deaf patient lacked standing to sue for injunctive relief under ADA in absence of evidence that he was likely to return to hospital in

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2001 WL 1112109 (S.D.Ind.)
(Cite as: Not Reported in F.Supp.2d, 2001 WL 1112109)

near future); _Cortez v. Nat'l Basketball Ass'n,_ 960 F.Supp. 113, 117-18 (W.D.Tex.1997) (holding plaintiff who had attended NBA "Jam" activities in the past lacked standing to seek injunctive relief under Title III of the ADA because she did not allege she intended to return to any NBA "Jam" activities in the future); _Hoepfl v. Barlow,_ 906 F.Supp. 317, 323 (E.D.Va.1995) (stating "a plaintiff who cannot demonstrate a likelihood that she will ever again suffer discrimination at the hands of a defendant, even one who has discriminated against her in the past, does not have standing to obtain an injunction under the ADA."); _see also Levy v. Mote,_ 104 F.Supp.2d 538, 544-45 (D.Md.2000) (holding plaintiff lacked standing to sue for injunctive relief under Title II of the ADA where he offered no evidence he had visited the challenged facility in recent months or attempted to use newly installed temporary ramp and where soon to be installed permanent access ramp would make the facility ADA compliant); _Jankey v. Twentieth Century Fox Film Corp .,_ 14 F.Supp.2d 1174, 1180 (C.D.Cal.1998) (concluding plaintiff had standing to challenge accessibility of facilities at defendant's studios where he produced evidence he had visited some of the facilities about a dozen times in the past 20 years), _aff'd._212 F.3d 1159 (9th Cir.2000).

**\*19** The district court in _Tyler v. Kansas Lottery,_ 14 F.Supp.2d 1220 (D.Kan.1998), held the plaintiffs to a slightly higher burden of proof as to standing. The plaintiff lived in Kansas when he filed suit under the ADA alleging the denial of access to nine retail lottery outlets in Manhattan, Kansas as well as outlets in other cities in Kansas. Subsequently, he moved to Wisconsin. _Id._ at 1222.It was represented that the plaintiff would continue to visit Manhattan, Kansas, where he had family, and would play the lottery during his visits. _Id._ The court concluded that though plaintiff may have had standing when he filed suit, he no longer had standing to sue for injunctive relief after his move out of state. _Id._ at 1225.The court explained that despite the plaintiff's intent to visit Kansas where he has family and to play the lottery when he visits, the court had no evidence of "where, or how often, or what lottery games plaintiff intends to play" or whether such location violated the ADA. _Id._ The _Tyler_ court did not expressly require concrete plans to return to Kansas and play the lottery; nor did the court require plans to return and play the lottery on a date certain, however

Further, _Steger v. Franco, Inc.,_ 228 F.3d 889 (8th Cir.2000), upon which Defendant relies, does not appear to require concrete plans to return to the alleged inaccessible building. Rather, in finding the plaintiffs lacked standing, the court wrote that there was no evidence as to some of the plaintiffs' "likelihood to visit the building in the imminent future," 228 F.3d at 893, "that [another plaintiff] intended to enter the building in the future," _id.,_ and yet another plaintiff "had a need or intent to access the building in the future." _Id._ It could be argued that entering a building that housed office space for health care providers as well as retail and service establishments, including a retail brokerage firm and coffee shop, would not necessarily require advanced planning. But the court did not differentiate amongst the possible activities in which the plaintiffs may have engaged in the building, requiring "concrete plans" if the plaintiff intended to attend an appointment with a health care provider but not if the plaintiff was going to the coffee shop, for example. As the _Steger_ court recognized, the intent to return must be more definite than an intent to return "some day." _See_228 F.3d at 893 (citing _Lujan,_ 504 U.S. at 564).

Plaintiffs claim the Association has standing through its members Mr. Ruiz and Ms. Price, who planned to spend Thanksgiving 1999 in Indianapolis and intended to stay at the Embassy Suites and who plan to visit Indianapolis for Thanksgiving this year (2001) and would like to stay at the hotel. Plaintiffs' demonstration of the Association's standing falters not on whether Ruiz and Price have concrete plans to stay at the hotel, but on their knowledge of the Hotel's barriers. Plaintiffs point to nothing in the record that would establish Price's knowledge as to any barriers at the hotel. Thus, she would not have standing to sue in her own right.

**\*20** As for Ruiz, the record establishes that he first visited the hotel on January 29, 2001, well after the Complaint was filed on February 28, 2000. (Ruiz Dep. at 20, 34.) Standing is based on the facts and circumstances as they exist at the time of the commencement of an action. Other courts would concur that Ruiz's post-filing visit to the hotel is insufficient to confer standing. _See Steger,_ 228 F.3d at 892-93 (holding plaintiff lacked standing under ADA when at the time the complaint was filed he had

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

not been in the building and did not know whether the building was ADA-compliant); _Moyer v. Walt Disney World Co.,_ No. 6:98CV1230ORL18B, 2000 WL 33310908, at *4 (M.D.Fla. Oct. 3, 2000) (holding plaintiff lacked standing as to facilities in which he had not been before commencement of the action). The only other evidence that Ruiz had actual notice [FN14] of any alleged barriers at the hotel before this action was commenced comes from inadmissible hearsay evidence. (_See_ Pls.' Statement Add'l Material Fact No. 200 ("Brennan called Ruiz and informed him that the Embassy Suites, Indianapolis, Indiana, did not have accessible guest rooms.") (citing Ruiz Dep. at 35.)

> FN14. "Actual notice" is the phrase used in the futile gesture provision. _See_ 42 U.S.C. § 12118(a)(1).

Plaintiffs claim that other members of the Association would like to stay at the Embassy Suites while assisting the Indiana chapter. Plaintiffs, however, do not point to any evidence that other such members would stay at the hotel in the near future. At its May 2001 meeting, the Association Board was to designate a delegation of members to visit Indianapolis to assist in organizing the Indiana chapter. No plans or reservations have been made for any such members to visit the hotel, and no date certain for their visit has been announced. As such, the desire of such members to visit the hotel at some unspecified time in the future is insufficient to confer standing on any such members. Thus, to the extent Plaintiffs claim that members of the Association other than Ruiz and Price have standing to sue, Plaintiffs have not carried their burden of demonstrating such standing. Therefore, Plaintiffs have not carried their burden of showing the Association's representational standing. Accordingly, the court finds that the Association lacks standing to assert the claims in this case and the Association's claims should be DISMISSED.

### 2. Mr. Brennan

In arguing that Mr. Brennan lacks standing, Claypool claims Mr. Brennan has no plans to visit the Embassy Suites in the imminent future outside his activities associated with this legal action, that is, to inspect the hotel as an expert on behalf of Plaintiffs. Claypool also contends that to the extent Mr. Brennan does

have standing, his standing is limited to those issues in the Complaint that are related to his own disability.

Plaintiffs have pointed to sufficient evidence to establish Mr. Brennan's pre-filing actual notice of the Embassy Suites's alleged non-compliance with the ADA-after all, he visited the Hotel in November 1999 and again in January 2000. Plaintiffs' evidence also demonstrates that Mr. Brennan would stay at the Hotel but for the alleged barriers, and further, that his reasons for staying are not necessarily because of his activities associated with this case. It is undisputed that Mr. Brennan came to Indianapolis in March and again in April 2001 and had plans to visit in May 2001; [FN15] he has family here and comes to Indianapolis every one or two years for family reunions and for alternating Thanksgiving and Christmas holidays, with the exception of 1999 when he came for neither holiday. Mr. Brennan has expressed a desire to stay overnight at the Embassy Suites on future visits to Indianapolis if the hotel were ADA compliant. Though Plaintiffs have not identified a date certain upon which Mr. Brennan will return to Indianapolis, they have produced evidence that supports a reasonable finding that he visits Indianapolis regularly, sometimes as often as several times a year and almost always at least once a year. Thus, the evidence does more than establish merely that Mr. Brennan "may" visit Indianapolis or might visit the city "some day." Rather, the evidence demonstrates a strong likelihood that he will visit the city in the near future, likely for Thanksgiving or Christmas of this year or for a family reunion next year.

> FN15. The court has no information as to whether Mr. Brennan did, in fact, visit Indianapolis during the month of May 2001. In the absence of any indication to the contrary, however, the court assumes that he did visit as planned.

**\*21** Moreover, the ADA was intended to "provide a clear and comprehensive national mandate for the elimination of discrimination against individuals with disabilities," 42 U.S.C. § 12101(b)(1), and is a remedial statute, _see_ Steger, 228 F.3d at 894;_Rehling v. City of Chicago,_ 207 F.3d 1009, 1016 (7th Cir.2000), _as amended_ (Apr. 4, 2000), which "should be broadly construed to effectuate its purposes."_Tcherepnin v. Knight,_ 389 U.S. 332, 336

(1967); *see Steger,* 228 F.3d at 894. In light of the evidence of record and the purpose of the ADA and construing the statute broadly to effectuate its purposes, the court finds that Plaintiffs have demonstrated Mr. Brennan's standing to sue under Title III of the ADA.

That does not end the standing inquiry as Claypool contends that Mr. Brennan's standing is limited to those issues in the Complaint that are related to his own disability.[FN16] Plaintiffs agree that an ADA plaintiff's standing is limited to those barriers related to his or her disabilities. Cases have so held. *See Steger,* 228 F .3d at 893. *Parr v. L & L Drive-Inn Rest.,* 96 F.Supp.2d 1065, 1083 (D.Haw.2000) (denying ADA plaintiff's claims not specifically related to his disability for lack of standing); *see also Lujan v. Defenders of Wildlife,* 504 U.S. 555, 563 (1992) (" '[T]he injury in fact' test requires more than an injury to a cognizable interest. It requires that the party seeking review be himself among the injured.' "). The parties' dispute, however, whether Mr. Brennan's disabilities include a visual impairment; Plaintiffs do not dispute that Mr. Brennan has no standing with regard to a hearing impairment, (*see* Pls.' Resp. Def.'s Mot. Summ. J. at 9 n.4.)

> FN16. Claypool claims that the following allegations are not related to Mr. Brennan's disability, quadriplegia: "ix) No auditory indicators are present for the elevator; x) At the bank of phones no phone is present with hearing aide compatibility or volume controls; xi) At a bank of three phones no phone is TDD capable; xiii) Restroom signage lacks required Braille and pictogram and is mounted in wrong location; xvi) No strobe emergency notification system is present; xxxii) House phones throughout the facility do not have a volume control or the required pictogram."(Compl., ¶ 14.)

In *Sutton v. United Air Lines, Inc.,* 527 U.S. 471 (1999), two severely myopic sisters sued under the ADA. *Id.* at 475. Each had 20/200 vision or worse in her better eye. But with the use of corrective lenses such as glasses or contact lenses their vision was 20/20 or better. *Id.* The Supreme Court held that the sisters did not have a "disability" under the ADA because whether an individual has a disability must

"be determined with reference to corrective measures...."*Id.* at 488.

Mr. Brennan gave the following testimony at his deposition:

Q Now, you were also asked about your vision, and your vision is not 20/20 without some type of glasses or corrective lenses; isn't that correct?

A Correct.

(Brennan Dep. at 99.) Though Plaintiffs argue Defendant has mischaracterized the evidence, the court finds that its characterization is accurate. The only reasonable inference from the above quoted testimony is that Mr. Brennan's vision is 20/20 with corrective lenses. Following *Sutton,* then, he does not suffer from a visual disability. Therefore, the court finds that Mr. Brennan lacks standing to sue with regard to alleged barriers related to a visual impairment or hearing impairment. His standing to sue is limited to barriers related to his quadriplegia, strength and endurance impairments.

*C. Mootness*

**\*22** Defendant argues that several allegations contained in paragraph 14 of Plaintiffs' Complaint are moot. A claim "is moot when the issues presented are no longer 'live' or the parties lack a legally cognizable interest in the outcome."*City of Erie v. Pap's A.M.,* 529 U.S. 277, 287 (2000) (quotations omitted); *see Stotts v. Cmty. Unit Sch. Dist. No. 1,* 230 F.3d 989, 990 (7th Cir.2000)."[A] defendant claiming that its voluntary compliance moots a case bears the formidable burden of showing that it is absolutely clear the allegedly wrongful behavior could not reasonably be expected to recur."*Friends of the Earth, Inc. v. Laidlaw Envtl. Servs. (TOC), Inc.,* 528 U.S. 167, 190 (2000); *see also id.* at 189;*Adarand Constructors, Inc. v. Slater,* 528 U.S. 216, 222 (2000).

The striking of Mr. Coursolle's affidavit leaves Defendant with only two citations to record evidence to support its claim that certain areas of the Embassy Suites are now ADA compliant:

The only bank of three public telephones in the Hotel

Not Reported in F.Supp.2d                                                                                    Page 19
Not Reported in F.Supp.2d, 2001 WL 1112109 (S.D.Ind.)
**(Cite as: Not Reported in F.Supp.2d, 2001 WL 1112109)**

is located on the 3rd Floor Main Entrance of the Hotel. An ADA compliant TDD public telephone is present at the bank of three public telephones. The TDD public telephone has hearing aid capability and volume controls. (Ruiz Dep. at 102.)

The reservation desk was re-built with a lowered working surface that is ADA compliant. (Ruiz Dep. at 105.) [FN17]

> FN17. It is noted that Defendant also cites to the Plan View of 4th Floor Lobby of the Hotel, Front Desk-Enlarged Plan, and Purchase Order Request; pool shower and public bathroom upgrade, dated 7/27/00.) These documents, however, are insufficient by themselves to establish that any area of the Embassy Suites has been made ADA compliant.

As for the first assertion, that relates to a disability for which Mr. Brennan lacks standing to assert a claim and the court need not address that claim further. As for the second assertion, Mr. Ruiz testified only that the reservation desk had a lower working surface. He offers no testimony as to whether the desk is ADA compliant. Thus, the cited portions of Mr. Ruiz's deposition testimony does not provide factual support for Defendant's claim that Plaintiffs' claims are moot. The court finds that Claypool is not entitled to summary judgment on the ground of mootness.

### D. Estoppel

Defendant contends that Plaintiffs are collaterally estopped from claiming that the ramp into the main entrance of the hotel and the service elevator to the 4th Floor Lobby are not compliant with the ADA because these issues have been resolved in a prior Settlement Agreement between the United States of America, Claypool and Promus Hotels ("Settlement Agreement" or "Agreement").

Collateral estoppel has four elements: " '(1) the issue sought to be precluded must be the same as that involved in the prior litigation, (2) the issue must have been actually litigated, (3) the determination of the issue must have been essential to the final judgment, and (4) the party against whom estoppel is invoked must be fully represented in the prior action.'

" *Meyer v. Rigdon,* 36 F.3d 1375, 1379 (7th Cir.1994) (quoting *La Preferida, Inc. v. Cerveceria Modelo, S.A. de C.V.,* 914 F.2d 900, 906 (7th Cir.1990)). Collateral estoppel is an affirmative defense; Claypool therefore bears the burden of proving that it applies. *See La Preferida,* 914 F.2d at 906.

**\*23** The Seventh Circuit has recognized that consent judgments do not ordinarily support collateral estoppel. *See, e.g., Meyer,* 36 F.3d at 1379; *La Preferida,* 914 F.2d at 906. This is because the "issues underlying a consent judgment generally are neither actually litigated nor essential to the judgment." *La Preferida,* 914 F.2d at 906. "Similarly, settlement agreements not approved by a court are not given preclusive effect." *Meyer,* 36 F.3d at 1379; *see also Ariz. v. Cal.,* 530 U.S. 392, 414 (2000) ("settlements ordinarily occasion no issue preclusion (sometimes called collateral estoppel), unless it is clear ... that the parties intend their agreement to have such an effect"), *supplemented by* 531 U.S. 1 (2000); *Frank v. United Airlines, Inc.,* 216 F.3d 845, 852 (9th Cir.2000) (concluding that settlement not incorporated into judgment has no preclusive effect), *cert. denied,* 121 S.Ct. 1247 (2001); *Rockford Mut. Ins. Co. v. Amerisure Ins. Co.,* 925 F.2d 193, 198 (7th Cir.1991) (applying Illinois law and concluding that issue resolved by parties' settlement agreement did not have preclusive effect in subsequent litigation).

Claypool argues that the Settlement Agreement's language reveals the parties' intent that the Agreement have preclusive effect. In *Klingman v. Levinson,* 831 F.2d 1292 (7th Cir.1987), the Seventh Circuit concluded that a consent decree should be given preclusive effect because the parties intended that the decree be given such effect. *Id.* at 1296. The consent decree resolved a state court trust action brought by Ms. Klingman against Mr. Levinson. After the parties entered into the decree, Mr. Levinson filed a petition for bankruptcy. Ms. Klingman argued her consent decree was nondischargeable. *Id.* at 1293. The consent decree provided that the debt owed to Ms. Klingman would "not be dischargeable in any bankruptcy or similar proceeding and that in any subsequent proceeding all of the allegations of the Complaint and findings of this Court may be taken as true and correct without further proof." *Id.* at 1296. The court concluded that this language revealed the parties' intent that the

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2001 WL 1112109 (S.D.Ind.)
(Cite as: Not Reported in F.Supp.2d, 2001 WL 1112109)

consent decree be given preclusive effect in a future bankruptcy proceeding. *Id.* The court held that the bankruptcy court and district court correctly applied collateral estoppel. *Id.*

Claypool relies on the following language in the Settlement Agreement as evidence of the parties' intent to foreclose accessibility issues involving the main entrance ramp and elevator in future litigation:

8. Agreement not to Prosecute. Provided that Claypool and Promus fully comply with all terms of this Agreement, the United States will cease its investigation and/or prosecution of the complaint reference in paragraph 2 of this Agreement; provided, however, that this shall not limit the United States' ability to enforce this Agreement as set forth in paragraph 9.

(Def.'s Ex. I, "Settlement Agreement", at 2, ¶ 8.) In contrast with the language relied upon by the *Klingman* court, this language says absolutely nothing about other legal proceedings. One cannot reasonably conclude that this language expresses the parties' intent that the Settlement Agreement have collateral estoppel effect. Furthermore, as Plaintiffs point out in their response, the Agreement contains language from which one could reasonably infer the parties did not intend that the issues resolved by the Agreement be foreclosed in other litigation. The Settlement Agreement expressly provides that it "shall not be admissible in any proceeding to show ... any violation of the ADA...."(*Id.* at 1, ¶ 5.)

**\*24** As Claypool has not come forward with sufficient evidence to show that the parties to the Settlement Agreement intended that the issues regarding the main entrance ramp and elevator be foreclosed in future litigation, Claypool cannot carry its burden of proving that collateral estoppel bars Plaintiffs' claims relating to the main entrance ramp or elevator.

*E. Prima Facie Case*

Title III of the ADA prohibits discrimination in places of public accommodation against persons with disabilities. See 42 U.S.C. § 12182(a). Discrimination includes "a failure to remove architectural barriers, and communication barriers that are structural in nature, in existing facilities ... where such removal is

readily achievable."42 U.S.C. § 12182(b)(2)(A)(iv). Discrimination also includes "with respect to a facility or part thereof that is altered by, on behalf of, or for the use of an establishment in a manner that affects or could affect the usability of the facility or part thereof, a failure to make alterations in such a manner that, to the maximum extent feasible, the altered portions of the facility are readily accessible to and usable by individuals with disabilities, including individuals who use wheelchairs."42 U.S.C. § 12183(a)(2). This heightened standard for accessibility requirements applies to public accommodations and facilities that have been altered after January 26, 1992. *See Lieber v. Macy's West, Inc.*, 80 F.Supp.2d 1065, 1074 (N.D.Cal.1999); 28 C.F.R. § 36.402(a)(1). Plaintiffs claim that certain areas of the Embassy Suites have been altered and, therefore, are subject to a heightened accessibility standard. Defendants dispute this. Thus, the court must resolve whether any area of the hotel has been altered within the meaning of the ADA after January 26, 1992.

An "alteration" is defined as "a change to a place of public accommodation ... that affects or could affect the usability of the building or facility or any part thereof."28 C.F.R. § 36.402(b). Alterations include

remodeling, renovation, rehabilitation, reconstruction, historic restoration, changes or rearrangement in structural parts or elements, and changes or rearrangement in the plan configuration of walls and full-height partitions. Normal maintenance, reroofing, painting or wallpapering, asbestos removal, or changes to mechanical and electrical systems are not alterations unless they affect the usability of the building or facility.

28 C.F.R. § 36.402(b)(1).

Plaintiffs claim that the 4th floor lobby was renovated at a cost of over one million dollars in 2000. Though the evidence cited by Plaintiffs to support this assertion is thin, (*see* Pls.' Ex. 6), Defendant does not dispute this claim. The court therefore accepts that the 4th floor lobby was renovated in the sense that it was subject to alteration within the meaning of the ADA regulations. The cost of the renovation alone suggests some change that could affect the usability of the lobby.

**\*25** Plaintiffs claim the 5th floor meeting rooms were renovated in 1997 at a cost in excess of $222,800. Defendant contends the evidence cited in support establishes that the only changes were installation of carpet, wall vinyl and lighting repair. The 1997 Capital Budget Summary indicates an additional "renovation" to the 5th floor meeting rooms at a cost of $73,250.09, but the nature of the renovation is not specified. The evidence relied upon by Plaintiffs is insufficient to create an issue of fact as to whether the 5th floor meeting rooms were subject to alteration within the meaning of the applicable ADA regulations.

According to Plaintiffs, the 18th floor penthouse suites were renovated in 1997 at a cost of $162,000. The evidence cited in support indicates that the hotel budgeted for such renovation.[FN18]The nature of the renovation is not indicated, however. Without more specific evidence regarding the renovation, Plaintiffs have not created a genuine issue regarding alteration of the 18th floor penthouse suites.

> FN18. The hotel also budgeted for replacement of the balcony roofs and priming and sealing of the metal seam roof. This is not an alteration. *See*28 C.F.R. § 36.402(b)(1).

As for the pool and spa area, Plaintiffs claim the area, including restrooms, flooring and whirlpools, was renovated in 1997. Defendant disputes this claim, alleging that the pool area floor tile was replaced to facilitate drainage. The evidence relied upon by Plaintiffs indicates that the pool flooring and support system were replaced-this involved a regrading, resloping and retiling of the pool floor-and a dehumidification system was installed. This work seems to be normal maintenance and thus, not an alteration. Unspecified work was performed in the men's and women's restrooms in the pool area at a cost of $360 and $290, respectively, and the spas apparently were replaced. The evidence is insufficient to establish an alteration of the restrooms, but the replacement of the spas seems to constitute an alteration within the meaning of that term as such replacement would likely affect the usability of the spa.

Plaintiffs claim that the guest elevators were renovated. Defendant disputes the extent of the alleged renovation of the guest elevators. The evidence cited by Plaintiffs does not provide enough information upon which the court can determine whether the elevators were altered under the meaning of the ADA regulations. Other than the cost of $27,274.50 to renovate 4 elevators, the evidence indicates that existing light rays and safety edges on the 4 elevators were removed and that new state-of-the-art door protection was installed. (Ex. 10.)

Plaintiffs claim that the service elevator was renovated in 1996. The evidence cited to support this claim consists of the 1996 Capital Plan-Embassy Suites, which apparently reflects expenditures for certain work performed at the hotel during that year and two invoices for labor and services to the service elevator. The Plan contains a line which states: "4. Service elevator renovation $3,902." (Pls.' Ex. 11 at 1.) The invoices reflect work performed on the ceiling, floor and walls of the elevator, though the nature of the work is not specified, as well as construction and installation of stainless rails for the elevator. (*Id.*) Neither invoice shows the name of the company that issued the invoice nor specifies the nature of the work which was performed. Defendant claims that in addition to the installation of the stainless rails, the only work performed was cleaning, but Defendant cites no evidence to support this claim. In the end, Plaintiffs have not directed the court to sufficient evidence to raise a genuine issue as to whether the service elevator was subject to alterations within the meaning of the ADA regulations.

**\*26** As for the installation of new signage, Plaintiffs do not support their factual assertion that the hotel installed considerable signage throughout the hotel in 1994 and 1996 with any citation to record evidence. (*See* Pls.' Statement Add'l Material Facts No. 92.) They therefore have not created a genuine issue of fact on this matter. The court finds that the only areas of the Embassy Suites which are subject to the heightened accessibility standards are the 4th floor lobby area and the spas.

Defendant argues that Plaintiffs cannot establish a prima facie case even under the heightened accessibility standard as the only evidence they present to demonstrate a prima facie case is the expert report of Mr. Brennan. The court understands Defendant as arguing that Mr. Brennan's report is the only evidence that the altered areas of the hotel are

Not Reported in F.Supp.2d                                                                                                                                       Page 22
Not Reported in F.Supp.2d, 2001 WL 1112109 (S.D.Ind.)
**(Cite as: Not Reported in F.Supp.2d, 2001 WL 1112109)**

not readily accessible to and usable by individuals with disabilities, that is, not in compliance with the applicable provisions of the Americans with Disability Act Access Guidelines ("ADAAG"), appendix A to 28 C.F.R. § 36, *see*28 C.F.R. § 36.402(b)(2); *see also*28 C.F.R. § 36.406(a).

Defendant is correct that Mr. Brennan's expert report, dated March 28, 2001, is the only evidence relied upon by Plaintiffs to establish that the 4th floor lobby area and the spas are not in compliance with the standards of the ADAAG. (*See* Pls.' Statement Additional Material Facts, Nos. 96-103, 107-115.)As this court has found that Mr. Brennan's report should be stricken, Plaintiffs have not come forward with any evidence to raise a genuine issue as to whether these altered areas are readily accessible to and usable by individuals with disabilities, that is, in compliance with the applicable provisions of the ADAAG. Therefore, even applying a heightened accessibility standard, Plaintiffs cannot prevail on their discrimination claims based on alleged barriers in the 4th floor lobby and spa areas.

With respect to the other alleged barriers in the hotel, the accessibility standard for an existing facility, a facility not newly constructed after January 26, 1992, or altered after January 26, 1992, *see*42 U.S.C. § 12183(a); 28 C.F.R. § 36.401, applies. To establish a prima facie case of disability discrimination based on an architectural barrier in an existing facility, a plaintiff must demonstrate, *inter alia,* that: (1) the facility presents an architectural barrier prohibited by the ADA; and (2) removal of the barrier is "readily achievable." *See Alford v. City of Cannon Beach,* No. CV-00-303-HU, 2000 WL 33200554, at *4 (D.Or. Jan. 17, 2000); *Parr v. L & L Drive-Inn Rest.,* 96 F.Supp.2d 1065, 1085 (D.Haw.2000). Once a plaintiff demonstrates a prima facie case, the burden shifts to the defendant to rebut that showing. *See id.;Pascuiti v. N.Y. Yankees,* No. 98 CIV. 8186(SAS), 1999 WL 1102748, at *5 (S.D.N.Y. Dec. 6, 1999) (addressing shifting burdens of proof on issue of whether the removal of an architectural barrier is readily achievable). Defendant bears the ultimate burden of persuasion that removal of an alleged barrier is not readily achievable. *Pascuiti,* 1999 WL 1102748, at *5.

**\*27** "Readily achievable" means "easily accomplishable and able to be carried out without

much difficulty or expense."42 U.S.C. § 12181(9); *see also*28 C.F.R. § 36.304(a). The ADA lists four factors to be considered in deciding whether an action is "readily achievable". The Act states:

In determining whether an action is readily achievable, factors to be considered include-

(A) the nature and cost of the action needed under this chapter;

(B) the overall financial resources of the facility or facilities involved in the action; the number of persons employed at such facility; the effect on expenses and resources, or the impact otherwise of such action upon the operation of the facility;

(C) the overall financial resources of the covered entity; the overall size of the business of a covered entity with respect to the number of its employees; the number, type, and location of its facilities; and

(D) the type of operation or operations of the covered entity, including the composition, structure, and functions of the workforce of such entity; the geographic separateness, administrative or fiscal relationship of the facility or facilities in question to the covered entity.

42 U.S.C. § 12181(9). The provision's language "factors to be considered" indicates that consideration of all of these factors is required. *See Pascuiti v. New York Yankees,* No. 98 CIV. 8186(SAS), 1999 WL 1102748, at *5 (Dec. 6, 1999) (concluding that "the finder of fact cannot determine whether a suggested method of barrier removal is readily achievable without considering those factors.")

Defendant argues that the sole evidence relied upon by Plaintiffs to prove the removal of alleged barriers is readily achievable is Mr. Brennan's expert report, which if stricken leaves Plaintiffs unable to demonstrate a prima facie case. Plaintiffs claim their evidence is sufficient to raise a genuine issue of fact as to whether the removal of the alleged barriers is readily achievable. They cite to the following: (1) Mr. Brennan's expert report which identifies barriers and proposes corrections; (2) photographs contained in that expert report; (3) Plaintiffs' estimate that the

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                                                                  Page 23
Not Reported in F.Supp.2d, 2001 WL 1112109 (S.D.Ind.)
**(Cite as: Not Reported in F.Supp.2d, 2001 WL 1112109)**

cost of total barrier removal is $200,000; (4) the Title III Department of Justice regulations listing various examples of "modest measures that may be taken to remove barriers and that are likely to be readily achievable"; and (5) the Embassy Suites alleged concession that it has the financial resources to provide $200,000 for barrier removal.

The court has concluded that Mr. Brennan's expert report should be stricken. This necessarily includes the photographs contained in that report. Thus, if Plaintiffs can create a genuine issue of fact it is upon items (3) through (5) alone.

Plaintiffs estimate that the total cost for complete barrier removal is $200,000. (*See* Pls.' Supplemental Resp. Def.'s Second Set Interrog. Pl. Ass'n Disabled Americans, Inc., No. 2.) They assert that both Mr. Brennan and Mr. Ruiz have provided estimates of individual costs during their depositions. Plaintiffs' Statement of Additional Material Facts does provide the approximate cost of removal of some but not all the alleged barriers. (*See* Pls.' Statement Additional Material Facts Nos. 134-149.)But Plaintiffs' cost estimates do not address whether the proposed changes are easily accomplishable or able to be completed without much difficulty. Similarly, that the Embassy Suites has the resources to spend $200,000 on barrier removal does not address these matters.

**\*28** The DOJ commentary to Title III regulations cited by Plaintiffs state in part:

Section 36.304(b) [of 28 C.F.R.] provides a wide-ranging list of the types of modest measures that may be taken to remove barriers and that are likely to be readily achievable.... It is not an exhaustive list, but merely an illustrative one. Moreover, the inclusion of a measure on this list does not mean that it is readily achievable in all cases. Whether or not any of these measures is readily achievable is to be determined on a case-by-case basis in light of the particular circumstances presented and the factors listed in the definition of readily achievable (S 36.104).

28 C.F.R. Pt. 36, App. B. With the striking of Mr. Brennan's expert report, however, Plaintiffs have no evidence that these measures would remove any barriers at the Embassy Suites. Indeed, without Mr. Brennan's report Plaintiffs have no evidence that any

areas of the Embassy Suites fail to comply with Title III of the ADA. Furthermore, as the regulation itself states, inclusion of a measure on the list "does not mean that it is readily achievable in all cases."*Id.* Whether a proposed measure is readily achievable is a factual question dependent on the four factors listed in 42 U.S.C. § 12181(9). Plaintiffs' evidence does not address the third and fourth factors. Even if Mr. Brennan's expert report was not stricken, Plaintiffs' evidence would still be insufficient with respect to the last two factors.

*Emerick v. Kahala L & L, Inc.,* No. CIV. 97-01174 FIY, 2000 WL 687662, (D.Haw. May 16, 2000), where the court found the plaintiff had sufficient evidence to establish that barrier removal was readily achievable, is distinguishable. The admissible evidence in that case included the expert testimony that barrier removal would involve minimal cost and effort and of reasonable modifications to remove the barriers, an acknowledgment by the defendant's president and ADA compliance officer that barrier removal is "very inexpensive," photographs showing that barrier modification would not be difficult or expensive, and the annual revenues of the defendant. *Id.* at \*1, \*24.The court finds that Plaintiffs have not raised a triable issue of fact as to whether removal of alleged barriers at the Embassy Suites is readily achievable.

Accordingly, Plaintiffs cannot demonstrate a prima facie case of disability discrimination under Title III of the ADA. Defendant's motion for summary judgment should be GRANTED.

*V. Conclusion*

Plaintiffs' motion to strike is GRANTED. Paragraphs 16, 18, 21, 24-30, 32-34, and 42, 44 and 45-47 of Joseph Coursolle's affidavit are STRICKEN. Defendant's motion for leave to file its sur-reply to Plaintiffs' reply to Defendant's response to Plaintiffs' motion to strike is DENIED. Defendant's motion to strike expert disclosure and expert report of Michael H. Brennan is GRANTED. Defendant's motion for summary judgment will be GRANTED. Judgment will be entered accordingly.

**\*29** ALL OF WHICH IS ORDERED this 6th day of August 2001.

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                    Page 24
Not Reported in F.Supp.2d, 2001 WL 1112109 (S.D.Ind.)
**(Cite as: Not Reported in F.Supp.2d, 2001 WL 1112109)**


S.D.Ind.,2001.
Association For Disabled Americans v. Claypool
Holdings, LLC
Not Reported in F.Supp.2d, 2001 WL 1112109
(S.D.Ind.)

END OF DOCUMENT

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

**EXHIBIT 14**
**Part B**

--- F.Supp.2d ----                                                                    Page 1
--- F.Supp.2d ----, 2008 WL 1757752 (D.D.C.)
**(Cite as: --- F.Supp.2d ----, 2008 WL 1757752)**

**H**Bourbeau v. The Jonathan Woodner Co.
D.D.C.,2008.
Only the Westlaw citation is currently available.
United States District Court,District of Columbia.
Sarah BOURBEAU, et al., Plaintiffs,
v.
THE JONATHAN WOODNER CO., Defendant.
**Civil Action No. 07-0164 (PLF).**

April 17, 2008.

**Background:** Prospective tenant who received
federally funded rental assistance through Housing
Choice Voucher Program (HCVP), administered by
Department of Housing and Urban Development
(HUD), and fair housing advocacy organization filed
claim against landlord, alleging violation of District
of Columbia Human Rights Act (DCHRA), by
discriminating against prospective tenants on basis of
source of income, and seeking declaratory and
injunctive relief. Landlord moved to dismiss for
failure to state claim.

**Holdings:** The District Court, Paul L. Friedman, J.,
held that:
(1) organization had standing only for injuries after
reinstatement as nonprofit corporation;
(2) DCHRA was not preempted by federal law
establishing HCVP; and
(3) private landlord's actions fell within DCHRA's
prohibition of source of income discrimination.

Motion granted in part and denied in part.

**[1] Federal Civil Procedure 170A** 🗝0

170A Federal Civil Procedure
Although detailed factual allegations are not
necessary to survive a motion to dismiss for failure to
state claim, to provide the grounds of entitlement to
relief, a plaintiff must furnish more than labels and
conclusions or a formulaic recitation of the elements
of a cause of action. Fed.Rules Civ.Proc.Rule
12(b)(6), 28 U.S.C.A.

**[2] Federal Civil Procedure 170A** 🗝0

170A Federal Civil Procedure
Under the plausibility standard for motion to dismiss
for failure to state claim, the facts alleged in the
complaint must be enough to raise a right to relief
above the speculative level, or must be sufficient to
state a claim for relief that is plausible on its face.
Fed.Rules Civ.Proc.Rule 12(b)(6), 28 U.S.C.A.

**[3] Federal Civil Procedure 170A** 🗝0

170A Federal Civil Procedure
On a motion to dismiss for failure to state a claim, the
district court must accept as true all of the factual
allegations contained in the complaint. Fed.Rules
Civ.Proc.Rule 12(b)(6), 28 U.S.C.A.

**[4] Federal Civil Procedure 170A** 🗝0

170A Federal Civil Procedure
On motion to dismiss for failure to state claim, the
complaint is construed liberally in the plaintiffs'
favor, and the district court should grant plaintiffs the
benefit of all inferences that can be derived from the
facts alleged. Fed.Rules Civ.Proc.Rule 12(b)(6), 28
U.S.C.A.

**[5] Federal Civil Procedure 170A** 🗝0

170A Federal Civil Procedure
While the complaint is to be construed liberally in
plaintiffs' favor on motion to dismiss for failure to
state claim, the district court need not accept
inferences drawn by plaintiffs if those inferences are
unsupported by facts alleged in the complaint; nor
must the court accept plaintiffs' legal conclusions.
Fed.Rules Civ.Proc.Rule 12(b)(6), 28 U.S.C.A.

**[6] Limitation of Actions 241** 🗝0

241 Limitation of Actions
Fair housing advocacy organization's claims against
landlord for discriminating against prospective
tenants on basis of source of income accrued,
commencing under two-year limitations period of
District of Columbia Human Rights Act (DCHRA),

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

--- F.Supp.2d ----                                                                    Page 2
--- F.Supp.2d ----, 2008 WL 1757752 (D.D.C.)
**(Cite as: --- F.Supp.2d ----, 2008 WL 1757752)**

when landlord allegedly discriminated against organization's testers posing as prospective tenants desiring to use federally funded rental assistance vouchers. D.C. Official Code, 2001 Ed. § 2-1403.16.

**[7] Landlord and Tenant 233** 🖙0

233 Landlord and Tenant
Standing under the District of Columbia Human Rights Act (DCHRA) is co-extensive with Article III standing. U.S.C.A. Const. Art. 3, § 2, cl. 1; D.C. Official Code, 2001 Ed. § 2-1401.01 et seq.

**[8] Federal Civil Procedure 170A** 🖙0

170A Federal Civil Procedure
Article III standing requires plaintiffs to show, at an irreducible constitutional minimum, that: (1) they have suffered an injury in fact, (2) the injury is fairly traceable to the defendant's conduct, and (3) a favorable decision on the merits likely will redress the injury. U.S.C.A. Const. Art. 3, § 2, cl. 1.

**[9] Federal Civil Procedure 170A** 🖙0

170A Federal Civil Procedure
The alleged injury, for Article III standing requirements, must be concrete and particularized and actual or imminent, not conjectural, hypothetical, or speculative. U.S.C.A. Const. Art. 3, § 2, cl. 1.

**[10] Landlord and Tenant 233** 🖙0

233 Landlord and Tenant
Fair housing advocacy organization's alleged injuries from landlord's refusal to rent to prospective tenants using federally funded rental assistance vouchers, false representations to organization's testers that qualifying apartments were not available, and conduct that diverted scarce resources from organization's central mission were sufficient for Article III standing, in housing discrimination suit against landlord, under District of Columbia Human Rights Act (DCHRA), only for injuries occurring after organization's reinstatement as nonprofit corporation, but not retroactively during period when articles of incorporation were revoked when organization had no legal existence. D.C. Official Code, 2001 Ed. § 2-1401.01 et seq.; D.C.Code §§ 29-301.85, 29-301.86(c), (d), 29-301.90(a).

**[11] Corporations 101** 🖙0

101 Corporations
Under District of Columbia law, a corporation may not take advantage of its revoked status, either to enjoy a benefit derived from acts taken during the period of revocation or to avoid liability for corporate debts incurred during that period. D.C.Code §§ 29-301.85, 29-301.86(c), (d), 29-301.90(a).

**[12] Action 13** 🖙0

13 Action
Plaintiff's right to any recovery depends upon its right at the inception of the suit, and the nonexistence of a cause of action when the suit was started is a fatal defect, which cannot be cured by the accrual of a cause pending suit.

**[13] Landlord and Tenant 233** 🖙0

233 Landlord and Tenant
Under District of Columbia Human Rights Act (DCHRA), landlords remain free not to rent to federally funded rental assistance voucher holders, provided that landlords do so on other legitimate, non-discriminatory grounds, such as an applicant's rental history or criminal history. Housing and Community Development Act of 1974, § 201, 42 U.S.C.A. § 1437f; 24 C.F.R. § 982.307(a)(3); D.C. Official Code, 2001 Ed. § 2-1401.01 et seq.

**[14] Landlord and Tenant 233** 🖙0

233 Landlord and Tenant
Under District of Columbia Human Rights Act (DCHRA), if a landlord charges rents that are too high for the Housing Choice Voucher Program (HCVP), administered by Department of Housing and Urban Development (HUD), assuming landlord does so for non-discriminatory reasons, he is not compelled to lower rents in order to permit voucher holders to rent those units. Housing and Community Development Act of 1974, § 201, 42 U.S.C.A. § 1437f; D.C. Official Code, 2001 Ed. § 2-1401.01 et seq.

**[15] Civil Rights 78** 🖙0

--- F.Supp.2d ----, 2008 WL 1757752 (D.D.C.)
**(Cite as: --- F.Supp.2d ----, 2008 WL 1757752)**

78 Civil Rights
District of Columbia Human Rights Act (DCHRA), prohibiting source of income housing discrimination against federally funded rental assistance voucher holders, did not alter, amend, or conflict with federal statute establishing Housing Choice Voucher Program (HCVP), permitting landlords to accept as many or as few voucher holders as they chose, as required for preemption of DCHRA, under Supremacy Clause, since preemption would affect District's power to regulate matter of local concern, and DCHRA's nondiscrimination requirement neither compelled nor permitted parties to violate any provision of HCVP and advanced HCVP's objective of aiding low-income families in obtaining decent place to live. U.S.C.A. Const. Art. 6, cl. 2; Housing and Community Development Act of 1974, § 201, 42 U.S.C.A. § 1437f; 24 C.F.R. § 982.53(d); D.C. Official Code, 2001 Ed. § 2-1401.01 et seq.

**[16] States 360** ☜0

360 States
Pursuant to the Supremacy Clause, a state law must give way to a federal law under the theory of conflict preemption when compliance with both the state law and the federal law is a physical impossibility, or when the state law stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress; however, a state law that imposes additional requirements over and above those imposed by a federal law does not necessarily conflict with federal law in either manner. U.S.C.A. Const. Art. 6, cl. 2.

**[17] Civil Rights 78** ☜0

78 Civil Rights
And federal preemption, under Supremacy Clause, is not to be lightly presumed, particularly if it would have an impact on a state's power to regulate matters of local concern, such as discrimination in housing. U.S.C.A. Const. Art. 6, cl. 2.

**[18] Administrative Law and Procedure 15A** ☜0

15A Administrative Law and Procedure
Under *Chevron*, the district court owes substantial

deference to Department of Housing and Urban Development's (HUD) interpretation of the laws it administers.

**[19] Civil Rights 78** ☜0

78 Civil Rights
It does not follow that, merely because Congress provided for voluntary participation in the Housing Choice Voucher Program (HCVP), the states are precluded from mandating participation absent some valid non-discriminatory reason for not participating; rather, the federal statute establishing HCVP merely creates the scheme and sets out the guidelines for the funding and implementation of the program through local housing authorities, but it does not preclude state regulation. Housing and Community Development Act of 1974, § 201, 42 U.S.C.A. § 1437f.

**[20] Landlord and Tenant 233** ☜0

233 Landlord and Tenant
Private landlord's refusal to rent apartment to prospective tenant who was federally funded rental assistance voucher holder fell within ambit of District of Columbia Human Rights Act (DCHRA), prohibiting source of income housing discrimination, despite technical amendments correcting error that applied intervening legislation to public, rather than private, housing, since amendments merely clarified DCHRA's long-standing definition of source of income as including federal payments, and intervening District of Columbia Low-Income Housing Preservation and Protection Act (LIHPPA) expressly declared that Housing Choice Voucher Program (HCVP) assistance was source of income under DCHRA. Housing and Community Development Act of 1974, § 201, 42 U.S.C.A. § 1437f; D.C. Official Code, 2001 Ed. §§ 2-1401.02(29), 2-1402.21(a), 2-1402.21(e); D.C.Code §§ 42-2851.01, 42-2851.06.

Robert Mark Bruskin, Donald Lee Kahl, Washington Lawyers' Committee, Thomas A. Reed, Kirkpatrick & Lockhart Preston Gates Ellis, LLP, Washington, DC, for Plaintiffs.
Richard W. Luchs, Roger David Luchs, Greenstein Delorme & Luchs, PC, Washington, DC, for Defendant.

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

--- F.Supp.2d ----                                                                    Page 4
--- F.Supp.2d ----, 2008 WL 1757752 (D.D.C.)
**(Cite as: --- F.Supp.2d ----, 2008 WL 1757752)**

*OPINION*

PAUL L. FRIEDMAN, District Judge.
**\*1** This matter is before the Court on defendant's motion to dismiss for failure to state a claim upon which relief may be granted pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure.[FN1]Plaintiffs Sarah Bourbeau and the Equal Rights Center ("ERC") allege that defendant violated and continues to violate the District of Columbia Human Rights Act, D.C.Code §§ 2-1401.01 *et seq.* ("DCHRA"), by discriminating against prospective tenants on the basis of source of income. In addition, plaintiff ERC alleges that defendant is liable for negligent supervision of its employees. On March 31, 2008, this Court issued an Order granting in part and denying in part defendant's motion to dismiss, and noting that an Opinion explaining the Court's reasoning would follow. The Court now sets forth its reasoning.

I. BACKGROUND

*A. Parties*

Sarah Bourbeau is a Washington, D.C. resident who receives federally funded rental assistance through the Housing Choice Voucher Program ("HCVP").*See* Complaint ("Compl.") ¶ 3. The Housing Choice Voucher Program is the largest assisted-housing program administered by the United States Department of Housing and Urban Development("HUD").*See id.* ¶ 11.[FN2]Under the program, local public housing authorities receive funds from HUD, which they use to issue vouchers to eligible individuals and families. *See id.* at ¶ 12;*see also*42 U.S.C. § 1437f (setting forth the program). These vouchers provide a "tenant-based subsidy that is not linked to any particular building ... or unit, but permits [voucher holders] to rent housing in the private market provided rents do not exceed the Program's rent limitations."Compl. ¶ 10. The voucher holders must contribute at least 30% of their adjusted monthly income to rent, which they pay directly to their landlords. The public housing authorities pay the remaining rent directly to the landlords on behalf of participating individuals and families. *See id.* ¶ 13.

ERC is a non-profit corporation that uses outreach, counseling and advocacy to "advance [ ] fair housing

and public accommodations throughout the United States."Compl. ¶ 4. The ERC also conducts and participates in programs to educate the real estate industry about its obligations under federal, state and local fair housing laws. *See id.* ¶ 15.In addition, the ERC investigates complaints of housing discrimination by conducting fair housing tests of entities that allegedly discriminate on the basis of source of income. *See id.* ¶ 16.

The Jonathan Woodner Company ("Woodner") is a New York-based company that owns and manages a Washington, D.C. apartment building called "The Woodner," which is located at 3636 16th Street N.W. *See* Compl. ¶ 2.

*B. Facts*

On January 29, 2002, an ERC tester posing as a prospective tenant visited The Woodner and spoke with one of defendant's agents. *See* Compl. ¶ 18. The tester said that she wished to use a HCVP voucher to rent a studio apartment. *See id.*According to plaintiffs, defendant's agent informed the tester that the apartment complex had reached its limit on accepting voucher holders as tenants and that it had not processed voucher applications for some time. *See id.*On the same day, another ERC tester posing as a prospective tenant contacted an agent at The Woodner. The second tester did not say that she wished to use a HCVP voucher to pay part of her rent. She allegedly was told that a studio apartment was available for $770 a month. *See id.* ¶ 19.Plaintiffs maintain that defendant's agents at The Woodner also turned away testers posing as voucher holders on March 21, 2005 and April 5, 2005. *See id.* ¶¶ 20, 21.On April 8, 2005, Ms. Bourbeau, a voucher holder, visited The Woodner to inquire about vacancies. *See id.* ¶ 22.[FN3]According to plaintiffs, she too was turned away because she sought to use a HCVP voucher. *See id.*Defendant denies all of these charges. *See* Def.'s Mot. at 2.

**\*2** Plaintiffs filed suit in this Court on January 23, 2007. In Count I, Ms. Bourbeau and ERC allege that Woodner, through its agents, violated and continues to violate the DCHRA by discriminating on the basis of the actual or perceived source of income of potential renters. *See* Compl. ¶ 36. In Count II, ERC alone alleges that Woodner is liable for negligent supervision of its employees because Woodner

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

--- F.Supp.2d ----                                                                    Page 5
--- F.Supp.2d ----, 2008 WL 1757752 (D.D.C.)
**(Cite as: --- F.Supp.2d ----, 2008 WL 1757752)**

"knew or should have known that its employees and/or agents were behaving in an illegal manner by refusing to consider any voucher-holder applicants" and it failed to prevent its employees and/or agents from engaging in illegal discrimination. *Id.* ¶ 39-40.Plaintiffs seek declaratory relief, injunctive relief, compensatory and punitive damages, costs and fees. *See id.* at 12.

### C. Nature of Claims

Under the DCHRA, it is "an unlawful discriminatory practice" to "refuse or fail to initiate or conduct any transaction in real property ... or to represent falsely that an interest in real property is not available for transaction" if such a practice is "wholly or partially ... based on the actual or perceived ... source of income ... of any individual."D.C.Code § 2-1402.21(a)(1).

Plaintiffs allege that Woodner violated and is violating the DCHRA by discriminating against individuals who wish to make rental payments (in part) with HCVP vouchers by refusing to rent to those individuals and/or falsely representing that qualifying apartment units are not available. *See* Compl. ¶ 36. ERC further argues that it was injured (and continues to be injured) by Woodner's allegedly discriminatory conduct because that conduct "interfer[ed] with its mission, efforts, and programs," and forced ERC to "commit [ ] scarce resources, including substantial staff time, to counsel complainants, investigate complaints, engage in an education and outreach campaign, and develop and disseminate educational materials."Compl. ¶ 25. Defendant responds that (1) ERC lacks standing; (2) to whatever extent the DCHRA compels landlords to participate in the Housing Choice Voucher Program it is preempted by federal law; and (3) HCVP voucher payments were not protected "source[s] of income" under the DCHRA when Woodner allegedly discriminated against ERC's testers and Ms. Bourbeau. *See* Def.'s Mot. at 2, 5. The Court addresses these arguments in turn.

### II. STANDARD OF REVIEW

[1][2] In *Bell Atlantic Corp. v. Twombly,* --- U.S. ----, 127 S.Ct. 1955, 167 L.Ed.2d 929 (2007), the Supreme Court clarified the standard of pleading that a plaintiff must meet in order to survive a motion to dismiss under Rule 12(b)(6). The Court noted that "Federal Rule of Civil Procedure 8(a)(2) requires only 'a short and plain statement of the claim showing that the pleader is entitled to relief,' in order to 'give the defendant fair notice of what the ... claim is and the grounds upon which it rests[.]' " *Id.* at 1965 (quoting *Conley v. Gibson,* 355 U.S. 41, 47, 78 S.Ct. 99, 2 L.Ed.2d 80 (1957)); *see also Erickson v. Pardus,* ---U.S. ----, ----, 127 S.Ct. 2197, 2200, 167 L.Ed.2d 1081 (2007). Although "detailed factual allegations" are not necessary to survive a Rule 12(b)(6) motion to dismiss, to provide the "grounds" of "entitle[ment] to relief," a plaintiff must furnish "more than labels and conclusions" or "a formulaic recitation of the elements of a cause of action." *Bell Atlantic Corp. v. Twombly,* 127 S.Ct. at 1964-65;*see also Papasan v. Allain,* 478 U.S. 265, 286, 106 S.Ct. 2932, 92 L.Ed.2d 209 (1986). The Court stated that while there was no "probability requirement at the pleading stage," *Bell Atlantic Corp. v. Twombly,* 127 S.Ct. at 1965, "something beyond ... mere possibility ... must be alleged[.]" *Id.* at 1966.The facts alleged in the complaint "must be enough to raise a right to relief above the speculative level," *id.* at 1965, or must be sufficient "to state a claim for relief that is plausible on its face." *Id.* at 1974.The Court referred to this newly clarified standard as "the plausibility standard." *Id.* at 1968 (abandoning the "no set of facts" language from *Conley v. Gibson* ).

**\*3**[3][4][5] On a motion to dismiss for failure to state a claim under Rule 12(b)(6), the Court "must accept as true all of the factual allegations contained in the complaint."*Erickson v. Pardus,* 127 S.Ct. at 2200;*see also Bell Atlantic Corp. v. Twombly,* 127 S.Ct. at 1965;*Summit Health, Ltd. v. Pinhas,* 500 U.S. 322, 325, 111 S.Ct. 1842, 114 L.Ed.2d 366 (1991). The complaint "is construed liberally in the plaintiffs' favor, and [the Court should] grant plaintiffs the benefit of all inferences that can be derived from the facts alleged."*Kowal v. MCI Communications Corp.,* 16 F.3d 1271, 1276 (D.C.Cir.1994); *see also Browning v. Clinton,* 292 F.3d 235, 242 (D.C.Cir.2002); *Sparrow v. United Air Lines, Inc.,* 216 F.3d 1111, 1113 (D.C.Cir.2000). While the complaint is to be construed liberally in plaintiffs' favor, the Court need not accept inferences drawn by plaintiffs if those inferences are unsupported by facts alleged in the complaint; nor must the Court accept plaintiffs' legal conclusions. *See Kowal v. MCI Communications Corp.,* 16 F.3d at 1276;*Browning v. Clinton,* 292 F.3d at 242.

### III. DISCUSSION

#### A. ERC's Standing[FN4]

Under D.C.Code §§ 29-301.85 and 29-301.86, when a nonprofit corporation's articles of incorporation are revoked for failure to comply with certain reporting rules, then all powers conferred on it are inoperative and it must cease all business activities (because it is deemed to be dissolved), except for those activities necessary for winding up its affairs. ERC concedes that its articles of incorporation were revoked on September 9, 2002 for failure to comply with the reporting and filing requirements of the law. *See* Compl. ¶ 5. ERC represents that it first learned about the revocation of its articles on April 20, 2005, and promptly took all action necessary (*e.g.,* filing the necessary reports and paying the necessary fees) to have that revocation annulled by April 25, 2005. *See id.* According to ERC, it failed to comply with the filing requirements due to a clerical error. *See* Pls.' Opp. at 6.

[6] Woodner argues that ERC lacks standing to pursue its claims because nearly all of Woodner's allegedly discriminatory conduct towards ERC's testers (and any resulting injuries ERC incurred) took place during the period of time when ERC's articles of incorporation were revoked.[FN5] According to Woodner, ERC cannot establish standing to sue on the basis of those allegedly discriminatory acts because, during the period when ERC's articles were revoked, ERC had no legal existence-it was "deemed to have been dissolved," D.C.Code § 29-301.86(c), and hence was legally incapable of suffering the requisite "injury in fact." *See* Def.'s Mot. at 3-4. Woodner further maintains that ERC's reinstatement on April 25, 2005 does not have retroactive effect-that is, it does not permit ERC to sue for injuries allegedly sustained while its articles were revoked. *See* Def.'s Mot. at 4.[FN6]

[7][8][9] Standing under the DCHRA is co-extensive with Article III standing. *See Molovinsky v. Fair Employment Council of Greater Washington, Inc.,* 683 A.2d 142, 146 (D.C.1996). Article III standing requires plaintiffs to show, at an "irreducible constitutional minimum": (1) that they have suffered an injury in fact; (2) that the injury is fairly traceable to the defendant's conduct; and (3) that a favorable

decision on the merits likely will redress the injury. *See Friends of the Earth v. Laidlaw,* 528 U.S. 167, 180-81, 120 S.Ct. 693, 145 L.Ed.2d 610 (2000) (citing *Lujan v. Defenders of Wildlife,* 504 U.S. 555, 560-61, 112 S.Ct. 2130, 119 L.Ed.2d 351 (1992)); *Gettman v. DEA,* 290 F.3d 430, 433 (D.C.Cir.2002). The alleged injury must be concrete and particularized and actual or imminent, not conjectural, hypothetical or speculative. *See Friends of the Earth v. Laidlaw,* 528 U.S. at 180-81; *Lujan v. Defenders of Wildlife,* 504 U.S. at 560-61.

**\*4** [10] The Court concludes that ERC has pled facts sufficient to establish its standing to sue with respect to events and injuries that occurred after its reinstatement, but not before. ERC cannot establish standing to sue with respect to events and injuries that occurred before its reinstatement because, as at least two judges of the Superior Court have concluded with respect to ERC's status:

> District of Columbia law makes clear that while Plaintiff's charter was revoked it ceased to exist except for the limited purpose of winding up its affairs. While in that state, Plaintiff could not suffer the injury it claims in this case, the diversion of its resources from its central mission, because it was not authorized to pursue that mission.... Plaintiff [therefore] may not recover for any injuries suffered during this period. *Equal Rights Center v. E & G Property Svcs., Inc.,* Civil Action No. 05-2761, Order at 2 (D.C.Sup.Ct. Oct. 31, 2006) (Fisher, J.) (citing D.C.Code § 29-301.86(c) and (d)). *See also Equal Rights Center v. Horning Bros.,* Civil Action No. 05-7191, Order at 1-2 (D.C.Sup.Ct. Dec. 21, 2005) (Weisberg, J.); *Equal Rights Center v. Phifer Realty Inc.,* Civil Action No. 05-7190, Order at 1-2 (D.C.Sup.Ct. Dec. 21, 2005) (Weisberg, J.).

[11] Plaintiff basically concedes this point, but argues that "when the District of Columbia reinstated the ERC's charter, the reinstatement ... retroactively 'cured' any actions [ERC] took during the revocation period." Pls.' Opp. at 6. In support of this argument, plaintiff relies primarily on D.C.Code § 29-301.90. Under that provision, reinstatement of a corporation's articles of incorporation shall

> have the effect of annulling the revocation proceedings theretofore taken as to such

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

--- F.Supp.2d ----                                                                                                    Page 7
--- F.Supp.2d ----, 2008 WL 1757752 (D.D.C.)
**(Cite as: --- F.Supp.2d ----, 2008 WL 1757752)**

corporation and such corporation shall have such powers, rights, duties, and obligations as it had at the time of the issuance of the proclamation with the same force and effect as to such corporation as if the proclamation had not been issued.

D.C.Code § 29-301.90(a). ERC's argument is not entirely implausible. As ERC acknowledges, however, other courts addressing this very issue have concluded that Section 29-301.90 does not permit a corporation to give legal effect to all conduct in which it engaged during revocation. In particular, "a corporation may not take advantage of its revoked status, *either to enjoy a benefit derived from acts taken during the period of revocation* or to avoid liability for corporate debts incurred during that period."*Equal Rights Center v. Phifer Realty Inc.,* Civil Action No. 05-7190, Order at 3 (emphasis added); *see also Community Credit Union Svcs., Inc. v. American Federal Express Svcs. Corp.,* 534 A.2d 331, 335 (D.C.1987).*Cf. Accurate Const. Co. v. Washington,* 378 A.2d 681, 684 (D.C.1977) ("*Accurate*") (corporation could not sue on contract executed during revocation period because corporation had no legal capacity to contract before reinstatement). But that is precisely what ERC is attempting to do here. ERC seeks to "enjoy a benefit" (namely, standing to sue) "derived from acts taken during the period of revocation" (namely, sending testers to The Woodner and expending resources to "counteract Defendant's discriminatory conduct," Compl. ¶ 25). The Court concludes that this is not permissible.[FN7]

**\*5** In the alternative, ERC contends that it should be permitted to sue on the basis of the injuries it suffered during the revocation period because (1) the DCHRA permits "unincorporated organizations" to bring suit; (2) ERC was an unincorporated organization during the period when its articles were revoked; and (3) once it was reinstated, ERC became "the successor-in-interest to all rights, title, and interest in any and all claims and causes of action held by the [ERC] as an [unincorporated] organization whiles its Articles of Incorporation were revoked."Compl. ¶ 6.[FN8] ERC cites not a single authority for this argument. In any event, the argument has no merit.

First, while the DCHRA's definition of "person[s]" who can sue includes "unincorporated organization[s]," it does not include successors-in-

interest of unincorporated organizations. D.C.Code § 2-1401.02(21). Second, and more fundamentally, ERC stands before this Court in its incorporated form and seeks relief as such. It therefore must establish standing based on injuries suffered while it was a duly licensed corporation. To hold otherwise would be to eviscerate the provisions of the District of Columbia Code that prescribe consequences for the failure to follow the statutory filing and reporting requirements for corporations. Because ERC cannot establish standing retroactively as a corporation with respect to claims based on events and injuries that occurred during the revocation period, the Court will grant Woodner's motion to dismiss with respect to all of ERC's claims based on events and injuries that occurred prior to April 25, 2005.

[12] Plaintiffs' complaint, however, also seeks relief for injuries purportedly suffered after ERC was reinstated, *see* Compl. ¶¶ 24-31, and Woodner has not argued that ERC has failed to plead facts sufficient to withstand a motion to dismiss with respect to those injuries. The Court therefore will not dismiss ERC's claims based on events that occurred after it was reinstated on April 25, 2005. *See Equal Rights Center v. Phifer Realty Inc.,* Civil Action No. 05-7190 at 3.[FN9]

### B. Preemption

Defendant also argues that plaintiffs' discrimination claims are premised on faulty readings of the DCHRA and basic misunderstandings of the relationship between local and federal law. According to defendant, the provision of the DCHRA prohibiting discrimination on the basis of a voucher holder's status as a voucher holder cannot be read as actually prohibiting such discrimination, because to read the provision in that way would be to override federal law, which provides that landlords' participation in the Housing Choice Voucher Program is voluntary. *See* Def.'s Mot. at 4; *id.* at 5 ("Under Federal law, landlords may accept as many or as few ... voucher holders as they so choose."). Thus, defendant argues that to allow the DCHRA to impose "mandatory" participation in the program by way of a prohibition on discrimination against voucher holders would contravene general principles of preemption, the District of Columbia Home Rule Act, and the plain language of the DCHRA itself. Def.'s Mot. at 5.[FN10]

--- F.Supp.2d ----                                                                    Page 8
--- F.Supp.2d ----, 2008 WL 1757752 (D.D.C.)
**(Cite as: --- F.Supp.2d ----, 2008 WL 1757752)**

**\*6**[13][14] As an initial matter, Woodner is wrong to assume that reading the DCHRA to prohibit discrimination against voucher holders on the basis of their status as voucher holders is tantamount to "mandating" participation in the program. Landlords remain free not to rent to voucher holders provided they do so on other legitimate, non-discriminatory grounds, such as an applicant's rental history or criminal history. *See Montgomery County v. Glenmont Hills Assocs. Privacy World at Glenmont Metro Centre,* 936 A.2d at 330;*see also*24 C.F.R. § 982.307(a)(3) ("The owner is responsible for screening of [voucher holders] on the basis of their tenancy histories," including such things as drug-related criminal activity, rental payment history, and care of premises.). In addition, the Housing Choice Voucher Program requires participants to rent units with rental costs in a particular range. If a landlord charges rents that are too high for the Housing Choice Voucher Program-assuming he or she does so for non-discriminatory reasons-he or she is not compelled to lower rents in order to permit voucher holders to rent those units. *See Montgomery County v. Glenmont Hills Assocs. Privacy World at Glenmont Metro Centre,* 936 A.2d at 334 n. 7.

[15][16][17][18]         Putting aside this mischaracterization of the issue, it appears that the essence of Woodner's preemption argument is that, if the DCHRA imposes a non-discrimination requirement, then it is preempted by the federal statute establishing the Housing Choice Voucher Program (and specifically the voluntary nature of that program) under the theory of "conflict preemption." *See California Federal Savings and Loan Assoc. v. Guerra,* 479 U.S. 272, 280-81, 107 S.Ct. 683, 93 L.Ed.2d 613 (1987). Pursuant to the Supremacy Clause of the United States Constitution, a state law must give way to a federal law under the theory of conflict preemption when "compliance with both [the state law and the federal law] is a physical impossibility," or when "the state law stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress."*Id.* at 281 (internal quotation marks and citations omitted). A state law that imposes additional requirements over and above those imposed by a federal law does not, however, necessarily "conflict" with federal law in either manner. *See id.* at 290-92.And federal preemption is not to be lightly presumed-particularly

if it would have an impact on a state's power to regulate matters of local concern, such as discrimination in housing. *See Medtronic v. Lohr,* 518 U.S. 470, 485, 116 S.Ct. 2240, 135 L.Ed.2d 700 (1996) ("[W]e have long presumed that Congress does not cavalierly pre-empt state-law causes of action."). Because preemption in this case would effect the District of Columbia's power to regulate a matter of local concern, the Court will not presume that Congress intended to circumscribe local authority in the manner suggested by Woodner.[FN11]

[19] Moreover, the applicable case law compels the conclusion that prohibiting discrimination on the basis of a voucher holder's status as a voucher holder would not conflict with federal law in a way prohibited by the Supremacy Clause. First, a non-discrimination requirement would neither compel nor permit parties to violate any provision of the Housing Choice Voucher Program. As the Supreme Judicial Court of Massachusetts has observed:

> **\*7** It does not follow that, merely because Congress provided for voluntary participation, the States are precluded from mandating participation absent some valid non-discriminatory reason for not participating. The Federal statute merely creates the scheme and sets out the guidelines for the funding and implementation of the program ... through local housing authorities. It does not preclude State regulation.

*Attorney General v. Brown,* 400 Mass. 826, 511 N.E.2d 1103, 1107 (Mass.1987); *see also Montgomery County v. Glenmont Hills Assocs. Privacy World at Glenmont Metro Centre,* 936 A.2d at 336-40 (same). Second, a non-discrimination requirement would not stand as an obstacle to the Housing Choice Voucher Program's central objective-that is, to "ai[d] low-income families in obtaining a decent place to live."*Cisneros v. Alpine Ridge Group,* 508 U.S. 10, 12, 113 S.Ct. 1898, 123 L.Ed.2d 572 (1993) (quoting 42 U.S.C. § 1437f(a)). Indeed, prohibiting discrimination in this manner will "advance rather than denigrate" that objective. *Montgomery County v. Glenmont Hills Assocs. Privacy World at Glenmont Metro Centre,* 936 A.2d at 336. Thus, the DCHRA's non-discrimination provision can hardly be described as altering, amending, or conflicting with federal law in any material sense. *See Assoc. Indus. of Mass. v. Snow,*

--- F.Supp.2d ----                                                                    Page 9
--- F.Supp.2d ----, 2008 WL 1757752 (D.D.C.)
**(Cite as: --- F.Supp.2d ----, 2008 WL 1757752)**

898 F.2d 274, 283 (1st Cir.1990) (noting that, under a conflict preemption analysis, "the question is not whether a congressionally calibrated system is altered by state law, but if altered, whether the change obstructs the purpose of Congress."); *see also Commission on Human Rights and Opportunities v. Sullivan Assocs.,* 250 Conn. 763, 739 A.2d 238, 245-46 (Conn.1999); *Franklin Tower One, LLC v. N.M.,* 157 N.J. 602, 725 A.2d 1104, 1113-14 (N.J.1999). The Court therefore concludes that the DCHRA's anti-discrimination requirement is not preempted by federal law.[FN12]

### C. "Source of Income"

Since 1977, the DCHRA has prohibited discrimination on the basis of an applicant's "source of income," *see* D.C.Code § 2-1402.21(a), and has defined "source of income" to include "federal payments." D.C.Code § 2-1401.02(29). In April 2002, the Council of the District of Columbia enacted the Low-Income Housing Preservation and Protection Act, D.C.Code §§ 42-2851.01 *et seq.,* which expressly declared that Housing Choice Voucher Program assistance constitutes a "source of income" for purposes of the DCHRA. *See* D.C.Code § 42-2851.06. The District of Columbia Council subsequently passed technical amendments to this provision. Those amendments, which became effective on April 13, 2005, corrected an error which applied the provision to public accommodations rather than to private housing. *See* D.C.Code § 2-1402.21(e). Woodner argues that it cannot be held liable for discriminating against applicants-including Ms. Bourbeau and ERC's testers-on account of their voucher holder status between April 2002 and April 13, 2005, because the DCHRA did not expressly prohibit discrimination on the basis of voucher holder status in private housing until after the technical amendments became effective on April 13, 2005. *See* Def.'s Mot. at 6-7. The Court disagrees.

**\*8** [20] Woodner's argument is foreclosed by the plain language of the statute. *See Desert Palace, Inc. v. Costa,* 539 U.S. 90, 98, 123 S.Ct. 2148, 156 L.Ed.2d 84 (2003) ("Where the words of the statute are unambiguous, the judicial inquiry is complete.") (internal quotation marks and citations omitted). Long before passage of the 2002 legislation or the 2005 technical amendments, the DCHRA defined "source of income" to include "federal payments."

The term "federal payments" clearly encompasses rental assistance payments provided by the federal government. Neither the passage of the 2002 legislation or the 2005 technical amendments undermines this conclusion. Plaintiffs argue, and defendant does not dispute, that in introducing the 2002 legislation the sponsors announced their intention to "clarify"-not establish-that voucher assistance is considered a "source of income" under the DCHRA. *See* Pls.' Opp. at 23. The mere fact that the Council *clarified* the point in 2002 does not demonstrate that voucher assistance was not regarded as a "source of income" before 2002. *See Needle v. Hoyt,* 644 A.2d 1369, 1372-73 (D.C.1994).

### D. Negligent Supervision Claim

The discussion above focused on plaintiffs' claims under the DCHRA. As noted, plaintiff ERC also alleges that Woodner is liable for negligent supervision of its employees. *See* Compl. ¶ 39. Woodner did not respond to this claim in any of its papers. The Court therefore will permit plaintiff ERC to pursue its negligent supervision claims to the extent that those claims are based on events that occurred *after* April 25, 2005.

SO ORDERED.

> FN1. The papers submitted in connection with this matter include: Defendant's Motion to Dismiss Complaint for Failure to State a Claim for which Relief May Be Granted ("Def.'s Mot."); Plaintiffs' Memorandum of Points and Authorities in Opposition to Defendant's Motion to Dismiss for Failure to State a Claim ("Pls.' Opp."); Defendants' Reply to Plaintiffs' Motion [sic] to Dismiss for Failure to State a Claim ("Def.'s Reply"); Plaintiffs' Notice of Supplemental Authority; and Supplemental Points and Authorities in Support of Defendant's Motion to Dismiss for Failure to State a Claim.

> FN2. "The Housing Choice Voucher Program [is] part of a multifaceted Federal housing program authorized under 42 U.S.C. §§ 1437 through 1440." *Montgomery County v. Glenmont Hills Assocs. Privacy World at Glenmont Metro Centre,* 402 Md. 250, 936

A.2d 325, 329 (Md.2007).

FN3. The parties' papers do not indicate whether Ms. Borbeau had any affiliation or connection with ERC at this point. The Court assumes that she did not.

FN4. As noted above, *See supra* at 4, Woodner challenges ERC's standing to sue, but not Ms. Bourbeau's standing to sue.

FN5. Though neither party addresses the issue, the Court notes that at least some of Woodner's allegedly discriminatory conduct took place *before* ERC's articles of incorporation were revoked. *See* Compl. ¶¶ 18-19 (alleging discriminatory behavior towards ERC's testers on January 29, 2002). These events cannot provide the basis for ERC's standing, however, because any claims based on these events are time-barred. *See*D.C.Code § 2-1403.16 (private DCHRA suits alleging discrimination in real estate transactions must be brought within two years of the unlawful discriminatory act).

FN6. To be clear, Woodner does not argue that the injuries identified by ERC are not "injuries" for purposes of the standing analysis. (Nor does Woodner maintain that ERC could not establish any other element of the standing test, *if* ERC had been incorporated during the time it alleges discriminatory conduct on Woodner's part.) Rather, Woodner simply argues that, because ERC was legally incapable of being injured between September 9, 2002 and August 25, 2005, it cannot establish standing based on Woodner's allegedly discriminatory conduct and any resulting injuries ERC suffered during that time period.

FN7. ERC relies on dicta in the *Accurate* decision for the proposition that "a case-by-case equitable analysis [must] be completed" before deciding whether a corporation's reinstatement retroactively validates revocation-period conduct. Pls.' Opp. at 8. In fact, in that case, the District of

Columbia Court of Appeals merely observed that "[t]here may ... be cases where equitable considerations [would make it] unreasonable to charge a corporation with responsibility for revocation of its charter," and that in such cases it might be appropriate to allow "reinstatement of corporate identity [to] retroactively validate [ ] ... unlawful action."Accurate Const. Co. v. Washington, 378 A.2d at 685. Here, ERC has argued that its failure to maintain its corporate status was inadvertent, but it has not argued that "equitable considerations" should relieve it of responsibility for that failure. Thus, the *Accurate* dicta is of no help to ERC.

FN8. The DCHRA grants a private right of action to "any person claiming to be aggrieved" by a violation of the DCHRA, D.C.Code § 2-1403.16, and defines "person" to include "unincorporated organization[s]." D.C.Code § 2-1401.02(21).

FN9. Woodner asserts that *all* of ERC's claims must be dismissed, but offers no explanation for this assertion. *See* Def.'s Reply at 2 n. 2. Because Woodner cites-among other cases-*Tatum v. Townsend,* 61 A.2d 478 (D.C.1948), the Court assumes that Woodner has in mind the proposition that a "[p]laintiff's right to any recovery depend[s] upon its right at the inception of the suit, and the nonexistence of a cause of action when the suit was started is a fatal defect, which cannot be cured by the accrual of a cause pending suit."Tatum v. Townsend, 61 A.2d at 480 (internal quotation marks and citation omitted). The proposition is correct but inapplicable; the Court is permitting ERC to pursue claims based on events that (allegedly) occurred *after* ERC was reinstated and *before* it filed suit.

FN10. The District of Columbia Home Rule Act provides that the District of Columbia City Council "shall have no authority to pass any act ... to amend or repeal any Act of Congress ... which is not restricted in its application exclusively in or to the District."D.C.Code § 1-206.02(a)(3).

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

--- F.Supp.2d ----                                                                    Page 11
--- F.Supp.2d ----, 2008 WL 1757752 (D.D.C.)
**(Cite as: --- F.Supp.2d ----, 2008 WL 1757752)**

> The DCHRA provides that it should not be "construed to supersede any Federal rule, regulation or act."D.C.Code § 2-1401.03.

> <u>FN11.</u> As plaintiffs point out, there is a good deal of evidence militating against such a presumption. For example, the federal law setting forth the Housing Choice Voucher Program does not contain an express preemption clause. In addition, HUD regulations themselves provide that the Housing Choice Voucher Program was not "intended to pre-empt operation of State and local laws that prohibit discrimination against a [Housing Choice Voucher Program] voucher-holder because of status as a ... voucher-holder."<u>24 C .F.R. § 982.53(d)</u>. The Court owes substantial deference to HUD's interpretation of the laws it administers. *See <u>Chevron, U.S.A., Inc. v. Natural Resources Defense Council, Inc.,</u> 467 U.S. 837, 844, 104 S.Ct. 2778, 81 L.Ed.2d 694 (1984)*.

> <u>FN12.</u> The Court disagrees with the Seventh Circuit's suggestion, in dictum, that prohibiting discrimination on the basis of a voucher holder's status as a voucher holder might conflict with federal law. *See <u>Knapp v. Eagle Prop. Mgmt. Corp.,</u> 54 F.3d 1272, 1282 (7th Cir.1995)*.

D.D.C.,2008.
Bourbeau v. The Jonathan Woodner Co.
--- F.Supp.2d ----, 2008 WL 1757752 (D.D.C.)

END OF DOCUMENT

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Westlaw.

Not Reported in F.Supp.                                                                                          Page 1
Not Reported in F.Supp., 1992 WL 236891 (E.D.Pa.)
**(Cite as: Not Reported in F.Supp., 1992 WL 236891)**

Ⅽ Gillis v. McDonald's Corp.
E.D.Pa.,1992.
Only the Westlaw citation is currently available.
United States District Court, E.D. Pennsylvania.
Lesha GILLIS and Randy GILLIS, Plaintiffs
v.
MCDONALD'S CORPORATION, Defendant.
**Civ. A. No. 91-7202.**

Sept. 10, 1992.

Joseph F. Roda, Joseph F. Roda, P.C., Ronald C. Messmann, Joseph F. Roda, P.C., Lancaster, Pa., for plaintiffs.
Michael W. Babic, Kevin M. French, Hartman, Underhill & Brubaker, Lancaster, Pa., for defendant.

MEMORANDUM AND ORDER

GAWTHROP, District Judge.
**\*1** The plaintiffs have sued McDonald's for injuries resulting from a slip and fall. McDonald's has moved to dismiss for failure to join an indispensable party, namely the franchisees, Robert and Catherine Snyder. The plaintiffs argue that the franchisees are not indispensable and that either McDonald's can implead them as third-party defendants under Fed.R.Civ.P. 14(a), or the franchisees can intervene under Fed.R.Civ.P. 24. They further argue that McDonald's is not prejudiced by the absence of their franchisees since nothing procedurally precludes McDonald's from establishing their liability as a defense at trial. See Clements v. Holiday Inns, Inc., 105 F.R.D. 467, 471 (E.D.Pa.1984), citing Campbell v. Triangle Corp., 56 F.R.D. 480 (E.D.Pa.1972). The issue presented is whether the franchisees are indispensable parties under Fed.R.Civ.P. 19 in a business invitee's negligence suit for injuries sustained on the premises.

On November 24, 1989, Lesha Gillis allegedly slipped and fell from an unreasonable accumulation of snow and ice on the premises of the McDonald's restaurant located on Route 501, Lititz, Warwick Township, Lancaster County, Pennsylvania. She and her husband, alleging diversity, sued McDonald's in

this court but omitted its franchisees. The Gillises later filed a complaint in state court against both McDonald's and the Snyders for the same incident. McDonald's has moved to dismiss the federal court proceeding arguing that the Snyders are indispensable parties. I agree.

1. Are the Franchisees Necessary?

Fed.R.Civ.P. 19(a) states that a person is a necessary party if any of three factors is met:

(1) in his absence complete relief cannot be accorded among those already parties, *or* (2) he claims an interest relating to the subject of the action and is so situated that the disposition of the action in his absence may (i) as a practical matter impair or impede his ability to protect that interest *or* (ii) leave any of the persons already parties subject to a substantial risk of incurring double, multiple or otherwise inconsistent obligations by reason of his claimed interest. (emphasis supplied)

The Snyders qualify as necessary parties in two ways. First, under Fed.R.Civ.P. 19(a)(1), the plaintiffs may not be able to obtain "complete relief," or any relief for that matter, from McDonald's, the current defendant. *See* Crompton v. Southland Corp., 1987 WL 8537 (E.D.Pa.1987). I perceive five relationships between McDonald's and the Snyders: (1) owner-possessor, (2) lessor-lessee, (3) licensor-licensee, (4) principal-agent, and (5) franchisor-franchisee. Under any of these, however, I find it highly unlikely that the plaintiffs could successfully hold McDonald's liable for the injuries. I treat them in turn.

(1) *Owner-possessor.* McDonald's cannot be held liable as the title owner of the property because Pennsylvania law imposes liability upon the possessor of land for physical harm to invitees caused by the possessor's failure to exercise reasonable care. Bloom v. Waste Management, Inc., 615 F.Supp. 1002, 1015 (E.D.Pa.1985), *aff'd,* 800 F.2d 1131 (1986), citing Giannone v. U.S. Steel Corp., 238 F.2d 544 (3d Cir.1956) and Mathis v. Lukens Steel Co., 415 Pa. 262, 203 A.2d 482 (1964). Title ownership is not a sufficient basis for liability; the possessor bears

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.                                                                                        Page 2
Not Reported in F.Supp., 1992 WL 236891 (E.D.Pa.)
**(Cite as: Not Reported in F.Supp., 1992 WL 236891)**

responsibility for hazardous conditions on the premises. *Bloom v. Waste Management, Inc.,* 615 F.Supp. 1002, 1015 (E.D.Pa.1985), *aff'd,* 800 F.2d 1131 (1986), citing *Bagley v. Philadelphia,* 148 Pa.Super. 318, 326, 25 A.2d 579, 582 (1942) and *Whitaker v. Hills,* 430 F.Supp. 1389, 1390-91 (E.D.Pa.1977).

**\*2** (2) *Lessor-lessee.* Similarly, it is doubtful that the lessor-lessee relationship would provide a basis for liability because the lease imposes responsibility upon the lessees for daily maintenance. Operator's Lease ¶ 2.08 & 4.02 [All references are to the three-year franchisee agreement of 12/28/87, the agreement in effect at the time of plaintiff's accident]. *See also Dorsey v. Continental Assoc.,* 404 Pa.Super. 525, 591 A.2d 716, 718-19 (1991) (discussing general rule that a landlord out of possession is not responsible for injuries sustained by third parties on the premises and listing exceptions which appear not applicable to the present case).

(3) *Licensor-licensee.* The Snyders, as franchisees, are also licensees of the restaurant system that McDonald's developed. License Agreement, ¶ A. However, McDonald's, as the licensor, is not liable for the alleged negligent removal of ice and snow because the license agreement explicitly provides that maintenance of the parking area is the responsibility of the licensees. License Agreement, ¶ 12(a) and (e).

(4) *Principal-agent.* The agency theory of recovery also fails, because the contract specifically negates any principal-agent relationship, express or implied, between McDonald's and the Snyders. Operator's Lease, ¶ 8.01 & License Agreement ¶ 16. This fact sufficiently distinguishes this case from the result reached in *Clements v. Holiday Inns, Inc.,* 105 F.R.D. 467, 469 (E.D.Pa.1984), which was based on an agency rationale.

(5) *Franchisor-franchisee.* Finally, resort to the franchisor-franchisee relationship is unavailing, because the franchise letter agreement incorporates by reference both the lease and license agreement which, as discussed above, make the franchisees responsible for day-to-day maintenance of the premises. Franchise Letter Agreement, ¶ 1.

The second way in which the franchisees are necessary parties is under Fed.R.Civ.P. 19(a)(2)(i)

because resolution of this action without them may severely "impair or impede" their ability to protect against incurring financial responsibility for the plaintiff's injuries. Notwithstanding my liability discussion, should McDonald's, perchance, lose on the merits, it will likely seek indemnification from the Snyders pursuant to the indemnity clause of the franchisee agreement. License Agreement, ¶ 24 & Operator's Lease, ¶ 7.02, incorporated into the franchisee agreement through ¶ 1 of the franchise letter agreement dated 12/28/87. Thus, the franchisees are necessary parties under both Fed.R.Civ.P. 19(a)(1) and (a)(2)(i).

2. Are the Franchisees Indispensable?

Not only are the Snyders necessary parties, but their joinder would destroy diversity because the Gillises and the Snyders are citizens of Pennsylvania. (This, obviously, is the reason their names do not grace the nether end of the caption in the federal suit.) As a result, I must decide whether they are indispensable parties, in which case the court must, in "equity and good conscience," dismiss the action. The factors to consider are:

**\*3** first, to what extent a judgment rendered in the person's absence might be prejudicial to him or those already parties; second, the extent to which, by protective provisions in the judgment, by the shaping of relief, or other measures, the prejudice can be lessened or avoided; third, whether a judgment rendered in the person's absence will be adequate; fourth, whether the plaintiff will have an adequate remedy if the action is dismissed for nonjoinder.

Fed.R.Civ.P. 19(b).

The Supreme Court has interpreted these four factors as (1) the plaintiff's interest in having a forum; (2) the defendant's interest in avoiding multiple litigation or sole responsibility for a shared liability; (3) the extent to which the judgment may hinder the outsider's ability to protect his interest in the subject matter; and (4) the court's and the public's interest in complete, consistent and efficient settlement of controversies. *Provident Tradesmen's Bank & Trust Co. v. Patterson,* 390 U.S. 102, 109-111 (1968).

Here, three of these four interests weigh in favor of dismissal. Plaintiffs have an alternative forum,

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.                                                                                   Page 3
Not Reported in F.Supp., 1992 WL 236891 (E.D.Pa.)
**(Cite as: Not Reported in F.Supp., 1992 WL 236891)**

namely state court, in which to litigate the dispute; the public's interest is best satisfied by dismissal because the dispute can be settled in its entirety in state court; and McDonald's understandably seeks to avoid multiple litigation. *See 123 S. Broad Street Corp. v. Cushman & Wakefield,* 121 F.R.D. 42 (E.D.Pa.1988). Furthermore, "there is a very real chance that any judgment obtained in the absence of the franchisees may be inadequate because the plaintiffs may be unable to obtain any relief at all in this federal action because of the franchisee agreement." *Crompton v. Southland Corp.,* 1987 WL 8537 (E.D.Pa.1987). It would appear that, rather than full recovery, at most, they could only get a quarter pound of flesh.

The plaintiffs cite *Bank of America v. Hotel Rittenhouse Assoc.,* 844 F.2d 1050, 1054 (3d Cir.1988), for the proposition that even if the Snyders were necessary parties, the Third Circuit has held that an absent, non-diverse joint tortfeasor is not indispensable. However, this statement assumes that McDonald's and the Snyders are joint tortfeasors and, thus, jointly and severally liable for the same injury. *See, e.g., Gold v. Johns-Manville Sales Corp.,* 723 F.2d 1068, 1076 (3d Cir.1983) (debtors are potential joint tortfeasors) and *Bank of American v. Hotel Rittenhouse Associates,* 844 F.2d 1050 (3d Cir.1988) (joint obligors). This court is not willing to make such an assumption, which would appear to fly in the face of fact and law. McDonald's is not a tortfeasor, let alone a joint tortfeasor, unless it was negligent. And notably, because of the franchisee agreement, McDonald's is most likely not legally responsible for the alleged accumulation of snow and ice on its parking lot, even though it is the record owner of the premises.

An order follows.

ORDER

AND NOW this 26th day of August, 1992, upon consideration of the defendant's Motion to Dismiss Pursuant to Fed.R.Civ.P. 12(b)(7) and the Opposition filed thereto,

**\*4** IT IS HEREBY ORDERED that Defendant's Motion to Dismiss is GRANTED, the case is dismissed.

E.D.Pa.,1992.
Gillis v. McDonald's Corp.
Not Reported in F.Supp., 1992 WL 236891 (E.D.Pa.)

END OF DOCUMENT

**EXHIBIT 14**
**Part C**

Westlaw.

Slip Copy                                                                                                      Page 1
Slip Copy, 2007 WL 1438489 (D.D.C.)
(Cite as: Slip Copy, 2007 WL 1438489)

C Holt v. American City Diner, Inc.
D.D.C.,2007.
Only the Westlaw citation is currently available.
United States District Court,District of Columbia.
Russell HOLT, Plaintiff,
v.
AMERICAN CITY DINER, INC., Defendant.
No. 05-1745 (CKK).

May 15, 2007.

Gene R. Zweben, Schwartz Zweben & Slingbaum, LLP, Stuart, FL, Jason E. Miles, Schwartz,Zweben & Slingbaum, LLP, Baltimore, MD, for Plaintiff.
Jay Stephan Weiss, Washington, DC, for Defendant.

**MEMORANDUM OPINION**

COLLEEN KOLLAR-KOTELLY, United States District Judge.
**\*1** Plaintiff Russell Holt filed a Complaint on August 31, 2005, against Defendant, American City Diner, Inc. (hereinafter, "American City Diner"), alleging that Defendant's restaurant (also named the American City Diner, hereinafter "the Restaurant") violated Title III of the Americans with Disabilities Act (ADA), 42 U.S.C. § 12101 et seq., by discriminating against Plaintiff by "denying access to, and safe, full and equal enjoyment of the goods, services, facilities, privileges, advantages and/or accommodations" at the Restaurant. Pl.'s Compl. ¶¶ 1, 3, 7, 9. Presently pending before the Court is Defendant's [25] Motion for Summary Judgment, filed on October 25, 2006, arguing that Plaintiff lacks standing to bring the instant suit. On November 13, 2006, Plaintiff filed an Opposition. No Reply was filed. Also pending before the Court is Plaintiff's [24] Motion for Summary Judgment on the merits, to which no Opposition was filed. As the Court concludes that Plaintiff does not have standing to bring this suit based the filings and the relevant statutes and case law, the Court shall GRANT Defendant's [25] Motion for Summary Judgment and accordingly DENY AS MOOT Plaintiff's [24] Motion for Summary Judgment.

**I. BACKGROUND**

The Court notes as an initial matter that neither party, in filing its summary judgment motion, complied with Local Civil Rule 7(h). According to Local Rule 7(h), the moving party to a summary judgment motion is required to separately provide "a statement of material facts as to which the moving party contends there is no genuine issue, which shall include references to the parts of the record relied on to support the statement."LCvR 7(h). Neither party explicitly complied with this mandate; both include such statements in their memoranda.

The Parties' deviation from the intent of this Local Civil Rule undermines the purpose of the Rule, which is to assist the Court in quickly determining if any facts are actually in dispute. See Jackson v. Finnegan, Henderson, Farabow, Garrett & Dunner, 101 F.3d 145, 153 (D.C.Cir.1996) ("[R]epeatedly blending factual assertions with legal argument, the 'relevant facts' section does not satisfy the purposes of a [Rule 7(h) ] statement."); Robertson v. Am. Airlines, 239 F.Supp.2d 5 (D.D.C.2002) (striking defendant's motion for summary judgment for noncompliance with the Local Civil Rules because the "statement of material facts not in genuine dispute" included no citations to the record and improperly mixed factual allegations with argument). While the purpose of Rule 7(h) is to "plac[e] the burden on the parties and their counsel, who are most familiar with the litigation and the record, to crystallize for the district court the material facts and relevant portions of the record," Finnegan, 101 F.3d at 151, the Court shall accept the additional burden placed on it in this instance by both Parties. Since the Court shall first address Defendant's [25] Motion for Summary Judgment, as the sole issue raised therein is whether Plaintiff has standing to bring the instant case, the Court shall compare the facts as set forth in Defendant's [25] Memorandum with those proffered by Plaintiff in his Opposition. In so doing, the Court concludes that no genuine issues of material fact exist, as both Parties rely on Plaintiff's affidavit and interrogatory answers in drawing their factual conclusions.

**\*2** Plaintiff is a resident of Boyds, Maryland, who is diagnosed with paraplegia and uses a wheelchair full

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Slip Copy                                                                                           Page 2
Slip Copy, 2007 WL 1438489 (D.D.C.)
(Cite as: Slip Copy, 2007 WL 1438489)

time. Def.'s Mot. for Summ. J. ¶ 1; Pl.'s Opp'n at 1; Compl. at 1. Plaintiff is the Executive Director of Access Information, Inc. and works from home.[FN1] Def.'s Mot. for Summ. J. ¶ 4(a); Pl.'s Opp'n, Ex. B at 3. Plaintiff has brought at least 17 other ADA actions, largely in the United States District Court for the District of Columbia and the United States District Court for the District of Maryland. Def.'s Mot. for Summ. J. ¶ 4(c) & (d); Pl.'s Opp'n, Ex. B (PACER Attachments to Interrog. Answers).

> FN1. While Plaintiff's Complaint states that "Mr. Holt works in Washington, DC," Compl. ¶ 3, Plaintiff's Interrogatory Answers clarify that his employment address is the same as his home address in Boyds, Maryland. Pl.'s Opp'n, Ex. B (Interrog.Answers) at 3.

Some time in August of 2004, Plaintiff visited the Restaurant, located at 5532 Connecticut Ave., NW, Washington, DC, 20015, at approximately 1:30 p.m. Def.'s Mot. for Summ. J. ¶ 2; Pl.'s Opp'n at 2, Ex. B at 3 (Plaintiff's Answers to Interrogatories ("Interrog .Answers")). Plaintiff's residence is located approximately 26 miles away from the Restaurant. Def.'s Mot. for Summ. J. ¶ 4(a) & n. 1, Ex. 1; Pl.'s Opp'n at 10. The Restaurant is not part of a larger chain of businesses. Def.'s Mot. for Summ. J. ¶ 4(c). On the unspecified date in question, Plaintiff:

had time prior to a meeting and was hungry and wanted to have lunch. Plaintiff further stated that he parked on the street in front of the restaurant to go inside and have some food and prepare for his meeting. He wheeled up toward the restaurant and saw how difficult and dangerous it was to access the main entrance due to his disability and use of a wheelchair. He looked to see if there was a way he could ask for help to gain access, but he couldn't even get close enough to the entrance to get anyone's attention from the restaurant for help so he left.

Pl.'s Opp'n at 2 (citing Ex. B (Interrog.Answers) ¶ 4).

On August 31, 2005, at least one year after Plaintiff visited the Restaurant, Plaintiff filed a Complaint alleging nine violations of the ADA and 28 C.F.R. § 36.302, et. seq. Compl. ¶ 12. Plaintiff's Complaint states that Defendant is discriminating against the Plaintiff via the following barriers to access:

i. The threshold at the ramp outside the entrance to the restaurant is too high;

ii. There is no level landing provided outside the entry door to the restaurant;

iii. There is insufficient clear floor space provided outside the entry door to the restaurant;

iv. There is insufficient knee clearance provided at the common use lavatory;

v. The door to the toilet room contains hardware that requires tight grasping, pinching and twisting of the wrist;

vi. The lavatory contains hardware that requires tight grasping, pinching and twisting of the wrist;

vii. The "accessible" toilet stall is too narrow;

viii. The "accessible" toilet stall lacks adequate and compliant grab bars;

ix. There is an insufficient number of "accessible" seating positions provided in the RESTAURANT.

Compl. ¶ 12. While in Plaintiff's Affidavit, Plaintiff indicates that during his "visits" to the Restaurant, Plaintiff himself "encountered barriers to access associated with the accessible parking, accessible route to the accessible restaurant entrance, accessible entrance doors, the toilet room and accessible dining room seating," Pl.'s Opp'n, Ex. A (Holt Affidavit) ¶ 3, Plaintiff admits in his Opposition that he did not actually enter the restaurant. Def.'s Mot. for Summ. J. ¶¶ 3, 6; Pl.'s Opp'n at 2 ("Plaintiff acknowledges not being served within the American City Diner. He further stated that he 'failed to enter the restaurant because it was too difficult and dangerous to do so and he believed that it was likely he would have been physically injured .'" (quoting Interrog. Answers 7, 14) (internal citations omitted)). Accordingly, a number of the "barriers to access" listed by Plaintiff were not observed by Plaintiff himself. Def.'s Mot. for Summ. J. ¶ 3; Pl.'s Opp'n at 2-3 (indicating that Plaintiff's prior counsel visited the restaurant prior to the filing of suit and informed Plaintiff of the other barriers to access). Plaintiff further admits that he did

not return to the restaurant after this one "visit" prior to filing the Complaint. Def.'s Mot. for Summ. J. ¶ 4(b); Pl.'s Opp'n at 2, 10-11.

**\*3** In Plaintiff's Complaint, Plaintiff states that he "continues to desire to and intends visit [sic] the Defendant's premises in the future, but continues to be denied full, safe and equal access due to the violations which continue to exist."Compl. ¶ 3. In his Opposition to Defendant's Motion for Summary Judgment, Plaintiff states that he "intends to go back to the restaurant once these barriers are removed."Pl.'s Opp'n at 8. Plaintiff states without further specification that "[h]e travels to this area approximately three times per week."Pl.'s Opp'n at 1. *See also id.,* Ex. B (Interrog.Answers) at 4 ("I frequently go to the area where this restaurant is located. I am in that area approximately three times per week."). Plaintiff requests injunctive and declaratory relief, in addition to reasonable attorney's fees. Compl. at 5-6. Defendant states and Plaintiff does not refute that "during that entire one year period [prior to Plaintiff filing suit], the Plaintiff never communicated personally or through counsel to the Defendant or anyone on behalf of the Defendant any concerns about accessibility to the restaurant for individuals with disabilities such as that from which [Plaintiff] suffers."Def.'s Mot. for Summ. J. ¶ 4.

On October 25, 2006, Defendant filed Defendant's [25] Motion for Summary Judgment, arguing that Plaintiff lacks standing to bring the instant suit. On November 13, 2006, Plaintiff filed an Opposition. No Reply was filed.

## II. LEGAL STANDARD

A party is entitled to summary judgment if the pleadings, depositions, and affidavits demonstrate that there is no genuine issue of material fact in dispute and that the moving party is entitled to judgment as a matter of law. *See*Fed.R.Civ.P. 56(c); *Tao v. Freeh,* 27 F.3d 635, 638 (D.C.Cir.1994). Under the summary judgment standard, Defendant, as the moving party, "bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of 'the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any' which it believes demonstrate the absence of a genuine issue of material fact."*Celotex Corp. v.*

*Catrett,* 477 U.S. 317, 323, 106 S.Ct. 2548, 2553, 91 L.Ed.2d 265 (1986). Plaintiff, in response to Defendant's motion, must "go beyond the pleadings and by [his] own affidavits, or by the 'depositions, answers to interrogatories, and admissions on file,' designate 'specific facts showing that there is a genuine issue for trial.' " *Id.* at 324, 106 S.Ct. 2548.

Although a court should draw all inferences from the supporting records submitted by the nonmoving party, the mere existence of a factual dispute, by itself, is not sufficient to bar summary judgment. *See Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 247-48, 106 S.Ct. 2505, 2510, 91 L.Ed.2d 202 (1986). To be material, the factual assertion must be capable of affecting the substantive outcome of the litigation; to be genuine, the issue must be supported by sufficient admissible evidence that a reasonable trier-of-fact could find for the nonmoving party. *Laningham v. U.S. Navy,* 813 F.2d 1236, 1242-43 (D.C.Cir.1987); *Liberty Lobby,* 477 U.S. at 251-52, 106 S.Ct. 2505 (the court must determine "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law")."If the evidence is merely colorable, or is not sufficiently probative, summary judgment may be granted."*Liberty Lobby,* 477 U.S. at 249-50, 106 S.Ct. 2505 (internal citations omitted)."Mere allegations or denials of the adverse party's pleading are not enough to prevent the issuance of summary judgment."*Williams v. Callaghan,* 938 F.Supp. 46, 49 (D.D.C.1996). The adverse party "must do more than simply show that there is some metaphysical doubt as to the material facts."*Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 586, 106 S.Ct. 1348, 1356, 89 L.Ed.2d 538 (1986). Instead, while the movant bears the initial responsibility of identifying those portions of the record that demonstrate the absence of a genuine issue of material fact, the burden shifts to the non-movant to "come forward with 'specific facts showing that there is a *genuine issue for trial.*' " *Id.* at 587, 106 S.Ct. 1348 (citing Fed.R.Civ.P. 56(e)) (emphasis in original).

## III. DISCUSSION

**\*4** Pursuant to 42 U.S.C. § 12182, "No individual shall be discriminated against on the basis of disability in the full and equal enjoyment of the

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

goods, services, facilities, privileges, advantages, or accommodations of any place of public accommodation by any person who owns, leases (or leases to), or operates a place of public accommodation."42 U.S.C. § 12182(a). Discrimination under Title III includes both "a failure to remove architectural barriers, and communication barriers that are structural in nature, in existing facilities ... where such removal is readily achievable," and "where an entity can demonstrate that the removal of a barrier under clause (iv) is not readily achievable, a failure to make such goods, services, facilities, privileges, advantages, or accommodations available through alternative methods if such methods are readily achievable."42 U.S.C. § 12182(b)(2)(A)(iv) & (v). Pursuant to 28 C.F.R. § 36.104, "readily achievable" means "easily accomplishable and able to be carried out without much difficulty or expense."28 C.F.R. § 36.104. Plaintiff's Complaint alleges violations of the aforementioned statute and regulation.

However, as an Article III court, this Court's judicial power is limited to adjudicating actual "cases" and "controversies." Allen v. Wright, 468 U.S. 737, 750, 104 S.Ct. 3315, 82 L.Ed.2d 556 (1984)."In an attempt to give meaning to Article III's case-or-controversy requirement, the courts have developed a series of principles termed 'justiciability doctrines,' among which are standing[,] ripeness, mootness, and the political question doctrine." Nat'l Treasury Employees Union v. United States, 101 F.3d 1423, 1427 (D.C.Cir.1996) (citing Allen, 468 U.S. at 750, 104 S.Ct. 3315). These doctrines incorporate both the prudential elements, which "Congress is free to override," id.(quoting Fair Employment Council of Greater Wash., Inc. v. BMC Mktg. Corp., 28 F.3d 1268, 1278 (D.C.Cir.1994)) (internal quotations omitted), and "core component[s]" which are "essential and unchanging part[s] of the case-or-controversy requirement of Article III,"id.(quoting Lujan v. Defenders of Wildlife, 504 U.S. 555, 560, 112 S.Ct. 2130, 119 L.Ed.2d 351 (1992) (internal quotations omitted)). In order to satisfy the constitutional standing requirements, a plaintiff must establish (1) that he or she has suffered an injury in fact, which is the invasion of a legally protected interest which is (a) concrete and particularized and (b) actual or imminent, not conjectural or hypothetical; (2) that there is a causal connection between the injury and the conduct at issue, such that the injury is fairly traceable to the challenged act; and

(3) that it is likely as opposed to speculative that the injury will be redressed by a favorable decision.Lujan, 504 U.S. at 560-61, 112 S.Ct. 2130.

Furthermore, in an action requesting injunctive or declaratory relief, a demonstration of imminent, future injury is required to demonstrate standing."In actions for injunctive relief, harm in the past-as the district court correctly held-is not enough to establish a present controversy, or in terms of standing, an injury in fact."Am. Soc'y for the Prevention of Cruelty to Animals v. Ringling Bros. & Barnum & Bailey Circus, 317 F.3d 334, 336 (D.C.Cir.2003)."Past exposure to illegal conduct does not in itself show a present case of controversy regarding injunctive relief, however, if unaccompanied by any continuing, present adverse effects."O'Shea v. Littleton, 414 U.S. 488, 495, 94 S.Ct. 669, 676, 38 L.Ed.2d 674 (1974). In a claim for injunctive relief, a plaintiff "must allege a likelihood of future violations of [his] rights ..., not simply future effects from past violations."Fair Employment Council of Greater Wash., Inc. v. BMC Marketing Corp., 28 F.3d 1268, 1273 (D.C.Cir.1994)." 'Because injunctions regulate future conduct, a party has standing to seek injunctive relief only if the party alleges, and ultimately proves, a real and immediate-as opposed to merely conjectural or hypothetical-threat of future injury.' " Natural Resources Defense Counsel v. Pena, 147 F.3d 1012, 1022 (D.C.Cir.1998) (quoting Church v. City of Huntsville, 30 F.3d 1332, 1337 (11th Cir.1994)).See also City of Los Angeles v. Lyons, 461 U.S. 95, 105, 103 S.Ct. 1660, 1667, 75 L.Ed.2d 675 (1983) ("Lyons' standing to seek the injunction requested depended on whether he was likely to suffer future injury....").

**5** Plaintiff in the instant case bears the burden of demonstrating that he has standing to bring suit. See Lujan, 504 U.S. at 561, 112 S.Ct. 2130 ("The party invoking federal jurisdiction bears the burden of establishing [the] elements [of standing]."). The Court further notes that in the context of a motion for summary judgment on the issue of standing, Plaintiff faces a higher burden in meeting the elements of standing than when faced with a motion to dismiss:

Since [the elements of standing] are not mere pleading requirements but rather an indispensable part of the plaintiff's case, each element must be supported in the same way as any other matter on

which the plaintiff bears the burden of proof, *i.e.*, with the manner and degree of evidence required at the successive stages of the litigation. At the pleading stage, general factual allegations of injury resulting from the defendant's conduct may suffice, for on a motion to dismiss we presume that general allegations embrace those specific facts that are necessary to support the claim. In response to a summary judgment motion, however, the plaintiff can no longer rest on such "mere allegations," but must "set forth" by affidavit or other evidence "specific facts," Fed. Rule Civ. Proc. 56(e), which for purposes of the summary judgment motion will be taken to be true.

*Id.* at 561 (internal citations and quotations omitted).

In the instant case, Plaintiff simply has not met his burden of demonstrating any intent to return to the Restaurant beyond his abstract statement that he desires to do so at some unspecified point in the future. Under existing Supreme Court and D.C. Circuit precedent, albeit in a slightly different context, an abstract statement of intent to return to a site where an alleged future injury will occur is not enough to demonstrate "imminent" future injury required for a plaintiff to have standing to seek injunctive relief:

The [affidavits allegedly demonstrating standing] plainly contain no facts, however, showing how damage to the species will produce "imminent" injury to [the affiants]. That the women "had visited" the areas of the projects before the projects commenced proves nothing. As we have said in a related context, " 'Past exposure to illegal conduct does not in itself show a present case or controversy regarding injunctive relief ... if unaccompanied by any continuing, present adverse effects.' " Lyons, 461 U.S. at 102, 103 S.Ct. at 1665 (quoting *O'Shea v. Littleton*, 414 U.S. 488, 495-496, 94 S.Ct. 669, 676, 38 L.Ed.2d 674 (1974)). And the affiants' profession of an "inten[t]" to return to the places they had visited before-where they will presumably, this time, be deprived of the opportunity to observe animals of the endangered species-is simply not enough. Such "some day" intentions-without any description of concrete plans, or indeed even any specification of *when* the some day will be-do not support a finding of the "actual or imminent" injury that our cases require.

*6 Lujan, 504 U.S. at 564, 112 S.Ct. 2130. In *Fair Employment Council*, the instant circuit concluded that tester plaintiffs bringing suit against an employment agency for violations of Title VII and § 1981 lacked standing to seek injunctive or declaratory relief, "for they have not made sufficient allegations that they are threatened with any future illegality." Fair Employment Council, 28 F.3d at 1272. Because said tester plaintiffs used fake credentials, they could not reasonably hope to be considered for employment referrals on the basis of said credentials; nor did they allege that they would return to that employment agency to seek referrals in the reasonably near future. *Id.* at 1273. Indeed, while the D.C. Circuit noted in *Animal Legal Defense Fund v. Espy* that an individual formerly working as a psychobiologist who alleged that a regulation's failure to define mice and rats as animals affected her ability to conduct research made "a marginally more impressive [claim] than that advanced by the affiants in *Lujan*... because *Lujan* contrasts vague intentions with 'a description of concrete plans,' "
the central question is the immediacy rather than the specificity of the plan, for the underlying purpose of the imminence requirement is to ensure that the court in which suit is brought does not render an advisory opinion in a case in which no injury would have occurred at all.

Animal Legal Defense Fund., Inc. v. Espy, 23 F.3d 496, 500 (D.C.Cir.1994) (internal quotations and citations omitted).

Plaintiff in this case has neither a concrete nor specific nor imminent plan to return to the Restaurant based on the statements set forth in Plaintiff's Opposition and the documents attached thereto. In Plaintiff's Complaint, Plaintiff states that he "continues to desire to and intends visit [sic] the Defendant's premises in the future, but continues to be denied full, safe and equal access due to the violations which continue to exist." Compl. ¶ 3. In his Opposition, Plaintiff states that he "intends to go back to the restaurant once these barriers are removed." Pl.'s Opp'n at 8. Plaintiff states without further specification that "[h]e travels to this area approximately three times per week." Pl.'s Opp'n at 1. *See also id.*, Ex. B (Interrog.Answers) at 4 ("I frequently go to the area where this restaurant is located. I am in that area approximately three times

per week."). These statements comprise the entirety of Plaintiff's "intention" to return to the Restaurant, and as such, do not meet Plaintiff's burden of setting forth specific facts to refute Defendant's Motion for Summary Judgment on standing grounds. In a case where the D.C. Circuit found that a plaintiff had standing to pursue injunctive relief, the plaintiff had demonstrated a factual predicate supporting his intent to return. On a motion to dismiss rather than a motion for summary judgment, the D.C. Circuit concluded that a former elephant handler for a particular circus, "[b]ased upon his desire to visit the elephants (which we must assume might include attending a performance of the circus), his experience with the elephants, his alleged ability to recognize the effects of mistreatment, and what an injunction would accomplish," had proffered allegations "sufficient to withstand a motion to dismiss for lack of standing."*Ringling Bros.,* 317 F.3d at 338. In contrast, Plaintiff in this action does not give the Court any reason why he desires to return to the Restaurant. For example, Plaintiff does not claim to enjoy diner food. Nor does Plaintiff substantiate his statement that he is in the "area" three times per week with any definition of what comprises the "area" he invokes, be it Washington, D.C. in general, Northwest Washington, D.C., Upper Northwest Washington, D.C., or Connecticut Avenue in particular. In Plaintiff's Exhibit C (Affidavit of Steven Mason, Tcherneshoff Consulting (specialist in barrier removal under the ADA)), the restaurant "Arucola" is listed as located "adjacent" to the American City Diner Restaurant. Pl.'s Opp'n, Ex. C at 22. In fact, a number of restaurants are located on Connecticut Avenue within a few blocks of the American City Diner, including Mandarin Palace, sued by Plaintiff in this court in Civil Action No. 05-1744, located across the street from the American City Diner Restaurant at 5540 Connecticut Avenue, NW. Plaintiff does not distinguish the American City Diner Restaurant or explain in any way why he wishes to return to that Restaurant in particular as opposed to the numerous other restaurants within a few-block vicinity or the multiplicity of restaurants in a larger area or in Washington, D.C. in its entirety. Finally, Plaintiff effectively admits that "during that entire one year period [prior to Plaintiff filing suit], [he] never communicated personally or through counsel to the Defendant or anyone on behalf of the Defendant any concerns about accessibility to the restaurant for individuals with disabilities such as that from which [Plaintiff] suffers," Def.'s Mot. for

Summ. J. ¶ 4, which further undercuts any genuine desire to visit the Restaurant with any immediacy.

**\*7** The Court notes that while the instant circuit has not considered standing in a manner directly applicable to the Title III ADA claim at issue in this case, a number of district court cases from the Ninth and Eleventh Circuits, invoking *Lujan,* apply a four-factor test in determining whether or not a Title III ADA plaintiff has sufficiently shown future injury warranting the injunctive relief requested. While this Court does not rely on such cases nor on this four-factor analysis in drawing its conclusion that Plaintiff does not have standing to pursue the instant case (instead relying on the standing requirements for injunctive relief set forth in Supreme Court and D.C. Circuit precedent) and acknowledges that the holdings of these district court cases do not reflect a uniform application of the tenets of this four-factor standard, the Court will briefly address this analysis herein.

As set forth by a court in the United States District Court for the Central District of California,

In evaluating whether an ADA plaintiff has established a likelihood of future injury, courts have looked to such factors as: (1) the proximity of the place of public accommodation to plaintiff's residence, (2) plaintiff's past patronage of defendant's business, (3) the definitiveness of plaintiff's plans to return, and (4) the plaintiff's frequency of travel near defendant.

*Molski v. Mandarin Touch Restaurant,* 385 F.Supp.2d 1042 (C.D . Cal.2005) (granting defendant's motion for summary judgment for lack of standing).*See also* *Harris v. Del Taco, Inc.,* 396 F.Supp.2d 1107, 1113 (C.D.Cal.2005) (same). Factor three, "the definitiveness of plaintiff's plans to return," is clearly undercut by Plaintiff's vague statement that he would like to return to the Restaurant absent any reason why (given that Plaintiff has never eaten at the Restaurant, and that the Restaurant is not part of a larger chain,[FN2] both of which are considered under Factor two) or when Plaintiff would like to do so.[FN3]

FN2.*See* *Pickern v. Holiday Quality Foods Inc.,* 293 F.3d 1133, 1138 (9th Cir.2002) ("[Plaintiff] has visited Holiday's Paradise

store in the past and states that he has actual knowledge of the barriers to access at that store. [Plaintiff] also states that he prefers to shop at Holiday markets and that he would shop at the Paradise market if it were accessible. This is sufficient to establish actual or imminent injury for purposes of standing.").

FN3. While Plaintiff cites to *Organization for the Advancement of Minorities with Disabilities Suing on Behalf of Its Members v. Brick Oven Restaurant,* 406 F.Supp.2d 1120, 1126 (S.D.Cal.2005), wherein the court found that plaintiff's declaration of an intent to return to the restaurant in the immediate future as he frequently visited the area was sufficient in demonstrating actual or imminent injury, the court's ruling was in the context of a pending motion to dismiss rather than a motion for summary judgment.

Relying on one of the cases employing this standard, Plaintiff implies that definite plans to return are not necessary, arguing that "where a plaintiff lacks 'concrete plans to return,' the Court must satisfy itself that the plaintiff's professed intent to return is sincere and supported by the factual circumstances of the case."Pl.'s Opp'n at 11 (quoting *Parr v. L & L Drive-Inn Restaurant,* 96 F.Supp.2d 1065, 1079-80 (D.Haw.2000)).[FN4] However, even taking Plaintiff's argument at face value, Plaintiff has not demonstrated an intent to return that is sincere and supported by the factual circumstances of the case, nor does *Parr* provide support for Plaintiff's argument in this case.

FN4. Plaintiff, in the same paragraph, also argues that "Defendant's statements regarding other lawsuits are unprofessional, irrelevant, scandalous, and should be stricken as immaterial pursuant to Fed.R.Civ.P. 12(f)." Pl.'s Opp'n at 11. The Court rejects Plaintiff's request to strike Defendant's statements, which note that Plaintiff "has been involved in no less than 17 lawsuits filed in the Washington metropolitan area from 2001 through 2006," Def.'s Mot. for Summ. J. ¶ 8, and which do not state that Plaintiff is engaging in abusive litigation. Rather, while the Court shall not

do so in the present case, numerous courts have considered a plaintiff's litigation history in other Title III suits in assessing standing. *See, e.g., Mandarin* Touch, 385 F.Supp.2d at 1046;*Brother v. Tiger Partner, LLC,* 331 F.Supp.2d 1368, 1373 (M.D.Fla.2004).

Standing to bring claims for injunctive relief for an ADA claim is established if a plaintiff can show a plausible intention or desire to return to the place of the injury but for the barriers to access. In contrast, the failure to allege an intention or desire to return to the place where a plaintiff encountered an ADA violation or merely alleging an intention to return "some day" merits dismissal.

**\*8***Access 4 All, Inc. v. Trump Intern. Hotel and Tower Condominium,* 458 F.Supp.2d 160, 168 (S.D.N.Y.2006) (internal quotations and citations omitted) (holding that Plaintiff demonstrated an intent to return to a hotel by indicating that he conducts business in New York City, had visited the building in which the hotel was located prior to his stay at the hotel, and would specifically like to dine at a world-famous restaurant (Jean Georges) in the same building). As stated above, Plaintiff in this case does not indicate why he would like to return to the American City Diner Restaurant, what distinguishes the Restaurant from other nearby restaurants, or what constitutes the "area" that Plaintiff alleges to frequent three times a week. Furthermore, in *Parr,* a court in the United States District Court for the District of Hawaii, noting that "[r]easonable courts could reach different results," held that a plaintiff who had visited a particular restaurant once but had visited other restaurants in the same chain and professed a distinct taste for that chain's food demonstrated a future injury sufficient to support standing.*Parr,* 96 F.Supp.2d at 1079. While the instant Court does not base its decision on Plaintiff's not having "visited" the Restaurant more than once or ever having been inside the Restaurant, Plaintiff must at very least profess some specific interest in the American City Diner Restaurant in order to support his claim that he desires to patronize it in the imminent future.

## IV. CONCLUSION

If the Court were to conclude that Plaintiff in the instant case had met his burden of demonstrating standing in his Opposition to Defendant's Motion for

Slip Copy, 2007 WL 1438489 (D.D.C.)
**(Cite as: Slip Copy, 2007 WL 1438489)**

Summary Judgment based on Plaintiff's statements that he intends to return to the Restaurant and frequents the "area" of the Restaurant approximately three times a week, with nothing further, the Court would in essence have to conclude that any disabled individual who had visited a restaurant one time and passed through the area with some regularity could properly bring suit against that public accommodation on the basis of such general declarations. The Court finds that such a conclusion would stretch the definition of Article III standing beyond its limits and turn *Lujan* on its face. Accordingly, based on the reasoning set forth in this Opinion, the Court shall GRANT Defendant's [25] Motion for Summary Judgment and DENY AS MOOT Plaintiff's [24] Motion for Summary Judgment. An Order accompanies this Memorandum Opinion.

D.D.C.,2007.
Holt v. American City Diner, Inc.
Slip Copy, 2007 WL 1438489 (D.D.C.)

END OF DOCUMENT

Westlaw.

Not Reported in F.Supp.                                                                                    Page 1
Not Reported in F.Supp., 1986 WL 11619 (N.D.Ill.)
**(Cite as: Not Reported in F.Supp., 1986 WL 11619)**

---

**C**Hoytt v. Docktor Pet Center, Inc.
N.D.Ill.,1986.
Only the Westlaw citation is currently available.
United States District Court, N.D. Illinois, Eastern
Division.
Barrie HOYTT, d/b/a The House of Hoytt, and Carl
Fitch, Plaintiffs,
v.
DOCKTOR PET CENTER, INC, Defendant.
**No. 85 C 6850.**

Oct. 10, 1986.

MEMORANDUM AND ORDER

MORAN, District Judge.
**\*1** Plaintiff Barrie Hoytt breeds a well-known variety
of Doberman dog, the "Hoytt Doberman," under the
business name "The House of Hoytt" in Tennessee.
Plaintiff Carl Fitch, a resident of Illinois, purchased a
Doberman from a pet store in a shopping mall in
Chicago Ridge, Illinois, which identified itself as a
"Docktor Pet Center." Allegedly Fitch first saw the
dog at a ' "Docktor Pet Center" at the Southlake
Mall, Merrillville, Indiana, where a sign on its cage
identified it as a "Hoytt Doberman." After Fitch
expressed interest in buying the dog it was apparently
"transferred," to use the word in plaintiffs' complaint,
to the Docktor Pet Center in Chicago Ridge. That
store sold it to Fitch, allegedly again identifying it as
a Hoytt Doberman. Later, however, a veterinarian
who examined the dog expressed some doubts about
its blood lines. Fitch contacted Hoytt, who soon
determined that he had not bred the dog.

Hoytt and Pitch then filed this diversity action against
Docktor Pet Center, Inc. (Docktor) . Defendant is a
Massachusetts corporation and the franchisor of a
number of "Docktor Pet Center" stores across the
United States. The plaintiffs claim both common law
fraud and a violation of the Illinois Deceptive Trade
Practices Act, III.Rev.Stat. ch. 121 1/2 , ¶311 *et seq.,*
in the sale of the dog. They seek both compensatory
and $250,000 punitive damages. Hoytt, singly,
further seeks an injunction preventing defendant from
ever again representing "that any dogs it sells are

Hoytt Dobermans."

Docktor, however, moves to dismiss under
Fed.R.Civ.P. 12(b) (6), arguing that the complaint
states no claim against it. As a mere franchisor, it
contends, it cannot be vicariously liable for the
fraudulent sale of a dog perpetrated by its franchisee.
It attaches a copy of the franchise agreement. Under
that agreement, although a franchisee is required to
call its facility by the name "Docktor Pet Center"
(¶25), any control that Docktor might exercise over
store operations is limited to protecting its trademark
and good will and the conditions for the retailing of
the pet care products it supplies to the franchisees
(*e.g.,* 113, 14-16) . Schedule F of the agreement
expressly states that "Dealer will provide its own
livestock." The agreement creates no master-servant
or principal-agent relationship. Thus, says Docktor,
as a matter of law there is no basis on which it could
be liable. In the alternative, it moves to join the
franchisees for the Chicago Ridge store, David and
Virginia Yaksic and Yaksic Enterprise II, Inc., as
indispensable parties under Rule 19, or to dismiss
under Rule 12(b) (7) for failure to join those parties.

*Discussion*

While the motion is to dismiss, it is in reality one for
summary judgment since it rests upon an affidavit
and exhibits. In response, plaintiffs do not appear to
contend that this was a fraud initiated by the
franchisor and perpetrated through the franchisees.
They complain of the conduct of the franchisee but
contend that the franchisor is answerable for
thatconduct. It is in that context that we consider the
motion.

**\*2** Vicarious liability eitists only for conduct within
the scope of an agent's authority, and the authority of
an agent must stem from the conduct of his principal.
*See, e.g., Prudential Insurance Co. v. Curt Bullock
Builders, Inc., 626 F.Supp. 159, 165-166 (N.D. Ill.
1985)* ; *Evanston Bank v. ContiCommodity Services,
Inc., 623 F.Supp. 1014, 1030-1031 (N.D. Ill. 1985)* .
The terms of the franchise agreement make clear that
the Yaksics of Chicago Ridge had no actual authority
to sell dogs for defendant. Similarly, plaintiffs have
not alleged any facts which would indicate a master-

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.                                                                    Page 2
Not Reported in F.Supp., 1986 WL 11619 (N.D.Ill.)
**(Cite as: Not Reported in F.Supp., 1986 WL 11619)**

servant relationship between Docktor and the Yaksics, at least not one the scope of which could include the sale of dogs, and none can be inferred from the agreement. *Cf. Coty v. U.S. Slicing Machine Co.*, 58 Ill.App.3d 237, 240-242, 373 N.E.2d 1371, 1374-1376, 15 Ill.Dec. 687, 690 692 (2d Dist. 1978.)(franchisor not liable for on-the-job injury to under-age employee of franchisee).

If any vicarious liability could be imposed here, then, it would have to be on a theory of apparent authority. Only rarely does apparent authority relate to a tort claim, but fraud is one of those rare instances. A defendant may be liable for torts which result from a plaintiff's reliance on the statements of a person who reasonably appears to be the defendant's agent when the statements are within that person's apparent authority. *American Sociey of Mechanical Engineers, Inc. v. Hydrolevel Corp.*, 456 U.S. 556, 566-567 (1982); 1 Restatement (2d) of the Law of Agency, § 265(1) (1958). The rule includes an agent's misrepresentations, whether the principal authorized them or not. Restatement, §§ 162, 257 (b) . The law imposes liability if the principal has allowed the apparent agent to occupy a position in which his statements appear to have the added weight of the principal's reputation behind them, because that position makes it easier for the agent to deceive. *Hydrolevel*, 456 U.S. at 567; *National Acceptance Co. v. Coal Producers Ass'n*, 604 F.2d 540, 543 (7th Cir. 1979). *See generally* Restatement, §§ 257 comments a and d; 261. If, for example, the name and signs "Docktor Pet Center" in the stores Fitch visited reasonably appeared to put the weight of a national corporation behind the retailer's affirmation of quality blood lines for the Doberman, the corporation might be liable for the retailer's fraud. *See* Restatement, § 199 comment a (principal's liability for agent's sale of misbranded product).

That rule, however, will not save Hoytt's claims. Before a third party may impose liability on a principal through the theory of apparent authority, there must have been some kind of communication from the principal to the third party. *Bellflower AG Service Inc. v. First National Bank & Trust Co.*, 130 Ill.App.3d 80, 85, 473 N.E.2d 998, 1001, 85 Ill.Dec. 399, 402 (4th Dist. 1985) ; Restatement, § 27 and comment b. The communication need not be purposefully directed to the third party; it can consist merely of the principal carelessly allowing the

apparent agent to have and display indicia of authority. But the third party must be on the receiving end of a communication which originated with the principal. Hoytt does not allege that he has ever set foot in the Docktor Pet Center in Chicago Ridge. Therefore, whatever indications of authority there may be in the identifying marks of that store, they cannot have been communicated to Hoytt. Further, in an apparent authority claim, the plaintiff must have reasonably relied on the indicia of authority so communicated. *Spiegel v. Sharp Electronics Corp.*, 125 Ill.App.3d 897, 901, 466 N.E.2d 1040, 1044, 81 Ill.Dec. 238, 242 (1st Dist. 1984). See also Restatement, §§ 8 comments c and e, and illustration 11; 257; 265(1); 267 and comment a. If Hoytt was not there to see signs of authority, he cannot have relied on them. All of Hoytt's claims must be dismissed.

**\*3** Fitch, on the other hand, might possibly have a claim on Docktor through apparent authority, though it might be more successful as a claim for rescission and return of the dog. *See* Restatement, § 259(1) and comment a. The question is whether he relied on the Docktor name and signs as an assurance of the quality of the dog's breeding, and whether under all the facts and circumstances it was reasonable for him to so rely. *Cf. Drummond v. Hilton Hotel Corp.*, 501 F.Supp. 29 (E.D. Pa. 1980) (alleged reliance on mark of national chain for assurance of quality design and maintenance of franchise hotel). See Restatement, §§ 8 comment c, 252 comment a. Docktor knowingly permitted the franchisees to use its name and did not, apparently, demand a prominently posted disclaimer. *Cf. Salisbury v. Chapman Realty*, 124 Ill.App.3d 1057, 1062, 465 N.E.2d 127, 131, 80 Ill.Dec. 336, 340 (3d Dist. 1984); Restatement, §§ 8 comment b, 49 comment c. Also, facts from which an agency relation may reasonably be inferred include a course of conduct. *Mitchell Buick & Oldsmobile Sale Inc. v. National Inc.*, 138 Ill.App.3d 574, 582-583, 485 N.E.2d 1281, 1287, 93 Ill.Dec. 71, 77 (2d Dist. 1985); *Wargel v. First National Bank of Harrisburg*, 121 Ill.App.3d 730, 460 N.E.2d 331, 77 Ill.Dec. 275 (5th Dist. 1984) . The dog in question was originally on sale at another Docktor store but was shifted to the Chicago Ridge store. The cooperation might fairly create the appearance of a national connecting network among stores, and so a central organization.

Of course, a trier of fact might also find that

Not Reported in F.Supp.                                                                Page 3
Not Reported in F.Supp., 1986 WL 11619 (N.D.Ill.)
**(Cite as: Not Reported in F.Supp., 1986 WL 11619)**

franchisees operating under the name of a franchisor are now so much a part of common knowledge that reliance was not reasonable. *See Salisbury,* 124 Ill.App.3d at 1060-1062, 465 N.E.2d at 131 132,80 Ill.Dec. at 340-341;*Slates v. International House of Pancakes,* 90 Ill.App.3d 716, 413 N.E.2d 457, 46 Ill.Dec. 17 (4th Dist. 1980). *See also* Restatement, § 258 comment c, § 262 comment C. But, though Docktor apparently had nothing to do with the pets themselves, Pitch would not be expected to know the terms of the franchise agreement. A franchisor of pet stores could supply the pets and stand behind their quality, much as a franchisor of fast food might supply and stand behind the patties for hamburgers or the flour for pancakes. *Cf. Slates,* 90 Ill.App.3d at 727, 413 N.E.2d at 465, 46 Ill.Dec. at 25. Thus we are not prepared to hold as a matter of law that it would be unreasonable for a customer to think that he could rely on "Doctor" as a sign of quality. The question cannot be decided on the meager record before us.

That Fitch may possibly have a claim against the franchisor does not mean he will necessarily prevail. The same claim against the franchisee, without the vicarious liability problems, would appear to rest on more solid ground. When franchisor's counsel learned the name of the franchisee he moved to add it as a party, actually three parties: the Yaksics and their corporation. Fitch quite wisely does not oppose the motion. Indeed, he states in his memorandum, page 5, "the plaintiff's (sic) agree that defendant should be allowed to join the franchisee, whose identity was unknown to plaintiff prior to the litigation." Hoytt would, apparently, have a claim for mismarking against them as well. We therefore grant the motion. While that motion brings before the court those parties who ought to be involved in the resolution of this dispute, it also disables this court from being the forum for that resolution. Since the Yaksics and Yaksic Enterprise 11 Inc. are citizens of Illinois, and so is Fitch, their joinder destroys our diversity jurisdiction. *See, e.g., Shaw v. Munford,* 526 F.Supp. 1209 (S.D.N.Y. 1981). We therefore must dismiss on our own motion.

### Conclusion

**\*4** Defendant's motion to dismiss is granted as to plaintiff Hoytt but denied as to plaintiff Fitch. Defendant's motion to join David and virginia yaksic

and Yaksic Enterprise 11, Inc. is granted. Since with that joinder the parties no longer have diversity of citizenship, the remainder of plaintiffs' complaint is dismissed on this court's own motion for lack of subject matter jurisdiction.

N.D.Ill.,1986.
Hoytt v. Docktor Pet Center Inc.
Not Reported in F.Supp., 1986 WL 11619 (N.D.Ill.)

END OF DOCUMENT

Westlaw.

Not Reported in F.3d, 1998 WL 938717 (C.A.D.C.)
**(Cite as: Not Reported in F.3d, 1998 WL 938717)**

**H**Maydak v. F.C.C.
C.A.D.C.,1998.
Only the Westlaw citation is currently available.
United States Court of Appeals, District of Columbia
Circuit.
Keith MAYDAK, Appellant
v.
FEDERAL COMMUNICATIONS COMMISSION,
Appellee
AMERICAN TELEPHONE AND TELEGRAPH
COMPANY, Intervenor
**No. 98-1383.**

Dec. 9, 1998.

Before: WILLIAMS, GINSBURG, and ROGERS,
Circuit Judges.

ORDER

PER CURIAM.
*1 Upon consideration of the motion to dismiss, the
response thereto, and the reply; the motion for leave
to expand the record; the motion for summary
reversal, the responses thereto, and the reply; and the
motion to take judicial notice and the response
thereto, it is

ORDERED that the motion for leave to expand the
record be granted. It is

FURTHER ORDERED that the motion to dismiss be
granted. Appellant's participation before the agency is
insufficient to confer judicial standing. *See California
Assoc. of the Physically Handicapped v. FCC,* 778
F.2d 823, 826 n. 8 (D.C.Cir.1985). Nor is the FCC
estopped from challenging jurisdiction by failing to
raise it below. *See Natural Resources Defense
Council v. Pena,* 147 F.3d 1012, 1021 n. 3
(D.C.Cir.1998). Appellant lacks standing under
Article III to appeal the Commission's decision
because he has not alleged a personal injury-in-fact
that is fairly traceable to the FCC's decision and
redressable by the relief requested. *See Steel Co. v.
Citizens for a Better Environment,* 118 S.Ct. 1003,
1012 (1998). Appellant's alleged injuries "in his

capacity as a consumer" are hypothetical and
conjectural, not the concrete and actual or imminent
injury that Article III requires. *See Steel Co.,* 118
S.Ct. at 1016-17;*United States v. Western Electric Co
., 900 F.2d 283, 310 (D.C.Cir.1990)* (unparticularized
consumer argument is too broad to confer standing).
The allegations of harm to appellant's financial
interests are vague and conclusory. Furthermore,
appellant has not shown a fairly traceable connection
between the injury and the FCC's decision because
the injury depends on the choices of third parties not
before the court. *See Florida Audubon Soc'y v.
Bentsen,* 94 F.3d 658, 663 (D.C.Cir.1996) (en banc).
Redressability is also lacking because it is not likely
that the relief sought, assuming the court chooses to
grant it, will alleviate the injury appellant alleges. *See
id.* at 663-64.It is

FURTHER ORDERED that the motions for
summary reversal and for judicial notice be dismissed
as moot.

The Clerk is directed to withhold issuance of the
mandate herein until seven days after disposition of
any timely petition for rehearing or petition for
rehearing *en banc. See*D.C.Cir. Rule 41.

C.A.D.C.,1998.
Maydak v. F.C.C.
Not Reported in F.3d, 1998 WL 938717 (C.A.D.C.)

END OF DOCUMENT

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Westlaw.

Slip Copy                                                                                                    Page 1
Slip Copy, 1998 WL 35177067 (N.D.Fla.)
(Cite as: Slip Copy, 1998 WL 35177067)

**H**Thompson v. Sand Cliffs Owners Ass'n, Inc.
N.D.Fla.,1998.
Only the Westlaw citation is currently available.
United States District Court, N.D. Florida,
Pensacola Division.
John THOMPSON, Plaintiff,
v.
SAND CLIFFS OWNERS ASSOCIATION, INC.,
Defendant.
**No. 3:96cv270/RV.**

March 30, 1998.

Joel Steven Carter, Henry Buchanan Hudson etc.,
Tallahassee, FL, for Plaintiff.
Ralph Alan Peterson, Beggs & Lane, Pensacola, FL,
for Defendant.

***ORDER***

ROGER VINSON, Chief United States District
Judge.
**\*1** Pending is defendant Sand Cliffs Owners
Association, Inc.'s ("Association") motion for
summary judgment. (doc. 76) Also before the Court
is John Thompson's cross-motion for partial summary
judgment on the issue of whether Sand Cliffs
Condominiums is a place of public accommodation.
(doc. 70)

**I. *BACKGROUND***

The following factual allegations are all contained in
the plaintiff's second amended complaint. This action
was brought by the plaintiff pursuant to Title III of
the Americans with Disabilities Act of 1990
("ADA") [Title 42, United States Code, Sections
12101-12201],[FN1] and the Florida Civil Rights Act of
1992 [Section 760.01 *et seq.*]. Both the ADA and the
Florida Civil Rights Act prohibit private entities from
discriminating on the basis of disability in places of
public accommodation. In addition, Title III of the
ADA also requires that recently altered places of
public accommodation or commercial facilities be
readily accessible to, and useable by, individuals with
disabilities.

FN1. The ADA is comprised of three
separate titles: Title I regulates employment
activities; Title II regulates public services;
and Title III regulates private entities that
meet the characteristics of a public
accommodation as specified in 42 U.S.C. §
12181(7).

Thompson is the owner of Unit 110 of the Sand
Cliffs Condominiums, located in Panama City Beach,
Florida. The parties agree that the plaintiff is
physically disabled or handicapped within the
meaning of the ADA. He suffers from a condition
known as peripheral neuropathy, which makes it
difficult for him to walk without braces on his legs.
The defendant Association maintains the commons
areas of the Sand Cliffs Condominiums and
administers a rental program whereby the individual
unit owners can rent their condominiums to the
public on a weekly or monthly basis. The Association
sets the rental rates to be charged and handles the
administrative duties related to the program,
including advertising, booking, and collecting rent.
As compensation, the Association receives a
percentage of the gross rental from each renting
owner. Under the rental program, 15 units
(approximately 20 percent of the total units) are
rented from time to time to the public. In order to run
the program, the State of Florida requires the
Association to maintain a public lodging license
issued by the Department of Professional and
Business Regulation.

The plaintiff contends that Sand Cliffs is a place of
public accommodation. The plaintiff also contends
that the since the Association operates a rental
program at Sand Cliffs, it is subject to the
accessibility requirements of the ADA. On October 4,
1995, the Sand Cliffs Condominiums were damaged
by Hurricane Opal. The Association contracted with
Phoenix Coatings, Inc. ("Phoenix") to repair the
damage caused by the hurricane, and to make other
repairs unrelated to the storm. The contract price for
the repairs totaled $1.2 million dollars. The plaintiff
claims that pursuant to the ADA, the Association was
required to make the Condominium's facilities
handicap accessible at the same time that it

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

completed the renovations and repairs mentioned above. Specifically, the plaintiff contends that the defendant was required to make the common area restrooms, game room entrance, and beach access steps accessible to physically disabled persons. The plaintiff also claims that the defendant was required to add disabled parking spaces to the Condominium's parking lot. The plaintiff seeks injunctive and declaratory relief requiring the defendant to make the above mentioned facilities handicap accessible, as well as damages, attorney's fees, and costs.

## II. ANALYSIS

### A. Summary Judgment Standard

**\*2** A motion for summary judgment should be granted when "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Rule 56(c), Fed.R.Civ.P. "[T]he plain language of Rule 56(c) mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." Celotex Corp. v. Catrett, 477 U.S. 317, 322, 106 S.Ct. 2548, 2552, 91 L.Ed.2d 265, 273 (1986); see also Everett v. Napper, 833 F.2d 1507, 1510 (11th Cir.1987).

However, summary judgment is improper "[i]f a reasonable fact finder could draw more than one inference from the facts, and that inference creates a genuine issue of material fact." Cornelius v. Highland Lake, 880 F.2d 348, 351 (11th Cir.1989).cert. denied,494 U.S. 1066, 110 S.Ct. 1784, 108 L.Ed.2d 785 (1990). An issue of fact is "material" if it might affect the outcome of the case under the governing law. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248, 106 S.Ct. 2505, 2510, 91 L.Ed.2d 202, 211 (1986). It is "genuine" if the record taken as a whole could lead a rational trier of fact to find for the non-moving party. Id.; see also Matsushita Electric Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586, 106 S.Ct. 1348, 1356, 89 L.Ed.2d 538, 552 (1986).

Conclusory allegations based on speculation, subjective beliefs, or bald assertions based upon unsubstantiated hearsay are insufficient to create a "genuine issue of material fact." Carter v. Miami, 870 F.2d 578, 585 (11th Cir.1989); Ramsey v. Leath, 706 F.2d 1166, 1170 (11th Cir.1983). On the other hand, if the record taken as a whole could lead a rational trier of fact to find for the nonmoving party, then the issue of fact is genuine.Matsushita Elec. Industrial Co. Ltd. v. Zenith Radio Corp., 475 U.S. 574, 586, 106 S.Ct. 1348, 1356, 89 L.Ed.2d 538, 552 (1986). On a summary judgment motion, the record and all reasonable inferences that can be drawn from it must be viewed in the light most favorable to the non-moving party. McCabe v. Sharett, 12 F.3d 1558, 1560 (11th Cir.1994).

### B. Discussion

### (1) Failure to Join Indispensable Parties

Initially, I will address the defendant's contention that this action should be dismissed because the plaintiff has failed to join the individual owners of the condominiums as indispensable parties pursuant to Rule 19, Federal Rules of Civil Procedure. I dismissed the plaintiff's original complaint on this ground because I found that if the plaintiff succeeded, the individual condominium owners would be required to make substantial additional renovations to their units, at their own expense, in order to make them accessible. In his second amended complaint, the plaintiff dropped his claim for relief seeking to have the individual condominiums modified so that they could accommodate individuals with disabilities. Apparently, the plaintiff believed that if he limited his relief to Sand Cliffs' common areas, he would not be required to join the individual unit owners. However, the defendant contends that the owners of each rental condominium must still be joined because they will be required to pay for the renovations to the common areas, and because they will also be required to renovate their condominiums to make them accessible if I determine that Sand Cliffs is a place of public accommodation. On the other hand, the plaintiff responds that the defendant never raised the joinder of indispensable parties issue in its motion for summary judgment. Therefore, he was not provided a full and fair opportunity to meet this proposition. Accordingly, the plaintiff contends that I should not consider the defendant's argument.

**\*3** Once again, I must agree with the defendant on

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

this issue. The amended complaint continues to seek the removal of architectural barriers, which are the responsibility of the individual condominium owners. There is no impediment to joinder of the individual owners, and it is apparent that Rule 19(a) requires their joinder. Although the defendant did not raise this issue in its motion for summary judgment, it pled it as an affirmative defense, and it also raised it pursuant to my order notifying the parties to submit any additional documents they would like me to consider when taking their motions for summary judgment under advisement. Therefore, I find that the joinder issue is properly before me, and that the plaintiff's action is subject to dismissal for failure to comply with Rule 19, Federal Rules of Civil Procedure.

Although it is not necessary for me to now reach the merits of the plaintiff's claims because the action is subject to dismissal, I will do so for completeness of the record and to give the parties some idea of how this Court construes the applicable statutes under the facts of this case.

**(2) Does the Association Own, Lease, or Operate a Place of Public Accommodation Under the ADA.**[FN2]

> FN2. Both parties raised this issue in their motions for summary judgment. In fact, this is the only issue raised by the plaintiff in his cross-motion for partial summary judgment. For simplicity and clarity, I will combine both parties' contentions here and address this issue only once.

Whether the condominium is a place of public accommodation is the first major issue. Title III of the ADA provides in pertinent part:

No individual shall be discriminated against on the basis of disability in the full and equal enjoyment of the goods, services, facilities, privileges, advantages, or accommodations of any place of public accommodation by any person who owns, leases (or leases to), or operates a place of public accommodation.

42 U.S.C. § 12182(a) (1995). The plaintiff contends that the Association owns, leases, or operates a place of public accommodation, and, therefore, must

comply with the requirements of Title III of the ADA. See 42 U.S.C. § 12182(a) (1995). Title III and the regulations promulgated to implement it define "place of public accommodation" as a "facility, operated by a private entity, whose operations affect commerce and fall within at least one" of twelve specified categories. The twelve categories are listed in Title 42, United States Code, Section 12181(7)(A)-(L) and in 28, Code of Federal Regulations, Section 36.104.[FN3] The plaintiff alleges that since the Association administers a rental program, Sand Cliffs qualifies as a "place of lodging" under the first category of Section 12181(7):

> FN3. The United States Department of Justice ("DOJ") is charged by statute with the implementation of Title III of the ADA. The DOJ has promulgated conventional regulations and published literature interpreting the regulations. The literature includes "accessibility guidelines," entitled Americans with Disabilities Act Accessibility Guidelines ("ADAAG"), found in 28 C.F.R. Pt. 36, App. A (1997), and commentary on the regulations, entitled Preamble to Regulation on Nondiscrimination on the Basis of Disability by Public Accommodations and in Commercial Facilities, found in 28 C.F.R. Pt. 36, App. B (1997).

(A) an inn, hotel, motel, or other place of lodging, except for an establishment located within a building that contains not more than five rooms for rent or hire and that is actually occupied by the proprietor of such establishment as the residence of such proprietor ...
42 U.S.C. § 12181(7)(A) (1995); 28 C.F.R. § 36.104 (1997).

The ADA only regulates non-residential facilities. H.R. Resp. No. 101-485(II), 101st Cong., 2d Sess. 383 (1990), *reprinted in* U.S.Code Cong. & Admin. News 1990, at p. 267; *see also* 28 C.F.R. Pt. 36, App. B, § 36.104, p. 614 (1997). The plaintiff contends that since approximately 15 out of the 70 unit owners at Sand Cliffs rent their condominiums, the condominium complex is no longer residential in nature. Furthermore, the plaintiff contends that because the Association acts as a rental agent for the unit owners that want to make their condominiums available for rental, it operates a place of public

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Slip Copy                                                                                                      Page 4
Slip Copy, 1998 WL 35177067 (N.D.Fla.)
**(Cite as: Slip Copy, 1998 WL 35177067)**

accommodation. I disagree. The fact that approximately 15 owners have decided to rent their condominiums on occasion does not change the residential nature of the Sand Cliffs Condominiums. Sand Cliffs' declaration of condominium provides that "[e]ach of the units shall be occupied or rented as a residence and for no other purpose;...." At least one court has held that residential condominiums do not constitute public accommodations within the meaning of the ADA. *See* _Independent Housing Services of San Francisco v. Fillmore Center Associates,_ 840 F.Supp. 1328, 1344, n. 14 (N.D.Cal.1993)(holding that the portion of a mixed rent housing project containing condominiums was residential in nature and did not fall within the bounds of the ADA). I have found no decision from the Eleventh Circuit recognizing that these kinds of condominiums are within the ADA. Sand Cliffs' residential nature does not change simply because some of the owners have decided to rent their units. Each owner is still free to use his condominium at anytime, and he may also decide not to rent it out at all. Furthermore, when the units are not being rented, there is no question that they remain the owners' residences.

**\*4** According to the commentary related to the regulations, the difference between a residential facility and a non-residential "place of lodging" is the length of the occupant's stay. "The nature of a place of lodging contemplates the use of the facility for short-term stays."*See* 28 C.F.R.App. B, § 36.104, p. 614-15 (1997). When one facility contains both residential and non-residential accommodations, the ADA only covers the non-residential portion of the facility.

For example, in a large hotel that has a separate residential apartment wing, the residential wing would not be covered by the ADA because of the nature of the occupancy of that part of the facility. This residential wing would, however, be covered by the Fair Housing Act. The separate nonresidential accommodations in the rest of the hotel would be a place of lodging, and thus a public accommodation subject to the requirements of this final rule. If a hotel allows both residential and short-term stays, but does not allocate space for these different uses in separate, discrete units, both the ADA and the Fair Housing Act may apply to the facility.

28 C.F.R.App. B, § 36.104, p. 614 (1997). Neither the ADA nor its corresponding regulations define what qualifies as a "short-term stay." The plaintiff relies on two policy letters from the Department of Justice for the proposition that short-term rentals under the ADA would include any rental for a period of one week or less. Although the letters do not constitute regulations that are binding on this Court, and the Department of Justice does not view them as binding on it, I will discuss some of the issues that they raise. One of the letters states that whether a given facility can be classified as an "other place of lodging" depends, in part, on the extent to which the facility does or does not share characteristics with the examples of "places of lodging" listed in the statute.

Sand Cliffs does not share characteristics with inns, hotels, or motels. The units are owned by separate individuals, not by one individual or entity. Furthermore, unlike the rooms in hotels and motels, the Sand Cliffs units retain their residential character when they are not being rented. In fact, each unit is furnished by the individual owner with his own personal property. Each unit owner is totally responsible for the unit's maintenance and repair. Also, the Association does not provide maid service for the rented units. Rental units are cleaned before and after each stay, but the renter is responsible for the unit's upkeep during his stay. Based on the totality of the circumstances, Sand Cliffs cannot be considered an "other place of lodging."

Next, the plaintiff cites two cases brought pursuant to the Civil Rights Act of 1964, which also prohibits discrimination in public accommodations. *See* _United States v. Young Men's Christ. Ass'n of Columbia, S.C.,_ 310 F.Supp. 79 (D.S.C.1970); _United States v. Beach Associates, Inc._ 286 F.Supp. 801, 808 (D.C.Md.1968). Section 2000a(b)(1) of the Act listed the establishments subject to that Act as "any inn, hotel, motel, or other establishment which provides lodging to transient guests."In both of the above cases, the courts were faced with defining the term "transient guests." The courts determined that transient guests were guests that stayed for a period of one week or less. The plaintiff contends that, based on those cases, the one week rentals at Sand Cliffs constitute short-term stays.

**\*5** I do not find these cases to be controlling or even persuasive on the issues before me. Congress left the

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

term transient guest out of the definition of a place of public accommodation under the ADA. The issue here is whether the property in question is residential or nonresidential in nature. Although the commentary to the regulations suggests that short-term stays would be indicative of the nonresidential nature of the property, the one week and longer stays at Sand Cliffs are unlike the normal length of stay at hotels, motels, or inns. In fact, the record indicates that the units at Sand Cliffs are often rented out for periods of time that exceed one month. More importantly, most of the units are not rented at all, and of those that are rented, it appears that the rental periods total less time each year than the periods when the owners utilized their units for their own residential purposes.

I find that the Sand Cliffs Condominiums are residential in nature despite the fact that they are occasionally rented for one week periods.[FN4] I also find that, in this case, the condominiums do not share sufficient similar characteristics with the other facilities listed in the statute to justify labeling them as other places of lodging. Accordingly, I find that the Association is not a public accommodation that is subject to the ADA.

> FN4. I note that using a specific amount of time like one week as the standard for determining whether a facility is residential or non-residential in nature is extremely arbitrary. Certainly, staying an eighth day by no means makes the facility any more or any less residential in nature.

**(3) Removal of Barriers**

Next, the plaintiff contends that the ADA requires the defendant to remove any existing architectural barriers to access including, *inter alia,* installing ramps, widening doors, installing grab bars in the restrooms, rearranging toilet partitions, and creating designated accessible parking spaces. It is true that Title III requires places of public accommodation to remove architectural barriers to access, where such removal is "readily achievable." 42 U.S.C. § 12182(b)(2)(A)(iv)(1995). However, since the Association does not own, lease, or operate a place of public accommodation, the statute does not apply to the defendant, and it is entitled to summary judgment on this claim. Other provisions may also exempt the Association from these ADA requirements, but I

need not address them now.

**(4) Alterations**

Next, the plaintiff contends that the repairs the Association did to the condominiums constitute "alterations", as that term is defined in Title III. Accordingly, the plaintiff contends that the defendant was required to make those alterations and the areas they affect accessible to individuals with disabilities. The ADA requires anyone making an alteration to a place of public accommodation or a commercial facility, after January 26, 1992, to do so in such a manner that the altered portions of the facility are readily accessible to, and useable by, individuals with disabilities. The applicable provision, Section 12183, provides, in pertinent part:

Except as provided in subsection (b) of this section, as applied to public accommodations and commercial facilities, discrimination for purposes of section 12182(a) of this title includes-

\* \* \*

**\*6** (2) with respect to a facility or part thereof that is altered by, on behalf of, or for the use of an establishment in a manner that affects or could affect the usability of the facility or part thereof, a failure to make alterations in such a manner that, to the maximum extent feasible, the altered portions of the facility are readily accessible to and usable by individuals with disabilities, including individuals who use wheelchairs. Where the entity is undertaking an alteration that affects or could affect usability of or access to an area of the facility containing a primary function, the entity shall also make the alterations in such a manner that, to the maximum extent feasible, the path of travel to the altered area and the bathrooms, telephones, and drinking fountains serving the altered area, are readily accessible to and usable by individuals with disabilities where such alterations to the path of travel or the bathrooms, telephones, and drinking fountains serving the altered area are not disproportionate to the overall alterations in terms of cost and scope (as determined under criteria established by the Attorney General).

Since I have already determined that Sand Cliffs is not a place of public accommodation, the only way that the Association could be required to make the

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

repairs so that they are accessible to individuals with disabilities is if Sand Cliffs qualifies as a commercial facility under the statute. Under the regulations, "commercial facilities" are "facilities-(1) Whose operations will affect commerce; (2) That are intended for nonresidential use by a private entity; and (3) That are not-(i) Facilities that are covered or expressly exempted from coverage under the Fair Housing Act of 1968, as amended (42 U.S.C. §§ 3601-3631)...."28 C.F.R. § 36.104 (1997)."The term 'commercial facilities' is not intended to be defined by dictionary or common industry definitions. Included in this category are factories, warehouses, office buildings, and other buildings in which employment may occur." 28 C.F.R. Pt. 36, App. B, § 36.104, p. 609 (1997)."The statute's definition of 'commercial facilities' specifically includes only facilities 'that are intended for nonresidential use'...."*Id* .Sand Cliffs is not a commercial facility as that term is defined under the ADA. It was most certainly intended for residential use, not for "nonresidential use." It does not fall within the categories specifically mentioned in the regulations [i.e., factories, warehouses, office buildings, and other buildings in which employment may occur]. Since Sand Cliffs does not qualify under the ADA as either a "place of public accommodation" or a "commercial facility," the repairs the Association made to the facility do not have to comply with the ADA's accessibility requirements.

I note that even if I determined that Sand Cliffs was a commercial facility or a place of public accommodation, the repairs made to the facility do not appear to be alterations under the ADA. The corresponding regulations to Section 12183 define what constitutes an alteration, and set forth some examples of conduct that would be considered an alteration. *See*28 C.F.R. § 36.402(b) (1997).Section 36.402 provides, in pertinent part:

**\*7** (a) General.

(1) Any alteration to a place of public accommodation or a commercial facility, after January 26, 1992, shall be made so as to ensure that, to the maximum extent feasible, **the altered portions of the facility are readily accessible to and usable by individuals with disabilities,** including individuals who use wheelchairs.

(b) Alteration. For the purposes of this part, an alteration is a change to a place of public accommodation or a commercial facility that affects or could affect the usability of the building or facility or any part thereof.

(1) Alterations include, but are not limited to, remodeling, renovation, rehabilitation, reconstruction, historic restoration, changes or rearrangement in structural parts or elements, and changes or rearrangement in the plan configuration of walls and full-height partitions. **Normal maintenance, reroofing, painting or wallpapering, asbestos removal, or changes to mechanical and electrical systems are not alterations unless they affect the usabilityofthe building or facility.**

(2) **If** existing elements, spaces, or common areas are altered, **then each such altered element, space, or area shall comply with the applicable provisions of appendix A to this part.**

28 C.F.R. § 36.402 (1997) (emphasis added).

In August, 1995, the Association entered into a contract with Taylor Architects, Inc. ("Taylor Architects"), to accomplish the following tasks: (1) replace the courtyard and ocean front windows; (2) replace the cedar siding and investigate the possibility of modifying the balconies; (3) replace the roofing and modify the present roof slopes as required to eliminate the pooling of water; and (4) waterproof the exterior of the building. After the hurricane hit, the Association entered into a new contract with Phoenix Coatings, Inc., as contractor, to repair the damages from the hurricane and complete the work originally contemplated in the contract with Taylor Architects. The Association's contract with Phoenix provided that Phoenix would rework the balconies and the handrails, and replace the windows. The contract also provided that Phoenix would waterproof and paint the building, and replace the roof covering and joint sealants. All of the work outlined in the contract with Taylor Architects was made a part of the contract with Phoenix. The only additional work that was not contemplated in the contract with Taylor Architects, was the rebuilding of the beach steps, which were destroyed by the hurricane. The cost of the work on Sand Cliffs condominium totaled $1.2 million. The insurance company paid about $184,000, and the balance was

divided among the individual owners.[FN5]

> FN5. An assessment of approximately $16,000 was made to each owner.

The regulations specifically exclude "[n]ormal maintenance, reroofing, painting, or wallpapering."It appears that most of the work done on Sand Cliffs falls under these categories. Additionally, the applicable statute and regulations only require individuals to make the altered portions of their facilities accessible to, and usable by, individuals with disabilities. Therefore, the plaintiff's contention that the Association must make all areas of the facility accessible because it made a few repairs is misplaced. For example, the plaintiff contends that the Association is required to add handicap parking spaces to Sand Cliffs' parking lot. However, the plaintiff admits that the Association has not made any alterations or repairs to the parking lot since the hurricane hit. Even if I were to find that the repairs to the facility [i.e., replacing the windows and opening up the balconies to provide more viewing area] constitute alterations, there is no way that the Association could make those alterations, or the surrounding areas, accessible to individuals with disabilities.[FN6]The only work done to the facility that could have been accomplished to make it accessible to individuals with disabilities would have been the repairs to the beach access stairs. However, those repairs do not seem to qualify as an alteration under the ADA.

> FN6. The commentary to Section 36.402 notes that "some commenters concluded that any alteration to a facility, even a minor alteration such as relocating an electrical outlet, would trigger an extensive obligation to provide access throughout an entire facility. That result was never contemplated." 28 C.F.R. Pt. 36, App. B., § 36.402, p. 654 (1997).

**\*8** An alteration is a change to a place of public accommodation or a commercial facility that affects or could affect the usability of the building or facility or any part thereof. There has been no change to the facility in this case. The Association simply rebuilt the stairs that were destroyed by the hurricane. The plaintiff points out that the stairs now have showers at the bottom instead of at the top. However, except

for that cosmetic change, the stairs, and the rest of the facility for that matter, are the same as when the plaintiff purchased his condominium ten years ago.[FN7]Since there have been no alterations to the condominium that would trigger the ADA in this case, the defendant is entitled to summary judgment on this claim.

> FN7. The Association also contends that if rebuilding the stairs constitutes an alteration, the cost of the alteration would be disproportionate to the cost of the repairs. Therefore, it would not be required to make the stairs accessible under the ADA. The defendant would be correct if some other alteration was made to the facility and if the beach stairs were part of the path of travel to that area of alteration. In this case, the plaintiff is contending that the stairs themselves are the alteration. Therefore, the disproportional cost exception does not apply. I also note that any claim on the part of the plaintiff that the beach is one of the defendant's primary facilities is specious. The commentary to 28 C.F.R. § 36.104 provides that the definition of facility only includes the site over which the private entity may exercise control or on which a place of public accommodation or a commercial facility is located. It does not include, for example, adjacent roads or walks controlled by a public entity that is not subject to this part. 28 C.F.R. Pt. 36, App. B., § 36.104, p. 613 (1997). The pubic beach adjacent to Sand Cliffs would certainly fall within this exclusion.

**(5) The Plaintiff's State Law Discrimination Claims**

At this point, I note that the only remaining claims are the plaintiff's state-law causes of action.[FN8]Title 28, United States Code, Section 1367(c)(3) provides that district courts may decline to exercise supplemental jurisdiction over state-law claims when the court has dismissed all claims over which it had original jurisdiction. *See Carnegie-Mellon University v. Cohill,* 484 U.S. 343, 350 n. 7, 108 S.Ct. 614, 98 L.Ed.2d 720 (1988) ("[I]n the usual case in which all federal-law claims are eliminated before trial, the balance of factors to be considered under the pendent

jurisdiction [now supplemental jurisdiction] doctrine-judicial economy, convenience, fairness, and comity-will point toward declining to exercise jurisdiction over the remaining state-law claims."); *Eubanks v. Gerwen,* 40 F.3d 1157, 1161 (11th Cir.1994). Since there is a lack of Florida precedent with respect to a majority of issues raised by the plaintiff's state-law claims, I find that it is appropriate under the circumstances to dismiss them, rather than to address the merits of these novel non-federal causes of action. *UMW v. Gibbs,* 383 U.S. 715, 726, 86 S.Ct. 1130, 1139, 16 L.Ed.2d 218 (1966); *Clifton Terrace Assocs. v. United Technologies Corp.,* 929 F.2d 714, 723 (D.C.Cir.1991); *Buethe v. Britt Airlines, Inc.,* 749 F.2d 1235, 1240-41 (7th Cir.1984). Therefore, the plaintiff's state-law claims are DISMISSED, without prejudice to pursue them in a Florida state court.

> FN8. The majority of the plaintiff's state-law claims were brought pursuant to Section 760.07 of the Florida Statutes. (1997). Section 760.07 was specifically designed to prohibit and protect against discrimination, including discrimination based on handicap. Section 760.07 contains a catch-all provision providing, in pertinent part:
>
> > Any violation of any Florida statute making unlawful discrimination because of ... handicap, ... in the areas of ... public accommodations gives rise to a cause of action for all relief and damages described in § 760.11(5), unless greater damages are expressly provided for.
>
> > § 760.07, Fla. Stat. (1997).
>
> Thus, any Florida statute that outlaws discrimination based on handicap in the area of public accommodations also gives rise to a private cause of action for damages pursuant to Section 760.07. The plaintiff points to three Florida statutes-Section 509.092, Sections 553.501-553.513, and 413.08(1)(a)-which he contends outlaw discrimination against disabled individuals, thus giving him a cause of action through Section 760.07. The plaintiff also alleges that the defendant has discriminated against him in violation of the Florida Fair Housing

Act, Section 760.23(8), Florida Statutes.

### III. *CONCLUSION*

For all of the above reasons, Sand Cliffs Owners Association, Inc.'s motion for summary judgment on the plaintiff's ADA claim is GRANTED. John Thompson's cross-motion for partial summary judgment is DENIED. The Clerk is directed to enter judgment for the defendant and against the plaintiff on that claim, together with taxable costs. The plaintiff's remaining state-law claims are DISMISSED, without prejudice to plaintiff's right to pursue them in state court.

DONE AND ORDERED.

N.D.Fla.,1998.
Thompson v. Sand Cliffs Owners Ass'n, Inc.
Slip Copy, 1998 WL 35177067 (N.D.Fla.)

END OF DOCUMENT