## UNITED STATES DISTRICT COURT
## DISTRICT OF COLUMBIA

———————————————————— )
)
EQUAL RIGHTS CENTER, *et al.*, )
)
              Plaintiffs, )    Civ. No.: 1:07-cv-01528-JR
        v. )
)
HILTON HOTELS CORPORATION, )
)
              Defendant. )
———————————————————— )


## MEMORANDUM OF POINTS AND AUTHORITIES
## IN OPPOSITION TO HILTON'S MOTION TO DISMISS
## THE AMENDED COMPLAINT

August J. Matteis, Jr. (DC Bar # 433068)    Elaine Gardner (DC Bar #271262)
Benjamin Davidson  (DC Bar # 975509)    WASHINGTON LAWYERS' COMMITTEE
GILBERT RANDOLPH LLP          FOR CIVIL RIGHTS & URBAN AFFAIRS
1100 New York Avenue, NW         11 Dupont Circle, NW
Suite 700                      Suite 400
Washington, DC 20005           Washington, DC 20035
Tel:   (202) 772-2200           Tel:   (202) 319-1000
Fax:   (202) 772-3333          Fax:   (202) 319-1010


Dated:  June 6, 2008              Counsel for Plaintiffs

## TABLE OF CONTENTS

Page

TABLE OF AUTHORITIES .................................................................................................. iii

I.      PRELIMINARY STATEMENT .................................................................................. 1

II.     FACTUAL ALLEGATIONS ...................................................................................... 3

III.    ARGUMENT ............................................................................................................... 8

        A.      Legal Standards............................................................................................... 8

                1.      The Standard for a Motion to Dismiss Has Not
                        Changed in This Circuit .................................................................... 8

                2.      Article III Standing Requirements ................................................... 8

        B.      Plaintiffs All Have Standing to Bring a Claim Under the ADA ............ 9

                1.      Plaintiffs Were Injured in Fact........................................................ 9

                        a.      The ERC and AAPD Were Injured in Fact Because
                                Hilton's Conduct Has Made the Organizations'
                                Activities More Difficult.................................................... 9

                                i.      The ERC Was Injured in Fact ............................. 10

                                ii.     The AAPD Was Injured in Fact.......................... 16

                        b.      The Individual Plaintiffs Were Injured in Fact Because
                                Their Knowledge of Hilton's Barriers to Accessibility
                                Deterred Them From Visiting Any Hilton Hotels ......... 19

                                i.      Mr. Fiedler Was Injured in Fact........................ 21

                                ii.     Mr. Johnson Was Injured in Fact...................... 22

                                iii.    Ms. Elliott-Vandivier Was Injured in Fact ....... 24

                                iv.     The Scope of Plaintiffs' Injuries and the
                                        Appropriate Remedy Do Not Bear on
                                        Their Standing.................................................... 26

                2.      Plaintiffs' Injuries Were Caused by Hilton................................. 29

3.    Plaintiffs' Injuries are Redressable by Hilton ........................................... 30

C.    The ERC and AAPD Have Representational Standing ....................................... 32

D.    Plaintiffs Have Standing to Sue for Monetary Damages Under
      the DCHRA ............................................................................................ 34

E.    Hilton's 12(b)(7) Motion Should be Denied Because Owners
      of Franchised Hotels are not Indispensable Parties ..................................... 36

      1.    The Owners of Franchised and Managed Hotels
            are Not Necessary Parties Under Rule 19(a) ..................................... 36

            a.    As Parties That are Jointly Liable, , the Owners of the
                  Managed and Franchised Hotels are Not Necessary Parties .......... 36

            b.    Complete Relief Can Be Accorded Without
                  the Absent Owners .......................................................... 37

            c.    Disposition of the Case Will Not Impair the
                  Absent Owner's Interests ................................................... 38

            d.    The Absent Hotel Owners May be Subject
                  to Jurisdiction .............................................................. 39

      2.    The Absent Owners are Not Indispensable Parties Under 19(b) .............. 40

F.    Hilton's 12(b)(6) Motion Should be Denied Because Hotels
      Built Prior to January 26, 1993 Must Disperse Rooms in
      Different Room Classes or Categories ....................................................... 42

IV.    CONCLUSION ............................................................................................ 45

# TABLE OF AUTHORITIES

## CASES

Page(s)

*A Helping Hand, LLC v. Baltimore County, Md.*, 515 F.3d 356 (4th Cir. 2008) ...................15

*Abigail Alliance for Better Access to Developmental Drugs v. Eschenbach*, 469 F.3d 129 (D.C. Cir. 2007) .........................................................................................................31

*Access 4 All v. Absecon Hospitality Corp.*, 04-6060, 2006 WL 3109966 (D.N.J. Oct. 30, 2006) ..........................................................................................................................21

*Action Alliance of Senior Citizens of Greater Phila. v. Heckler*, 789 F.2d 931 (D.C. Cir. 1986) .....................................................................................9, 12

*Addiction Specialists, Inc. v. The Twp. of Hampton*, 411 F.3d 399 (3d Cir. 2005) ................15

*Am. Council of Blind v. Paulson*, 463 F. Supp. 2d 51 (D.D.C. 2006) ...................................27

*Am. Soc'y for Prevention of Cruelty to Animals v. Ringling Bros. and Barnum & Bailey Circus*, 317 F.3d 334 (D.C. Cir. 2003) .........................................................................33

*\*Aktieselskabet AF 21. Nov. 2001 v. Fame Jeans, Inc.*, --- F.3d ----, No. 07-7105, 2008 WL 1932768 (D.C. Cir. April 29, 2008)   ........................................ *passim*

*\*Bacon v. City of Richmond*, 386 F. Supp. 2d 700 (E.D. Va. 2005) ................................20, 24

*Baker v. Carr*, 369 U.S. 182 (1962).........................................................................................27

*Bell Atl. Corp. v. Twombly*, 127 S. Ct. 1955 (2007)  .................................................................8

*Blake v. Prof'l Travel Corp.*, 768 A.2d 568 (D.C. 2001).........................................................35

*Botosan v. Paul McNally Realty*, 216 F.3d 827 (9th Cir. 2000) .............................................30

*Califano v. Yamasaki*, 442 U.S. 682 (1979) ..........................................................................26

*\*Celano v. Marriott Int'l, Inc.*, No. 05-4004, 2008 WL 239306 (N.D. Cal. Jan. 28 2008) ........................................................................................................................20, 23

*Ctr. for Law and Educ. v. U.S. Dept. of Educ.*, 315 F. Supp. 2d 15 (D.D.C. 2004) ...............17

*Cherokee Nation of Okla. v. Babbitt*, 117 F.3d 1489 (D.C. Cir. 1997) .............................36, 40

*Clark v. Burger King Corp.*, 255 F. Supp. 2d 334 (D.N.J. 2003)............................................28

*Clark v. McDonald's Corp.* 213 F.R.D. 198 (D.N.J. 2003)..........................................16, 34, 42

*Coalition on Sensible Transp., Inc. v. Dole*, 631 F. Supp. 1382 (D.D.C. 1986).....................38

*D.C. v. Wash. Hosp. Ctr.*, 722 A.2d 332 (D.C. 1998) .............................................................37

*Dayton Bd. of Educ. v. Brinkman*, 433 U.S. 406 (1977).........................................................27

*D'Lil v. Anaheim Hotel P'ship*, 43 F. App'x. 96 (9th Cir. 2002)........................................18, 44

*Doe v. D.C. Comm'n on Human Rights*, 624 A.2d 440 (D.C. 1995)......................................35

*Doran v. 7-Eleven, Inc.*, 524 F.3d 1034 (9th Cir. May 2, 2008) ....................................19, 22

*Dudley v. Hannaford Bros. Co.*, 146 F. Supp. 2d 82 (D. Me. 2001) ......................................19

*Equal Rights Center v. Equity Residential*, 483 F. Supp. 2d 482 (D.Md. 2007) ....................15

*Erickson v. Pardus,* 127 S. Ct. 2197 (2007) ..........................................................................12

*Fair Employment Council of Greater Wash. v. BMC Mktg. Corp.*, 28 F.3d 1268
(D.C. Cir. 1994) .............................................................................................2, 10, 13, 25

*Feezor v. Chico Lodging, LLC*, 422 F. Supp. 2d 1179 (E.D. Cal. 2006)................................21

*Gillis v. McDonald's Corp.*, Civ. A. No. 91-7202, 1992 WL 236891 (E.D. Pa. Sept.
10, 1992) ....................................................................................................................41

*Gladstone Realtors v. Vill. of Bellwood*, 441 U.S. 91 (1979).................................................14

*Gorman v. Ameritrade Holding Corp.*, 293 F.3d 506 (D.C. Cir. 2002) ...........................39, 41

*Gregory v. Melrose Group, LLC*, No. Civ. A 03-2414, 2003 WL 22928805 (E.D. La.
Dec. 8, 2003) ..............................................................................................................23

*Grove v. De La Cruz*, 407 F. Supp. 2d 1126 (C.D. Cal. 2005)...............................................30

*Harris v. Del Taco, Inc.*, 396 F. Supp. 2d 1107 (C.D. Cal. 2005) ..........................................34

*Havens Realty Corp v. Coleman*, 455 U.S. 363 (1982) ....................................2, 9, 10, 11, 16

*Hill v. McDonald*, 442 A.2d 133 (D.C. 1982) .......................................................................37

*Holt v. Am. City Diner, Inc.,* No. Civ. 05-1745, 2007 WL 1438489 (D.D.C. May 15,
2007) .........................................................................................................................34

*Hunt v. Wash. State Apple Adver. Comm'n*, 432 U.S. 333 (1977) .......................................32

*Indep. Living Res v.. Or. Arena Corp.*, 982 F. Supp. 698 (D. Or. 1997) ....................15, 22, 36

*Innovative Health Sys., Inc. v. City of White Plains*, 117 F.3d 37 (2d Cir. 1997) .................15

*Interstate Natural Gas Ass'n v. Fed. Energy Regulatory Comm'n*, 285 F.3d 18 (D.C. Cir. 2002) ....................................................................................................................12

*Kickapoo Tribe of Indians of Kickapoo Reservation in Kan. v. Babbitt*, 43 F.3d 1491 (D.C. Cir. 1995) ...............................................................................................................41, 42

*Kosloff v. Wash. Square Assoc., LLC,* No. C. 06-5060, 2007 WL 2023497 (N.D. Cal. July 12, 2007) ...............................................................................................................37

*Kratzer v. Gamma Mgmt. Group,* No. Civ. A. 04-6031, 2005 WL 2644996 (E.D. Pa. Oct. 12, 2005) ...............................................................................................................21

*LPA Inc v. Chao*, 211 F. Supp. 2d 160 (D.D.C. 2002) ............................................................17

*Lewis v. Casey*, 518 U.S. 343 (1996)...................................................................27, 28, 29

*Liban v. Churchey Group II, L.L.C.*, 305 F. Supp. 2d 136 (D.D.C. 2004) ............................34

*Long Term Care Pharmacy Alliance v. UnitedHealth Group, Inc.*, 498 F. Supp. 2d 187 (D.D.C. 2007) .............................................................................................................17

*Lujan v. Defenders of Wildlife*, 504 U.S. 555 (1992) ...................................................... *passim*

*Mass. v. Envtl. Prot. Agency*, 127 S. Ct. 1438 (2007) .............................................................9

*Matthews v. Automated Bus. Sys. & Servs., Inc.*, 558 A.2d 1175 (D.C. 1989).......................35

*Maydak v. Fed. Commc'n Comm'n*, No. 98-1383, 1998 WL 938717 (D.C. Cir. 1998)..........12

*Molski v. Mandarin Touch Rest.*, 385 F. Supp. 2d 1042 (C.D. Cal. 2005)..............................34

*Mountain States Legal Found. v. Glickman*, 92 F.3d 1228 (D.C. Cir. 1996).........................25

*N.C. Fisheries Assoc., Inc. v. Gutierrez*, 518 F. Supp. 2d 62 (D.D.C. 2007) .........................31

*Naartex Consulting Corp. v. Watt*, 722 F.2d 779 (D.C. Cir. 1983).........................................41

*Nat'l Fair Housing Alliance v. Prudential Ins. Co. of Am.*, 208 F. Supp. 2d 45 (D.D.C. 2002) ...............................................................................................................13

*Nat'l Parks Conservation Assoc. v. Manson*, 414 F.3d 1 (D.C. Cir. 2005)...........................31

*Nat'l Taxpayers Union, Inc. v. U.S.*, 68 F.3d 1428 (D.C. Cir. 1995) ......................................33

*Nat'l Treasury Employees Union v. U.S.*, 101 F.3d 1423, 1426 (D.C. Cir. 1996) .................12

*Natural Res. Def. Council v. Envtl. Prot. Agency*, 464 F.3d 1 (D.C. Cir. 2006) ....................33

*Paralyzed Veterans of Am. v. Ellerbe Becket Architects & Eng'rs, P.C.*, 950 F. Supp. 393, 405 (D.D.C. 1996) ...........................................................................................................45

*Parr v. L & L Drive-Inn Rest.*, 96 F. Supp. 2d 1065 (D. Haw. 2000) ....................................27

*Pasco Int'l (London) Ltd. v. Stenograph Corp.*, 637 F.2d 496 (7th Cir. 1980) ......................38

*Pickern v. Holiday Quality Foods Inc.*, 293 F.3d 1133 (9th Cir. 2002) ..................................19

*Provident Tradesmens Bank & Trust Co. v. Patterson*, 390 U.S. 102 (1968)..................40, 41

*Public Citizen v. Fed. Trade Comm'n*, 869 F.2d 1541 (D.C. Cir. 1989)................................33

*Rishell v. Jane Phillips Episcopal Mem'l Med. Ctr.*, 94 F.3d 1407 (7th Cir. 1980)...............41

*Roberts v. Royal Atlantic Corp.*, 445 F. Supp. 2d 239 (E.D.N.Y. 2006)................................43

*S. Cal. Edison Co. v. Fed. Energy Regulatory Comm'n*, 502 F.3d 176 (D.C. Cir. 2007) ................................................................................................................................8

*Small v. Gen. Nutrition Cos.*, 388 F. Supp. 2d 83 (E.D.N.Y. 2005)................................16, 28

*\*Spann v. Colonial Vill., Inc.*, 899 F.2d 24 (D.C. Cir. 1990) ......................................... *passim*

*Steger v. Franco, Inc.*, 228 F.3d 889 (8th Cir. 2000).............................................................19, 22

*Tandy v. City of Wichita*, 380 F.3d 1277 (10th Cir. 2004) ......................................................20

*Temple v. Synthes Corp. Ltd.*, 498 U.S. 5 (1990) ...................................................................36

*Thompson v. Jiffy Lube Int'l, Inc.*, 505 F. Supp. 2d 907 (D. Kan. 2007)...............................41

*Thompson v. Sand Cliffs Owners Ass'n, Inc.*, No. 3:96 CV 270/RV, 1998 WL 35177067 (N.D. Fla. 1998) ......................................................................................................41

*Trafficante v. Metro. Life Ins. Co.*, 409 U.S. 205 (1972)...................................................14, 25

*U.S. v. Days Inns of Am., Inc.*, 997 F. Supp. 1080 (N.D. Ill. 1998)...................................30, 37

*Vill. of Elk Grove Vill. v. Evans*, 997 F.2d 328 (7th Cir. 1993)..............................................25

*Warth v. Seldin*, 422 U.S. 490 (1975) ........................................................................14, 23, 32

## STATUTES

42 U.S.C. § 12101 .....................................................................................................................15

42 U.S.C. § 12182(a) ....................................................................................................31, 38, 44

42 U.S.C. § 12182(b)(2)(A)(iv) 44 ..........................................................................................46

42 U.S.C. § 12183(a)(2).............................................................................................................44

42 U.S.C. § 12188(a)(1)......................................................................................................15, 20

42 U.S.C. § 12188(a)(1).............................................................................................................16

42 U.S.C. § 1981 .......................................................................................................................15

28 C.F.R. § 36.404......................................................................................................................45

28 C.F.R. § 36.405......................................................................................................................45

D.C. CODE § 2-1402.01 ..............................................................................................................36

D.C. CODE §13-423(a)(4) (2001) ..............................................................................................41

FED. R. CIV. P. 19...........................................................................................................37, 38, 41

**MEMORANDUM OF POINTS AND AUTHORITIES
IN OPPOSITION TO HILTON'S MOTION TO DISMISS
THE AMENDED COMPLAINT**

The Equal Rights Center ("ERC"), American Association of People with Disabilities ("AAPD"), Marc Fiedler, Mark Johnson, and Wendy Elliott-Vandivier ("Plaintiffs"), through undersigned counsel, respectfully submit this Memorandum of Points and Authorities in Opposition to Hilton Hotels Corporation's ("Hilton") Motion to Dismiss the Amended Complaint ("Motion to Dismiss").  For all the reasons set forth below, the Court should deny Hilton's Motion to Dismiss.

## I.    PRELIMINARY STATEMENT

To most of the world, "Hilton" means luxury and quality.  To people with disabilities, "Hilton" means inaccessibility because Hilton hotels throughout the country contain a shocking number of barriers to access that violate the Americans with Disabilities Act ("ADA").

Hilton does not deny that these violations exist.  Instead, Hilton argues vehemently that it *cannot* and *will not* correct the violations.  Hilton argues that it *cannot* correct the violations because it is powerless to implement any such changes throughout the thousands of hotels across the country, some of which are owned by franchisees.  This is patently false.  Control and uniformity throughout its hotels is critical to the strength of Hilton's brand name.  Indeed, when marketing its brands, Hilton boasts of the rigorous standards that it imposes on each of its hotels to ensure that they offer a uniform experience – down to the type of *alarm clock* available in each room.  If Hilton can assure guests of uniform alarm clocks, one would think that Hilton could assure its disabled guests that its hotels comply with federal law.

In any event, Hilton argues that even if it has the power to correct the ADA violations, it *will not* correct them because all of the plaintiffs failed to allege sufficiently that they have standing to bring this lawsuit. Hilton's standing arguments are non-starters.

First, Hilton misstates the D.C. Circuit's standards for pleading by suggesting that the Supreme Court elevated the level of detail required to withstand a motion to dismiss. The D.C. Circuit expressly held that this was not the case, and a complaint need only contain a "short and plain statement of the claim showing the pleader is entitled to relief." *Aktieselskabet AF 21. Nov. 2001 v. Fame Jeans, Inc.*, --- F.3d ---, No. 07-7105, 2008 WL 1932768, at *4 (D.C. Cir. April 29, 2008) ("*Fame Jeans*"). Thus, to properly allege standing, a plaintiff need only allege that it suffered an injury that was caused by the defendant and that will likely be redressed by a favorable decision. All of the plaintiffs pled more than sufficient facts to satisfy the standard.

The ERC and AAPD sufficiently pled organizational standing by alleging that Hilton's actions frustrated their purposes and required them to devote additional resources to combating Hilton's discriminatory practices. The goals of the ERC and AAPD include eliminating discrimination against people with disabilities, and both organizations have had to expend resources to combat the effects of Hilton's widespread discrimination. Binding precedent establishes that these allegations are sufficient. *See Havens Realty Corp. v. Coleman*, 455 U.S. 363, 379 (1982); *Spann v. Colonial Vill, Inc.*, 899 F.2d 24, 27 (D.C. Cir. 1990); *Fair Employment Council of Greater Wash. v. BMC Mktg. Corp.*, 28 F.3d 1268, 1276 (D.C. Cir. 1994); *infra* III.(B)(1)(a)(i-ii).

The individual plaintiffs sufficiently pled standing because they alleged that they directly encountered accessibility barriers at Hilton hotels, and they either face a threat of future injury or

they have a continuing desire to revisit Hilton hotels but for their knowledge of accessibility barriers. *See infra* III(B)(1)(b).

Hilton's half-hearted arguments under Rule 12(b)(7) and 12(b)(6) also fail. Hilton argues that the case should be dismissed under Rule 12(b)(7) for failure to join indispensable parties because each of the thousands of franchisees was not named as a defendant in the lawsuit. This argument is frivolous because, among many other reasons, the franchisees are not indispensable as they are merely jointly liable with Hilton for ADA violations. *See infra* III(E).

Finally, Hilton's 12(b)(6) motion contends, without citing a single case, that hotels built prior to the enactment of the ADA are never required to disperse accessible rooms among the various classes of rooms. This argument incorrectly misconstrues the ADA Accessibility Guidelines and ignores the fact that Hilton hotels would still be required to disperse accessible rooms because it is a readily achievable removal of an architectural barrier. *See infra* III(B)(F)

Accordingly, as set forth fully below, Hilton's Motion to Dismiss should be denied.

## II.    FACTUAL ALLEGATIONS

Hilton owns one of the largest and most successful hotel operations in the world with over 2,800 hotels in the United States and annual revenues exceeding eight billion dollars. (First Amended Complaint ("Compl.") at ¶ 1). To preserve the strength of its brands, Hilton exercises significant control over the daily operations of each of its hotels and ensures that guests receive a uniform experience regardless of the particular Hilton hotel they visit. (Compl. at ¶ 2). Hilton employees regularly inspect each hotel to ensure that it complies with Hilton's strict quality standards. (Compl. at ¶ 30). Hilton reserves the right to require individual hotels to implement specific changes, and in the past, it has instituted changes applicable to all of its hotel rooms (for example installing new alarm clocks, or implementing a "new bedding initiative").

(Compl. at ¶¶ 30, 31).  Hilton's franchise website boasts that "the name 'Hilton' has become synonymous with first-class hospitality… [and] high quality accommodations."  (Compl. at ¶ 33).

Disabled individuals receive a far different experience at Hilton hotels.  The ERC's survey of over twenty Hilton hotels revealed accessibility barriers in virtually every room it inspected.  (Compl. at ¶ 24).  Common barriers included doors that required too much force to open, door knobs that required pinching, twisting, or grabbing, rooms that did not have an accessible route running throughout, and temperature controls that are too high on the walls.  (Compl. at ¶ 5).  Nearly a third of Hilton hotels only offer ADA accessible rooms with one bed, and more than 85% of Hilton hotels that offer rooms with particular views do not offer ADA accessible rooms with views.  (Compl. at ¶ 27).[1]

Common areas in Hilton hotels also contain accessibility barriers.  Hotel restaurants do not contain accessible seating, front desks are inaccessible to guest patrons who use wheelchairs, public restrooms do not have sufficient clear floor space or adequate grab bars, and retail areas are inaccessible.  (Compl. at ¶ 6).  Moreover, Hilton's central reservation system accepts reservations for accessible rooms, and it provides disabled individuals with confirmations specifying that they will receive accessible rooms, but Hilton does not ensure that accessible rooms are actually available.  (Compl. at ¶¶ 35-38).

---

[1] More specifically, rooms in the Hilton Washington in Washington D.C. use a round bathroom doorknob that requires grasping and twisting and fail to provide an accessible route throughout the room.  (Compl. at ¶ 18).  The Capital Hilton in Washington D.C. fails to provide any rooms with roll-in showers, and it also lacks an accessible route throughout rooms.  (Compl. at ¶ 19).  The Hilton Washington Embassy Row does not disperse accessible rooms among the classes of available rooms.  (Compl. at ¶ 20).  The Hilton Oceanfront Resort in Hilton Head, South Carolina, fails to provide grab bars, an accessible path to the balcony, and accessible rooms with views.  (Compl. at ¶¶ 21, 29).

Each of the plaintiffs has been injured as a direct result of these violations which stem from Hilton's corporate indifference to the rights of people with disabilities.

The Equal Rights Center is a national non-profit civil rights membership organization whose purpose is to identify, challenge, and eliminate discrimination across the country in housing, employment, public accommodations, and government services. (Compl. at ¶ 11). Over the years, the ERC has received many complaints regarding access to hotels and motels, including hotels owned by Hilton Corporation. (Declaration of Rabbi Bruce E. Kahn. ("Kahn Decl.") at ¶ 3 (attached at Exhibit 1)). For example, in the Summer of 2006, ERC staff counseled an individual who complained of her family's inability to book an accessible room with double beds at any Hampton Inn Hotels. (Kahn Decl. at ¶ 4). The ERC performed tests of Hampton Inn hotels, which belong to Hilton, to identify the extent of discrimination at these hotels and in order to better counsel its members. *Id.* The ERC's tests confirmed the individual's complaint. *Id*.

Then, in the fall of 2006, Marc Fiedler complained to the ERC of his inability to book an ocean front room at a Hilton hotel in Hilton Head, South Carolina. (Kahn Decl. at ¶ 4). The ERC then inspected other Hilton hotels throughout the country to identify the extent of discrimination at these hotels in order to better counsel its members. (Kahn Decl. at ¶ 5). The ERC found accessibility barriers at virtually every Hilton hotel it inspected. (Compl. at ¶ 24).

Hilton's ongoing discrimination has harmed the ERC by: forcing the ERC to divert resources from other issues vital to its membership in order to counsel individuals complaining of discrimination; forcing the ERC to divert resources from other issues in order to investigate the extent of accessibility barriers that occur in Hilton hotels; and frustrating the ERC's organizational purpose and making the ERC's activities more difficult. (Compl. at ¶ 42). If the

violations at Hilton hotels remain unremedied, the ERC will continue to be forced to divert resources from other issues vital to its membership in order to combat Hilton's discrimination. (Compl. at ¶ 43). The ERC also brings suit as a representative of its members who have been injured by Hilton's ADA violations. (Compl. at ¶ 44).

The American Association of People with Disabilities is the largest non-profit cross-disability organization in the United States. (Compl. at ¶ 12). The AAPD's mission is to further the productivity, independence, full citizenship, and total integration of people with disabilities into all aspects of society. (Compl. at ¶ 12). AAPD members frequently face accessibility barriers in hotels and motels. (Declaration of Andrew J. Imparato ("Imparato Decl.") at ¶ 4 (attached at Exhibit 2)). Hilton's ongoing discrimination has harmed the AAPD by: forcing the AAPD to divert resources from other issues vital to its membership in order to spend time to inspect meeting and hotel facilities to ensure that they are ADA compliant; forcing the AAPD to divert resources from other issues vital to its membership in order to spend time increasing its lobbying efforts to promote accessibility; and frustrating the AAPD's organizational purpose and making the AAPD's activities more difficult. (Compl. at ¶ 47, Imparato Decl. at ¶ 5 ). The AAPD also brings suit as a representative of its members who have been injured by Hilton's ADA violations. (Compl. at ¶ 49).

Marc Fiedler is disabled by a spinal cord injury, and he requires the use of a wheelchair. He attempted to reserve a hotel room with an ocean view at the Hilton Oceanfront Resort in Hilton Head, South Carolina. (Compl. at ¶ 50). The Hilton Oceanfront Resort offers rooms with ocean views, but none are accessible. (Compl. at ¶ 51). Mr. Fiedler has a continuing desire to stay at the Hilton Oceanfront, and he would do so but for the hotel's failure to disperse accessible rooms among the various classes of sleeping accommodations. (Compl. at ¶ 51).

Wendy Elliott-Vandivier is disabled by a spinal cord injury, and she requires the use of a motorized wheelchair. (Compl. at ¶ 14). On March 20, 2008, she reserved a wheelchair-accessible room at the Doubletree Guest Suites, Philadelphia West. (Compl. at ¶ 52). She received multiple confirmations specifying that she had reserved an accessible room, but when she attempted to check-in, she was told that all accessible rooms were under renovation. (Compl. at ¶¶ 53-54). On a quarterly basis, she stays at hotels for departmental meetings, and there is an ongoing possibility that she will be forced to stay at a Hilton hotel and face the threat of either not having her reservation for an accessible room honored, or being provided a so-called accessible room that contains accessibility barriers. (Compl. at ¶ 56).

Mark Johnson is disabled by a spinal cord injury, and he requires the use of a motorized wheelchair. (Compl. at ¶ 15). On March 6, 2007, Mark Johnson received an award from the AAPD that recognized his activism and advocacy on behalf of disabled individuals. (Compl. at ¶ 57). Mr. Johnson stayed at the Capital Hilton and encountered an accessibility barrier when the Capital Hilton failed to provide a hotel room with a roll-in shower. (Compl. at ¶ 59). Hotel employees actually suggested that Mr. Johnson use the shower in the men's locker room. (Compl. at ¶ 59). Mr. Johnson regularly visits Washington D.C. for work, and he would stay at a Hilton hotel but for his knowledge of accessibility barriers present in Hilton hotels. (Compl. at ¶ 61).

## III.    ARGUMENT

### A.    Legal Standards

#### 1.    The Standard for a Motion to Dismiss Has Not Changed in This Circuit.

In this Circuit, a complaint need only contain a "short and plain statement of claim showing that the pleader is entitled to relief, enough to give a defendant fair notice of the claims against him" and "a complaint may proceed even if it appears that a recovery is very remote and unlikely." *Fame Jeans*, 2008 WL 1932768, at *4. In deciding a 12(b)(6) motion, a court "construes the complaint liberally in the plaintiff's favor, accepting as true all of the factual allegations contained in the complaint;" and the plaintiff is entitled to "the benefit of all reasonable inferences derived from the facts alleged." *Id.* (internal quotations and citations omitted).

Hilton desperately argues that the Supreme Court's decision in *Bell Atlantic Corp. v. Twombly*, 127 S. Ct. 1955 (2007) ("Twombly") changed the pleading requirements in this circuit. (Motion to Dismiss at 11). Hilton is plainly wrong. *See Fame Jeans*, 2008 WL 1932768, at *4 ("We conclude that *Twombly* leaves the long-standing fundamentals of notice pleading intact."). Accordingly, Hilton's central argument – that the Amended Complaint should be dismissed for its failure to provide sufficiently detailed allegations – is based on an incorrect standard. (Motion to Dismiss at 11, 18, 19, 21, 27, 32). As set forth below, Plaintiffs' allegations are sufficient and Hilton's motion is without merit.

#### 2.    Article III Standing Requirements

Article III standing assesses "whether the litigant is entitled to have the court decide the merits of the dispute or of particular issues." *See Warth v. Seldin*, 422 U.S. 490, 498 (1975); *S. Cal. Edison Co. v. Fed. Energy Regulatory Comm'n*, 502 F.3d 176, 180 (D.C. Cir. 2007)

("[I]n reviewing the standing question, the court must… assume that on the merits the petitioner would be successful in its claims.") (internal citations omitted).  The fundamental question is "whether petitioners have 'such a personal stake in the outcome of the controversy as to assure that concrete adverseness which sharpens the presentation of issues upon which the court so largely depends for illumination.'" *Mass. v. Envtl. Prot. Agency*, 127 S. Ct. 1438, 1453 (2007) (quoting *Baker v. Carr*, 369 U.S. 186, 204 (1962)).

The Article III standing requirements are generally the same for organizations as they are for individuals.  *See Havens Realty Corp. v. Coleman*, 455 U.S. 363, 378 (1982) ("*Havens*").  In either case, standing has three requirements: first, the plaintiffs must have been injured in fact; second, there must be a causal connection between the injury and the conduct complained of; and third, it must be likely that the injury will be redressed by a favorable decision.  *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560-61 (1992) (internal citations omitted).  As set forth below, all of the plaintiffs have standing to bring this action.

 **B.**  **Plaintiffs All Have Standing to Bring a Claim Under the ADA.**

   **1.**  **Plaintiffs Were Injured in Fact.**

     **a.**  **The ERC and AAPD Were Injured in Fact Because Hilton's Conduct Has Made the Organizations' Activities More Difficult.**

An organization has been injured in fact if it can show a "concrete and demonstrable injury to the organization's activities" and not just a "setback to the organization's abstract social interests."  *Havens*, 455 U.S. at 379 (allegations that defendant's racial steering impaired the organization's ability to provide counseling and referral services to homebuyers established an injury in fact).  Moreover, the injury an organization sustains "need not be large or intense; an 'identifiable trifle'… is sufficient to meet the constitutional minimum."  *Action Alliance of*

*Senior Citizens of Greater Phila. v. Heckler*, 789 F.2d 931, 937 (D.C. Cir. 1986) (organization

had standing when its counseling and advocacy services were diminished by regulations limiting

the flow of information concerning age discrimination) (quoting *U.S. v. Students Challenging*

*Regulatory Agency Procedures*, 412 U.S. 669, 689 n.14 (1973)).

### i.    The ERC Was Injured in Fact.

Hilton's pattern of discrimination has directly injured the ERC by forcing it to divert

resources from other issues vital to its membership in order to combat Hilton's discrimination.

(Compl. at ¶ 42).  This injury has been repeatedly recognized as sufficient to confer standing on

an organization.  *See, e.g., Havens*, 455 U.S. at 379 ("there can be no question that the

organization has suffered injury in fact" when it alleged that it "has been frustrated by

defendants' racial steering practices in its efforts to assist equal access to housing" and that

"it has had to devote significant resources to identify and counteract the defendant's racially

discriminatory steering practices"); *Spann v. Colonial Village, Inc.*, 899 F.2d 24, 27

(D.C. Cir. 1990) (defendant's advertisements that steered black home buyers away from

housing complexes injured organization by impelling it to "devote resources to checking or

neutralizing the ads' adverse impact… [and] to devote more time, effort, and money to

endeavors designed to educate… the public that racial preference in housing is indeed illegal");

*Fair Employment Council of Greater Wash. v. BMC Mktg. Corp.*, 28 F.3d 1268, 1276 (D.C. Cir.

1994) ("BMC") (employment agency's discriminatory referral practices injured the Fair

Employment Council because they interfered with the Council's programs designed at promoting

equal opportunity and "required the Council to expend resources to counteract BMC's alleged

discrimination").

The ERC's injuries closely resemble the injuries in *Havens*, *Spann*, and *BMC*. The ERC's goals include eliminating discrimination in public accommodations. (Compl. at ¶ 11). The ERC conducts various programs aimed at achieving that goal, including counseling individuals who have encountered discrimination, teaching know-your-rights classes and advocacy workshops to people with disabilities, and educating businesses about applicable accessibility requirements. (Compl. at ¶ 11). Indeed, Hilton actually contacted the ERC regarding the ERC's advice on the use of service animals at a Hilton hotel. (Answer to Amended Complaint at ¶ 40). Hilton's pattern of discrimination has interfered with the ERC's programs and required the ERC to divert resources in order to combat discrimination at Hilton hotels. (Compl. at ¶ 42). In fact, over the years, the ERC has received many complaints regarding accessibility barriers at Hilton hotels, and it has spent time counseling individuals who have been discriminated against by Hilton. (Kahn Decl. at ¶ 3). This includes counseling Marc Fiedler regarding his experience at the Hilton Oceanfront resort, as well as counseling another individual whose family was unable to book an accessible room with two double beds at any Hampton Inn hotel. (Kahn Decl. at ¶¶ 4-5).

Hilton makes a series of unpersuasive arguments in an attempt to deny the ERC standing. First, several of Hilton's arguments fault the ERC for not providing enough detail in the complaint.[2] (Motion to Dismiss at 27-30). As set forth above, the ERC's complaint only needs to contain "a short and plain statement of the claim showing that the pleader is entitled to relief,

---

[2] Hilton's allegation that "not a single allegation in the complaint" if true would establish that the ERC's rights under the ADA or DCHRA will likely be violated by Hilton in the future (Motion to Dismiss at 27) overlooks the allegation that "the ERC will continue to be forced to divert resources necessary to combat discrimination in Hilton hotels, and its activities will continue to be made more difficult as a direct result of Hilton's conduct." (Compl. at ¶ 43).

enough to give a defendant fair notice of the claims against him." *Fame Jeans*, 2008 WL

1932768, at *4 (internal quotation omitted); *Erickson v. Pardus*, 127 S. Ct. 2197, 2200 (2007)

(*per curiam*) ("Specific facts are not necessary; the statement need only give the defendant fair

notice of what the claim is and the grounds upon which it rests.") (citing *Twombly*) (internal

quotation omitted).  The Amended Complaint, as well as Rabbi Kahn's declaration, provides far

more details than are necessary to establish injury, (Compl. at 39-42, Kahn Decl. at ¶¶ 3-6) and

the size of the injury does not affect the ERC's standing.  *See Action Alliance*, 789 F.2d at 937

("an identifiable trifle is sufficient to meet the constitutional minimum") (internal citation

omitted).

Moreover, the cases that Hilton relies on for its argument against organizational standing

are inapposite because they were not brought against private parties who directly injured the

plaintiffs.  Rather, Hilton's cases were brought by plaintiffs who sought to challenge *government

regulations* that regulated third parties rather than the plaintiffs' activities.  *See generally Lujan*,

504 U.S. at 559 (environmental groups sued the Secretary of the Interior for not complying with

the Endangered Species Act); *Nat'l Treasury Employees Union v. U.S.*, 101 F.3d 1423, 1426

(D.C. Cir. 1996) (union of federal employees attempted to challenge the constitutionality of

the Line Item Veto Act); *Maydak v. Fed. Commc'n Comm'n*, 1998 WL 938717, at *1

(D.C. Cir. 1998) (appellant challenged FCC regulations for injuries sustained as a consumer);

*Interstate Natural Gas Ass'n v. Fed. Energy Regulatory Comm'n*, 285 F.3d 18, 29

(D.C. Cir. 2002) (trade associations sued commission for changes to rate structures in the

natural gas industry).  In *Spann*, the D.C. Circuit expressly explained this distinction:  "Plaintiffs

are private actors suing other private actors, traditional grist for the judicial mill.  Their suit does

not raise the concerns that may arise when a public agency or officer is sued to achieve change in

a government policy." 899 F.2d at 30 (internal citation omitted); *see also Lujan*, 504 U.S. at 562 ("when the plaintiff himself is not the object of the government action or inaction he challenges, standing is… substantially more difficult to establish.") (internal quotation omitted).

Second, Hilton argues that the ERC cannot allege injuries stemming from its investigation of individual hotels because those "self-inflicted" injuries cannot constitute an injury in fact. (Motion to Dismiss at 28-29). In *BMC*, while the court held that, on the facts of the case, an organization could not claim an injury arising solely from its use of testers, the court did not rule that employing testers is never an injury; rather, the court explained that "this particular harm is self-inflicted; it results not from any actions taken by BMC, but rather from the Council's own budgetary choices." 28 F.3d at 1276-77. If an organization's costs in hiring testers result from the defendant's conduct as opposed to its own choices, that harm will establish Article III standing. The ERC did not make a "budgetary choice" to inspect Hilton hotels. The ERC first learned of disability barriers at Hilton hotels through several complaints of individuals who encountered accessibility barriers at Hilton hotels. (Compl. at ¶ 39, Kahn Decl. at ¶¶ 3-6). In response to the complaints, and in order to learn the extent of Hilton's ADA violations in order to better counsel its members, the ERC began investigating Hilton hotels. (Compl. at ¶ 39, Kahn Decl. at ¶¶ 4-5). These harms were a direct result of Hilton's discrimination. Hilton's contention that the ERC is at its core an organization devoted to litigation (Motion to Dismiss at 29-30) is undermined by Hilton's own actions. Indeed, *Hilton admits that it contacted the ERC* to discuss advising it on the use of service animals at one of its hotels. (Answer to Amended Complaint at ¶ 40).

Additionally, in *National Fair Housing Alliance v. Prudential Insurance Co. of America*, 208 F. Supp. 2d 45, 52-53 (D.D.C. 2002), the court cited *BMC* as suggesting that money spent on

testing cannot "by itself" establish an injury in fact, but "if the defendants' conduct caused

independent harms to other programs of plaintiff organizations, sufficient injury would exist"

(finding that organization that used testers had standing because it had also alleged that as a

result of the defendant's discriminatory practices it was required to divert resources in order to

educate homeowners and the general public that discrimination in residential property housing is

illegal). Hilton's conduct caused the ERC harms independent of the expenses ERC incurred in

testing Hilton. These harms include the resources the ERC spent counseling individuals and

teaching know-your-rights classes and advocacy seminars in order to counteract Hilton's

discrimination. (Compl. at ¶ 11).

Finally, Hilton argues that prudential standing requirements bar the ERC's claim under

Title III of the ADA because the ERC cannot show that it is a person being subjected to

discrimination. (Motion to Dismiss at 25). Prudential standing limitations can be eliminated by

congressional intent to confer standing as broadly as is permitted under Article III. *See, e.g.,*

*Trafficante v. Metro. Life Ins. Co.*, 409 U.S. 205, 209 (1972) (the Civil Rights act of 1968

showed congressional intent to define standing "as broadly as is permitted by Article III");

*Gladstone Realtors v. Vill. of Bellwood*, 441 U.S. 91, 102-09 (1979) (finding that prudential

standing did not apply to the Fair Housing Act). In *Warth v. Seldin*, 422 U.S. 490, 512-13

(1975), the Court explained that the Civil Rights Act of 1968 evidenced congressional intent to

eliminate prudential standing requirements because of its "clear congressional purpose" and

"broad definition of person aggrieved," but that no such intent could be found in 42 U.S.C.

§ 1981 (internal citation omitted). Both factors are present with the ADA. Congress enacted the

ADA to "provide a clear and comprehensive national mandate for the elimination of

discrimination against individuals with disabilities" and it did so in part based on a finding that

"people with disabilities... are severely disadvantaged socially, vocationally, economically, and educationally." 42 U.S.C. § 12101. Congress also provided a cause of action to "any person being subjected to discrimination," 42 U.S.C. § 12188(a)(1), and not only "a disabled person being subjected to discrimination." Thus, Hilton's argument that no organization should ever be able to challenge accessibility barriers at a place of public accommodation based on injuries that the organization sustains in its own right, conflicts with the intent behind the ADA.

Several circuit courts have found that jurisdiction under Title II of the ADA extends to the full reach of Article III because Congress provided a cause of action to "any person." *See, e.g., Innovative Health Sys. Inc. v. City of White Plains*, 117 F.3d 37, 47 (2d Cir. 1997) (because the enforcement provision of Title II "extends relief to *any person* alleging discrimination on the basis of disability," it evinces a congressional intent to define standing "as broadly as is permitted by the Constitution") (emphasis in original); *A Helping Hand, LLC v. Baltimore County, Md.*, 515 F.3d 356, 363-64 (4th Cir. 2008) ("Title II's enforcement provision does *not* limit its remedies to individuals with disabilities. Rather, Title II expressly provides a remedy to *any person* alleging discrimination on the basis of disability") (emphasis in original) (internal citations omitted); *Addiction Specialists, Inc. v. Twp. of Hampton*, 411 F.3d 399, 405 (3d Cir. 2005) (same). This reasoning applies with equal force to Title III of the ADA where Congress also provided a cause of action to "*any person* who is being subjected to discrimination" as opposed to only "a disabled person who is being subjected to discrimination." 42 U.S.C. § 12188(a)(1) (emphasis added). *See Indep. Living Res. v. Or. Arena Corp.*, 982 F. Supp. 698, 760-61 (D. Or. 1997) (relying on *Spann* to find that an organization could challenge an arena's accessibility); *ERC v. Equity Residential*, 483 F. Supp. 2d 482, 487 n.7 (D. Md. 2007) (noting without deciding that it would create an "absurdity of extraordinary proportions" if the

15

ERC could challenge apartment units under the FHA but not common areas of buildings under Title III).[3]

### ii.    The AAPD Was Injured in Fact.

The AAPD has been injured in fact first because Hilton's conduct has frustrated the AAPD's activities and caused it to divert resources to combat Hilton's discrimination, and second, because the AAPD has been required to expend resources to find accessible meeting facilities.

First, like the ERC and the plaintiffs in *Havens*, *Spann*, and *BMC*, the AAPD's mission has been frustrated and its resources diverted. The AAPD's mission is to enhance the productivity, independence, full citizenship, and total integration of people with disabilities into all aspects of society. (Compl. at ¶ 12). The AAPD participates in several activities designed to further this mission including: lobbying the federal government to promote legislation designed to assist people with disabilities; organizing a disability mentoring program to assist people with disabilities in pursuing job opportunities; and organizing internship programs that provide opportunities for people with disabilities. (Compl. at ¶ 12). Hilton's discrimination has made it more difficult for people with disabilities to travel throughout the country and integrate themselves into society. (Compl. at ¶ 47). This frustrates the AAPD's purpose, makes its activities more difficult, and has resulted in the AAPD having to spend additional resources in

---

[3] Hilton cites two district court cases that found prudential standing limitations under Title III. (Motion to Dismiss at 25). Both decisions acknowledged that prudential standing limitations did not apply to Title II of the ADA, but they attempted to distinguish Title III based on the difference between Title II's requirement that the person "allege discrimination" and Title III's requirement that the person be "subjected to discrimination." *Small v. Gen. Nutrition Cos., Inc.*, 388 F. Supp. 2d 83, 92 (E.D.N.Y. 2005); *Clark v. McDonald's Corp.*, 213 F.R.D. 198, 210 (D.N.J. 2003). That distinction is at odds with the circuit court decisions discussed above.

order to combat the discrimination at Hilton hotels.  (Compl. at ¶¶ 47-48, Imparato Decl. at ¶¶ 4-5).

Hilton does not argue that prudential limits apply to the AAPD's injuries or that the AAPD is an organization primarily devoted to pursuing litigation.  Instead, Hilton argues that spending time to increase lobbying efforts is not a sufficient injury to confer standing.  (Motion to Dismiss at 33).  But the cases Hilton relies on stand only for the proposition that an organization does not have standing to challenge a government policy if the organization cannot show any injury other than having lobbied unsuccessfully against that policy.  *See LPA Inc v. Chao*, 211 F. Supp. 2d 160, 165 (D.D.C. 2002) (organization had not been injured by the Secretary of Labor's final rule creating a voluntary program in which no state had elected to participate); *Ctr. for Law and Educ. v. U.S. Dep't of Educ.*, 315 F. Supp. 2d 15, 24 (D.D.C. 2004) ("Education's final rule does not injure the organizational plaintiffs in the required sense; it does no more than arguably offend their policy goals"); *Long Term Care Pharmacy Alliance v. UnitedHealth Group, Inc.*, 498 F. Supp. 2d 187, 192 (D.D.C. 2007) ("Were an association able to gain standing merely by choosing to fight a policy that is contrary to its mission, the courthouse door would be open to all associations.").  The AAPD is not suing to challenge a government policy that it has lobbied against.  The AAPD has been injured by Hilton's systemic violations of the ADA, and one form of this injury is that it has been required to divert resources and increase its lobbying efforts in order to counteract the effects of Hilton's discrimination.

Second, the AAPD has been injured by diverting resources in order to spend time finding accessible meeting facilities.  (Compl. at ¶¶ 45- 47).  In 2003, the AAPD had hoped to hold an event at the Doubletree in Rockville, Maryland, but after inspecting the venue and encountering numerous accessibility barriers, it decided to hold the event at a different hotel.  (Compl. at ¶ 45).

In 2007, after Mark Johnson was unable to secure a room with a roll-in shower at the Capital

Hilton, the AAPD was forced to expend resources looking for a new accessible venue for its

2008 Leadership Gala. (Compl. at ¶ 46). Hilton calls this allegation "completely insubstantial"

contending that organizations always review potential event venues. (Motion to Dismiss

at 32 n.11). The allegation, however, is that because the AAPD encountered discrimination at

Hilton hotels, it has had to spend *more* time ensuring that facilities are accessible than it

otherwise would have. (Compl. at ¶ 47).

Hilton argues that the AAPD cannot claim injury in the resources it spent finding a new

location for its 2008 Leadership Gala because the absence of a room with a roll-in shower does

not violate the ADA or DCHRA when there is no allegation that the hotel was constructed after

January 26, 1993, or that the rooms were altered after January 26, 1992. (Motion to Dismiss

at 33). In fact, the complaint makes that allegation twice. *See* Compl. at ¶ 19 ("The Capital

Hilton... has undergone substantial renovations since the enactment of the ADA.") and ¶ 68 ("the

rooms, suites, and common areas of the... Capital Hilton... are newly renovated within the

meaning of the ADA."). Moreover, the complaint also alleges that the Capital Hilton would still

be required to provide roll-in showers because the lack of roll-in showers is an accessibility

barrier whose removal is readily achievable. Compl. at ¶ 68 ("Any remaining areas of hotels are

subject to the barrier removal and 'readily achievable' requirements of the ADA."); *see also*

*D'Lil v. Anaheim Hotel P'ship*, 43 F. App'x. 96, 98 (9th Cir. 2002) (applying the "readily

achievable" standard to the installation of a roll-in shower at the Anaheim Hilton that was

constructed prior the ADA and had not been renovated).

Hilton also argues that the AAPD's injury resulting from accessibility barriers at the

Rockville Hilton is time-barred because the AAPD encountered the discrimination more than

three years ago.  (Motion to Dismiss at 32).  However, the AAPD suffers a continuing injury because it continues to expend resources to investigate venues.  Other courts have recognized that a claim can be brought under the ADA challenging  accessibility barriers first encountered outside the statute of limitations period if they continue to suffer injuries caused by those barriers. *See e.g., Pickern v. Holiday Quality Foods Inc.*, 293 F.3d 1133, 1137 (9th Cir. 2002) (plaintiff had standing to challenge accessibility barriers encountered outside the statute of limitations period because "[s]o long as the discriminatory conditions continue, and so long as plaintiff is aware of them and remains deterred, the injury under the ADA continues"); *Dudley v. Hannaford Bros. Co.*, 146 F. Supp. 2d 82, 86 (D. Me. 2001) (because the "defendant's discriminatory practices continue to exist" the plaintiff could challenge accessibility barriers encountered outside the statute of limitations period).  Accordingly, like the ERC, the AAPD has organizational standing to bring this action.

>    **b.    The Individual Plaintiffs Were Injured in Fact Because Their Knowledge of Hilton's Barriers to Accessibility Deterred Them From Visiting Any Hilton Hotels.**

Although the D.C. Circuit has not considered injury in fact under the ADA, it is widely recognized that a person with disabilities is injured when he or she is aware of accessibility barriers at a place of public accommodation and would visit the public accommodation but for knowledge of those barriers.  *See, e.g., Doran v. 7-Eleven, Inc.*, 524 F.3d 1034, 1041 (9th Cir. 2008) ("Allegations that a plaintiff has visited a public accommodation on a prior occasion and is currently deterred from visiting that accommodation by accessibility barriers establish that a plaintiff's injury is actual or imminent."); *Steger v. Franco, Inc.*, 228 F.3d 889, 892 (8th Cir. 2000) (plaintiffs must prove knowledge of barriers and that they would visit the building in the imminent future but for barriers).  This rule is derived from 42 U.S.C.

§ 12188(a)(1): "Nothing in this section shall require a person with a disability to engage in a *futile gesture* if such person has actual notice that a person or organization covered by this subchapter does not intend to comply with its provisions" (emphasis added).

Accordingly, it is not necessary for people with disabilities to directly encounter every accessibility barrier that they challenge, provided that their knowledge of those barriers acts as a deterrent. *See, e.g., Celano v. Marriott Int'l, Inc.*, No. 05-4004, 2008 WL 239306, at *1, 6-7 (N.D. Cal. Jan. 28, 2008) (finding that three disabled individuals had standing to sue all twenty-six Marriott-owned or operated golf courses on a nationwide basis, and rejecting Marriott's argument that standing was limited to courses they had actually visited because "deterrence alone provides sufficient injury in fact"); *Bacon v. City of Richmond*, 386 F. Supp. 2d 700, 703 (E.D. Va. 2005), *later proceeding*, 419 F. Supp. 2d 849 (E.D. Va. 2006), *later proceeding rev'd on other grounds*, 475 F.3d 633 (4th Cir. 2007)[4] (four plaintiffs had standing to challenge accessibility barriers at every school in Richmond and not just the four schools named in the complaint because the ADA does not require "a handicapped plaintiff... to suffer the public humiliation of unsuccessfully attempting to enter a public school facility in order to have standing"); *Tandy v. City of Wichita*, 380 F.3d 1277, 1282-83 (10th Cir. 2004) (plaintiff's desire to use the Wichita Transit system several times a year established standing to challenge the lack of accessible buses on a systemwide basis).

---

[4] The later proceedings related to the appropriate remediation plan and whether the city could be required to provide funding for retrofitting of schools. The plaintiffs' standing to challenge the systemwide violations was not subsequently questioned.

i.      **Mr. Fiedler Was Injured in Fact.**

Mr. Fiedler has a continuing desire to stay at the Hilton Oceanfront Resort and he

would do so, but for that resort's failure to provide accessible rooms with an ocean view.

(Compl. at ¶ 50-51).  In deciding a motion to dismiss, the court must accept the truth of

Mr. Fiedler's allegation.  *Fame Jeans*, 2008 WL 1932768, at *4.  Hilton argues that his "some

day" intentions to return are inadequate to establish an injury.  (Motion to Dismiss at 19).  Mr.

Fiedler did not allege that he would generally like to visit the hotel at some point in the future;

rather, he alleged that the reason he does not visit the Oceanfront Resort is that it contains

accessibility barriers.  (Compl. at 51).  Mr. Fiedler is not required to engage in the "futile

gesture" of attempting to revisit the Hilton Oceanfront, despite his knowledge of its accessibility

barriers.  *See Feezor v. Chico Lodging, LLC*, 422 F. Supp. 2d 1179, 1180-81 (E.D. Cal. 2006)

(plaintiffs had standing to sue hotel they had visited before, and it was "unnecessary for plaintiff

to frequently return to a facility and suffer repeated abuse in order to obtain standing"); *Kratzer*

*v. Gamma Mgmt. Group*, No. Civ. A. 04-6031, 2005 WL 2644996, at *3 (E.D. Pa. Oct. 12, 2005)

(plaintiffs were injured by ADA barriers at a hotel based on their allegations that they have a

continuing desire to visit the hotel but for the barriers).

Citing suits brought against restaurants, Hilton also suggests that Mr. Fiedler's intent to

return to the hotel is conjectural because he lives more than 600 miles away from the hotel.

(Motion to Dismiss at 19).  Hilton would appear to suggest that people with disabilities can

challenge ADA violations at its hotels only if, for some reason, they regularly stay at hotels

located near their homes.  This argument has not been accepted by any court.  *See, e.g., Access 4*

*All, Inc. v. Absecon Hospitality Corp.*, 04-6060, 2006 WL 3109966, at *6 (D.N.J. Oct. 30, 2006)

( "hotels tend to serve people who do not live nearby").

ii.    **Mr. Johnson Was Injured in Fact.**

Mr. Johnson alleges that he encountered accessibility barriers at the Capital Hilton when he was not provided a roll-in shower, that he is regularly in Washington D.C. for work, and that he would stay at a Hilton hotel but for his knowledge of accessibility barriers at Hilton hotels. (Compl. at ¶¶ 58-61). First, Hilton argues that these allegations do not establish that Mr. Johnson would stay at the Capital Hilton but for the lack of a roll-in shower. (Motion to Dismiss at 22). At the pleading stage, general factual allegations are presumed to embrace the specific facts necessary to support the claim, *Lujan*, 504 U.S. at 561, and the court must accept the truth of all factual allegations, *Fame Jeans*, 2008 WL 1932768, at *4. The allegation that Mr. Johnson would stay at "a Hilton hotel" embraces the specific facts that he would stay at the Capital Hilton. Hilton's argument that the lack of a roll-in shower at the Capital Hilton does not violate the ADA has been addressed. *See supra* p. 17.

Next, Hilton argues that because Mr. Johnson did not allege knowledge of specific accessibility barriers at other Washington D.C. Hilton hotels, he does not have standing to challenge ADA violations at those hotels. Mr. Johnson's experience at the Capital Hilton taught him that Hilton does not ensure that its hotels comply with the ADA. As the Ninth Circuit recognized in *Doran v. 7-Eleven*, a "natural consequence" of this deterrence is that Mr. Johnson does not have personal knowledge of every accessibility barrier present in the Washington D.C. area, but a disabled person does not need to have knowledge of every accessibility barrier that he or she challenges. 524 F.3d at 1042-44; *see also Steger*, 228 F.3d at 894 (blind plaintiffs had standing to sue for barriers they had not directly encountered; the alternative would require numerous blind plaintiffs to sue repeatedly until every barrier had been removed); *Indep. Living Res.*, 982 F. Supp. at 761-62 (plaintiffs could sue for barriers they had not directly encountered

because "[i]t is unlikely that any individual plaintiff will ever sit in each of the seats in the arena, or use each of the restrooms, or attempt to reach each of the ketchup dispensers"); *Gregory v. Melrose Group, LLC*, No. Civ. A 03-2414, 2003 WL 22928805, at *4 (E.D. La. Dec. 8, 2003) (plaintiff's standing included challenges to "other current violations" he would identify in an expert report).

Last, Hilton argues that because there are at least two other Hilton-branded hotels in Washington D.C. Mr. Johnson's allegation that he would likely stay at "a Hilton hotel" cannot establish that there is a more than fifty percent chance that he would stay at the Capital Hilton. (Motion to Dismiss at 22). Hilton suggests that Mr. Johnson's allegations in the complaint should be construed as establishing that there is an equal likelihood that he will stay at every Hilton hotel in the Washington D.C. area, and, because there are several Hilton hotels, it cannot be likely that he will stay at the Capital Hilton.[5] *Id.* This forced and unfavorable reading of Mr. Johnson's allegations should be rejected because the Court "must construe the complaint in favor of the complaining party." *Warth*, 422 U.S. at 501.

Moreover, Mr. Johnson still suffers an injury from inaccessible hotels even if he cannot establish a greater than 50% chance that he would visit each Hilton in the Washington D.C. area. In *Celano v. Marriott International, Inc.*, the U.S. District Court for the Northern District of California recognized the plaintiffs' were injured from accessibility barriers at Marriott's golf courses on a nationwide basis because they were deterred from visiting them, and under the ADA, "deterrence alone provides sufficient injury in fact." 2008 WL 239306, at *7 (internal citation omitted). The court did not require the plaintiffs to allege or prove that they had

---

[5] Hilton uses the same reasoning when it argues that Ms. Elliott-Vandivier cannot show a likelihood that she will stay at a Hilton because there are more than 47,000 hotels in the United States. (Motion to Dismiss at 18).

imminent plans to play golf at every Marriott-owned facility. In *Bacon v. City of Richmond*, plaintiffs had standing to sue the city for accessibility barriers at its fifty-seven schools based on a desire to attend events held at other schools open to the public. *See* 386 F. Supp. 2d at 705. The court did not require that the plaintiffs to show specific plans to visit each school. *Id.* Mr. Johnson's knowledge of accessibility barriers deters him from visiting Hilton hotels, and that is enough to constitute an injury in fact.

### iii.    Ms. Elliott-Vandivier Was Injured in Fact.

Ms. Elliott-Vandivier was forced to stay in an inaccessible room at the Doubletree Guest Suites, Philadelphia because Hilton provided her with a reservation for an accessible room despite the fact that none were available. (Compl. ¶ 54-55). On a quarterly basis, Ms. Elliott-Vandivier is required to stay at the hotel where her employer's human resources meetings are held, and she faces a threat of future injury if she is forced to stay at a Hilton hotel. (Compl. at ¶ 56). First, Hilton argues that Ms. Elliott-Vandivier lacks standing to challenge the reservation system because she has not alleged that she plans on using the Hilton central reservation system in the future. (Motion to Dismiss at 24). Ms. Elliott-Vandivier alleges that she faces a threat of future injury "if she is forced to stay in an accessible room because her reservation for an accessible room is not honored." (Compl. at ¶ 56). This allegation entails the allegation that Ms. Elliott-Vandivier will make a reservation using Hilton's central reservation system.

Hilton also argues that Ms. Elliott-Vandivier is not entitled to injunctive relief because she faces a possibility of future injury and not an imminent injury. (Motion to Dismiss at 12-14,

18-19).  But standing can be based on "probabilistic injuries."[6]  *See, e.g., Mountain States Legal Found. v. Glickman*, 92 F.3d 1228, 1234-35 (D.C. Cir. 1996) (plaintiffs had standing to challenge new logging regulations under the theory that those regulations increased the chances of forest fires in forests that the plaintiffs regularly used for recreational purposes); *Vill. of Elk Grove Vill. v. Evans*, 997 F.2d 328, 329 (7th Cir. 1993) (city had standing to challenge the installation of a radio tower in a floodplain because it would increase the risk of flood and "even a small probability of injury is sufficient to create a case or controversy") (Posner, J.).

Next, Hilton argues that based on the large number of hotels in the United States, Ms. Elliott-Vandivier's allegations that she will be required to stay at hotels in the future is not enough to "raise a right to relief above the speculative level." (Motion to Dismiss at 18, citing *Twombly*).  Hilton's reliance on *Twombly* is misplaced.  *See Fame Jeans*, 2008 WL 1932768, at *6. ("A court deciding a motion to dismiss must not make any judgment about the probability of the plaintiff's success, for a complaint may proceed even if it appears that a recovery is very remote and unlikely.").

Moreover, standing under the ADA should be construed liberally because it is a civil rights statue with a broad remedial purpose.  *See supra*, p. 14-16 (citing*, inter alia, Trafficante*, 409 U.S. at 209).  In *Independent Living Resources*, the defendant argued that the plaintiffs did not have standing to challenge the accessibility of luxury suites because no plaintiff had reserved

---

[6] Hilton incorrectly argues that in *BMC*, the D.C. Circuit "specifically rejected the notion that the 'possibility' of future injury was enough to confer standing." (Motion to Dismiss at 18).  In *BMC*, however, the court cited several cases that found a possibility of future injury sufficient to confer standing, and concluded that "[w]hatever the exact standard for judging the likelihood of future injury," the tester plaintiffs could not meet it because they had not shown that a future violation of their rights was "even remotely probable" and their complaint "does not even *address*" that probability.  28 F.3d at 1274 (emphasis in original).  There is nothing speculative about whether Hilton will ensure that Ms. Elliott-Vandivier's reservation is honored because, as a corporate practice, it never does so.  (Compl. at 36-37).

a luxury suite, and the arena would make the appropriate accommodations if provided prior

notice. 982 F. Supp. at 762. The court disagreed, explaining:

> Although the court can confidently forecast that the injury is likely to
> recur to someone, the probability is that a specific person will be injured
> only once. The court is reluctant to embrace a rule of standing that would
> allow an alleged wrongdoer to evade the court's jurisdiction so long as he
> does not injure the same person twice.

*Id.*; *see also Parr v. L & L Drive-Inn Rest.*, 96 F. Supp. 2d 1065, 108 (D. Haw. 2000) (finding a

likelihood of future injury and noting that "[i]f this Court rules otherwise, like defendants would

always be able to avoid enforcement of the ADA."). If Hilton's standing arguments are correct,

then people with disabilities in Ms. Elliott-Vandivier's position who regularly have to stay at

hotels they do not choose (because of a company meeting, a wedding, or a business convention)

have no recourse when they are injured by ADA violations at those hotels. Hilton could

continue to accept reservations for "accessible" rooms without ensuring that those rooms are

available or that they comply with ADA because Hilton could rest assured that none of the

injured people would be able to establish standing to challenge its practices.

Accordingly, Ms. Elliot-Vandivier, like Mr. Fiedler and Mr. Johnson has been injured in

fact.

### iv.    The Scope of Plaintiffs' Injuries and the Appropriate Remedy Do Not Bear on Their Standing.

Hilton argues that even if Plaintiffs have been injured, they do not have standing to seek

relief with regard to all 2,869 hotels because "a plaintiff only has standing to seek injunctive

relief for conditions that caused him injury." (Motion to Dismiss at 15, 31-32). It is true that

injunctive relief must be tailored to address the actual injuries plaintiffs establish at trial.

*See generally Califano v. Yamasaki*, 442 U.S. 682, 702 (1979) ("the scope of injunctive relief

is dictated by the extent of the violation established"); *Dayton Bd. of Educ. v. Brinkman*,

433 U.S. 406, 420 (1977) (remanding for a supplementation of the record in order to determine

whether the injunction was appropriately tailored to the nature of the violation), *later proceeding*

*at* 443 U.S. 526 (1979); *Am. Council of Blind v. Paulson*, 463 F. Supp. 2d 51, 61 (D.D.C. 2006)

(finding that U.S. Currency violates the Rehabilitation Act and setting further proceedings to

discuss what relief may be appropriate), *aff'd*, --- F.3d ----, No. 07-5063, 2008 WL 2095846

(D.C. Cir. May 20, 2008).  But whether a plaintiff has standing to seek systemwide relief and

whether a plaintiff is entitled to a systemwide injunction are separate concepts that Hilton

repeatedly conflates.  Standing means that a plaintiff is entitled to have a court evaluate the

merits and determine what relief may be appropriate.  *See Baker v. Carr*, 369 U.S. 182,

208 (1962) (finding that voters had standing to challenge their state's voter apportionment statute

and noting that "[i]t would not be necessary to decide whether appellants' allegations of

impairment of their votes... will, ultimately, entitle them to relief, in order to hold that they have

standing to seek it.").

The Supreme Court's decision in *Lewis v. Casey* makes this distinction clear.

518 U.S. 343 (1996).  In *Lewis*, several prisoners sued the Arizona Department of Corrections

arguing that the inadequacies of prison libraries effectively denied them meaningful access to the

courts.  *Id.* at 346.  At trial, the district court found actual injury on the part of only one prisoner

and ordered systemwide injunctive relief.  *Id.* at 358.  The Supreme Court reversed on the

grounds that the violations established at trial did not support systemwide relief.  *Id.*  The Court

explained however, "Our holding regarding the inappropriateness of systemwide relief for

illiterate inmates *does not rest upon the application of standing rules*, but rather... upon the

respondents' failure to prove that denials of access to illiterate prisoners pervaded the State's

prison system." *Lewis*, 518 U.S. at 361 n.7 (emphasis added) (internal quotation omitted). The Court even noted that at the pleading stage, the allegations "may have well sufficed" to warrant systemwide relief, but that "point is irrelevant now… for we are beyond the pleading stage." *Id.* at 357. The fact that the district and circuit courts reached decisions on the merits further demonstrates that they were satisfied with the plaintiff's standing to seek systemwide relief.[7]

The ADA cases Hilton relies on are consistent with this distinction because the plaintiffs in those cases did not allege that their injuries resulted from a systemwide policy. *See, e.g., Clark v. Burger King Corp.*, 255 F. Supp. 2d 334, 343 n.11 (D.N.J. 2003) (Even though an individual plaintiff lacked standing to challenge ADA violations at Burger King restaurants he had not visited, the court noted that if "there existed an allegation that all Burger King restaurants... implement a corporate policy violative of the ADA, Clark may have standing as to restaurants he has yet to visit."); *Small v. Gen. Nutrition Cos.*, 388 F. Supp. 2d 83, 88-89 (E.D.N.Y. 2005) (plaintiff did not allege that GNC stores violated the ADA based on a common corporate practice, in fact, he alleged that he had visited some GNC stores that contained no architectural barriers).

Here, Plaintiffs claim that their injuries arise from Hilton's practices at a corporate level. Mr. Fiedler is deterred from staying at the Hilton Oceanfront Resort because Hilton does not ensure that the hotel disperses accessible rooms. Mr. Johnson has a continuing desire to stay at Hilton hotels in the Washington D.C. area but for his knowledge of accessibility barriers

---

[7] Hilton argues that *Lewis* "makes clear that a plaintiff only has standing to seek injunctive relief for specific conditions that caused him injury." (Motion to Dismiss at 15). Under Hilton's theory, the plaintiffs in *Lewis* would have been required to show in detail the inadequacies of the facilities at each prison library in order to have standing. In *Lewis*, however, the fact that the plaintiffs could not make this showing only limited their right to systemwide injunctive relief; it did not mean that they lacked standing.

contained in those hotels.  Ms. Elliott-Vandivier faces a continuing threat of injury if she is required to stay at a Hilton hotel and Hilton provides her a reservation for an accessible room, but then fails to honor that reservation.  The ERC has had to spend time counseling individuals who have been discriminated against by Hilton hotels, and its mission of eliminating discrimination against people with disabilities has been made more difficult by Hilton.  (Kahn Decl. at ¶¶ 3, 6).  The AAPD's activities aimed at empowering its members and integrating them into society have been made more difficult by the widespread accessibility barriers present at Hilton hotels.  (Imparato Decl. at ¶¶ 4,5).

## 2.  Plaintiffs' Injuries Were Caused by Hilton.

Article III's causation test requires a "causal connection between the injury and the conduct complained of - the injury has to be fairly traceable to the challenged action of the defendant."  *See Lujan*, 504 U.S. at 560 (internal citation omitted).  Hilton does not dispute that it caused the injuries resulting from ADA violations at hotels Hilton owns, as well as hotels it operates under a management agreement.  Hilton's causation argument is limited to whether it caused the ADA violations that occur at its franchised hotels.  (Motion to Dismiss at 20-21, 31).  But, because Hilton is jointly liable for ADA violations that occur at its franchised hotels, injuries stemming from violations at those hotels also meet Article III's causation requirement.

ADA liability applies to any person who "owns, leases, (or leases to), or operates a place of public accommodation."  42 U.S.C. § 12182(a).  The complaint alleges that "every Hilton hotel is either owned, leased by, leased to, or operated by Defendant."  (Compl. at ¶ 70).  More specifically, the complaint explains that  Hilton "exercises extensive control over individual hotels," sets strict quality standards for hotels, inspects hotels to ensure that they comply with Hilton's standards, and requires hotels to implement the changes necessary to fix existing

problems.  (Compl. at ¶ 30).  Although the merits of the plaintiffs' legal theory are not now before the Court, hotel chains have been held liable at the corporate level as operators of individual franchised hotels that contain accessibility barriers.  *See U.S. v. Days Inns of Am.*, 997 F. Supp. 1080, 1084 (C.D. Il. 1998) (finding Days Inns liable at the corporate level as "operators of the Champaign Days Inn hotel").

Moreover, Hilton's ADA liability as an "operator" of its franchised hotels cannot be altered by the terms of its franchise agreements.  *See, e.g., Botosan v. Paul McNally Realty*, 216 F.3d 827, 832 (9th Cir. 2000) ("the lease agreement… did not transfer all liability for ADA compliance to the lessee"); *Grove v. De La Cruz*, 407 F. Supp. 2d 1126, 1133 (C.D. Cal. 2005) ("The ADA's prohibitions against discrimination apply to any person who owns... or operates a place of public accommodation.  As a result, both the landlord and the tenant... have full responsibility for complying" with the ADA) (internal citations and quotation omitted); 28 C.F.R. § 36.201(b) ("Both the landlord ... and the tenant... are public accommodations subject to the requirements of this part.  *As between the parties*, allocation of responsibility for complying with the obligations of this part may be determined by lease or other contract.") (emphasis added).  An operator of a public accommodation cannot use a contractual relationship (landlord/tenant or franchisor/franchisee) to avoid its duty to comply with the ADA. Accordingly, Hilton cannot assign its responsibility for complying with the ADA to its franchisees.

### 3.    Plaintiffs' Injuries are Redressable by Hilton.

Hilton argues that the injuries resulting from accessibility barriers at franchised and managed hotels are not redressable.  First, Hilton argues that the complaint has not alleged that Hilton "has the actual authority to make structural modifications" to any franchised hotel.

(Motion to Dismiss at 21). The Amended Complaint alleges that Hilton has "the right to require individual hotels to implement specific changes." (Compl. at ¶ 30). It even points to two specific examples, Hilton's decisions to require all hotel rooms to install new alarm clocks and new bed linens. (Compl. at ¶ 31). These general factual allegations encompass the more specific allegation that Hilton can require its hotels to implement the changes necessary to be compliant with the ADA.

Second, Hilton contends that although it could "request the changes," there is no "guarantee" that the subsidiaries would make the changes, and Hilton's only recourse would be to terminate the franchise agreement.[8] Hilton misstates its authority under its own Franchise License Agreement. Hilton can also impose "interim remedies," including disabling the franchisee from the reservation service, disabling the franchisee's software, and charging the franchisee for the cost of computer software. (*See* Franchise License Agreement, attached to Raynard Decl. as Ex. B at 14(a)(1)).

Regardless, the plaintiffs do not need a "guarantee" to have a redressable injury. An injury is redressable if a favorable decision "will likely ameliorate the harm alleged." *N.C. Fisheries Ass'n, Inc. v. Gutierrez*, 518 F. Supp. 2d 62, 81 (D.D.C. 2007) (citing *Shays v. Fed. Election Comm'n*, 414 F.3d 76, 83 (D.C. Cir. 2005)); *see also Nat'l Parks Conservation Ass'n v. Manson*, 414 F.3d 1, 6-7 (D.C. Cir. 2005) (plaintiff's injury from a proposed power plant was redressable by the National Park Conservation Association even though the association could only recommend to a state agency that it not approve the power plant); *Abigail Alliance for*

---

[8] This argument is roughly equivalent to a corporation arguing that a plaintiff's racial discrimination injuries are not redressable because the corporation's only recourse is to fire the discriminating employees. If Hilton terminates the franchise agreement for all franchised hotels that refuse to comply with the ADA, people with disabilities could know that the Hilton name indicates ADA compliance.

*Better Access to Developmental Drugs v. Eschenbach*, 469 F.3d 129, 135-36 (D.C. Cir. 2006)

(plaintiff's injury from the FDA's regulations of experimental drugs was redressable by the FDA

because even though the FDA could not require drug companies to market experimental drugs,

in the absence of the regulations drug companies would presumably act in their "pecuniary

interest" and make experimental drugs available to terminally ill patients), *rehearing en banc*

*granted for separate issue*, 495 F.3d 695 (D.C. Cir. 2007), *cert. denied*, 128 S. Ct. 1069 (2008).

Moreover, armed only with the threat of terminating the franchise agreement, Hilton has been

able to create a brand that it boasts is "unmatched by any hospitality company in the world" and

"synonymous with first-class hospitality."  (Compl. at ¶ 33).  Clearly this threat establishes that

the Plaintiffs' injuries are redressable.

      **C.**    **The ERC and AAPD Have Representational Standing.**

      An organization can bring suit as a representative of its members if: (1) its members

would have standing to sue in their own right; (2) the interests the organization seeks to protect

are germane to its purpose; and (3) individual participation is not necessary.  *Hunt v. Wash.*

*State Apple Adver. Comm'n*, 432 U.S. 333, 343 (1977).  Only one member is required to have

standing for the association to have representational standing.  *Warth*, 422 U.S. at 511.  Hilton

only challenges the ERC and AAPD's ability to satisfy the first prong of the *Hunt* test.

(Motion to Dismiss at 36-38).

      There is no doubt that the AAPD has representational standing if either Mr. Johnson or

Ms. Elliott-Vandivier has standing, and that the ERC has representational standing if Mr. Fiedler

has standing.[9]  The dispute is only whether the ERC and AAPD's allegations that other unnamed

members have encountered discrimination at Hilton's hotels are sufficient to confer

representational standing upon the organizations.  (Compl. at ¶ 44, 49).

The D.C. Circuit has repeatedly held that organizations do not need to identify particular

members in order to have standing to represent their interests.  In *Public Citizen v. Federal Trade

Commission*, 869 F.2d 1541, 1551-52 (D.C. Cir. 1989), the D.C. Circuit explained that although

it is often "expedient" to identify particular members, it is not necessary; the real inquiry is

whether the court is satisfied that individual members, whether named or not, have been injured.

(allowing an organization to sue on behalf of unnamed members because "common sense

compels the conclusion" that the organization's members would include people at risk from a

lack of health warnings on objects used to advertise tobacco).  *See also Nat'l Taxpayers Union,

Inc. v. U.S.*, 68 F.3d 1428, 1435 (D.C. Cir. 1995) (organization of taxpayers had representational

standing to challenge an increase in the estate and gift taxes based on allegations that at least one

of its members would be affected by the new taxes); *Natural Res. Def. Council v. Envtl. Prot.

Agency*, 464 F.3d 1, 7 (D.C. Cir 2006) (organization had standing to challenge regulation that

resulted in a lifetime risk of 1 in 200,000 people developing cancer based on inference that two

to four of the organization's nearly half a million members would develop cancer).

The complaint generally alleges that members of the ERC and AAPD have been harmed

by accessibility barriers at Hilton hotels and Hilton's central reservation system, and that these

members would stay at Hilton hotels but for their knowledge of inaccessible features.  These

_____

[9] Of course, if the court finds that any plaintiff has standing under any theory, it does not need to continue with its
standing analysis.  *See, e.g., Am. Soc'y for Prevention of Cruelty for Animals v. Ringling Bros. and Barnum &
Bailey Circus*, 317 F.3d 334, 335 (D.C. Cir. 2003) (limiting standing determination to single individual who
presented the "strongest case" for standing in suit brought by three organizations and one individual).

allegations are sufficient to establish representational standing.  (Compl. at ¶¶ 44, 49).  In *Clark v. McDonald's Corp.*, 213 F.R.D. 198, 215-16 (D.N.J. 2003), the court found that requiring the organization to identify specific members who had encountered accessibility barriers at various McDonald's would impose an "exaggerated pleading requirement as it relates to associational standing." (*citing Hosp. Council of W. Pa. v. City of Pittsburgh*, 949 F.2d 83, 88 (3d Cir. 1991) (Alito, J.)).  Hilton's argument that plaintiffs must establish "very specific facts" in order to have standing to seek injunctive relief, similarly attempts to exaggerate the requirements for notice pleading.  (Motion to Dismiss at 34).[10]  *See Lujan*, 504 U.S. at 561 ("At the pleading stage, general factual allegations of injury resulting from the defendant's conduct may suffice, for on a motion to dismiss we presume that general allegations embrace those specific facts that are necessary to support the claim.") (internal quotations omitted).

> ### D.    Plaintiffs Have Standing to Sue for Monetary Damages Under the DCHRA.

The DCHRA prohibits discrimination that occurs in the District of Columbia ("D.C.").  D.C. CODE § 2-1402.01 (2007).  Hilton takes this to mean that the DCHRA only applies to its hotels that are located in Washington D.C.  (Motion to Dismiss at 36-37).  But the DCHRA only requires that some of the discriminatory events take place in D.C.  In *Liban v. Churchey Group II, L.L.C.*, 305 F. Supp. 2d 136, 140 (D.D.C. 2004), a Maryland resident was allowed to sue a Maryland company for discrimination at a Maryland housing facility under the DCHRA because the plaintiff read an advertisement in the Washington Post and contacted the company

---

[10] None of the cases Hilton cites in support of its proposition that Plaintiffs must allege "very specific" details involved allegations of a common corporate practice violative of the ADA.  Additionally, most were decided on summary judgment, where the plaintiff bears a higher burden.  *See Holt v. Am. City Diner, Inc.*, No. CIV. 05-1745, 2007 WL 1438489 (D.D.C. May 15, 2007); *Harris v. Del Taco, Inc*, 396 F. Supp. 2d 1107, 1124-25 (C.D. Cal. 2005); *Molski v. Mandarin Touch Rest.*, 385 F. Supp. 2d 1042, 1045-46 (C.D. Cal. 2005) (ruling on an order to show cause which the court elected to treat as a motion for summary judgment).

from a telephone located in D.C.  *See also Blake v. Prof'l Travel Corp.*, 768 A.2d 568, 569-71

(D.C. 2001) (resident of Maryland who worked in Virginia brought sexual harassment suit under

DCHRA because some of the harassment took place in D.C.), *cert denied*, 534 U.S. 1115 (2002);

*Matthews v. Automated Bus. Sys. & Servs., Inc.*, 558 A.2d 1175, 1180 (D.C. 1989) (Maryland

employee sued employer for discrimination under the DCHRA because some of the events took

place in D.C.).

Hilton's discrimination against Mr. Fiedler took place in D.C.  Mr. Fiedler called the

Hilton Oceanfront resort from his home in D.C., and his injury, being deterred from visiting the

Hilton Oceanfront Resort, took place in D.C. because he is a D.C. resident.  (Compl. at

¶¶ 50-51).  It does not matter that the actual hotel is located outside of D.C. because some of the

discriminatory events took place in D.C.

Hilton argues that Mark Johnson and the AAPD do not have standing to bring suit under

the DCHRA because the lack of a roll-in shower does not violate the ADA or DCHRA.

(Motion to Dismiss at 37).  Those arguments were addressed at page 19, *supra*.

Hilton argues that the ERC lacks standing under the DCHRA because it has not alleged

that it has had to counsel someone as a result of accessibility barriers at a D.C. Hilton Family

Brand Hotel.  (Motion to Dismiss at 37-38).  This allegation is not necessary because the ERC's

injury occurred in D.C.  Moreover, the ERC's injuries are traceable to Hilton's pattern of

discrimination which includes accessibility barriers at D.C. hotels.  Hilton's argument that

the statute of limitations bars the ERC's claims ignores the ongoing nature of the ERC's injury.

*See Doe v. D.C. Comm'n on Human Rights*, 624 A.2d 440, 445 n.5 (D.C. 1995) ("A continuing

violation exists where there is a series of related acts, one or more of which falls within the

limitations period, or the maintenance of a discriminatory system both before and during the

statutory period.") (citations omitted).

> **E.      Hilton's 12(b)(7) Motion Should be Denied Because Owners
> of Franchised Hotels are not Indispensable Parties.**

Whether a party is indispensable under Rule 19 requires a two-step inquiry.

*Cherokee Nation of Okla. v. Babbitt*, 117 F.3d 1489, 1496-97 (D.C. Cir. 1997).  First, the

court must determine if the absent party is necessary and whether it can be joined.  *Id.* at 1496.

If a necessary party cannot be joined, the court must apply the Rule 19(b) factors to determine

whether in equity and good conscience the action can proceed.  *Id.* (citing FED. R. CIV. P. 19(b)).

> **1.      The Owners of Franchised and Managed Hotels
> are Not Necessary Parties Under Rule 19(a).**

A party is necessary under Rule 19(a) if, in that person's absence, complete relief cannot

be accorded; or that person claims an interest relating to the subject of the action and disposing

of that action in the absence of that person would limit his or her ability to protect its interest or

leave that person subject to a substantial risk of inconsistent obligations.  FED. R. CIV. P. 19(b).

> **a.      As Parties That are Jointly Liable, the Owners of the Managed
> and Franchised Hotels are Not Necessary Parties.**

As a preliminary matter, joint tortfeasors are never indispensable parties under Rule 19.

The Advisory Committee Notes make clear that the multi-part test used by Rule 19 does

not affect the settled authority that a party with joint-and-several liability is not a necessary party.

FED. R. CIV. P. 19 advisory committee's notes to 1966 Amendments ("Advisory Committee

Notes"); *see also Temple v. Synthes Corp.*, 498 U.S. 5, 7 (1990) (*per curiam*) (doctor who

installed medical device was not indispensable party in suit brought by patient against device

manufacturer because as a "potential joint tortfeasor," he was not a necessary party).  Like joint

tortfeasors, the owners of franchised and managed hotels are jointly liable for the ADA violations that occur at those hotels, so they cannot be necessary parties.

First, both Hilton and the owners of franchised and managed hotels are liable for ADA violations occurring at the hotels. ADA liability applies to any person who "owns, leases (or leases to), or operates a place of public accommodation." 42 U.S.C. § 12182(a). By definition the owner of a franchised or managed hotel owns a public accommodation. And, as discussed, Hilton exercises enough control over those hotels to be an operator under the ADA. *See supra* pp. 30-31; Compl. at ¶¶ 30, 70; *Days Inns of Am.*, 997 F. Supp. at 1084 (C.D. Ill. 1998) (finding Days Inn liable at the corporate level as "operators of the Champaign Days Inn hotel").

Because Hilton and the owners of its franchised and managed hotels are both responsible for the ADA violations that occur at those hotels, they are jointly and severally liable. *See Kosloff v. Wash. Square Assocs., LLC*, No. C. 06-05060, 2007 WL 2023497 (N.D. Cal. July 12, 2007) (finding landlord and restaurant owner jointly and severally liable under the ADA because the ADA holds both parties liable); *see generally Hill v. McDonald*, 442 A.2d 133, 137 (D.C. 1982) ("Two persons whose concurrent negligence causes injury to a third are liable jointly and severally"); *D.C. v. Wash. Hosp. Ctr.*, 722 A.2d 332, 337 (D.C. 1998) (parties whose independent acts combine to cause injury are joint tortfeasors).

### b.    Complete Relief Can Be Accorded Without the Absent Owners.

Hilton makes the same argument here that it does to show that injuries are not redressable. (Motion to Dismiss at 19-21, 40). Hilton alleges that it can only request that franchised facilities institute the changes to comply with the ADA, and, if they refuse, its only option is to terminate the franchise agreement. As discussed, the fact that Hilton implements

quality control programs and regularly inspects hotels to ensure that they comply with Hilton's standards demonstrates Hilton's ability to compel change.  *See supra* p. 32.

### c.    Disposition of the Case Will Not Impair the Absent Owner's Interests.

Hilton argues that the absent owners' interests will be impaired because, if Hilton uses its franchise agreement to require franchise owners to comply with the ADA, those owners will face a Hobson's choice of either incurring significant expenses on their own or losing their valuable franchise agreements.  (Motion to Dismiss at 41).  Any hotel owner that faces this choice does so because the hotel contains accessibility barriers that violate the ADA.  The "interest" Hilton speaks of is the interest of its franchised and managed hotels to continue to operate in violation of the ADA, and this is not the sort of interest that Rule 19 seeks to protect.

Moreover, how Hilton and the owners of the franchised and managed hotels choose to allocate the costs for complying with the ADA does not affect whether the absent owners are indispensable parties.  *See Pasco Int'l (London) Ltd. v. Stenograph Corp.*, 637 F.2d 496, 503 (7th Cir. 1980) ("potential indemnitors have never been considered indispensable parties or even parties whose joinder is required if feasible") (citing 3A MOORE'S FEDERAL PRACTICE ¶ 19.07-1 at n.32 (2d ed. 1979)).

To the extent that the absent owners have an interest in the outcome of the suit, that interest can be protected by Hilton.  *See Coalition on Sensible Transp., Inc. v. Dole*, 631 F. Supp. 1382, 1386 (D.D.C. 1986) (absent Maryland officials' interests were adequately protected by the federal government because both sought approval of a highway plan).  Hilton argues that it will not adequately represent the interests of the absent owners because Hilton bears no responsibility for any costs associated with ADA compliance at the franchised and managed

hotels.  (Motion to Dismiss at 41).  Hilton does bear financial responsibility for ensuring ADA

compliance at the hotels it owns, and this aligns its interests with the absent owners.  Moreover,

Hilton cannot seriously suggest that it lacks motivation to avoid a finding that its hotels contain

widespread ADA violations.[11]  Additionally, the franchised and managed hotel owners can

protect their interests by intervening in the suit.  *Id.; see also* Advisory Committee Notes

(absentees may protect their interests by intervening).

### d.    The Absent Hotel Owners May be Subject to Jurisdiction.

For thirteen of its hotels, Hilton argues that the owners are not amenable to jurisdiction

in D.C. because they are not residents of D.C. and their hotels are located outside D.C.

(Motion to Dismiss at 44-45).  However, the long-arm statute also applies to a person who

causes tortious injury in the District of Columbia by an act or omission outside the District

of Columbia "if he regularly does or solicits business... in the District of Columbia."

D.C. CODE §13-423(a)(4) (2001).  In *Gorman v. Ameritrade Holding Corporation*, 293 F.3d 506,

513 (D.C. Cir. 2002), the D.C. Circuit found that a district court erred in dismissing a complaint

against Ameritrade before allowing discovery when it was possible that Ameritrade's website

established sufficient contacts with D.C., depending on the frequency and volume of transactions

with D.C. residents.  Hilton's website also allows customers to transact business with Hilton by

placing reservations at its hotels, and depending on the volume of reservations made by D.C.

residents, the absent owners may be amenable to jurisdiction.  The complaint alleges that 15

percent of all reservations are booked through Hilton's website.  (Compl. at ¶ 35).  Hilton has not

shown that the absent hotel owners are outside D.C.'s jurisdiction.

---

[11] This suggestion reinforces Hilton's disregard for the ADA.

## 2.   The Absent Owners are Not Indispensable Parties Under 19(b).

If the court determines that the absent owners are necessary parties who cannot be joined under Rule 19(a), Rule 19(b) directs that "the court shall determine whether in equity and good conscience" the action should proceed or be dismissed. FED. R. CIV. P. 19(b); *see also Cherokee Nation of Okla.*, 117 F.3d at 1496-97 (describing Rule 19 as employing a "two-step procedure"). Hilton acknowledges that this is usually the next step, but contends that because this case is "unwieldy," the Court should exclude all franchised and managed hotels at this time. (Motion to Dismiss at 43). There is no "unwieldy case" exception to Rule 19. Hilton only applies the 19(b) factors to thirteen of its hotels. (Motion to Dismiss at 45-46). For the rest of its hotels, its 12(b)(7) motion should be denied automatically.

With respect to the 13 hotels at issue, Hilton's arguments for the first two 19(b) factors, prejudice to absent owners and the possibility of lessening that prejudice, have been addressed. For the third factor, Hilton argues that the relief provided without the absent owners would not be adequate because it would not necessarily result in changes that would improve accessibility. (Motion to Dismiss at 46). This argument misunderstands what it means for a decision to be adequate under Rule 19(b). The adequacy requirement addresses the public's interest in "complete, consistent, and efficient settlement of controversies... settling disputes by wholes, whenever possible." *Provident Tradesmens Bank & Trust Co. v. Patterson*, 390 U.S. 102, 111 (1968). The only possibility for adequate relief is to allow the suit to continue without the absent owners so that Hilton's pattern of discrimination can be addressed in one judicial proceeding. Dismissing the portions of the suit that pertain to accessibility barriers at hotels owned by absent owners would require multiple suits and risk inconsistent judgments.

Finally, plaintiffs have no adequate remedy if this suit is dismissed.  Hilton argues that

there is no impediment to plaintiffs suing each owner in whatever court has jurisdiction, but once

again, this misses the point.  (Motion to Dismiss at 46).  The Advisory Committee notes explain

that this factor assesses whether there is any "assurance" that the plaintiff can sue "in another

forum where better joinder would be possible."  *See also Provident Tradesmens Bank & Trust

Co.*, 390 U.S. at 112 (describing the factor as inquiring "whether the plaintiffs could have

brought the same action, against the same parties plus [the absent party] in a state court.")

Because the "doing business" portion of the D.C. long-arm statute is coextensive with the limits

of Due Process, no other forum could provide assurance of better joinder.  *Gorman*, 293 F.3d at

510.  Dismissing the suit would most likely require the Plaintiffs to litigate in all 50 states, and

by definition, this is not an adequate alternative.

The availability of an adequate alternative forum is the most heavily weighted factor.

*See, e.g., Kickapoo Tribe of Indians of Kickapoo Reservation in Kan. v. Babbitt*, 43 F.3d 1491,

1499 (D.C. Cir. 1995) (absence of alternative forum is "properly weighed heavily against

dismissal"); *Rishell v. Jane Phillips Episcopal Mem'l Med. Ctr.*, 94 F.3d 1407, 1413 (10th Cir.

1996) ("absence of an alternative forum would weigh heavily, if not conclusively against

dismissal").  Hilton cites no case where a court granted a 12(b)(7) motion despite the absence of

an alterative forum.  *See Naartex Consulting Corp. v. Watt*, 722 F.2d 779, 788-89 (D.C. Cir.

1983) (Wyoming provided an adequate alternative forum); *Thompson v. Sand Cliffs Owners

Ass'n, Inc.*, No. 3:96 CV 270/RV, 1998 WL 35177067, at *3 (N.D. Fla. 1998) (noting there was

no impediment to joining the individual owners); *Thompson v. Jiffy Lube Int'l, Inc.*, 505 F. Supp.

2d 907, 920-21 (D. Kan. 2007) (plaintiffs could file a statewide class action in Tennessee); *Gillis*

*v. McDonald's Corp.*, Civ. A. No. 91-7202, 1992 WL 236891, at *3 (E.D. Pa. Sept. 10, 1992)

(state court provided an alternative forum).[12]

> **F.     Hilton's 12(b)(6) Motion Should be Denied Because
> Hotels Built Prior to January 26, 1993 Must Disperse
> Rooms in Different Room Classes or Categories.**

Hilton's 12(b)(6) motion contends that hotels built prior to January 26, 1993 ("Pre-1993"

Facilities") are not required to disperse accessible rooms among the classes of available rooms.

There are two ADA requirements applicable to Pre-1993 facilities.  First, when undergoing

alterations they are required to enact those alterations "in such a manner that, to the maximum

extent feasible, the altered portions of the facility are readily accessible to and usable by

individuals with disabilities."  42 U.S.C. § 12183(a)(2).  Second, those facilities are required to

remove architectural barriers to the extent that such removal is readily achievable.  42 U.S.C.

§ 12182(b)(2)(A)(iv).  The ADA Accessible Guidelines ("ADAAG")[13] contain specific

requirements hotels must meet in order to comply with both standards, and under both standards

§ 9.1.4 requires hotels to disperse accessible rooms among the classes of available rooms.

First Hilton contends that the ADAAG do not require hotels undergoing alterations to

disperse accessible rooms because the alterations requirements applicable to hotels are located in

§ 9.1.5, and that section does not expressly reference the dispersal requirement in § 9.1.4. But,

---

[12] The other cases were decided on other grounds entirely.  *See Kickapoo*, 43 F.3d at 1499 (Kansas was an indispensable party in part because it enjoyed sovereign immunity); *Roberts v. Royal Atlantic Corp.*, 445 F. Supp. 2d 239, 247 (E.D.N.Y. 2006) (plaintiff's renovation proposed renovation plan was inadequate); *Clark v. McDonalds Corp.*, 213 F.R.D. at 230 (plaintiffs could not meet the class requirements to certify a defendant class).

[13] It is more correct to refer to ADAAG as the "Standards for Accessible Design" or "Standards."  ADAAG was developed by the federal Access Board, and submitted to the U.S. Department of Justice.  Once the Department of Justice adopted them as part of its regulation, however, they became standards, not guidelines, and are more correctly referred to as such.  Because Hilton's brief and many of the cases refer to the Standards as ADAAG, however, this brief will do so as well.

§ 9.1.5 applies "when sleeping rooms are being altered… subject to the requirements of *this section*." (emphasis added). This language acknowledges that the ADAAG requirements of Section 9, "Accessible Transient Lodging" apply to hotels undergoing alterations. The room dispersal requirement is located at subsection 9.1.4, within Section 9, and as such, it applies to hotels that are being altered.[14] Second, § 9.1.5 requires that at least one of each twenty-five sleeping rooms being altered "compl[y] with the requirements of § 9.2." But the very first requirement of § 9.2 is that "Units, sleeping rooms, and suites *required to be accessible by § 9.1 shall comply with § 9.2.*" (emphasis added). And one of the requirements of § 9.1 is the dispersal requirement of § 9.1.4. Third, Hilton argues that although § 9.1.5 cites the requirements in § 9.2 (containing specific accessibility requirement for individual rooms), and § 9.3 (requiring visual alarms in accessible rooms), it does not cite the requirements for room dispersal in § 9.1.4, and this must mean that Pre-1993 hotels are never required to disperse accessible rooms. However § 9.1.5 explains that while hotels are undergoing renovations, they must have "at least one sleeping room or suite that complies with the requirements of 9.2" and "at least one sleeping room or suite that complies with the requirements of 9.3" for each 25 rooms until they meet the standards for accessible rooms applicable to new construction. It would not make any sense to say that a hotel must contain "at least one sleeping room or suite" that meets the requirement that accessible rooms be dispersed among the classes of available rooms because that requirement applies to hotels viewed as a whole, rather than individual rooms, which is the focus of § 9.1.5.

---

[14] Hilton may be tempted to argue that the "this section" language is meant to refer only to § 9.1.5. But in its motion to dismiss Hilton clearly refers to §9.1.5 and § 9.1.4 as "subsections" (Motion to Dismiss at 48).

Ultimately, Hilton's argument amounts to asking the Court to infer that the ADAAG creates an exception to the general alterations requirements. Nothing in § 9.1.5 says that the altered rooms do not need to be dispersed or that § 9.1.4 does not apply to those rooms. Nor does § 9.1.4 say that it does not apply to hotel rooms altered under § 9.1.5 When the DOJ creates exceptions to ADA compliance, it says so expressly. *See, e.g.*, ADAAG § 4.13.5 Exception (creating an exception to the normal width requirement for doors); ADAAG § 9.2.2(6)(D) Exception (exempting hotel guestroom patios and terraces from threshold-height requirement where it is necessary to protect the unit from wind or water damage); 28 C.F.R. § 36.404 (creating an exception to the elevator installation requirement for altered facilities less than three stories tall); 28 C.F.R. § 36.405 (creating exceptions to the alterations requirements for historic buildings). Hilton's argument asks the court to entertain a strained reading of ADAAG and infer that the DOJ intended to create an exception to the dispersal requirements that it failed to express in ADAAG.

Second, Hilton's Pre-1993 hotels are still required to distribute accessible rooms because it is a readily achievable removal of an architectural barrier. The ADAAG requirements for new design define accessibility barriers in preexisting hotels. *See* 28 C.F.R. § 304(d) (measures taken to comply with this barrier-removal requirement must also conform to ADAAG); *D'Lil*, 43 F. App'x. at 97 ("ADAAG's requirement of roll-in showers in new buildings demonstrates that the *lack* of roll-in showers is both a barrier and the kind of barrier the ADA was intended to overcome. Otherwise, ADAAG would not require roll-in showers at all.") (emphasis in original). The ADAAG requirement that newly built hotels disperse accessible rooms reflects a determination that people with disabilities should not be required to stay only in the lowest class of available rooms. A failure to disperse rooms in preexisting hotels is an architectural barrier,

and Hilton's 12(b)(6) motion should be denied because the ADA requires its hotels to remove that barrier.

In short the ADA's alterations and barrier-removal provisions require dispersal of accessible guestrooms in Hilton's hotels built for first occupancy before January 26, 1993.  The same is required under the DCHRA because "[t]he D.C. law is applied in the same manner as the parallel federal antidiscrimination provisions."  *Paralyzed Veterans of Am. v. Ellerbe Becket Architects & Eng'rs, P.C.*, 950 F. Supp. 393, 405 (D.D.C. 1996), *aff'd,* 117 F.3d 579 (D.C. Cir. 1997).

## IV.    CONCLUSION

For all the foregoing reasons, Hilton's motion to dismiss should be denied.

Dated:  June 6, 2008                                Respectfully submitted,

_____/s/_____

August J. Matteis, Jr. (DC Bar # 433068)          E. Elaine Gardner (DC Bar #271262)
Benjamin Davidson (DC Bar # 975509)               WASHINGTON LAWYERS' COMMITTEE
GILBERT RANDOLPH LLP                              FOR CIVIL RIGHTS & URBAN AFFAIRS
1100 New York Avenue, NW                           11 Dupont Circle, NW
Suite 700                                          Suite 400
Washington, DC 20005                               Washington, DC 20035
Tel:    (202) 772-2200                             Tel:    (202) 319-1000
Fax:    (202) 772-3333                             Fax:    (202) 319-1010

## CERTIFICATE OF SERVICE

I, August J. Matteis, Jr., hereby certify that the foregoing Memorandum of Points and Authorities in Opposition to Hilton's Motion to Dismiss the Amended Complaint was served electronically this 6th day of June, 2008 to Hilton's counsel:

Frank C. Morris, Jr., Esq.
Minh N. Vu, Esq.
Epstein Becker & Green P.C.
1227 25th Street, NW
Suite 700
Washington, DC  20037

Lisa A. Krupicka, Esq.
Burch, Porter & Johnson, PLLC
130 N. Court Avenue
Memphis, Tennessee 38103

_____ /s/ _____
August J. Matteis, Jr. (DC Bar No. 433068)

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

EQUAL RIGHTS CENTER et al.,

               Plaintiffs,

    *v.*

HILTON HOTELS CORPORATION,

               Defendant.

Civ. Action No. 1:07-cv-01528-JR

**PROPOSED ORDER**

AND NOW, this ___ day of _____, 2008, upon consideration of Defendant

Hilton Hotels Corporation's Motion to Dismiss the Amended Complaint, it is

ORDERED, that this motion is hereby denied in its entirety.

Date: _____, 2008

_____
United States District Judge

## **CERTIFICATE OF SERVICE**

I certify that a true and correct copy of the foregoing Proposed Order was this 6th day of June 2008, by electronic service, on the following:

Frank C. Morris, Jr., Esq.
Minh N. Vu, Esq.
Epstein Becker & Green P.C.
1227 25th Street, NW
Suite 700
Washington, DC  20037

Lisa A. Krupicka, Esq.
Burch, Porter & Johnson, PLLC
130 N. Court Avenue
Memphis, Tennessee 38103

_____/s/_____
August J. Matteis, Jr. (DC Bar No. 433068)

# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

EQUAL RIGHTS CENTER et al.,

               Plaintiffs,

     *v.*

HILTON HOTELS CORPORATION,

               Defendant.

Civ. Action No. 1:07-cv-01528-JR

**PLAINTIFF'S INDEX OF EXHIBITS FILED IN SUPPORT OF ITS
MEMORANDUM OF POINTS AND AUTHORITIES IN OPPOSITION TO
HILTON'S MOTION TO DISMISS THE AMENDED COMPLAINT**

August J. Matteis, Jr. (DC Bar # 433068)
Benjamin Davidson (DC Bar # 975509)
GILBERT RANDOLPH LLP
1100 New York Avenue, NW
Suite 700
Washington, DC 20005
Tel: (202) 772-2200
Fax: (202) 772-3333

E. Elaine Gardner (DC Bar # 271262)
WASHINGTON LAWYERS'
COMMITTEE FOR CIVIL RIGHTS &
URBAN AFFAIRS
11 Dupont Circle, NW
Suite 400
Washington, DC 20035
Tel: (202) 319-1000
Fax: (202) 319-1010

DATED: June 6, 2008

Counsel for Plaintiffs

**INDEX OF EXHIBITS**

| EXHIBIT DESCRIPTION | EXHIBIT NUMBER |
|---|---|
| | |
| Declaration of Rabbi Bruce Kahn dated June 5, 2008 | 1 |
| Declaration of Andrew J. Imparato dated June 4, 2008 | 2 |
| Unpublished decisions | 3 |
| • *Access 4 All, Inc. v. Absecon Hospitality Corp.*, 04-6060, 2006 WL 3109966 (D.N.J. Oct. 30, 2006) | 3-A |
| • *Aktieselskabet AF 21. Nov. 2001 v. Fame Jeans, Inc.*, ---F.3d ----, No. 07-7105, 2008 WL 1932768 (D.C. Cir. Apr. 29, 2008) | 3-B |
| • *Celano v. Marriott Int'l, Inc.*, No. 05-4004, 2008 WL 239306 (N.D. Cal. Jan. 28 2008) | 3-C |
| • *Gillis v. McDonald's Corp.*, Civ. A. No. 91-7202, 1992 WL 236891 (E.D. Pa. Sept. 10, 1992) | 3-D |
| • *Gregory v. Melrose Group, LLC*, No. Civ. A 03-2414, 2003 WL 22928805 (E.D. La. Dec. 8, 2003) | 3-E |
| • *Holt v. Am. City Diner, Inc.*, No. Civ. 05-1745, 2007 WL 1438489 (D.D.C. May 15, 2007) | 3-F |
| • *Kosloff v. Wash. Square Assocs., LLC*, No. C. 06-05060, 2007 WL 2023497 (N.D. Cal. July 12, 2007) | 3-G |
| • *Kratzer v. Gamma Mgmt. Group*, No. Civ. A. 04-6031, 2005 WL 2644996 (E.D. Pa. Oct. 12, 2005) | 3-H |
| • *Maydak v. Fed. Commc'n Comm'n*, No. 98-1383, 1998 WL 938717 (D.C. Cir. 1998) | 3-I |
| • *Thompson v. Sand Cliffs Owners Ass'n, Inc.*, No. 3:96 CV 270/RV, 1998 WL 35177067 (N.D. Fla. 1998) | 3-J |

## **CERTIFICATE OF SERVICE**

I certify that a true and correct copy of Exhibits 1-3 and the Exhibit Index were served this 6th day of June 2008, by electronic service, on the following:

Frank C. Morris, Jr., Esq.
Minh N. Vu, Esq.
Epstein Becker & Green P.C.
1227 25th Street, NW
Suite 700
Washington, DC  20037

Lisa A. Krupicka, Esq.
Burch, Porter & Johnson, PLLC
130 N. Court Avenue
Memphis, Tennessee 38103


_____/s/_____
August J. Matteis, Jr. (DC Bar No. 433068)

**EXHIBIT 1**

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

|  |  |  |
|---|---|---|
| | * | |
| EQUAL RIGHTS CENTER, et al. | * | |
| | * | |
| Plaintiffs, | * | |
| | * | CIVIL ACTION NO. 1:07-CV-01528-JR |
| v. | * | |
| | * | |
| HILTON HOTELS CORPORATION, | * | |
| | * | |
| Defendant. | * | |
| | * | |

## DECLARATION OF RABBI BRUCE KAHN

I, Rabbi Bruce Kahn, declare and state as follows:

1. I am the Executive Director of the Equal Rights Center ("ERC"). I offer this Declaration in support of the Plaintiffs' opposition to the Defendant's motion to dismiss the Plaintiffs' amended complaint. The statements set forth in this Declaration are based upon my personal knowledge.

2. The ERC is a plaintiff in the amended complaint in this matter. The ERC is a membership organization and a not-for-profit corporation with a membership, staff and Board of Directors comprised of individuals, including persons with disabilities, who have a direct interest in protecting the rights of persons with disabilities. One of the principal goals of the ERC is the elimination of discrimination against persons with disabilities, which includes the elimination of the discriminatory effects of architectural barriers to access and use of public accommodations.

3.   Travelers with disabilities commonly face barriers in hotels and motels.  The ERC has received many complaints over the years regarding access to hotels and motels, including access to hotels owned by the Hilton Corporation.

4.   In the summer of 2006, ERC staff counseled an individual who complained of her family's inability to book an accessible room with two double beds at virtually all Hampton Inn hotels.  The ERC performed testing of Hampton Inn hotels, to identify the extent of discrimination at these hotels in order to better counsel its members. The testing confirmed this individual's complaint.

5.   In the fall of 2006, ERC staff counseled Marc Fiedler who complained of his inability to book an ocean front room at the Hilton Hotel in Hilton Head, South Carolina. At this point, the ERC performed testing of Hilton hotels throughout the country, to identify the extent of discrimination at these hotels in order to better counsel Mr. Fiedler and the rest of its members.  The testing confirmed that barriers and lack of dispersal existed throughout the country.

6.   The ERC's mission of eliminating discrimination against people with disabilities has been made more difficult by the barriers at Hilton hotels.

I state under penalty of perjury that the foregoing is true and correct.

Executed on June _5_, 2008
Washington, DC

Rabbi Bruce Kahn

**EXHIBIT 2**

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

|  |  |  |
|---|---|---|
| EQUAL RIGHTS CENTER, et al. | * | |
| | * | |
| Plaintiffs, | * | |
| | * | CIVIL ACTION NO. 1:07-CV-01528-JR |
| v. | * | |
| | * | |
| HILTON HOTELS CORPORATION, | * | |
| | * | |
| Defendant. | * | |
| | * | |

## DECLARATION OF ANDREW J. IMPARATO

I, Andrew J. Imparato, declare and state as follows:

1. I am the President and CEO of the American Association of People with Disabilities (AAPD). I offer this Declaration in support of the Plaintiffs' opposition to the Defendant's motion to dismiss the Plaintiffs' amended complaint. The statements set forth in this Declaration are based upon my personal knowledge.

2. AAPD is a plaintiff in the amended complaint in this matter, and is the largest national nonprofit cross-disability member organization in the United States, dedicated to ensuring economic self-sufficiency and political empowerment for the more than 50 million Americans with disabilities. AAPD works in coalition with other disability organizations for the full implementation and enforcement of disability nondiscrimination laws, particularly the Americans with Disabilities Act (ADA) of 1990 and the Rehabilitation Act of 1973.

3. Travelers with disabilities commonly face barriers in hotels and motels. According to a 2005 research poll conducted by Harris Interactive® for the Open Doors

Organization (ODO) in cooperation with the Travel Industry Association of America (TIA), 60% of travelers with disabilities who have stayed overnight in paid accommodations said they had problems at these properties, either physical barriers (48%), problems with customer service (45%) or communication barriers (15%). Many of the most common complaints identified by the study, such as heavy doors and lack of knowledge among staff, could be easy and inexpensive to resolve.

4. The results of the 2005 research poll are confirmed by reports received by AAPD. AAPD members frequently face barriers in hotels and motels similar to those reported in the research poll.

5. The AAPD's activities designed at empowering our members and integrating them into society have been made more difficult by these barriers.

I state under penalty of perjury that the foregoing is true and correct.

Executed on June 4, 2008
Washington, DC

Andrew J. Imparato

**EXHIBIT 3**
**Part A**

Not Reported in F.Supp.2d                                                                    Page 1
Not Reported in F.Supp.2d, 2006 WL 3109966 (D.N.J.)
**(Cite as: 2006 WL 3109966 (D.N.J.))**

C

Only the Westlaw citation is currently available.

United States District Court,
D. New Jersey.
ACCESS 4 ALL, INC., and Felix Esposito,
Plaintiffs,
v.
ABSECON HOSPITALITY CORPORATION, Defendant.
**Civil Action No. 04-6060 (JEI).**

Oct. 30, 2006.

Law Offices of Alan R. Ackerman, by Alan R. Ackerman, Parsippany, NJ, for Plaintiffs.

Fox Rothschild LLP, by Joseph G. Antinori, Atlantic City, NJ, for Defendant.

**OPINION**

IRENAS, Senior District Judge.

**\*1** Plaintiffs commenced this action on December, 6, 2004, alleging that while visiting Hampton Inn, Defendant's property located in Absecon, New Jersey (the "Hampton Inn"), Plaintiff Esposito encountered architectural barriers, and such barriers violated Title III of the Americans with Disabilities Act (the "ADA"). [FN1] Plaintiffs seek (1) declaratory judgment declaring that Defendant's property is in violation of Title III of the ADA; (2) injunctive relief requiring that Defendant making all readily achievable alterations to the Hampton Inn, to the extent required by the ADA; and (3) attorney's fees, costs, and litigation expenses. Subject matter jurisdiction in this case is based on 28 U.S.C. § 1331.

> FN1. Title III of the ADA provides, in pertinent part, that "[n]o individual shall be discriminated against on the basis of disability in the full and equal enjoyment of the goods, services, facilities, privileges, advantages, or accommodations of any place of public accommodation ..." 42 U.S.C. § 12182(a). Discrimination includes "a fail-

ure to remove architectural barriers ... that are structural in nature, in existing facilities ..." 42 U.S.C. § 12182(b)(2)(A)(iv).

Pending before the Court are Plaintiffs' Motion for Summary Judgment, Defendant's Motion for Summary Judgment, Defendant's Cross Motion for Summary Judgment, and Defendant's Motion to Bar or Strike the Testimony of Plaintiffs' Expert. For the reasons stated below, Defendant's Motion and Cross Motion for Summary Judgment will be denied, and Plaintiffs' Motion for Summary Judgment will be denied.

**I.**

Plaintiffs, Access 4 All, Inc. ("A4A") and Felix Esposito, commenced this action on December 6, 2004 against Defendant, Absecon Hospitality Corporation ("AHC"), alleging a violation of Title III of the Americans with Disabilities Act, 42 U.S.C. § 12181, et seq. (the "ADA").

Plaintiff A4A is a not-for-profit Florida corporation whose members consist of individuals with disabilities. A4A's stated purpose is to represent the interests of its members by ensuring that places of public accommodations are accessible to disabled persons. (Compl.¶ 8). Plaintiff Esposito is a Florida resident who resides in Margate, Florida. (Compl.¶ 2). Mr. Esposito was one of the founding members of A4A, which was formed approximately four to five years ago. Mr. Esposito served as A4A's first treasurer. (Esposito Dep., Def. Ex. 2 at 150:10-22). Defendant AHC owns and operates a Hampton Inn hotel located in Absecon, New Jersey (the "Hampton Inn").

Mr. Esposito currently resides in Florida. He has one sister and three brothers, none of whom live in New Jersey. Mr. Esposito's father is deceased and his mother currently resides in Long Island, New York. (Esposito Dep. at pp. 16-22). None of Mr. Esposito's family members lives in New Jersey except an uncle, whom Mr. Esposito has not seen for

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

30 or 40 years and has no knowledge of where in New Jersey the uncle resides. (*Id.* at 20:19-21:2, 21:3-7).

Mr. Esposito claims that two of his former girlfriends, Elizabeth Manley and Joan Rodriguez, reside in New Jersey. (Esposito Dep. at 173:7-9). Ms. Manley is a casino waitress that Mr. Esposito met during a visit in 2004 to one of the Atlantic City casinos. He does not know where Manley resides nor does he have her phone number. (*Id.* at 173:10-174:9). He testified that if he wanted to get into contact with her, he would have to go back to the casino where she works. (*Id.*). However, Mr. Esposito forgot the name of the casino in which Ms. Manley was employed. (*Id.*).

**\*2** Mr. Esposito testified that he knew Ms. Rodriguez from Florida, before she moved to New Jersey approximately two years ago. He does not have Ms. Rodriguez's telephone number, does not know where Ms. Rodriguez resides, and has not spoken to her in two years. (Esposito Dep. at 176:9-20).

In 2004, Mr. Esposito visited Atlantic City with Richard Wyrsch. (Esposito Dep. at 81:22-82:5). At that time, Mr. Wyrsch was an employee of Access-Ability Inc, the entity that has provided an expert report for Plaintiffs in this case. Mr. Esposito testified that he stayed in five different hotels in connection with the Atlantic City trip. (*Id.* at 85:20-86:17). Mr. Esposito subsequently filed ADA lawsuits against all of the hotels in which he stayed. [FN2] (*Id.* at 97:3-6).

> FN2. Mr. Esposito has filed approximately 100 ADA lawsuits. (Def. Br. at p. 4).

Mr. Esposito and Mr. Wyrsch stayed at the Hampton Inn on the night of August 31, 2004. Upon arrival at the Hampton Inn at approximately 9:00 p.m., Mr. Esposito and Mr. Wyrsch parked in a designated handicap space. (Esposito Dep. at 103:19-104:2). Mr. Esposito does not recall how he went from the parking space to the hotel lobby, or whether he encountered any difficulty. (*Id.* at

111:17-112:1). Indeed, Mr. Esposito's testimony contained many statements such as "I don't remember exactly how the hotel looked like," (*Id.* at 111:21-22), and "It's rough to remember 19 months ago. I can't remember." (*Id.* at 120:19-22; *see also id.* at 115:12-17).

Mr. Esposito did not have any problem checking into the hotel. (Esposito Dep. at 115:18-20). He stayed in Room 128, which is not one of the Hampton Inn's designate handicap accessible rooms. (Stillwagon Cert, ¶ 2). The Hampton Inn has four rooms designated "handicap accessible." (*Id.*).

After arriving in his room, Mr. Esposito and Mr. Wyrsch proceeded to examine the room. (Esposito Dep. at 121:18-23). Mr. Esposito claims taht he personally encountered accessibility barriers in his hotel room. These barriers include:

> (1) A bathtub, instead of a roll-in shower, in the bathroom;
> (2) No grab bars behind the toilet;
> (3) No 36-inch clearance space on the sides of the beds;
> (4) No lift to get into the bed;
> (5) Storage hangers were too high;
> (6) The bathtub controls were unreachable; and
> (7) Not enough clearance spaces inside the bathroom.

(*Id.* at 123:8-23, 126:10-11, 129:24-130:14). Mr. Wyrsch took measurements and photographs of the hotel room to document these barriers.

In addition to the room, Mr. Esposito claims he had trouble utilizing the soda machine and ice machine. (Esposito Dep. at 136:19-137:1). In addition, Mr. Esposito claims that he could not reach the public telephone in the lobby, but he admits that he did not attempt to use the public phone. (*Id.* at 138:12- 16). Finally, Mr. Esposito claims that the restroom in the lobby was inaccessible because it had no grab bars. However, he did not attempt to use them. (*Id.* at 138:22-139:2). Mr. Esposito does not recall any other difficulties he encountered while staying at the Hampton Inn.

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2006 WL 3109966 (D.N.J.)
**(Cite as: 2006 WL 3109966 (D.N.J.))**

Page 3

**\*3** Mr. Esposito did not specifically request a handicap accessible room and was therefore given a non-handicap accessible room by the Hampton Inn. Defendant claims that a handicap accessible room was available for him had he requested one. (Stillwagon Cert., ¶¶ 2-6). During his stay, Mr. Esposito made no complaint to the hotel about his room assignment, (*Id.,* ¶ 9), and did not report to the hotel about any problems or difficulties he encountered. (Esposito Dep. at 145:13-19).

After the commencement of this action, Plaintiffs' expert on ADA compliance, Access-Ability, Inc., examined the Hampton Inn on September 20, 2005. The expert report documented, in its view, ADA violations, remedial measures, and approximate cost. (Pl.Ex.B). The alleged ADA violations in Plaintiffs' expert report include accessibility barriers that Mr. Esposito personally encountered, as well as barriers relevant to his disability that he did not encounter (e.g. the door at the rear of the property), and barriers not relevant to his disability(e.g. potential access barriers for visual or audible disabilities). (*See* Pl.Ex. B). Defendant did not provide any experts on this issue.

Mr. Esposito testified that he is planning another trip to the Atlantic City region. He stated that he would like to check into the Hampton Inn again to ensure improved accessibility. (Esposito Dep. at 163:23-164:18). Mr. Esposito has returned to the Hampton Inn on June 11, 2006 for another visit. (Esposito Aff., ¶¶ 5, 6).

Mr. Esposito claims that he is an individual with disabilities as defined by the ADA. (Compl.¶ 9). In his answers to interrogatories, Mr. Esposito stated that he has a Neurological Conversion Reaction [FN3] resulting in wheelchair dependency for mobility and safety. (Def. Ex. 3, Plaintiffs Answers to Interrogatories, No. 1). Mr. Esposito testified that he cannot stand for long periods of time and he requires the assistance of a wheelchair. (Esposito Dep., Def. Ex. 2 at 32:23-33:1).

FN3. "The essential feature of Conversion

Disorder is the presence of symptoms or deficits affecting voluntary motor or sensory function that suggest a neurological or other general medical condition." *Diagnostic and Statistical Manual of Mental Disorder (DSM-IV),* 4th ed. (p. 452).

According to Mr. Esposito, his condition is neuropsychological in nature. (Esposito Dep., Def. Ex. 2 at 33:5). He believes that his condition was related to a car accident that took place in 1971. (*Id.* at 33:10-20). In 1974, Mr. Esposito consulted with a neurology group in Fort Lauderdale, underwent extensive testing, and was directed to a psychiatrist. (*Id.* at 35:15-36:1).

Between 1974 and 1980, Mr. Esposito was treated by a social worker at a mental health clinic. (Esposito Dep., Def. Ex. 2 at 37:20-38:13). Approximately 3 years ago, Mr. Esposito's doctors at the Veterans Administration sent him to Miami for 3 days of testing. But Mr. Esposito testified that they could not find any problems with him. (*Id.* at 181:1-4).

According to Defendant, Mr. Esposito has not yet supplied any expert reports addressing his medical condition and he has not identified anyone in his answers to interrogatories who will testify at trial about his medical condition. (*See* Def. Ex. 3, Plaintiffs Answers to Interrogatory No. 13). Defendant also claims that Plaintiffs have not provided disclosures of treating medical personnel pursuant to Fed.R.Civ.P. 26, and reference to, or identify of, any medical records. [FN4]

FN4. According to the Court's Scheduling Order dated February 24, 2006, all factual pretrial discovery was to be concluded by April 28, 2006, and the depositions of all experts were to be concluded by April 30, 2006. (Docket No. 23).

**\*4** On May 11, 2006, Plaintiffs supplied to Defendant a one-page letter dated October 21, 2003, from Dr. Thomas C. Hammond. Dr. Hammond's letter

Not Reported in F.Supp.2d                                                                                    Page 4
Not Reported in F.Supp.2d, 2006 WL 3109966 (D.N.J.)
**(Cite as: 2006 WL 3109966 (D.N.J.))**

offers the opinion that Mr. Esposito suffers from hysterical conversion reaction disorder. Mr. Esposito objected to the production of any other medical records.

Plaintiffs move for summary judgment and request the Court to: (1) find Defendant liable for maintaining its property in violation of Title III; and (2) require parties to submit additional briefing with an estimation of time needed to make the necessary repairs on Defendant's property for compliance with the ADA. Defendant moves for summary judgment, claiming that: (1) Plaintiffs have no standing to bring this Title III action against Defendant; and (2) Plaintiff Esposito has not established that he is a disabled person under the definition of the ADA. Defendant, however, does not dispute the existence of accessibility barriers in violation of the ADA.

## II.

"Under Rule 56(c), summary judgment is proper 'if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law.' " *Celotex Corp. v. Catrett,* 477 U.S. 317, 322 (1986). (quoting Fed.R.Civ.P. 56(c)).

In deciding a motion for summary judgment, the Court must construe the facts and inferences in a light most favorable to the non-moving party. *Pollock v. Am. Tel & Tel. Long Lines,* 794 F.2d 860, 864 (3d Cir.1986). The role of the Court is not "to weigh the evidence and determine the truth of the matter, but to determine whether there is a genuine issue for trial." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 249 (1986). "[A] party opposing a properly supported motion for summary judgment may not rest upon the mere allegations or denials of his pleading, but ... must set forth specific facts showing that there is a genuine issue for trial ." *Id.* at 248 (internal quotation and citation omitted; ellipsis in original).

" 'With respect to an issue on which the non-

moving party bears the burden of proof, the burden on the moving party may be discharged by 'showing'--that is, pointing out to the district court--that there is an absence of evidence to support the non-moving party's case.' " *Conoshenti v. Public Serv. Elec. & Gas,* 364 F.3d 135, 145-46 (3d Cir.2004).

## III.
### A.

Defendant first argues that Plaintiffs do not have standing to seek prospective injunctive relief under the ADA. Defendant also argues that even if Plaintiffs have standing to commence the action, they do not have standing with respect to barriers contained in the expert report but not encountered by Mr. Esposito, or barriers beyond Mr. Esposito's disability. Plaintiffs argue that Mr. Esposito has individual standing, and A4A has associational standing to challenge all accessibility barriers at the Hampton Inn.

**\*5** "[T]he question of standing is whether the litigant is entitled to have the court decide the merits of the dispute or of particular issues." *Warth v. Seldin,* 422 U.S. 490, 498 (1975). Section 2 of Article III of the United States Constitution limits federal jurisdiction to "Cases" or "Controversies." *See Lujan v. Defenders of Wildlife,* 504 U.S. 555, 559 (1992). The doctrines that have developed to elaborate the case or controversy requirement are "founded in concern about the proper-and properly limited-role of the courts in a democratic society." *Warth,* 422 U.S. at 498.

The requirement of a case or controversy places the burden on Plaintiffs to allege that they have "such a personal stake in the outcome of the controversy as to warrant invocation of federal-court jurisdiction and to justify exercise of the court's remedial powers on [their] behalf." *Paige v. Philadelphia Housing Authority,* No. 99-497, 2002 WL 500677, at \*4 (E.D.Pa.2002) (citing *Warth,* 422 U.S. at 498-99).

The doctrine of standing consists of constitutional and prudential considerations. *See Allen v. Wright,*

Not Reported in F.Supp.2d                                                    Page 5
Not Reported in F.Supp.2d, 2006 WL 3109966 (D.N.J.)
**(Cite as: 2006 WL 3109966 (D.N.J.))**

468 U.S. 737, 751 (1984). The prudential component of standing embraces "judicially self-imposed limits on the exercise of federal jurisdiction, such as the general prohibition on a litigant's raising another person's legal rights, the rule barring adjudication of generalized grievances ..., and the requirement that a plaintiff's complaint fall within the zone of interests protected by the law invoked." *Id.* at 751.

Constitutional component of the standing requirement, on the other hand, is "derived directly from the Constitution." *Allen,* 468 U.S. at 751. At an "irreducible constitutional minimum," *Paige,* 2002 WL 500677, at *4, Plaintiffs must demonstrate that they have: (1) "suffered an 'injury in fact' that is (a) concrete and particularized and (b) actual or imminent, not conjectural or hypothetical; (2) the injury is fairly traceable to the challenged action of the defendant; and (3) it is likely, as opposed to merely speculative, that the injury will be redressed by a favorable decision." *Friends of the Earth, Inc. v. Laidlaw Envtl. Servs.,* 528 U.S. 167, 180-81 (2000)(citing *Lujan,* 504 U .S. at 560-61). *See* **Clark v. Burger King Corp., 255 F.Supp.2d 334, 341 (D.N.J.2003)**(Irenas, J.); *Heir v. Delaware River Port Authority,* 218 F.Supp.2d 627, 639 n. 9 (D.N.J.2002)(Irenas, J.); *see also The Pitt News v. Fisher,* 215 F.3d 354, 359 (3d Cir.2000); *Doe v. National Bd. of Medical Examiners,* 199 F.3d 146, 152-53 (3d Cir.1999). The party invoking federal jurisdiction has the burden of satisfying these elements. *Lujan,* 504 U.S. at 561. Failure to make the necessary showing means the party they has no standing. **Clark, 255 F.Supp.2d at 341**.

Furthermore, because Plaintiffs seek prospective injunctive relief, [FN5] they must demonstrate a "real and immediate threat" of injury in order to satisfy the "injury in fact" requirement. *City of Los Angeles v. Lyons,* 461 U.S. 95, 103-04 (1983). The Third Circuit has held that "[p]ast exposure to illegal conduct does not in itself show a present case or controversy regarding injunctive relief ..." *Brown v. Fauver,* 819 F.2d 395, 400 (3d Cir.1987). In order to obtain standing for prospective relief, Plaintiffs must "establish a real and immediate threat that [they] would again be [exposed to the alleged violations of his lawful rights]." *Id.* For example, in *Lujan,* the Court found that " 'some day' intentions-without any description of concrete plans, or indeed even any speculation of when the some day will be--do not support a finding of the 'actual or imminent' injury ..." 504 U .S. at 564. In the context of Title III of the ADA, the Third Circuit has held that the principles of standing are equally applicable. *Doe,* 199 F.3d at 153.

> FN5. Under Title III of the ADA, only injunctive relief is available. *See* 42 U.S.C. § 12188; *W.G. Nichols, Inc. v. D. Ferguson,* No. 01-834, 2002 WL 1335118 at *10 (E.D.Pa.2002).

                              i.

*6 Plaintiff Esposito claims that he has standing to seek prospective injunctive relief pursuant to Title III. Thus, he must demonstrate that he meets both components of the standing requirement.

Defendant does not dispute the traceability and the redressability elements of the constitutional component of standing analysis. His argument here focuses on whether Plaintiff Esposito's future injury is concrete and particularized. *See Friends of the Earth, Inc.,* 528 U.S. at 180-81. To determine whether a future injury is concrete and particularized for the purpose of a Title III claim, the Court must consider the likelihood of Mr. Esposito returning to the Hampton Inn, Defendant's place of public accommodation. *See Access 4 All, Inc. v. 539 Absecon Blvd., LLC,* No. 05-5624, 2006 WL 1804578 at *3 (D.N.J.2006). An alleged intention to "someday" return to the place in question is insufficient. *Id.*

Generally, courts examine four factors to determine a plaintiff's likelihood to return: "(1) the plaintiff's proximity to the defendant's place of public accommodation; (2) the plaintiff's past patronage of the defendant's place of public accommodation; (3) the

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d                                                                                     Page 6
Not Reported in F.Supp.2d, 2006 WL 3109966 (D.N.J.)
**(Cite as: 2006 WL 3109966 (D.N.J.))**

definitiveness of the plaintiff's plan to return; and (4) the plaintiff's frequency of travel near the defendant." *539 Absecon Blvd., LLC,* 2006 WL 1804578 at *3. For example, the Court held in **Clark v. Burger King** that a plaintiff established a likelihood of future injury based on his previous visits to defendant's restaurants and his desire to return to those locations. **255 F.Supp.2d at 343**. On the other hand, in *Access 4 All v. Oak Spring, Inc.,* the court found that a plaintiff only established a speculative injury where he alleged a general intent return to defendant's hotel and no continuing connection to the area where defendant's hotel was located. 2005 WL 1212663 at *5 (M.D.Fla.2005).

When the place of public accommodation is a hotel, as opposed to a restaurant, Plaintiff's proximity is less probative of intent to return. *See 539 Absecon Blvd., LLC,* 2006 WL 1804578 at *3. This rule reflects the fact that hotels tend to serve people who do not live nearby. For example, in *Access 4 All, Inc. v. Wintergreen Commercial Partnership,* the court found that plaintiff's proximity to defendant's hotel neither injured nor advanced his claim, and that this part of the analysis was irrelevant. 2005 WL 2989307 at *3 (N.D.Tex.2005). Similarly, in this case, Plaintiff Esposito's claim arises out of barriers he encountered at Defendant's hotel; thus, although Plaintiff resides in Florida, the considerable distance from the hotel does not foreclose his claim for lack of standing. *See 539 Absecon Blvd., LLC,* 2006 WL 1804578 at *3.

Additionally, the Court must consider Plaintiff's past patronage of Defendant's hotel. According to the Complaint, Plaintiff Esposito spent one night in the Hampton Inn in 2004. He also claims that he returned to the Hampton Inn during June of 2006. (Esposito Aff., ¶¶ 5, 6). This fact is undisputed, and thus this element is satisfied. *See Kratzer v. Gamma Management Group, Inc.,* 2005 WL 2644996 at *3 (E.D.Pa.2005) (finding that plaintiffs' visit and alleged intent to return to defendant's hotel stated a claim of an actual injury under the ADA).

*7 Finally, factors 3 and 4 both address the same is-

sue, the definitiveness of Plaintiff Esposito's plan to return. Here, Plaintiff must show definitive plans to return to the Hampton Inn. Mr. Esposito claims that he demonstrated his intent to return by revisiting the Hampton Inn in June of 2006. In addition, Mr. Esposito claims that he loves gambling and the Atlantic City region. (Esposito Aff. ¶¶ 3, 5). He also claims that he particularly likes to gamble at the Borgata Hotel and Casino, which is close to the Hampton Inn. (*Id.* at ¶ 5). Finally, Plaintiff Esposito claims that he intended to return to the Hampton Inn in order to conduct additional examination to ensure ADA compliance. (Esposito Dep. at 163:23-164:18).

Defendant relies on the distance between Florida and Atlantic City to draw the inference that Plaintiff Esposito is unlikely to return to the Hampton Inn. Defendant also claims that the motive for Mr. Esposito's returning to the Hampton Inn was improper. (Def. Reply Br. at pp. 14-17). The Court rejects both arguments.

First, as the Court noted above, because Defendant's place of public accommodation in this case is a hotel, the distance between Mr. Esposito's residence and the hotel neither advances nor injuries his claim of intent to return. In addition, the motive for a plaintiff to return to a particular place of public accommodation is not a factor typically considered by the Court. *See 539 Absecon Blvd., LLC,* 2006 WL 1804578 at *3 (enumerating the factors to consider for standing determination). Indeed, because Plaintiff Esposito is a frequent litigant with the stated goal of ensuring ADA compliance, his claim of intent to return to do the Hampton Inn to do additional examinations is made more, not less, credible. [FN6] Furthermore, Mr. Esposito's mother lives in Long Island, New York, and Mr. Esposito claims that he enjoys gambling in Atlantic City. Thus, it is likely that when Mr. Esposito visits his mother, he may take the opportunity to make trips to Atlantic City and stay in the Hampton Inn. Thus, The Court finds that Mr. Esposito has met his burden of showing an intent to return to the Hampton

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d                                                                                      Page 7
Not Reported in F.Supp.2d, 2006 WL 3109966 (D.N.J.)
**(Cite as: 2006 WL 3109966 (D.N.J.))**

Inn, and thus demonstrated a "concrete and particularized" injury.

> FN6. The court in *539 Absecon Blvd.* noted that another court has held that hotel reservations made after the filing of the complaint may not be used to assert an intent to return. 2006 WL 1804578 at *4. However, Mr. Esposito's June 2006 trip to the Hampton Inn is not the decisive factor in the Court's decision. Indeed, even without the June 2006 trip, the Court would still find sufficient intent to return to confer standing.

In addition to satisfying the constitutional component, allowing Mr. Esposito standing to pursue his Title III claim does not implicate the prudential component of standing analysis. Mr. Esposito is not attempting to raise another person's legal rights, and not asserting a generalized grievance. His claim also falls within the zone of interests protected by the ADA. *See Allen,* 468 U.S. at 751.

Thus, the Court holds that Mr. Esposito has standing to personally seeking prospective injunctive relief against Defendant.

### ii.

Plaintiff A4A argues that it has associational standing to seek the requested prospective injunctive relief. An organization may claim associational standing when: "(1) its members would otherwise have standing to sue in their own right; (2) the interests it seeks to protect are germane to the organization's purpose; and (3) neither the claim asserted nor the relief requested requires the participation in the lawsuit of each of the individual members." *Hunt v. Washington State Apple Advertising Comm'n,* 432 U.S. 333, 343 (1977); *Clark v. McDonald's Corp.,* 213 F.R.D. 198, 207 (D.N.J.2003). Associations bringing claims on behalf of its members are limited to relief that, "if granted, will inure to the benefit of those members of the association actually injured." *Addiction Specialists, Inc. v. Township of Hampton,* 411 F.3d 399, 406 (3d Cir.2005).

**\*8** As the Court stated above, Mr. Esposito has personal standing to bring this claim. Thus, the first element of the *Hunt* test is satisfied.

Under the second element, the Court must consider whether the interests that A4A seeks to protect are germane to its organizational purpose. According to the Complaint, Plaintiff A4A is a not-for-profit Florida corporation whose members consist of individuals with disabilities, and A4A's stated purpose is to represent the interests of its members by ensuring that places of public accommodation are accessible to disabled persons. (Compl.¶ 8). Because this case is germane to Plaintiff A4A's organizational purpose, the second element of *Hunt* test is satisfied.

Finally, the Court must consider whether the claim advanced by the association requires participation of each individual member. "It is almost a bright-line rule 'that requests by an association for declaratory and injunctive relief do not require participation by individual association members' ... but conversely 'damages claims usually require significant individual participation, which fatally undercuts a request for associational standing.' " *Clark,* 213 F.R.D. at 207 (citing *Pennsylvania Psychiatric Society v. Green Spring Health Services, Inc.,* 280 F.3d 278, 284 (3d Cir.2002). In this case, Plaintiffs only seek declaratory judgment and prospective injunctive relief, not damage awards. [FN7] Individualized assessments of Plaintiff A4A's members and their participation in this case is unnecessary.

> FN7. Plaintiffs also seek attorneys' fees. However, attorneys fees do not require individualized assessment of A4A's members. Therefore, it does not injury A4A's claim to associational standing.

The Court holds that Plaintiff A4A has met its burden to establish associational standing.

### iii.

Plaintiffs claim that they have standing to challenge the accessibility barriers not encountered by Mr.

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2006 WL 3109966 (D.N.J.)
(Cite as: 2006 WL 3109966 (D.N.J.))

Esposito, and barriers beyond his disability (e.g. barriers to the blind or the hearing impaired). Defendant disputes Plaintiffs' standing on both types of barriers.

The Eighth Circuit has considered both of these questions in *Steger v. Franco, Inc.,* 228 F.3d 889 (8th Cir.2000). Courts within the Third Circuit have cited this case with approval. *See* 539 Absecon Blvd., 2006 WL 1804578; *Kratzer v. Gamma Mgmt. Group, Inc.,* 2005 WL 2644996 (E.D.Pa.2005); *Clark v. Burger King Corp.,* 255 F.Supp.2d 334; *Clark v. McDonald's Corp.,* 213 F.R.D. 198 (D.N.J.2003); *W.G. Nichols, Inc. v. Ferguson,* 2003 WL 22158794 (E.D.Pa.2002).

In *Steger,* a blind plaintiff sued an office building under Title III for its failure to install raised lettering, braille, or other signage that would identify the men's restroom to a blind person. 228 F.3d at 892. In addition to the restroom, which was the only accessibility barrier he encountered, the plaintiff also sought prospective injunctive relief for the removal of all accessibility barriers, regardless of his encounter with them or their relations to blindness.

The Eighth Circuit held that the plaintiff need not encounter all of the barriers in order to challenge them. The effect of such a rule, argued the Eighth Circuit, "would be piecemeal compliance." *Steger,* 228 F.3d at 894. Under such a rule, "numerous blind plaintiffs, each injured by a different barrier, would have to seek injunctive relief as to the particular barrier encountered until all barriers had been removed. This not only would be inefficient, but impractical." *Id.; see also Independent Living Resources v. Oregon Arena Corp.,* 982 F.Supp. 698, 762 (D.Or.1997).

*9 On the other hand, the Eighth Circuit rejected the plaintiff's argument that he has standing to seek relief for ADA violations unrelated to his disability. *Steger,* 228 F.3d at 893. "To meet the injury-in-fact requirement, 'the party seeking review [must] be himself among the injured.' " *Id.* (quoting *Lujan,* 504 U.S. at 560). A disabled person is not among

the injured when the alleged ADA violations do not affect him. Indeed, "granting [such a plaintiff] standing to seek relief on behalf of all disabled individuals would expand the standing doctrine beyond the limits of Article III." *Id.; see also Lewis v. Casey,* 518 U .S. 343, 358 n. 6 (1996).

The Court agrees with the reasoning and analysis of the Eighth Circuit. Therefore, Plaintiffs have standing with respect to all alleged accessibility barriers related to Mr. Esposito's disability (wheelchair confinement) but no standing with respect to barriers unrelated to his disability.

**B.**

Title III of the ADA protects individuals from discrimination on the basis of disability "in the full and equal enjoyment of the goods, services, facilities, privileges, advantages, or accommodations of any place of public accommodation by any person who owns, leases (or leases to), or operates a place of public accommodation." 42 U.S.C. § 12182(a). Discrimination against disabled individuals includes "failure to remove architectural barriers ... in existing facilities, ... where such removal is readily achievable." 42 U.S.C. § 12182(b)(2)(A)(iv). Title III gives a private right of action "to any person who is being subjected to discrimination on the basis of disability ..." 42 U.S.C. § 12188(a)(1). In cases of violation of § 12182(b)(2)(A)(iv), a court may order injunctive relief which shall include an order to make the facility compliant to the extend required by Title III. 42 U.S.C. § 12188(a)(2).

Defendant does not dispute that the Hampton Inn is a place of public accommodation, that Defendant owns or operates the Hampton Inn, or that the Hampton Inn failed to comply with Title III. However, Defendant disputes that Plaintiff Esposito is a disabled individual under the ADA.

In order to state a cognizable cause of action under the ADA, a plaintiff must establish that he is a "qualified individual with a disability." *See* 42 U.S.C. § 12112(a); *Cleveland v. Policy Management Sys. Corp.,* 526 U.S. 795, 806 (1999). The

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

term "disability" is defined in 42 U.S.C. § 12102(2)(A), as "a physical or mental impairment that substantially limits one or more of the major life activities of such individual ..." The Supreme Court has recognized the term "major life activities" to include "functions such as caring for one's self, performing manual tasks, walking, seeing, hearing, speaking, breathing, learning, and working." *Bragdon v. Abbott,* 524 U.S. 624, 638-39 (1998) (quoting 45 C.F.R. § 84.3(j)(2)(ii)).

Mr. Esposito is currently wheelchair bound. According to his discovery materials, he has an Neurological Conversion Reaction resulting in wheelchair dependency for mobility and safety. (Def. Ex. 3, Plaintiffs Answers to Interrogatories, No. 1). Mr. Esposito also testified that he cannot stand for long periods of time, has a limited ability to walk, and has required the use of a wheelchair since 1981. (Esposito Dep. at 32:23-33:1).

**\*10** In *Marinelli v. City of Erie, Pa.,* the Third Circuit noted that "[t]here is certainly no general rule that medical testimony is always necessary to establish disability." 216 F.3d 354, 360 (3d Cir.2000)(citing *Katz v. City Metal Co.,* 87 F.3d 26 (1st Cir.1996)). Indeed, [s]ome long-term impairments would be obvious to a jury (e.g., a missing arm) and it is certainly within the realm of possibility that a plaintiff himself in a disabilities case might offer a description of treatment and symptoms over a substantial period that would [allow] the jury [to] determine that [the plaintiff] did suffer from a disability." *Id.*

The necessity of medical testimony, in any given case, turns on the extent to which the alleged impairment is within the comprehension of a jury that does not possess a command of medical or otherwise scientific knowledge. *Marinelli,* 216 F.3d at 360. Under this rule, the Third Circuit held that the plaintiff in *Marinelli,* who was suffering from arm and neck pain, did not need medical testimony to establish his disability because such symptoms are "among those ailments that are the least technical in nature and are the most amenable to comprehension

by a lay jury." *Id.*

In the current state of the record, it is clear that Defendant is not entitled to summary judgment. Mr. Esposito's deposition testimony and Dr. Hammond's letter created, at the minimum, a factual dispute with respect to Mr. Esposito's disability. Thus, Defendant's Motion and Cross Motion for Summary Judgment will be denied.

Plaintiffs submitted an expert report in support of their summary judgment motion. (Pl.Ex.B). This report contains various ADA violations existing at the Hampton Inn, including barriers that Plaintiffs have no standing to challenge because they are unrelated to Mr. Esposito's disability (e.g. barriers to the blind). For this reason, Plaintiffs' Motion for Summary Judgment will be denied pending the resolution of (i) the issues related to which barriers Plaintiffs have standing to challenge; (ii) the unresolved discovery issues; and (iii) a determination of whether Defendant should have an opportunity to file its own expert report.

Defendant complained of discovery problems with respect to Plaintiff Esposito's physical conditions, and moved to strike the expert report related to alleged ADA violations for late filing. Plaintiffs also filed discovery motions (Docket No. 41, 49), which have not yet been decided. The Court will schedule a conference with the parties to resolve these disputes.

**V.**

For reasons set forth above, the Court will deny Plaintiffs' Motion for Summary Judgment and Defendant's Motion and Cross Motion for Summary Judgment. The Court will issue an appropriate order.

END OF DOCUMENT

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

**EXHIBIT 3**
**Part B**

2008 WL 1932768                                                                                                    Page 1
--- F.3d ----, 2008 WL 1932768 (D.C.Cir.)
**(Cite as: 2008 WL 1932768 (D.C.Cir.))**

H

Only the Westlaw citation is currently available.

United States Court of Appeals,
District of Columbia Circuit.
AKTIESELSKABET AF 21. NOVEMBER 2001,
Appellant
v.
FAME JEANS INC., Appellee.
**No. 07-7105.**

Argued March 13, 2008.
Decided April 29, 2008.

**Background:** Owner of foreign trademark brought
action against rival, filing intent-to-use application
for the mark, seeking vacation of decision of Trade-
mark Trial and Appeal Board (TTAB) allowing
rival to proceed with application, denial of registra-
tion application, and judgment that owner was en-
titled to register mark. The United States District
Court for the District of Columbia, 511 F.Supp.2d
1, dismissed action. Owner appealed.

**Holdings:** The Court of Appeals, Brown, Circuit
Judge, held that:
(1) owner met pleading requirements challenging
rival's registration as likely to cause confusion with
respect to mark previously used in United States;
(2) owner's allegations were sufficient to meet
pleading requirements in challenging rival's regis-
tration for lack of bona fide intent to use mark; but
(3) owner failed to allege elements of reliance on
rival's alleged misrepresentation, as required to
state claim for fraud.
Affirmed in part and reversed in part.

**[1] Trademarks ☞1322**

382Tk1322 Most Cited Cases
Although a district court owes a certain degree of
deference to the Trademark Trial and Appeal
Board's (TTAB) findings of fact, both parties may
introduce new evidence in a civil action brought
under the Lanham Act challenging TTAB's de-

cision. Lanham Trade-Mark Act, § 21(b), 15
U.S.C.A. § 1071(b).

**[2] Trademarks ☞1317(1)**

382Tk1317(1) Most Cited Cases
District courts have broad authority to review trade-
mark decisions by the U.S. Patent and Trademark
Office (PTO), both before and after the registration
of a mark.

**[3] Trademarks ☞1319**

382Tk1319 Most Cited Cases
Section of Lanham Act permitting a civil action to
challenge a decision of the Trademark Trial and
Appeal Board (TTAB) limits a district court to
evaluation
of "the application involved" in the TTAB's de-
cision but directs the district court to consider all
the relevant issues brought by either party, regard-
less of whether those issues were before the TTAB.
Lanham Trade-Mark Act, § 21(b), 15 U.S.C.A. §
1071(b).

**[4] Federal Civil Procedure ☞673**

170Ak673 Most Cited Cases
Ordinarily a sufficient complaint contains a short
and plain statement of the claim showing that the
pleader is entitled to relief, enough to give a de-
fendant fair notice of the claims against him.
Fed.Rules Civ.Proc.Rule 12(b)(6), 28 U.S.C.A.

**[5] Federal Civil Procedure ☞623**

170Ak623 Most Cited Cases
The pleadings under the Federal Rules of Civil Pro-
cedure serve specific functions of giving notice of
the general nature of the case and the circumstances
or events upon which it is based, so the parties can
prepare and the court can dispose of the case prop-
erly. Fed.Rules Civ.Proc.Rule 8, 28 U.S.C.A.

**[6] Federal Civil Procedure ☞673**

170Ak673 Most Cited Cases
In general, a complaint should simply identify the
circumstances, occurrences, and events giving rise

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

--- F.3d ----, 2008 WL 1932768 (D.C.Cir.)

**(Cite as: 2008 WL 1932768 (D.C.Cir.))**

to the claim, or inform the opponent of the affair or transaction to be litigated.

**[7] Trademarks ☞1292**

382Tk1292 Most Cited Cases

An opposer under Lanham Act provision prohibiting registration of a mark if it is likely to cause confusion with respect to a mark previously used in the United States must show it has priority and that registration of the mark creates a likelihood of confusion. Lanham Trade-Mark Act of 1946, § 2(d), 15 U.S.C.A. § 1052(d).

**[8] Federal Civil Procedure ☞673**

170Ak673 Most Cited Cases

So long as the basis for a claim is clear, a complaint need not plead law in specific detail.

**[9] Trademarks ☞1285**

382Tk1285 Most Cited Cases

While an intent-to-use trademark application does not, by itself, confer any rights enforceable against others, it does give an applicant the right to engage in the statutorily prescribed application procedure. Lanham Act, § 1, 15 U.S.C.A. § 1051.

**[10] Trademarks ☞1292**

382Tk1292 Most Cited Cases

A trademark opposition must be based on a statutory ground, such as a legal defect or deficiency in the application, which negates the appellant's right to the subject registration.

**[11] Trademarks ☞1285**

382Tk1285 Most Cited Cases

Provision of Lanham Act establishing a trademark application as a constructive use contingent on registration of a mark is a potential source of rights for a trademark registrant, not a requirement for or a source of defects in an application. Lanham Act, § 7(c), 15 U.S.C.A. § 1057(c).

**[12] Trademarks ☞1367**

382Tk1367 Most Cited Cases

Under Lanham Act provision prohibiting registration of a mark if it is likely to cause confusion with

respect to a mark previously used in the United States, an intent-to-use applicant prevails over any opposer who began using a similar mark after the intent-to-use filing date. Lanham Trade-Mark Act of 1946, § 2(d), 15 U.S.C.A. § 1052(d).

**[13] Trademarks ☞1244**

382Tk1244 Most Cited Cases

Courts have no power to deny a pending trademark registration on the basis of equity, because the registration procedure is a statutory construct.

**[14] Trademarks ☞1108**

382Tk1108 Most Cited Cases

Sporadic or minimal sales are not sufficient to establish actual use of trademark in opposing a trademark registration under Lanham Act provision prohibiting registration of a mark likely to cause confusion with respect to a mark previously used in the United States; while a single sale may indicate the first use of a mark, it must be the beginning of continuous commercial utilization. Lanham Trade-Mark Act of 1946, § 2(d), 15 U.S.C.A. § 1052(d).

**[15] Trademarks ☞1110**

382Tk1110 Most Cited Cases

An opposer to a trademark registration may rely on myriad forms of activity besides sales themselves, including, among others, regular business contacts, after-sales services, advertising of various forms, and marketing, in showing use under Lanham Act provision prohibiting registration of a mark likely to cause confusion with respect to a mark previously used in the United States; even marketing of a trademarked product before the product is ready for sale has the potential to defeat a rival's registration. Lanham Trade-Mark Act of 1946, § 2(d), 15 U.S.C.A. § 1052(d).

**[16] Trademarks ☞1110**

382Tk1110 Most Cited Cases

Desultory marketing such as sending out occasional press releases with trademark is not enough to defeat a rival's trademark registration under Lanham Act provision prohibiting registration of a mark likely to cause confusion with respect to a mark

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

--- F.3d ----, 2008 WL 1932768 (D.C.Cir.)
**(Cite as: 2008 WL 1932768 (D.C.Cir.))**

previously used in the United States; analogous use must be of such a nature and extent as to create public identification of the target term with the opposer's product. Lanham Trade-Mark Act of 1946, § 2(d), 15 U.S.C.A. § 1052(d).

**[17]** Trademarks ⬤═1295
382Tk1295 Most Cited Cases
Foreign trademark owner's allegation in its complaint that it conducted research and marketing for use of trademark in the United States was sufficient to meet pleading requirements in challenging rival's trademark registration under Lanham Act provision prohibiting registration of a mark likely to cause confusion with respect to a mark previously used in the United States; even though complaint did not state marketing was sufficiently extensive to create an awareness of trademark among American consumers, it was reasonable to infer such an awareness from owner's other allegations, which, coupled with the allegation of marketing in the United States, was enough to give rival fair notice of what it had to contest. Lanham Trade-Mark Act of 1946, § 2(d), 15 U.S.C.A. § 1052(d).

**[18]** Trademarks ⬤═1295
382Tk1295 Most Cited Cases
Foreign trademark owner's allegations in its complaint were sufficient to meet pleading requirements in challenging rival's registration under Lanham Act for lack of bona fide intent to use mark, where allegations indicated generally the circumstances suggesting rival lacked bona fide intent to use trademark, and, although circumstances did not necessarily indicate a lack of good faith, owner directly alleged rival simply wanted to interfere with owner's stated intention to use mark. Lanham Act, § 1(b), 15 U.S.C.A. § 1051(b).

**[19]** Trademarks ⬤═1141
382Tk1141 Most Cited Cases
A trademark registration opposer may defeat a trademark application for lack of bona fide intent by proving the applicant did not actually intend to use the mark in commerce or by proving the circumstances at the time of filing did not demonstrate

that intent. Lanham Act, § 1(b), 15 U.S.C.A. § 1051(b).

**[20]** Trademarks ⬤═1295
382Tk1295 Most Cited Cases
To defeat a trademark application for lack of bona fide intent by proving the circumstances at the time of filing did not demonstrate that intent, an opposer, in stating a claim, only has to notify the applicant of the general circumstances, occurrences, and events causing the flaw in the application; although the complaint need not go into detail, it must at least notify the applicant of how the general circumstances fail to show intent. Lanham Act, § 1(b), 15 U.S.C.A. § 1051(b).

**[21]** Fraud ⬤═20
184k20 Most Cited Cases
Foreign trademark owner failed to allege elements of reliance on rival's alleged misrepresentation to Patent and Trademark Office (PTO) that rival intended to use trademark in commerce, as required to state claim for fraud against rival. Fed.Rules Civ.Proc.Rule 9(b), 28 U.S.C.A.

**[22]** Fraud ⬤═20
184k20 Most Cited Cases
A plaintiff may recover for a defendant's fraudulent statement only if the plaintiff took some action in reliance on that statement.

Trademarks ⬤═1800
382Tk1800 Most Cited Cases
Jack & Jones.
Appeal from the United States District Court for the District of Columbia, (No. 06cv00585).

Monica P. McCabe argued the cause for appellant. With her on the briefs were Oliver N. Blaise, III and Mary E. Gately.

Robert L. Byer argued the cause for appellee. With him on the brief were Lewis F. Gould, Jr., Barry Golob, Maxim A. Voltchenko, and Matthew C. Mousley.

Before HENDERSON, ROGERS and BROWN,

Case 1:07-cv-01528-JR    Document 25-7    Filed 06/06/2008    Page 5 of 15
--- F.3d ----, 2008 WL 1932768 (D.C.Cir.)
**(Cite as: 2008 WL 1932768 (D.C.Cir.))**

Circuit Judges.

Opinion for the court filed by Circuit Judge
BROWN.

BROWN, Circuit Judge.

**\*1** For some reason, a pair of jeans labeled Jack &
Jones will sell for the equivalent of $96. Clearly
there is magic in the name, and Fame Jeans tried to
capture that magic by registering Jack & Jones as a
trademark in the United States. Aktieselskabet
(Bestseller), [FN1] which generated the magic by
selling Jack & Jones jeans elsewhere in the world,
opposed Fame's trademark application. After the
Trademark Trial and Appeal Board (TTAB) granted
summary judgment to Fame, Bestseller filed this
action in district court, alleging several new
grounds for its opposition. The district court dis-
missed Bestseller's complaint, holding the new
grounds waived because Bestseller failed to present
them to the TTAB and because Bestseller's com-
plaint failed to meet a new pleading standard the
court thought *Bell Atlantic Corp. v. Twombly, ---
U.S. ----, 127 S.Ct. 1955, 167 L.Ed.2d 929 (2007),*
required. Bestseller appeals the dismissal. We hold
the district court should hear new claims in a trade-
mark opposition, and we disagree with the district
court's interpretation of *Twombly.* Even so, some of
Bestseller's claims are legally flawed. Accordingly,
we affirm in part and reverse in part.

I

Bestseller, a Danish corporation, has been selling
Jack & Jones jeans since 1990. By 2005, its busi-
ness with the brand had expanded to include jeans,
T-shirts and jackets, distributed in Europe, the
Middle East, South America, and Asia. In the
European Union alone, Bestseller sold nineteen
million articles of branded clothing in 2005. It has
registered Jack & Jones and related marks in forty-
six countries, and it owns twenty-one domain
names incorporating variations of the name.

In 2003, Bestseller decided to expand into North
America; its competitor Fame Jeans appears, so far,

to have stalled that expansion into the United States
by assiduous effort at the U. S Patent and Trade-
mark Office (PTO). Bestseller planned to begin op-
erations in Canada, from which it would develop
the brand into the United States. Accordingly, it ap-
plied to register the Jack & Jones mark in Canada
in August 2004 and in the United States on Decem-
ber 6, 2004. Unfortunately for Bestseller, Fame had
already applied to register Jack & Jones in the
United States on January 9, 2004. As of their re-
spective filing dates, neither party had tested the
susceptibility of American consumers to the allure
of Jack & Jones by actually trying to sell any jeans
under the brand. Fame, therefore, filed its applica-
tion under Lanham Act § 1(b), 15 U.S.C. § 1051(b),
avowing its intent to use the trademark in com-
merce. Bestseller, on its part, filed under Lanham
Act § 44(e), 15 U.S.C. § 1126(e), swearing it inten-
ded to use the mark and citing its 1990 Danish re-
gistrations.

Nine days after filing its U.S. application to register
Jack & Jones, Bestseller filed an opposition to
Fame's application to register the mark, alleging
that Fame's registration was likely to cause confu-
sion with Bestseller's Jack & Jones mark and inter-
fere with Bestseller's application to register the
mark. On January 30, 2006, the TTAB granted
summary judgment on Bestseller's opposition. First,
the TTAB pointed out Bestseller had admitted it
never used the mark in commerce in the United
States, and it explained foreign use alone gave
Bestseller no right of priority here. Second, the
TTAB held Bestseller's December 6, 2004, applica-
tion junior to Fame's January 9, 2004, application.

**\*2** Bestseller sought district court review of the
TTAB decision, under Lanham Act § 21(b), 15
U.S.C. § 1071(b). In its complaint, Bestseller re-
newed its allegation that it had prior rights to the
Jack & Jones mark due to its § 44(e) application,
and it also claimed to have used the mark in the
United States. In addition, Bestseller argued the
court should apply equitable principles to give it
rights in the mark, since it has used the mark

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

around the world for seventeen years and Fame has never used it anywhere. Bestseller also added new claims that Fame's § 1(b) application was void *ab initio* for lack of bona fide intent to use the mark and that Fame misrepresented its intent to the PTO. The district court dismissed all the claims. The new claims it held waived; it agreed with the TTAB that Bestseller's § 44(e) application was too late; and it thought the misrepresentation claim fell short of its putative **Twombly** standard.

## II

This Court reviews the dismissal of a complaint *de novo. Stewart v. Nat'l Educ. Ass'n,* 471 F.3d 169, 173 (D.C.Cir.2006). We first discuss two threshold issues on which the district court based most of its analysis.

## A

[1] Although a district court owes a certain degree of deference to the TTAB's findings of fact, both parties may introduce new evidence in a § 21(b) action. *Material Supply Int'l, Inc. v. Summatch Indus. Co.,* 146 F.3d 983, 989 (D.C.Cir.1998) (citing 3 J. Thomas McCarthy, McCarthy on Trademarks and Unfair Competition § 21:20 (1997)). The question before us is whether a party may also introduce new issues not brought before the TTAB. We join several of our fellow circuits in allowing new issues in § 21(b) actions. *See, e.g., PHC, Inc. v. Pioneer Healthcare, Inc.,* 75 F.3d 75, 80 (1st Cir.1996); *CAE, Inc. v. Clean Air Eng'g, Inc.,* 267 F.3d 660, 674 (7th Cir.2001).

[2] District courts have broad authority to review trademark decisions by the U.S. Patent and Trademark Office (PTO), both before and after the registration of a mark. They may order the PTO to cancel a registration "in whole or in part" or to restore a canceled registration, Lanham Act § 19, 15 U.S.C. § 1119, and during a civil action for infringement, a registration is only *prima facie* evidence that the registrant owns a valid mark, Lanham Act § 15, 15 U.S.C. § 1115(a); *Am. Online, Inc. v. AT & T Corp.,* 243 F.3d 812, 817-18 (4th Cir.2001). In addition, district courts may authorize

the PTO to register or to deny registration to a pending mark. 15 U.S.C. § 1071(b)(1). Courts use this power to remedy erroneous decisions of the TTAB in any of the various kinds of proceeding committed to it, including oppositions, cancellation petitions, and interferences. For a person challenging a TTAB decision, a civil action in district court is an alternative to review by the Court of Appeals for the Federal Circuit. *Id.*

The proceedings differ in important ways, with Federal Circuit review taking the form of an appeal and the district court alternative being an ordinary civil action. In a Federal Circuit appeal, the PTO transmits its record to the court, which "shall review the decision from which the appeal is taken on the record." 15 U.S.C. § 1071(a)(4). In an *ex parte* case, the PTO must also explain the grounds for its decision, "addressing all the issues involved in the appeal." 15 U.S.C. § 1071(a)(3). By contrast, in a § 21(b) action, the PTO does not automatically transmit its record to the court; rather, any party may, on its own motion, enter the record into evidence. Once entered, "[t]he testimony and exhibits" of the PTO record "have the same effect as if originally taken and produced in the suit." 15 U.S.C. § 1071(b)(3). The district court then decides *de novo* whether the application at issue should proceed to registration, or the registration involved should be canceled, or "such other matter as the issues in the proceeding require, as the facts in the case may appear." 15 U.S.C. § 1071(b)(1); *see Material Supply,* 146 F.3d at 990.

**\*3** Fame presses the general rule that judicial review of agency action is limited to the issues presented before the agency. But this rule usually arises from statutes providing for judicial review, *Sims v. Apfel,* 530 U.S. 103, 107-08, 120 S.Ct. 2080, 147 L.Ed.2d 80 (2000), and it is certainly subject to statutory modification, *Time Warner Entm't, Co. v. FCC,* 144 F.3d 75, 79 n. 5 (D.C.Cir.1998); *cf. Darby v. Cisneros,* 509 U.S. 137, 153-54, 113 S.Ct. 2539, 125 L.Ed.2d 113 (1993) (APA governs exhaustion). Just so here: the

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

Lanham Act directs a district court to conduct a new trial to decide whether an applicant is entitled to a registration. In that proceeding, the court may consider both new issues and new evidence that were not before the TTAB. This statutory mandate becomes clear from a comparison of § 21(b), containing the "issues in the proceeding" language, with the analogous provision in the Patent Act, 35 U.S.C. § 145, which lacks that phrase. Both statutes direct a district court to decide "as the facts in the case may appear." The "case" in question refers to the district court action, not the prior events at the PTO, with the consequence that the court should decide on the facts before it, even though they were not before the PTO. Accordingly, in both patent and trademark cases, a party may introduce new evidence. *Am. Steel & Wire Co. of N.J. v. Coe,* 105 F.2d 17, 19 (D.C.Cir.1939) (patent); *Material Supply,* 146 F.3d at 989 (trademark). While new issues, on the other hand, are barred in a patent case, *De-Seversky v. Brenner,* 424 F.2d 857, 858 (D.C.Cir.1970), under § 21(b), the district court is also to decide "as the *issues* in the proceeding may require." 15 U.S.C. § 1071(b)(1) (emphasis added). Like "case," the word "proceeding" refers to the district court action. Thus, in a § 21(b) action, a district court should decide on the issues before it, including new issues.

Indeed, this conclusion seems unavoidable, since a district court does not necessarily receive the TTAB record. Rather, the record "shall be admitted on motion of any party." 15 U.S.C. § 1071(b)(3). By comparison, in judicial review under the Administrative Procedure Act, a court shall "review the whole record," which of course the court receives as a matter of course. 5 U.S.C. § 706; *see also* CHARLES A. WRIGHT & CHARLES H. KOCH, JR., FEDERAL PRACTICE AND PROCEDURE: JUDICIAL REVIEW OF ADMINISTRATIVE ACTION § 8306, at 73 (2006) ("It is black letter law that ... review in federal court must be based on the record before the agency...."). If, in an *inter partes* matter like an opposition, in which the PTO may choose not to participate, 15 U.S.C. § 1071(b)(2), no party

introduced the TTAB record, a district court would not even be able to identify the issues raised before the TTAB, much less hold other issues waived.

Moreover, the Lanham Act establishes a fluid relationship between the TTAB and the courts, in which the TTAB does not have the authority of an ordinary agency. Unlike an ordinary agency, whose decisions we would review under the deferential standards of APA § 706, the PTO's decision to register a trademark is subject to later collateral attack during which registration is only *prima facie* evidence of the mark's validity, rebuttable by a preponderance of the evidence. *See Colt Def. LLC v. Bushmaster Firearms, Inc.,* 486 F.3d 701, 708 (1st Cir.2007); *Tie Tech., Inc. v. Kinedyne Corp. .,* 296 F.3d 778, 783 (9th Cir.2002); *Am. Online,* 243 F.3d at 817. [FN2] Further, whereas ordinarily parties must exhaust their administrative remedies before seeking judicial review of agency decisions, the Lanham Act provides an independent civil action to cancel a completed trademark registration without first petitioning the PTO. 15 U.S.C. § 1119; *Ditri v. Coldwell Banker Residential Affiliates, Inc.,* 954 F.2d 869, 873 (3rd Cir.1992); *Windsurfing Int'l Inc. v. AMF Inc.,* 828 F.2d 755, 758 (Fed.Cir.1987). In addition, two of our sister circuits have even interpreted § 21(b) as allowing a court, in appropriate circumstances, to adjudicate a registration while the application is still pending at the PTO. *Pioneer Healthcare,* 75 F.3d at 80-81; *Goya Foods, Inc. v. Tropicana Prods., Inc.,* 846 F.2d 848, 854 (2d Cir.1988). When the statute does not require exhaustion of the administrative procedure itself, it would be odd to require exhaustion on particular issues during that procedure.

**\*4** [3] Nor does *Wilson Jones Co. v. Gilbert & Bennett Mfg. Co.,* 332 F.2d 216, 218 (2d Cir.1964) (as amended), persuade us to the contrary. That case relied on *Gold Seal Co. v. Weeks,* 129 F.Supp. 928, 937 (D.D.C.1955), which itself mistook this circuit's existing rule against considering new patent claims, *Cherry-Burrell Corp. v. Coe,* 143 F.2d 372, 373 (D.C.Cir.1944), for a rule against new issues.

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

In any case, *Gold Seal* arose under a previous version of § 21. At the time, the Lanham Act cross-referenced 35 U.S.C. § 145 to provide the procedure for trademark review, but the modern statute prescribes its own procedures, including the "issues in the proceeding" language. *Compare* 15 U.S.C. § 1071 (1952), *amended by* Pub.L. No. 87-772, § 12, 76 Stat. 769, 771 (1962), *with* § 1071(b)(1) (2000). *Wilson Jones* postdated the amendment, but it relied on *Gold Seal* without discussing the change. Section 21(b) in its current form limits a district court to evaluation of "the application involved" in the TTAB's decision but directs the district court to consider all the relevant issues brought by either party, regardless of whether those issues were before the TTAB.

**B**

In addition, this case questions how much detail Bestseller must allege to avoid dismissal under Rule 12(b)(6) of the Federal Rules of Civil Procedure. The district court performed such an analysis only for Bestseller's third claim, for fraudulent misrepresentation, because it dismissed Bestseller's claim to have made prior use of the mark in the United States and its claim that Fame's application was void *ab initio* as waived. Since we have concluded § 21(b) does not provide for issue waiver, our *de novo* review must proceed to the adequacy of Bestseller's allegations.

[4] Ordinarily a sufficient complaint "contain[s] a short and plain statement of the claim showing that the pleader is entitled to relief," enough to give a defendant "fair notice of the claims against him." *Ciralsky v. CIA,* 355 F.3d 661, 668-70 (D.C.Cir.2004) (quoting Fed.R.Civ.P. 8(a)). In deciding a 12(b)(6) motion, a court "constru[es] the complaint liberally in the plaintiff's favor," "accept[ing] as true all of the factual allegations contained in the complaint," *Kassem v. Wash. Hosp. Ctr.,* No. 06-7161, 2008 U.S.App. LEXIS 1174, at *2 (D.C.Cir. Jan. 22, 2008), "with the benefit of all reasonable inferences derived from the facts alleged," *Stewart,* 471 F.3d at 173. However, the district court interpreted *Twombly* as establishing a new threshold for complaints: enough facts to "clarify the grounds" on which each claim rests and "nudge[ ] their claims across the line from conceivable to plausible." *Aktieselskabet AF 21. November 2001 v. Fame Jeans, Inc.,* 511 F.Supp.2d 1, 18-19 (D.D.C.2007). Many courts have disagreed about the import of *Twombly.* [FN3] We conclude that *Twombly* leaves the long-standing fundamentals of notice pleading intact.

*5 [5] "Rule 8 is the keystone of the system of pleading" in federal procedure, and "the functioning of all the procedures in the federal rules ... are intertwined inextricably with the pleading philosophy embodied in Rule 8." 5 CHARLES A. WRIGHT & ARTHUR R. MILLER, FEDERAL PRACTICE AND PROCEDURE § 1202, at 87-88 (3d ed.2004). The pleadings serve specific functions of giving notice of "the general nature of the case and the circumstances or events upon which it is based," so the parties can prepare and the court can dispose of the case properly. Charles E. Clark, *Simplified Pleading,* 2 F.R.D. 456, 457, 460 (1943). Accordingly, Rule 8 requires, not a specific quantity of facts, but simply "a short and plain statement of the claim showing that the pleader is entitled to relief." Fed.R.Civ.P. 8(a)(2); *see also* Richard L. Marcus, *The Revival of Fact Pleading Under the Federal Rules of Civil Procedure,* 86 Colum. L.Rev. 433, 439 (1986).

Over the years, courts have tended to drift away from this standard by imposing various requirements of particularity. *See generally* Christopher M. Fairman, *Heightened Pleading,* 81 TEX. L.REV. 551 (2002). The Supreme Court has continually pruned back such requirements, with the admonition that we are not to impose heightened pleading requirements. *See, e.g., Swierkewicz v. Sorema N.A.,* 534 U.S. 506, 511-12, 122 S.Ct. 992, 152 L.Ed.2d 1 (2002); *Leatherman v. Tarrant County Narcotics Intelligence & Coordination Unit,* 507 U.S. 163, 164, 113 S.Ct. 1160, 122 L.Ed.2d 517 (1993); *Scheuer v. Rhodes,* 416 U.S.

--- F.3d ----, 2008 WL 1932768 (D.C.Cir.)

**(Cite as: 2008 WL 1932768 (D.C.Cir.))**

232, 249-50, 94 S.Ct. 1683, 40 L.Ed.2d 90 (1974). After decades of such consistency, we will not lightly assume the Supreme Court intended to tighten pleading standards.

Indeed, the Court has indicated quite clearly that it meant no such thing. *Twombly* itself reiterated that a complaint "**does not need detailed factual allegations.**" **127 S.Ct. at 1964**. Further, the Court denied "apply[ing] any 'heightened' pleading standard," because any heightened standard would have to arise from an amendment of the Federal Rules of Civil Procedure. *Id.* **at 1973 n. 14** (citing *Swierkewicz* and *Leatherman*). Rule 8(a), as the Court reminded, contains only "the threshold requirement" that the statement of a claim "show that the pleader is entitled to relief." *Id.* **at 1966**. As the Court said, Twombly's complaint failed that basic requirement, not any higher requirement for allegations that were "[ ]sufficiently particularized." *Id.* **at 1973 n. 14**. If, despite this clear language, *Twombly* itself left any doubt, the Court subsequently emphasized the continuation of the prior Rule 8(a) standard: "[S]pecific facts are not necessary," and a complaint need only give the defendant fair notice of the claims. *Erickson v. Pardus, --- U.S. ----, ----, 127 S.Ct. 2197, 2200, 167 L.Ed.2d 1081 (2007)* (per curiam).

[6] The forms accompanying the Federal Rules of Civil Procedure illustrate the concept of fair notice with numerous exemplary complaints that "suffice under these rules." Fed.R.Civ.P. 84; *see also* Clark, 2 F.R.D. at 464 ("[Q]uite essential ... are the illustrative forms."). In general, a complaint should simply identify the "circumstances, occurrences, and events" giving rise to the claim, *Twombly*, **127 S.Ct. at 1965 n. 3** (quoting Wright & Miller, *supra*, § 1202, at 94, 95), or "inform the opponent of the affair or transaction to be litigated," Clark, 2 F.R.D. at 460-61. [FN4] For example, Form 11, the example complaint for negligence, says that defendant drove a car against the plaintiff at a certain time in a certain place. Form 10, for suing on a note, cites the date of the note, the sum promised, and the in-

terest rate imposed. Form 18, for patent infringement, recites the number of the patent allegedly infringed and explains what product of the defendant's infringes. *Twombly* observed that a direct allegation of conspiracy analogous to the forms would say who conspired, at what time, to do what. **127 S.Ct. at 1970 n. 10**.

**\*6** Of course, these forms illustrate details that are sufficient, not necessary. Thus, in *Twombly,* although the complaint provided only a conclusory allegation of conspiracy, the plaintiff could have made out the claim in other ways. **127 S.Ct. at 1970** ("[T]he complaint leaves no doubt that plaintiffs rest their § 1 claim on descriptions of parallel conduct and not on any independent allegation of actual agreement**."). To the extent direct allegations are missing, "**a complaint must contain ... inferential allegations**." *Id.* at 1969. *Twombly* determined that a certain set of factual allegations did not support an inference that the defendants conspired in violation of the Sherman Act: "**Without more, parallel conduct does not suggest conspiracy**," and "**nothing contained in the complaint invests either the action or inaction alleged with a plausible suggestion of conspiracy**." *Twombly*, **127 S.Ct. at 1966, 1971**.

In sum, *Twombly* was concerned with the plausibility of an inference of conspiracy, not with the plausibility of a claim. A court deciding a motion to dismiss must not make any judgment about the probability of the plaintiff's success, for a complaint "may proceed even if it appears 'that a recovery is very remote and unlikely,' " *Id.* at 1965 (quoting *Scheuer);* a complaint "may not be dismissed based on a district court's assessment that the plaintiff will fail to find evidentiary support for his allegations," *id.* **at 1969 n. 8**. Further, the court must assume "all the allegations in the complaint are true (even if doubtful in fact)," *Twombly*, **127 S.Ct. at 1965** (citing *Swierkewicz),* and the court must give the plaintiff "the benefit of all reasonable inferences derived from the facts alleged," *Stewart, 471 F.3d at 173*.

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

--- F.3d ----, 2008 WL 1932768 (D.C.Cir.)
**(Cite as: 2008 WL 1932768 (D.C.Cir.))**

### III

Bearing in mind these general considerations, we turn to the claims at issue in this appeal. Bestseller contests Fame's pending trademark application on three grounds, and the district court rejected most of Bestseller's arguments on the improper ground that Bestseller failed to raise them before the TTAB. Nevertheless, we may affirm the dismissals for any reason properly raised by the parties. *Barr v. Clinton,* 370 F.3d 1196, 1202 (D.C.Cir.2004).

### A

[7][8] First, Bestseller opposes Fame's application based on Lanham Act § 2(d), under which a mark may not be registered if it is "likely ... to cause confusion" with respect to "a mark ... previously used in the United States." 15 U.S.C. § 1052(d). An opposer under § 2(d) must show "it ha[s] priority and that registration of the mark creates a likelihood of confusion." *Herbko Int'l, Inc. v. Kappa Books, Inc.,* 308 F.3d 1156, 1162 (Fed.Cir.2002) (cancellation proceeding under § 2(d)). The parties do not dispute that Bestseller has sufficiently alleged likelihood of confusion, since Bestseller and Fame want to use the same trademark on the same product. *See* Am. Comp. ¶ 18. [FN5] As to priority, Bestseller asserts prior rights to the Jack & Jones mark on the basis of its December 6, 2004, § 44(e) application and on the basis of its alleged use in the United States. Because Fame filed its intent-to-use application on January 9, 2004, Bestseller must be able to claim priority earlier than that date.

*7 Bestseller disputes even this point, pointing to Lanham Act § 7(c), which establishes a trademark application as constructive use "[c]ontingent on registration of a mark." 15 U.S.C. § 1057(c). An intent-to-use application cannot mature into a registration before the applicant actually uses the mark in commerce. 15 U.S.C. § 1051(d). Therefore, according to Bestseller, an intent-to-use application, by itself, earns no trademark rights, and no priority attaches before the intent-touse applicant engages in actual use of the mark. Until that point, the intent-to-use applicant would continue to be vulnerable to rival users, even those who begin use after the intent-to-use filing date or, like Bestseller, file a later application.

[9][10][11] While an intent-to-use application does not, by itself, confer any rights enforceable against others, it does give an applicant the right to engage in the statutorily prescribed application procedure. *See* *WarnerVision Entm't Inc. v. Empire of Carolina, Inc.,* 101 F.3d 259, 262 (2d Cir.1996) (because an intent-to-use applicant has the right to engage in use so as to complete registration, a court may not enjoin that use to protect the rights of a rival who began use after the intent-to-use filing date). Bestseller may only contest Fame's application within the confines of that scheme. A trademark opposition must be based on "a *statutory* ground"--such as a legal defect or deficiency in the application-"which negates the appellant's right to the subject registration." *Young v. AGB Corp.,* 152 F.3d 1377, 1380 (Fed.Cir.1998); 3 MCCARTHY, *supra,* § 20:13, at 20-28. Section 7(c) is a potential source of rights for a trademark registrant, not a requirement for or a source of defects in an application. Bestseller mistakes § 7(c) for the true ground for its opposition, which is § 2(d). *See* TTAB Op., Am. Compl. Exh. 1, at 3; Am. Comp. ¶ 18 (alleging likelihood of confusion).

[12] We conclude that under § 2(d), an intent-to-use applicant prevails over any opposer who began using a similar mark after the intent-to-use filing date. Covering applications of all types, including § 1(b) applications, § 2(d) simply says a mark is invalid if there is a likelihood of confusion with a mark "previously used." 15 U.S.C. § 1052(d). "Previously used" must mean used before some date, and for a pending § 1(b) application, there is only one date that could apply: the filing date. Perhaps one could argue that a § 1(b) applicant will eventually use the mark in commerce; § 2(d) might refer to the date of that use. However, the Lanham Act does not require an intent-to-use applicant to begin using his mark until he receives a notice of allowance, which can happen only after the end of all opposition proceed-

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

--- F.3d ----, 2008 WL 1932768 (D.C.Cir.)
**(Cite as: 2008 WL 1932768 (D.C.Cir.))**

ings on the application. 15 U.S.C. §§ 1051(d), 1063(b). Given the sequence of events established by statute, we must assess Bestseller's claim to priority in opposition without asking whether Fame has used the mark, relying only on Fame's filing date as an intent-to-use applicant.

**\*8** Holding to the contrary, as Bestseller urges, would not only make nonsense of § 2(d) but would also vitiate the intent-to-use application system itself. Congress created the intent-to-use application in the 1988 amendments to the Lanham Act with the goal of eliminating the need to use a mark before applying to register it. *See* S.Rep. No. 100-515, at 6 (1978), *as reprinted in* 1988 U.S.C.C.A.N. 5577, 5582. Congress regretted the "unnecessary legal uncertainty" caused by the use requirement, since a business might adopt a mark and invest in product development and marketing without being sure its use had earned it rights to the mark. *Id.* at 5. Constructive use, as codified in § 7(c), was a central element of the system: "Without constructive use, the certainty envisioned by the intent-to-use application system would not be achieved; an intent-to-use applicant would be vulnerable to pirates and *to anyone initiating use after it files its application." Id.* at 29 (emphasis added). Bestseller, as an applicant claiming priority from December 5, 2004, stands in exactly the position of a rival starting use after an intent-touse filing. [FN6] Allowing priority to Bestseller would devalue Fame's application on the assumption Fame had not made actual use by that date, precisely the result Congress wanted to avoid. Thus, the legislative history supports our conclusion, based on the text of § 2(d), that an intent-to-use applicant may rely on his filing date to establish priority during an opposition proceeding. The TTAB has consistently maintained the same position, and other courts have ordinarily assumed this interpretation as well. *Zirco Corp. v. AT & T Co.,* 21 U.S.P.Q.2d 1542, 1544 (T.T.A.B.1992); *see also, e.g., Lucent Info. Mgmt., Inc. v. Lucent Techs., Inc.,* 186 F.3d 311, 315 (3rd Cir.1999).

B

[13] Since Fame Jeans filed its application on January 9, 2004, Bestseller must establish use, either actual or constructive, before that date. [FN7] Constructive use can arise under § 7(c), which grants priority, based on filing date, to a U.S. application or to a foreign application that was followed by a timely U.S. application under § 44(d). Bestseller filed a U.S. application on December 6, 2004, based on its 1991 Danish registration. It neither complied with the six-month timeliness requirement of § 44(d) nor even filed its application under § 44(d). Therefore, Bestseller cannot demonstrate any constructive use prior to Fame's filing date. However, Bestseller has adequately alleged actual use. Although the complaint does not set forth trademark use to earn Bestseller rights in the Jack & Jones mark, an opposer who has made enough "analogous" use can still defeat a registration. *See Malcolm Nicol & Co. v. Witco Corp.,* 881 F.2d 1063, 1065 (Fed.Cir.1989) (quoting 3 MC-CARTHY, *supra,* § 20:4 (1984)).

[14] First, Bestseller fails to allege actual use in the most straightforward way, by showing its own protectible right to the Jack & Jones trademark in the United States. At common law, "prior ownership of a mark is only established as of the first actual use of a mark in a genuine commercial transaction." *Allard Enters., Inc. v. Adv. Programming Res., Inc.,* 146 F.3d 350, 358 (6th Cir.1998). The 1988 amendments to the Lanham Act codified a standard of "use in commerce," necessary for a valid trademark registration, which means "the bona fide use of a mark in the ordinary course of trade," including, for a trademark, attaching the trademark to goods. 15 U.S.C. § 1127. In any case, "sporadic or minimal" sales are not sufficient. *Allard Enters.,* 146 F.3d at 359; *see also Zazu Designs v. L'Oreal, S.A.,* 979 F.2d 499, 503 (7th Cir.1992) ("A few bottles sold over the counter ... and a few more mailed to friends" are not sufficient use.). While a single sale may indicate the first use of a mark, it must be the beginning of "continuous commercial utilization." *Allard,* 146 F.3d at 358. Obviously, as § 1052(d) requires, such use must also be "in the United States."

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

See *Person's Co. v. Christman,* 900 F.2d 1565, 1568-69 (Fed.Cir.1990) (T-shirt sales in Japan are not "use in United States commerce").

**\*9** [15][16] However, Bestseller need not "meet the technical statutory requirements to register ... [a mark] to have a basis for objection to another's registration." *Nat'l Cable Television Ass'n v. Am. Cinema Editors, Inc.,* 937 F.2d 1572, 1578 (Fed.Cir.1991). Section 2(d) requires only "use[ ] in the United States," and adoption of the mark by use analogous to strict trademark use will therefore suffice. *T.A.B. Sys., Inc. v. Pactel Teletrac,* 77 F.3d 1372, 1375 (Fed.Cir.1996). An opposer may rely on myriad forms of activity besides sales themselves, including, among others, regular business contacts, after-sales services, advertising of various forms, and marketing. *First Niagara Ins. Brokers, Inc. v. First Niagara Fin. Group,* 476 F.3d 867, 868-69 (Fed.Cir.2007); *Johnny Blastof, Inc. v. L.A. Rams Football Co.,* 188 F.3d 427, 434 (7th Cir.1999); *Malcolm Nicol,* 881 F.2d at 1064. Even marketing of a trademarked product before the product is ready for sale has the potential to defeat a rival's registration. See *Old Swiss House, Inc. v. Anheuser-Busch, Inc.,* 569 F.2d 1130, 1133 (C.C.P.A.1978). Still, desultory marketing such as sending out occasional press releases is not enough. *Id.* Analogous use must be "of such a nature and extent as to create public identification of the target term with the opposer's product." *T.A.B. Sys.,* 77 F.3d at 1375.

Bestseller's allegations fall short of showing a sale, whether in the United States or to an American abroad, as the beginning of a continuous commercial exploitation of the Jack & Jones mark in the United States; but they do give fair notice of a claim to analogous use. While Bestseller clearly sells millions of dollars worth of Jack & Jones branded clothing elsewhere in the world, it fails to allege any sales in the United States or to Americans. The closest Bestseller comes is saying this clothing "has been available to U.S. consumers through Bestseller's foreign customers and stores as well as through re-sales on eBay.com." Am. Compl.

¶ 14. This allegation does not imply any American sales at all, much less continuous commercial sales.

[17] By contrast, Bestseller actually does say it conducted "research and marketing for use of the mark within the United States." Am. Compl. ¶ 29. [FN8] The complaint does not say this marketing was sufficiently extensive to create an awareness of the Jack & Jones brand among American consumers, but it is reasonable to infer such an awareness from Bestseller's other allegations. Presumably, Bestseller will need to produce more substantial evidence if Fame contests this conclusion. In light of our conclusion that *Twombly* did not tighten the requirements for pleading, we need not consider whether it is convincing or plausible that Bestseller adopted the Jack & Jones mark in the United States. Simply put, the allegation of marketing in the United States, together with the inference of public association, is enough to give Fame fair notice of what it must contest. No more is required of a complaint.

### C

**\*10** Second, Bestseller claims Fame's application was void *ab initio* for lack of a bona fide intent to use the Jack & Jones mark in commerce. A bona fide intent is a statutory requirement of a valid trademark application under § 1(b), and the lack of such intent is therefore a ground on which Bestseller may oppose Fame's application. MC-CARTHY, *supra,* § 20:21, at 20-60; *see also Lipton Indus., Inc. v. Ralston Purina Co.,* 670 F.2d 1024, 1031 (C.C.P.A.1982) ("Standing having been established, petitioner is entitled to rely on any statutory ground which negates [applicant's] right to the subject registration.").

The TTAB has held § 1(b) to require both actual intent to use a mark in commerce and evidence, contemporary with the application, that objectively demonstrate such an intent. *Wet Seal, Inc. v. FD Mgmt., Inc.,* 82 U.S.P.Q.2d 1629, 1633 (T.T.A.B.2007) (actual intent); *Commodore Elecs. Ltd. v. CBM Kabushiki Kaisha,* 26 U.S.P .Q.2d 1503, 1507 (T.T.A.B.1993) (objective standard).

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

--- F.3d ----, 2008 WL 1932768 (D.C.Cir.)

**(Cite as: 2008 WL 1932768 (D.C.Cir.))**

We agree with this interpretation. The provision says "[a] person who has a bona fide intention, under circumstances showing the good faith of such person, to use a trademark in commerce" may apply to register the mark. 15 U.S.C. § 1051(b)(1). The phrases "bona fide" and "good faith" ordinarily refer to a person's actual, subjective state of mind. BLACK'S LAW DICTIONARY 177 (6th ed.1990); *see Howard v. SEC,* 376 F.3d 1136, 1145 (D.C.Cir.2004). Certainly a person will fail to have a "bona fide" intent to use a trademark if his actual intent is otherwise. In addition, "bona fide" means not fraudulent or feigned, BLACK'S LAW DICTIONARY, *supra,* at 177, and in some circumstances, showing a "bona fide" intent will actually require proving certain objective facts, *e.g. W. Air Lines, Inc. v. Criswell,* 472 U.S. 400, 412-14, 105 S.Ct. 2743, 86 L.Ed.2d 321 (1985) (under ADEA, a "bona fide occupational qualification" must be reasonably necessary). Here, Congress made clear that a "bona fide intent to use" also involves an objective standard by specifying there must be "circumstances showing ... good faith."

[18][19][20] Thus, an opposer may defeat a trademark application for lack of bona fide intent by proving the applicant did not actually intend to use the mark in commerce or by proving the circumstances at the time of filing did not demonstrate that intent. To state a claim on the latter ground, an opposer only has to notify the applicant of the general "circumstances, occurrences, and events" causing the flaw in the application. *Twombly,* 127 S.Ct. at 1965 n. 3. Although the complaint need not go into detail, it must at least notify the applicant of how the general circumstances fail to show intent. *Cf. Commodore Elecs.,* 26 U.S.P.Q.2d at 1507 (because under the objective standard, "the absence of any documentary evidence on the part of an applicant regarding such intent is sufficient to prove that the applicant lacks" a bona fide intent, an opposer need only allege that absence).

\*11 Bestseller's allegations certainly depict circumstances that belie Fame's good faith intent to sell

Jack & Jones jeans. Bestseller alleges it has used the Jack & Jones mark around the world, and it says the mark has become famous. It alleges Fame is a rival in the clothing industry around the world and particularly in Canada, where Bestseller began its North American market entry. Bestseller further alleges Fame knew Bestseller was planning to expand in the United States and planned to "thwart" that expansion. Finally, Bestseller claims Fame "has never used the Jack & Jones mark anywhere in the world" and "investigation reveals that it does not intend" to use it in the United States. Notably, despite how long Bestseller has been selling clothes under the brand, Fame filed its U.S. application for the mark immediately after Bestseller began preparing to sell its products in Canada.

Bestseller's allegations meet two necessary conditions. First, they indicate generally the circumstances that suggest Fame lacked a bona fide intent to use Jack & Jones. These circumstances do not *necessarily* indicate a lack of good faith, but we need not infer that lack because Bestseller directly alleged Fame simply wanted "to interfere with Bestseller's stated intention to use the mark," Am. Compl. ¶ 39. *See, e.g., Rochon v. Gonzales,* 438 F.3d 1211, 1220 (D.C.Cir.2006) (Title VII plaintiff need not "negate the FBI's alternative explanations for its actions," because the complaint alleged " 'the Government retaliated against me because I engaged in protected activity' "); *Sparrow v. United Air Lines, Inc.,* 216 F.3d 1111, 1117 (D.C.Cir.2000) (court must take as true employee's allegation that employer used his convictions as "a pretext for termination"). We assume that allegation to be true, and thus Bestseller has given Fame adequate notice of the claim it must defend.

D

[21] Finally, Bestseller's third claim rests on Fame's alleged misrepresentation to the PTO that Fame intended to use the Jack & Jones mark in commerce. The district court assumed this claim rested on District of Columbia law and, having dismissed all Bestseller's Lanham Act claims, dismissed its mis-

representation claim as well for lack of supplemental jurisdiction and for failure to state a claim. Bestseller disputes the dismissal but has consistently agreed the claim sounds in common law. Appellant's Reply Br. at 18-19; Oral Argument at 7:50-8:00. As an independent, non-statutory claim, it is not a basis for reversing the TTAB's decision or directing the PTO to grant or deny a trademark registration. *See Young,* 152 F.3d at 1378, 1380.

[22] A fraudulent misrepresentation claim should meet the requirements of particularity of Rule 9(b) of the Federal Rules of Civil Procedure, but we need not discuss the adequacy of Bestseller's allegations of fraud because Bestseller utterly fails to allege, indeed contradicts, the element of reliance. A plaintiff may recover for a defendant's fraudulent statement only if the plaintiff took some action in reliance on that statement. *See Va. Acad. of Clinical Psychologists v. Group Hospitalization & Med. Servs., Inc.,* 878 A.2d 1226, 1237-38 (D.C.2005). Rather than suggesting its own reliance, Bestseller says the PTO relied on Fame's alleged misrepresentation. Bestseller's only action in response to Fame's statement of an intent to use the mark appears to have been opposing Fame's application--an action that hardly suggests Bestseller detrimentally relied on that statement.

## IV

**\*12** In conclusion, the district court erred insofar as it dismissed any of the claims because Bestseller failed to raise them before the TTAB. Considering the pleadings on the merits, Bestseller stated two grounds for opposing Fame's application: likelihood of confusion with respect to the mark already used by Bestseller and lack of a bona fide intent to use the mark. With respect to the former, Bestseller adequately alleged priority only in the sense of its marketing of Jack & Jones clothing in the United States. The district court was correct to dismiss the third claim for common-law fraudulent misrepresentation, because Bestseller did not claim to have relied on Fame's supposedly false statement.

For these reasons, the judgment of the district court

is affirmed in part and reversed in part.

*So ordered.*

FN1. Throughout its filings, Appellant refers to itself as Bestseller, the name of its corporate parent. We follow the same convention.

FN2. We do not mean to suggest that we would not defer to the TTAB's findings of fact during § 21(b) review. After *Dickinson v. Zurko,* which prescribed "substantial evidence" review of the PTO's fact-finding in patent examinations, 527 U.S. 150, 119 S.Ct. 1816, 144 L.Ed.2d 143 (1999), some courts have applied that standard in trademark cases as well, *e.g. On-Line Careline, Inc. v. Am. Online, Inc.,* 229 F.3d 1080, 1085 (Fed.Cir.2000), in place of the older "thorough conviction" standard. We need not address this issue, because the TTAB granted summary judgment, making no findings of fact, and therefore the district court owed it no deference at all. *Material Supply,* 146 F.3d at 990.

FN3. *See, e.g., ACA Fin. Guar. Corp. v. Advest, Inc.,* 512 F.3d 46, 58 (1st Cir.2008) (*Twombly* gave 12(b)(6) "more heft"); *Iqbal v. Hasty,* 490 F.3d 143, 157-59 (2d Cir.2007) ("requiring not a universal standard of heightened fact pleading" but a "flexible 'plausibility standard' " under which "a conclusory allegation might ... need to be fleshed out ... [in] response to a defendant's motion for a more definite statement"); *Phillips v. County of Allegheny,* 515 F.3d 224, 234 (3d Cir.2008) (no probability requirement at the pleading stage); *Barclay White Skanska, Inc. v. Battelle Mem'l Inst.,* No. 07-1084, 2008 U.S.App. LEXIS 1916, at *9 (4th Cir. Jan. 29, 2008) (unpublished) (pleading only needs to give "fair notice"); *Lindsay v. Yates,* 498 F.3d 434, 440 n. 6 (6th Cir.2007) (concluding only that

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

--- F.3d ----, 2008 WL 1932768 (D.C.Cir.)

**(Cite as: 2008 WL 1932768 (D.C.Cir.))**

*Twombly* did not overrule *Swierkewicz*); *Airborne Beepers & Video, Inc. v. AT & T Mobility L.L. C.,* 499 F.3d 663, 667 (7th Cir.2007) ("*Twombly* did not signal a switch to fact-pleading"); *Stalley v. Catholic Health Initiatives,* 509 F.3d 517, 521 (8th Cir.2007) (plaintiff must allege facts "that affirmatively and plausibly suggest" he has the claimed right, not just "facts that are merely consistent with such a right"); *Skaff v. Meridien N. Amer. Beverly Hills, L.L.C.,* 506 F.3d 832, 842 (9th Cir.2007) (citing *Twombly* as instructing courts "not to impose such heightened [pleading] standards"); *Dudnikov v. Chalk & Vermilion Fine Arts, Inc.,* 514 F.3d 1063, 1070 (10th Cir.2008) (courts must "tak[e] as true all well-pled (that is, plausible, non-conclusory, and non-speculative) facts alleged in plaintiff's complaint"); *Watts v. Fla. Int'l Univ.,* 495 F.3d 1289, 1295- 96 (11th Cir.2007) (courts may not assess the probability of facts, but a plaintiff must "allege[ ] enough facts to suggest, raise a reasonable expectation of, and render plausible" his claim); *McZeal v. Sprint Nextel Corp.,* 501 F.3d 1354, 1357 (Fed.Cir.2007) (plaintiff need only "place [a defendant] on notice as to what he must defend").

FN4. Since a complaint has always had to meet this standard, it has never been literally true, as *Twombly* noted, that a complaint is adequate unless "no set of facts" consistent with the complaint could support a claim. **127 S.Ct. at 1968-70** (citing *Conley v. Gibson,* 355 U.S. 41, 45-46, 78 S.Ct. 99, 2 L.Ed.2d 80 (1957)). We have never accepted "legal conclusions cast in the form of factual allegations," *Kowal v. MCI Commc'ns Corp.,* 16 F.3d 1271, 1276 (D.C.Cir.1994), because a complaint needs *some* information about the circumstances giving rise to the claims.

FN5. Although Fame does not dispute the sufficiency of Bestseller's allegations of confusion, it does argue Bestseller fails to bring a § 2(d) claim at all because Bestseller failed to cite § 2(d). But so long as the basis for a claim is clear, a complaint need not "plead law" in specific detail. *Krieger v. Fadely,* 211 F.3d 134, 136 (D.C.Cir.2000).

FN6. If anything, Bestseller's argument is even weaker, since a second main motivation for the 1988 amendments was to eliminate the perceived unfairness of the § 44(d) and § 44(e) applications. Since foreign applicants were able to claim priority from their filing dates without actual use, Congress wanted domestic applicants to be able to do the same. S.Rep. No. 100-515, at 4-5.

FN7. Bestseller also demands priority as a matter of equity. Courts have no power to deny a pending trademark registration on this basis, because the registration procedure is a statutory construct. In the cases on which Bestseller relies, equity was a defense to infringement liability. *E.g. Manhattan Indus., Inc. v. Sweater Bee by Banff, Ltd.,* 627 F.2d 628, 630 (2d Cir.1980).

FN8. We continue to construe complaints liberally by interpreting ambiguous text in the complaint in the light most favorable to the plaintiff. *E.g. ACLU Found'n of S. Cal. v. Barr,* 952 F.2d 457, 472 (D.C.Cir.1991) ("The allegations ... although not framed in precisely these terms, could be interpreted to support such a cause of action."). Here, we take Bestseller to mean marketing *in* the United States.

--- F.3d ----, 2008 WL 1932768 (D.C.Cir.)

END OF DOCUMENT

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

**EXHIBIT 3**
**Part C**

Slip Copy                                                                    Page 1
Slip Copy, 2008 WL 239306 (N.D.Cal.), 36 NDLR P 86
(Cite as: 2008 WL 239306 (N.D.Cal.))

H

United States District Court,
N.D. California.
Lawrence CELANO, Richard Thesing, and William
Hefferon, Plaintiffs,
v.
MARRIOTT INTERNATIONAL, INC., a
Delaware corporation, Defendant.
**No. C 05-4004 PJH.**

Jan. 28, 2008.

Mark Andrew Chavez, Nance Felice Becker,
Chavez & Gertler LLP, Mill Valley, CA, Sidney M.
Wolinsky, Kevin Martin Knestrick, Disability
Rights Advocates, Kim E. Card, Law Offices of
Kim E. Card, Berkeley, CA, for Plaintiffs.

Gregory F. Hurley, Greenberg Traurig LLP, Irvine,
CA, Gerald L. Maatman, Jr., Seyfarth Shaw LLP,
Chicago, IL, for Defendant.

**ORDER GRANTING IN PART AND DENYING
IN PART PLAINTIFFS' MOTION FOR SUM-
MARY
JUDGMENT; DENYING DEFENDANT'S MO-
TION FOR SUMMARY JUDGMENT; VACAT-
ING PRETRIAL
AND TRIAL DATES**

PHYLLIS J. HAMILTON, District Judge.

*1 Plaintiffs' and defendant's motions for summary
judgment came on for hearing before this court on
December 12, 2007. Plaintiffs Lawrence Celano,
Richard Thesing, and William Hefferon
("plaintiffs") appeared through their counsel, Nance
F. Becker and Kevin Knestrick. Defendant, Marri-
ott International, Inc. ("defendant" or "Marriott")
appeared through its counsel, Gregory F. Hurley.
Having read the parties' papers and carefully con-
sidered their arguments and the relevant legal au-
thority, and good cause appearing, the court
GRANTS IN PART AND DENIES IN PART
plaintiffs' motion for summary judgment and
DENIES defendant's motion for summary judg-

ment.

**BACKGROUND**
This is a disability access case. Plaintiffs Celano,
Thesing, and Hefferon filed this proposed class ac-
tion arising under the Americans with Disabilities
Act ("ADA"), 42 U.S.C. §§ 12101 et seq., the Cali-
fornia Disabled Persons Act ("CDPA"), Cal. Civil
Code §§ 54 et seq., and California's Unruh Civil
Rights Act, Cal. Civil Code § 51. Plaintiffs allege
that defendant's failure to provide "accessible" or
"single-rider" golf carts to allow disabled persons
to play golf at defendant's courses violates these
provisions. Plaintiffs seek a declaration that Marri-
ott's policies are unlawful and an injunction requir-
ing defendant to provide single-rider carts at each
of its golf facilities. They do not seek damages.

Plaintiffs filed their original complaint in this court
on October 4, 2005, and amended their complaint
on October 18, 2006. All three plaintiffs require a
single-rider cart to play golf. Mr. Celano sustained
a spinal cord injury while serving in the United
States Army and must use a wheelchair; Mr. Thes-
ing suffers from a mobility disability due to a driv-
ing accident and must use a wheelchair; and Mr.
Hefferon has limited use of the left side of his body
due to a stroke. A single-rider cart is a specially-de-
signed golf cart that allows individuals with mobil-
ity impairments to hit the golf ball while seated in
the cart on a rotating swivel seat. The carts also
contain hand brakes and accelerators to allow mo-
bility-impaired users to drive them.

Marriott owns and operates twenty-six golf courses
throughout the United States. Plaintiffs contacted
several Marriott golf resorts expressing an interest
in playing at the resort's golf courses and requesting
a single-rider golf cart. Each plaintiff was told that
Marriott does not maintain single-rider carts at its
courses. Celano and Thesing then wrote letters to
Marriott complaining about the lack of single-rider
carts. In response, Marriott informed them that it
was not required by current ADA rules to maintain

single-rider golf carts. While Marriott informed plaintiffs that they could bring their own single-rider carts to its courses, plaintiffs claim this is impractical because: 1) the carts are too difficult to load on and off of a trailer; and 2) it is impracticable to bring their own carts when traveling out of state.

**\*2** On April 18, 2007, this court denied plaintiffs' motion for certification of a national class and a California subclass representing individuals with mobility disabilities who require an accessible golf cart. These summary judgment motions followed.

## DISCUSSION

### A. Summary Judgment Standard

Summary judgment is appropriate when there is no genuine issue as to material facts and the moving party is entitled to judgment as a matter of law. Fed.R.Civ.P. 56. Material facts are those that might affect the outcome of the case. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). A dispute as to a material fact is "genuine" if there is sufficient evidence for a reasonable jury to return a verdict for the nonmoving party. *Id.*

A party seeking summary judgment bears the initial burden of informing the court of the basis for its motion, and of identifying those portions of the pleadings and discovery responses that demonstrate the absence of a genuine issue of material fact. *Celotex Corp. v. Catrett,* 477 U.S. 317, 323, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). Where the moving party will have the burden of proof at trial, it must affirmatively demonstrate that no reasonable trier of fact could find other than for the moving party. On an issue where the nonmoving party will bear the burden of proof at trial, the moving party can prevail merely by pointing out to the district court that there is an absence of evidence to support the nonmoving party's case. *Id.* If the moving party meets its initial burden, the opposing party must then set forth specific facts showing that there is some genuine issue for trial in order to defeat the

motion. *See* Fed.R.Civ.P. 56(e); *Anderson,* 477 U.S. at 250.

"To show the existence of a 'genuine' issue, ... [a plaintiff] must produce at least some significant probative evidence tending to support the complaint." *Smolen v. Deloitte, Haskins & Sells,* 921 F.2d 959, 963 (9th Cir.1990) (quotations omitted). The court must view the evidence in the light most favorable to the non-moving party. *United States v. City of Tacoma,* 332 F.3d 574, 578 (9th Cir.2003). The court must not weigh the evidence or determine the truth of the matter, but only determine whether there is a genuine issue for trial. *Balint v. Carson City,* 180 F.3d 1047, 1054 (9th Cir.1999). If the nonmoving party fails to show that there is a genuine issue for trial, "the moving party is entitled to judgment as a matter of law." *Celotex,* 477 U.S. at 323. Regardless of whether plaintiff or defendant is the moving party, each party must "establish the existence of the elements essential to [its] case, and on which [it] will bear the burden of proof at trial." *Id.* at 322.

### B. Title III of the ADA

Plaintiffs' ADA claim arises under Title III of the ADA, which prohibits discrimination against disabled individuals in any place of public accommodation, and provides injunctive relief against private entities that discriminate against the disabled. 42 U.S.C. § 12182(a); *PGA Tour, Inc. v. Martin,* 532 U.S. 661, 674-75, 121 S.Ct. 1879, 149 L.Ed.2d 904 (2001). Damages are not recoverable under Title III of the ADA. *See* § 12188(a)(1); *Wander v. Kaus,* 304 F.3d 856, 858 (9th Cir.2002).

**\*3** An individual alleging discrimination under Title III must show that: (1) he is disabled as that term is defined by the ADA; (2) the defendant is a private entity that owns, leases, or operates a place of public accommodation; (3) the defendant employed a discriminatory policy or practice; and (4) the defendant discriminated against the plaintiff based upon the plaintiff's disability by (a) failing to make a requested reasonable modification that was

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

(b) necessary to accommodate the plaintiff's disability. *PGA Tour,* 532 U.S. at 683 n. 38. If the plaintiff makes such a showing, the defendant must make the requested modification unless it proves that doing so would alter the fundamental nature of its business. *See id.*

Title III applies to persons and entities "who own[ ], lease[ ] (or leases to), or operate[ ] a place of public accommodation." 42 U.S.C. § 12182(a). The Supreme Court has held that lessors and operators of golf courses, even those who do not own the facility and use the course for a limited period of time, are covered by the ADA. *See id.* at 677; *see also Disabled Rights Action Committee v. Las Vegas Events, Inc.* 375 F.3d 861, 873-74 (9th Cir.2004).

The determination as to whether a particular modification is "reasonable" and "necessary" involves a fact-specific, case-by-case inquiry that considers, among other factors, the effectiveness of the modification in light of the nature of the disability in question, and the cost to the organization that would implement it. *See Fortyune v. American Multi-Cinema, Inc.,* 364 F.3d 1075, 1083 (9th Cir.2004); *see also Wong v. Regents of the Univ. of Cal.,* 192 F.3d 807, 818 (9th Cir.1999).

## C. State Law Claims

### 1. California Disabled Persons Act (CDPA)

The CDPA provides that "[i]ndividuals with disabilities ... have the same right as the general public to the full and free use of ... public facilities, and other public places." Cal. Civ.Code § 54(a). Under the CDPA, "[i]ndividuals with disabilities or medical conditions have the same right as the general public to the full and free use of the streets, highways, sidewalks, walkways, public buildings, medical facilities, including hospitals, clinics, and physicians' offices, public facilities and other public places." Cal. Civ.Code § 54(a). Further, "[i]ndividuals with disabilities shall be entitled to full and equal access, as other members of the general public, to accom-

modations ... places of accommodation, amusement, or resort, and other places to which the general public is invited ..." Cal. Civ.Code § 54.1(a)(1). The CDPA incorporates by reference an individual's rights under the ADA. Cal. Civ.Code §§ 54(c), 54.1. Thus, a violation of the ADA also constitutes a violation of the CDPA. *See Pickern v. Best Western Timber Cove Lodge Marina Resort,* 194 F.Supp.2d 1128, 1130 (E.D.Cal.2002).

### 2. Unruh Act

The Unruh Civil Rights Act protects the right of California residents to "full and equal accommodations ... in all business establishments of every kind whatsoever." Cal. Civ.Code § 51(b). The Unruh Act provides that "[a]ll persons within the jurisdiction of this state are free and equal, and no matter what their sex, race, color, religion, ancestry, national origin, disability, or medical condition are entitled to the full and equal accommodations, advantages, facilities, privileges, or services in all business establishments of every kind whatsoever." Cal. Civ.Code § 51(b). In 1992, the Unruh Act was amended to provide that "[a] violation of the right of any individual under the Americans with Disabilities Act (Public Law 101-336) shall also constitute a violation of this section." Cal. Civ.Code § 51(f).

**\*4** The California Supreme Court has held that the Unruh Act prohibits only intentional discrimination. *Harris v. Capital Growth Investors XIV,* 52 Cal.3d 1142, 1175, 278 Cal.Rptr. 614, 805 P.2d 873 (Cal.1991) ("[W]e hold that a plaintiff seeking to establish a case under the Unruh Act must plead and prove intentional discrimination in public accommodations in violation of the terms of the Act."). However, *Harris* was decided prior to the 1992 amendment that added § 51(f). Thus, the question arose as to whether, as a result of the 1992 amendment, a showing of intentional discrimination was required in cases where the plaintiff predicated his Unruh Act claim on a showing that the defendant violated the ADA. In 2004, the Ninth Circuit held that "no showing of intentional discrimination

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

is required where the Unruh Act violation is premised on an ADA violation." *Lentini v. Cal. Ctr. for the Arts, Escondido,* 370 F.3d 837, 847 (9th Cir.2004).

**D. Parties' Motions**

**1. Summary of Motions**

**a. Plaintiffs**

In terms of plaintiffs' prima facie case of discrimination, plaintiffs note that each plaintiff is disabled as defined by the ADA. Second, they note that Marriott owns, leases, and/or operates twenty-six public golf facilities throughout the continental United States. Third, plaintiffs have alleged three theories in support of a discriminatory policy or practice, and have moved for summary judgment on all three theories including: (1) Marriott's failure to make reasonable accommodations under 42 U.S.C. § 12182(b)(2)(A) (ii); (2) Marriott's failure to remove barriers under 42 U.S.C. § 12182(b)(2)(A)(iv); and (3) Marriott's failure to provide auxiliary aids and services under 42 U.S.C. § 12182(b)(2)(A)(iv).

Turning to the fourth element, plaintiffs contend that Marriott has discriminated against them by failing to make accessible golf carts available to would-be seated golfers at Marriott-managed resorts. They argue that this modification is reasonable because it would enable each of the plaintiffs to play at Marriott courses that they are otherwise unable to, and that in terms of finances, the modification is eminently reasonable given Marriott's operational budget. In support of the modification's reasonableness, plaintiffs note that since their filing of this lawsuit, Marriott has implemented a pilot project of introducing the golf carts at the four courses it owns. Plaintiffs also argue that accessible carts are necessary because plaintiffs are unable to play otherwise. They note that many disabled golfers don't own their own accessible carts, and that if they do, it is not feasible for them to transport the carts to Marriott's courses given their disabilities.

In opposition to plaintiffs' motion, Marriott raises two issues that are not raised in its own motion, including that Federal Rule of Civil Procedure 19 requires joinder of the owners of the golf courses operated, but not owned by Marriott, because the owners will have to pay for the accessible carts and could be subjected to liability if there are safety issues with the carts. Marriott also argues that it is impractical for the court to grant the injunctive relief plaintiffs seek because the relief is infeasible.

**b. Marriott**

**\*5** In its motion, Marriott contends that it is entitled to judgment on several grounds. Preliminarily, Marriott argues that plaintiffs lack standing, and that alternatively, plaintiffs' claims are rendered moot because Marriott has made accessible golf carts available at the four courses it owns.

As for the merits of plaintiffs' ADA claim, Marriott argues that plaintiffs cannot rely on the general anti-discrimination provisions of the ADA for their claim, and that the ADA and its implementing regulations do not require golf courses to purchase single-rider carts. Marriott further contends that it does not discriminate against disabled golfers because it allows them to bring their own accessible carts and because it makes other accommodations on courses that it owns and operates.

Marriott also argues that the accommodations plaintiffs request are not required by the ADA because the carts constitute "personal devices," and do not constitute auxiliary aids. Finally, Marriott contends that the accommodation plaintiffs request is not required because it constitutes a direct threat to the health and safety of others, and argues that there is evidence that the carts may be unsafe and that Marriott is still in the process of evaluating their safety with its pilot program.

As for plaintiffs' state law claims, Marriott argues that this court should decline to exercise jurisdiction over them.

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

**2. Analysis**

Because many of the issues raised by the parties' summary judgment motions are overlapping, the court addresses together the common issues. It addresses first the issues preliminary to the merits, then the issues pertinent to the merits of the ADA claim, and finally, the state law claims raised by plaintiffs.

**a. Preliminary Issues**

**i. Mootness**

On August 14, 2006, Marriott instituted a pilot program at the four golf courses that it owns, by which it leased at least one single-rider golf cart with a stand-up seat, the EZ Go Eagle, in order to determine the level of demand for such carts and their safety. Marriott argues that its remedial efforts render plaintiffs' ADA claim moot.

In opposition, plaintiffs argue that their ADA claim is not moot because Marriott's pilot program is limited to the courses it owns, and has not been implemented at the facilities they manage and/or operate. Plaintiffs further cite to extensive evidence that, at the courses that it operates, Marriott actively directs and controls the decision regarding whether a course is, or is not, accessible to the mobility-impaired. Plaintiffs also note that the pilot project is just that--a "pilot" project, and that there is no guarantee that Marriott will continue with the project. Marriott did not respond to plaintiffs' arguments in its reply.

The court concludes that Marriott's pilot program does not render plaintiffs' ADA claim moot, and DENIES Marriott summary judgment on this basis. First and significantly, under the ADA, an *operator* of a facility is liable under the ADA as well. *See Lentini,* 370 F.3d at 849; *Las Vegas Events,* 375 F.3d at 861. Marriott concedes that it has not implemented the pilot program at the twenty-two courses that it operates. Second, by its own concession, Marriott has suggested that the pilot program at the

courses it owns may be temporary.

**ii. Plaintiffs' Standing**

**\*6** Marriott also argues that plaintiffs lack standing because they cannot establish that they attempted to visit all twenty-six of its owned and operated golf courses, for which they seek relief, and thus they were not personally knowledgeable of all of the alleged barriers they might face and/or all of Marriott's discriminatory policies and practices at all of its courses. It contends that the only course plaintiffs actually attempted to play was Camelback in Arizona, a Marriott-owned course, and notes that the Camelback course now offers accessible carts in conjunction with the pilot program. Marriott also argues that plaintiffs lack standing because they visited the Camelback golf course for the sole purpose of filing a lawsuit.

Plaintiffs respond that it is enough that Marriott's nationwide policies deterred them from visiting or patronizing its owned and operated golf courses, and that they were not required to physically attempt to play all of its golf courses. Plaintiffs note that they each have a mobility disability which requires an accessible cart, that each asked Marriott to provide an accessible cart, and that each was told that Marriott would not accommodate the request. They contend that this was enough to deter them from playing Marriott's courses, and that there was no need for them to subsequently physically attempt to play or visit the courses. Plaintiffs further note that Marriott's policies regarding accessible golf carts are identical at all of the courses that it owns and/or operates.

To satisfy Article III's case or controversy requirement, plaintiffs need to show that: (1) they have suffered an "injury in fact," an invasion of a legally protected interest which is (a) concrete and particularized, and (b) actual or imminent, not conjectural or hypothetical; there must be a causal connection between the injury and the conduct complained of, or in other words, that the injury is traceable to Marriott's challenged actions; and (3) that the injury

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

Slip Copy
Slip Copy, 2008 WL 239306 (N.D.Cal.), 36 NDLR P 86
**(Cite as: 2008 WL 239306 (N.D.Cal.))**

can be redressed by a favorable decision. *Doran v. 7-Eleven, Inc.,* 506 F.3d 1191, 1195 (9th Cir.2007).

In the context of injunctive relief, a plaintiff must additionally demonstrate "a sufficient likelihood that he will again be wronged in a similar way[.]" *Fortyune,* 364 F.3d at 1081. That is, he must establish a "real and immediate threat of repeated injury." *Id.* While "past wrongs do not in themselves amount to [a] real and immediate threat of injury necessary to make out a case or controversy," *Lyons,* 461 U.S. at 103, "past wrongs are evidence bearing on whether there is a real and immediate threat of repeated injury." *Id.*

> In terms of standing to assert a claim under the ADA, the Ninth Circuit has held that a disabled individual who is currently deterred from patronizing a public accommodation due to a defendant's failure to comply with the ADA has suffered "actual injury." Similarly, a plaintiff who is threatened with harm in the future because of existing or imminently threatened non-compliance with the ADA suffers "imminent injury."

*\*7 Pickern v. Holiday Quality Foods Inc.,* 293 F.3d 1133, 1138 (9th Cir.2002).

The court concludes that all three plaintiffs have standing to bring their ADA claim as to all twenty-six of Marriott's courses nationwide, owned and/or operated, and DENIES Marriott summary judgment on this basis. It is unnecessary that plaintiffs *actually* visit each of the golf courses to have been deterred from playing there. *See id; see also Doran,* 506 F.3d at 1195-96. All three plaintiffs have attempted to arrange tee times at numerous Marriott courses, but have been unable to play because Marriott advised them that it did not provide accessible carts. Additionally, all three plaintiffs have demonstrated that they require accessible carts to play golf, and that they regularly play golf on non-Marriott courses where accessible carts are available. Finally, all three plaintiffs indicate a sufficient interest to play on Marriott courses nationwide.

Given the fact that the three plaintiffs have demonstrated a sufficient desire to play on Marriott courses and knowledge of the fact that by virtue of its national corporate policy, Marriott does not supply accessible carts, Marriott's argument that these mobility-impaired plaintiffs actually have to show up in person at the courses in order to have standing to assert the ADA claim here flies in the face of established ADA law, under which deterrence alone provides a sufficient injury in fact. *See Pickern,* 293 F.3d at 1138. Additionally, given the fact that Marriott's pilot program is temporary, and that it still operates courses that do not provide accessible carts, future injury is also imminent. *See id.* Finally, there is also sufficient evidence that plaintiffs' injuries would be redressed by a favorable decision because they have all attested that they would play at Marriott courses if provided with accessible carts.

### iii. Joinder of Owners

In its opposition to plaintiffs' motion, Marriott contends that the owners of the golf courses that it manages or operates must be joined under Federal Rule of Civil Procedure 19. It does not, however, specify the relief that it is seeking based on plaintiffs' alleged Rule 19 violation, other than to note that it is plaintiffs' burden to join all necessary parties.

Marriot argues that under all of its management agreements, the purchase of an accessible cart would constitute a capital improvement that must be paid for by the *owner.* It asserts that is the reason that it has implemented the pilot program only at the courses that it owns. Marriott further argues that the owners must be joined based on their potential liability for any accidents involving the accessible carts.

In reply, plaintiffs note that under Marriott's management agreements, Marriott reserves the right and responsibility to comply with the law, and guarantees owners that their properties will be managed in accordance with uniform Marriott standards. They note that Marriott receives revenue in the millions simply for its provision of expertise in the manage-

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

ment of the golf courses, and that decisions regarding accessibility are inherent in management. Plaintiffs further note that the evidence shows that it is in fact Marriott and its employees that decide what equipment to provide at the managed courses, what fees to charge, and what policies govern access to the courses. Plaintiffs argue that regardless of who actually pays for the lease of a golf cart, Marriott is the party that has made the decision not to make accessible golf carts available, and that it is *Marriott's* discriminatory policy that is at issue here. Plaintiffs additionally argue that joinder of the owners is unnecessary because a judgment against Marriott would not alter its contracts with golf course owners. Plaintiffs further contend that joinder of the owners is impractical because there are over a dozen different entities that own the courses.

**\*8** Federal Rule of Civil Procedure 19 provides in pertinent part:

(a) Persons Required to Be Joined if Feasible.

(1) *Required Party.* A person who is subject to service of process and whose joinder will not deprive the court of subject-matter jurisdiction must be joined as a party if:

(A) in that person's absence, the court cannot accord complete relief among existing parties; or

(B) that person claims an interest relating to the subject of the action and is so situated that disposing of the action in the person's absence may:

(i) as a practical matter impair or impede the person's ability to protect the interest; or

(ii) leave an existing party subject to a substantial risk of incurring double, multiple, or otherwise inconsistent obligations because of the interest.

The Ninth Circuit has held that under Rule 19(a), a party may be "necessary" in one of two ways. *Las Vegas Events, Inc.* 375 F.3d at 879. First, under Rule 19(a)(1)(A), a party is deemed "necessary" if complete relief cannot be granted in its absence. [FN1] *Id.* "This factor is concerned with consummate rather than partial or hollow relief as to those already parties, and with precluding multiple lawsuits on the same cause of action." *Id.* (quoting

*Northrop Corp. v. McDonnell Douglas Corp.,* 705 F.2d 1030, 1043 (9th Cir.1983)). In conducting the Rule 19(a)(1) (A) analysis, the court asks whether the absence of the party would preclude it from fashioning meaningful relief as between the parties. *Id.* Rule 19(a)(1)(B), by contrast, focuses on whether the absent party's participation is necessary to protect its legally cognizable interests or to protect other parties from a substantial risk of incurring multiple or inconsistent obligations because of those interests. *See* Fed.R.Civ.P. 19(a)(1)(B)(i) & (ii).

> FN1. On December 1, 2007, Rule 19 was amended. Previously, the predecessor to Rule 19(a)(1)(A) was found at Rule 19(a)(1); and the current version of Rule 19(a)(1)(B) was found at Rule 19(a) (2). Those sections of Rule 19, although relabeled, remain substantively the same.

The Ninth Circuit recently addressed a similar issue in *Las Vegas Events, Inc.* 375 F.3d at 861. In *Las Vegas Events,* plaintiffs brought a claim under the ADA alleging that disabled persons had been subjected to discriminatory access based on the defendant's operation of a rodeo. Defendants were private entities that staged the rodeo at a Las Vegas arena, publicly-owned by the University System, a subentity of the State of Nevada. *Id.* Defendants moved to join the University System as a necessary party pursuant to Rule 19. *Id.* The district court concluded that the University System was a necessary and indispensable party because it was the entity that owned and operated the arena, and that complete relief among existing parties was not possible because enforcement of any judgment would require the cooperation of the University System.

The Ninth Circuit reversed and remanded, concluding that the University System was not a necessary party under Rule 19. The court noted that "the district court entirely failed to consider whether remedies not requiring [the] University System's cooperation would provide meaningful relief." *Id.* at 879. The court considered the limitations of the

leasing agreement between the private entity and the public owner, noting that the lease "does not prevent [the private entity] from taking action to make the [r]odeo accessible to the degree possible within the scope of its lease...." *Id.* at 880. The court also found that the district court could grant meaningful relief by enjoining the private entities from making "certain kinds of operational decisions regarding conditions over which they have control." *Id* .

**\*9** Here, like the defendants in *Las Vegas Events,* Marriott, under its management agreements with the owners, is exclusively responsible for the operation and management of the golf courses, including the decision whether or not to allow accessible carts on the courses, and whether or not to provide accessible carts to the public. At the December 12, 2007 hearing, Marriott was unable to advance a persuasive reason as to why the accessible golf carts would or should be treated differently than any other capital expenditure under Marriott's management agreement, and conceded that it was not necessary for Marriott to obtain an owner's approval for other capital expenditures, such as the acquisition of riding lawn mowers. Moreover, Marriott's concern regarding the an owner's potential liability based on its acquisition of accessible carts at the courses it operates is extremely suspect given that Marriott was the one to establish the current policy by which disabled golfers may utilize their own accessible carts on courses owned *and operated by Marriott.* If owner liability based on alleged safety risks unique to accessible carts was really an issue, then such potential liability would seemingly undermine Marriott's current policy. Accordingly, the court concludes that joinder of owners is not required under Rule 19(a)(1)(A) or (B). The court addresses in more detail the alleged safety risks associated with accessible carts in its discussion of the merits of plaintiffs' ADA claim.

**b. ADA Claim**

**i. Whether Plaintiffs' May Rely on ADA's General Anti-Discrimination Provisions in the Ab-**

**sence of DOJ Regulations**

When the ADA was enacted, the Attorney General was instructed to establish standards to guide businesses, service providers, employers, and governmental entities in complying with Title III of the statute. *See* 42 U.S.C. § 12186(b) (directing the Attorney General to "issue regulations ... to carry out the provisions of" Title III). Congress further provided that these implementing regulations must be consistent with the minimum guidelines issued by the Architectural and Transportation Barriers Compliance Board ("the Access Board"), an independent federal agency charged with issuing guidelines to ensure that public accommodations are accessible to individuals with disabilities. *See* 42 U.S.C. § 12186(c). In 1991, to fulfill the § 12186(b) mandate, the Department of Justice ("DOJ") adopted the ADA Accessibility Guidelines ("ADAAG") issued by the Access Board as its own regulations. *See* 28 C.F.R. Part 36.

The Access Board subsequently began the process of comprehensively amending ADAAG in 1994. In 2004, the Access Board published a final rule revising ADAAG. The revised ADAAG still have not been finally adopted by the DOJ, though. [FN2] In terms of golf courses, the revised ADAAG require that all newly constructed or altered golf courses have accessible routes connecting all "accessible elements and spaces within the boundary of the golf course" and that teeing grounds and putting greens "shall be designed and constructed so that a golfer can exit." 67 Fed.Reg. 56375. The Access Board, however, did not include a provision in the revised ADAAG requiring that accessible golf carts be provided. The Access Board noted that this omission was because the Board's jurisdiction was limited to the physical environment--e.g., the design and construction of golf courses--as opposed to operational issues. 69 Fed.Reg. 58768, 58774.

> FN2. Until the DOJ's currently pending rulemaking regarding adoption of the revised ADAAG is complete, the revised ADAAG are effective only as guidance to

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

the DOJ. 69 Fed.Reg. 58768. They have no legal effect on the public. 69 Fed.Reg. 58768.

**\*10** Subsequently, on September 30, 2004, the DOJ issued an "Advanced Notice of Proposed Rulemaking" (ANPRM) to begin the process of revising the DOJ's ADA regulations to adopt standards consistent with the revised ADAAG published by the Access Board on July 23, 2004. 69 Fed.Reg. 58768. In the ANPRM, the DOJ noted that it was considering the issue of accessible golf carts under the ADA even though the issue was not addressed by the revised ADAAG. The ANPRM provides in pertinent part:

Recreation Facilities: Golf Courses

ADAAG now establishes comprehensive requirements for the design and construction of accessible golf courses. In addition to establishing scoping and technical requirements for individual elements in or serving the golf course, section 206.2.15 provides that--

At least one accessible route shall connect accessible elements and spaces within the boundary of the golf course. In addition, accessible routes serving golf car rental areas; bag drop areas; course weather shelters complying with 238.2.3; course toilet rooms; and practice putting greens, practice teeing grounds, and teeing stations at driving ranges complying with 238.3 shall comply with Chapter 4 except as modified by 1006.2.

EXCEPTION: Golf car passages complying with 1006.3 shall be permitted to be used for all or part of accessible routes required by 206.2.15.

The Department anticipates that it will propose to adopt the ADAAG requirements for golf courses. However, the Department is aware that these requirements may raise operational issues that are within the purview of the Department's enforcement responsibilities.

The Department has been asked whether, and under what circumstances, a golf course must make specially designed or adapted golf cars available to persons with mobility impairments who are not able to walk from a golf car passage to the fair-

ways or to the green.

The Department is considering addressing this issue in its ADA regulations by requiring each golf course that provides golf cars to make at least one, and possibly two, specialized golf cars available for the use of persons with disabilities, with no greater advance notice to be required from the disabled golfer than from other golfers. The Department believes that relevant considerations in determining whether and under what circumstances this requirement should be imposed include (i) whether the golf course makes golf cars available to golfers who are not disabled, (ii) the burden that such a requirement would impose on golf course facilities, and (iii) whether the course requires the use of golf cars during play.

The Department understands that the principal type of special golf car 15 currently available is a one-seater with hand controls and a swivel seat (the swivel seat enables the golfer to play from the car). Golf course operators have expressed concern in the past that the available one-person cars (i) tip over easily on steep terrain and (ii) are too heavy for green use. Producers of newer designs for one-person cars claim to have overcome these problems.

**\*11** 69 Fed.Reg. 58768.

The September 30, 2004 ANPRM was simply the first of three steps in the regulatory process. Proposal to Issue Revised ADA Design Standards, http:// www.ada.gov/proposal.htm (last visited January 23, 2008). The ANPRM must still be followed by a notice of proposed rulemaking ("NPRM"), and then a final rule. Id.

Marriott argues that because there is currently no DOJ regulation in effect requiring accessible carts, plaintiffs have no ADA claim. In support, it asserts that plaintiffs cannot simply rely on the ADA's general anti-discrimination provisions, noting that the specific ADA provisions should govern the general. Marriott further argues that even if plaintiffs may bring an ADA claim in the absence of a controlling DOJ regulation, this court should not rule on the

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

claim given the pending DOJ rulemaking. It contends that plaintiffs brought the instant lawsuit because they were unsuccessful before the DOJ and the Access Board, and that they seek to preempt the pending DOJ rulemaking, and to have the court "make" the specific regulations instead. It contends that it is concerned that the DOJ may incorporate a standard that conflicts with any relief this court may order.

Plaintiffs respond that the ADA does not proscribe only those discriminatory practices that have been catalogued in the ADA, the ADAAG, and/or the DOJ regulations, but prohibits all practices which deprive individuals with disabilities from participating on an equal basis in recreational opportunities. Plaintiffs contend that the general anti-discrimination provisions of the ADA apply in the absence of *express* applicable regulations and/or guidelines, and note several cases in which courts have allowed claims to proceed despite the absence of controlling regulations. Plaintiffs thus argue that even if the current guidelines do not *expressly* require single-rider carts, the existing law and regulations should be interpreted to require them.

Plaintiffs further argue that Marriott should not be allowed to hide behind the protracted DOJ rulemaking in order to shirk its current legal responsibilities. They assert that the DOJ's ongoing rulemaking process "neither nullifies the existing regulations for public accommodations nor eviscerates the broad anti-discrimination provisions of the ADA." Plaintiffs additionally contend that Marriott's argument, taken to its logical extension, would prohibit adjudication of disputes involving numerous aspects of life, given that in its ongoing ADA rulemaking process, the DOJ is also considering rules affecting correctional facilities, homeless shelters, halfway houses, office buildings, and hospitals, among others. [FN3]

> FN3. Plaintiffs also argue that there is strong evidence that the DOJ, via its rulemaking, is going to require accessible golf carts. They point to the ANPRM itself,

along with a November 2002 settlement agreement between the DOJ and City of Indianapolis, in which the DOJ required the city to purchase and maintain two accessible golf carts, to notify golfers that such carts were available, and to maintain records of the use of such carts. Plaintiffs also point to the Department of Interior's ("DOI") opinion that accessible golf carts are a "reasonable modification" which *public* golf courses that provide standard golf carts must also provide. Knestrick Decl., Exh. BB, CC. Additionally, they note that the Department of Defense ("DOD") has announced its intention to purchase accessible golf carts at all of the 174 golf courses it operates on military bases. Knestrick Decl., Exh. O. However, as discussed *infra,* the court found it unnecessary to consider this evidence in ruling on the issue.

In cases where the Department of Justice has issued implementing regulations, based on ADAAG, and the ADA itself is silent or ambiguous with regard to the specific issue covered by the regulations, "the court must defer to the agency's answer [if it] is based on a permissible construction of the statute." *Las Vegas Events, Inc.,* 375 F.3d at 876. However, where ADAAG and the DOJ's implementing regulations do not articulate a particular standard for a particular facility (e.g., a golf course or a movie theater), the covered entity should nevertheless attempt to follow ADAAG to the greatest extent possible. Anne Marie Estevez & Beth S. Joseph, Public Accommodations Under the Americans with Disabilities Act, § 2:6 (West 2007 ed.); *see also Las Vegas Events,* 375 F.3d at 875-76.

**\*12** In *Fortyuna,* the Ninth Circuit rejected the very argument made by Marriott in this case: "that ADA plaintiffs must prove that the defendant contravened a 'specific requirement of ADAAG' to establish a violation of the ADA." 364 F.3d at 1085. Marriott's attempt to distinguish this case from *Fortyuna* based on the fact that the DOJ is currently

Slip Copy, 2008 WL 239306 (N.D.Cal.), 36 NDLR P 86
**(Cite as: 2008 WL 239306 (N.D.Cal.))**

in the middle of the rulemaking process is unpersuasive since the ANPRM has no legal effect until the final rulemaking is complete. *See* 69 Fed.Reg. 58768. Accordingly, the court concludes that plaintiffs' ADA claim may go forward as a general ADA anti-discrimination claim in the absence of specific ADAAG standards or other DOJ implementing regulations. *See id.*

The pending DOJ rulemaking, which is far from final, does not prohibit the court from ruling on the ADA claim. The question, therefore, is not whether the court *can* act on plaintiffs' ADA claim in light of the current DOJ rulemaking proceedings, but whether it *should* act. It is unclear when the DOJ will issue a final regulation. However, given that it is currently 2008, the ANPRM was issued in 2004, and the DOJ has yet to issue even an NPRM, let alone a final rule, it appears that a final regulation may still be years away. Given this delay, and the fact that the final DOJ regulation ultimately may not even address the issue raised by plaintiffs in this case, the court declines to stay the proceedings indefinitely to wait for *possible* DOJ guidance. Additionally, the court sees no reason at this stage to "guess" the final outcome of the pending DOJ rulemaking proceedings, and therefore has not considered plaintiff's evidence regarding the DOJ/ Indianapolis settlement, and the DOI and DOD policies, objected to by Marriott.

Marriott's motion for summary judgment is therefore DENIED on the above grounds.

### ii. Whether Marriott's Current Policy Discriminates Against Mobility-Impaired Golfers

Marriott argues that its current policy, which allows disabled golfers to play from their own assistive device, including their own accessible cart if they have one and are able to transport it to the course, to bring an assistant to ride the course with them, and to play from a standard cart under a medical flag, sufficiently accommodates mobility-impaired golfers and is non-discriminatory. *See* Nault Decl., Exh. T.

Plaintiffs respond that this policy is discriminatory because it places them, disabled golfers, in a distinctly unequal situation from their able-bodied counterparts. Plaintiffs contend that it is simply not possible for them to play at Marriott's courses under Marriott's current policy. First, plaintiffs note that they require an accessible cart to play golf because the carts enable them to operate the accelerator and brake by hand. Additionally, as noted, accessible carts feature swivel seats that allow plaintiffs to get into a hitting position to swing and strike a golf ball while remaining seated or strapped into the cart.

**\*13** Plaintiffs are unable to get in and out of a standard cart, and are thus unable to play using a standard cart, even under a medical flag. Two of the three plaintiffs are unable to stand or walk, and one is unable to get in and out of a standard cart due to ensuing pain. Additionally, plaintiffs note that they are not able to simply golf from their wheelchairs, and assert that the fact that a few mobility-impaired golfers may have the ability to wheel themselves around the golf course and hit the ball from their wheelchair does not change the fact that plaintiffs require the accommodation of an accessible cart.

Furthermore, plaintiffs note that it is also not feasible for them to simply transport their own carts to Marriott courses because they are physically unable to load the carts on and off of a trailer, as required for transport. Moreover, assuming plaintiffs were physically capable of transporting the carts, which they are not, they would still be prevented from playing at non-local courses, including on vacation and/or at business conventions, where they did not actually tow the accessible cart to the course.

Although Marriott refers to anecdotal evidence of other disabled golfers who are able to golf in accordance with its current policy, it does not dispute that plaintiffs require an accessible golf cart in order to play golf at its courses, or that plaintiffs are physically unable to transport their own accessible carts to the Marriott golf courses they desire to play.

Title III of the ADA outlaws not just intentional discrimination but also certain practices that have a disparate impact upon persons with disabilities even in the absence of any conscious intent to discriminate. *Indep. Living Res. v. Or. Arena Corp.,* 1 F.Supp.2d 1159, 1169 (D.Or.1998); *see also Forty-une,* 364 F.3d at 1080. Thus, a public accommodation may not "utilize standards or criteria or methods of administration that have the *effect* of discriminating on the basis of disability, or that perpetuate the discrimination of others who are subject to common administrative control." 28 C.F.R. § 36.204 (emphasis added); *see also Indep. Living Res. v. Or. Arena Corp.,* 982 F.Supp. 698, 733 (D.Or.1997) ("the ADA requires more than merely refraining from active discrimination...., [t]he operator of a public accommodation may also be required to take affirmative steps to ensure that the 'opportunity' to patronize the facility is a meaningful one").

Within reason, a public accommodation may be required to modify its policies, practices, or procedures to mitigate any disparate impact upon persons with disabilities. 28 C.F.R. § 36.302(a). Public accommodations must also take affirmative measures to ensure that such persons have an equal opportunity to participate in or benefit from the goods, services, facilities, privileges, advantages, or accommodations that are available from that public accommodation. 42 U.S.C. § 12182; 28 C.F.R. §§ 36.202(b), 36.201(a); *see also Indep. Living,* 982 F.Supp. at 733 ("[a]s a general rule, the objective of Title III is to provide persons with disabilities who utilize public accommodations *with an experience that is functionally equivalent to that of other patrons,* to the extent feasible given the limitations imposed by that person's disability") (emphasis added).

**\*14** Marriott's current policy does not provide plaintiffs, mobility-impaired golfers, with an experience that is functionally equivalent to that of other non-disabled golfers. Plaintiffs here have presented overwhelming evidence that they are unable to golf

at Marriott's courses under the current policy. By contrast, non-disabled golfers can simply show up at the course and Marriott will provide them with a functional cart as part of the cost of their round of golf. Accordingly, Marriott provides golf carts for able-bodied golfers, but does not provide accessible carts for mobility-impaired golfers like plaintiffs. Because Marriott's policy places plaintiffs in a distinctly unequal situation, as compared to their able-bodied counterparts, it is discriminatory under the ADA.

**iii. Whether Plaintiffs' Proposed Accommodation Constitutes an Undue Burden on Marriott because it Poses a "Direct Threat"**

Even though plaintiffs are able to establish a prima facie case of discrimination, Marriott's failure to make modifications will not constitute discrimination if it "can demonstrate that making such modifications would fundamentally alter the nature of such goods, services, facilities, privileges, advantages, or accommodations." 42 U.S.C. § 12182(b)(2)(A)(ii); *see Lentini,* 370 F.3d at 843-844. Whether an accommodation fundamentally alters a service or facility is an affirmative defense, and is "an intensively fact-based inquiry." *Id.; see also PGA Tour,* 532 U.S. at 683-85 (holding that a golf course's prohibition of golf carts was "not an essential attribute of the game itself" and was "not an indispensable feature of tournament golf either," and therefore that allowing Casey Martin to use a golf cart would not be a fundamental alteration). Additionally, Marriott is not required to make a modification or alteration, where allowing a disabled individual "to participate in or benefit from goods, services, facilities, privileges, advantages, or accommodations ... [would] pose[ ] a direct threat to the health or safety of others." 42 U.S.C. § 12182(b)(3).

Marriott raised a direct threat defense in its motion papers. It argued that the accessible carts requested by plaintiffs present an undue burden because they would result in a direct threat to the safety of other golfers. However, on the record at the December

Slip Copy, 2008 WL 239306 (N.D.Cal.), 36 NDLR P 86
**(Cite as: 2008 WL 239306 (N.D.Cal.))**

12, 2007 hearing, counsel for Marriott suggested that although Marriott had not argued that the acquisition of accessible carts would alter the nature of the services it provided, thus raising a fundamental alteration defense "per se," that such a defense could simply be considered a continuum of its undue burden defense, as far as the cost and potential liability posed by the modification were concerned. Marriott's counsel subsequently conceded, though, that its liability argument was tied to its concerns regarding the safety of the accessible carts, and also conceded that the financial cost of the proposed modification was "minimal." Accordingly, as noted on the record, the court finds that to the extent that Marriott challenges the safety of the accessible carts, it is really raising only a direct threat defense, and *not* a fundamental alteration defense, a conclusion that is further supported by review of the arguments made by Marriott in its papers.

**\*15** In support of its direct threat defense, Marriott contends that it is not clear that the accessible carts are safe, and that the DOJ is still evaluating their safety in conjunction with the currently pending rulemaking. Marriott also asserts that one of the reasons it instituted its pilot program was to enable it to competently respond to the DOJ's inquiries regarding the rulemaking. It argues that until accessible carts are subjected to an independent safety standard and their safety is reviewed by the DOJ, this court should not order such an accommodation.

In support, Marriott cites to a May 18, 2005 letter from the National Golf Car Manufacturers Association (NGCMA) written in response to the DOJ's request for comments on the pending rulemaking, in which the NGCMA concluded that "until and unless single rider so-called 'adaptive' golf cars are subjected to rigorous safety testing and are the subject of their own American National Standards Institute (ANSI) ... sanctioned safety and performance standard, they should not be mandated by DOJ for either purchase or use on golf courses." Hurley Decl., Exh. L. The NGCMA notes that there have been

roll-over concerns because the carts may tip on steep terrain, and also concerns regarding the sun protection provided by the accessible carts. *Id.*

Marriott also submitted a declaration from Tom Houston, the chairperson of the ANSI standards committee for accessible cars and a member of the National Alliance for Accessible Golf (NAAG), who attests to two accidents of which he is aware involving accessible carts. One involved a roll-over, and the other involved a golfer who backed her accessible cart into a lake, and who claimed she would have drowned if she had been strapped into the accessible cart as recommended.

In support of its safety concerns, Marriott also submitted an April 2001 recall alert from one of the accessible cart manufacturers, in which the manufacturer recalled the car because "its software can be corrupted by static electricity allowing it to move forward without assistance." Hurley Decl., Exh. N. The alert noted that the manufacturer "received one report of a showroom golf cart that continued to operate after it was turned off," but that "no injuries have been reported." *Id.*

Finally, Marriott cites to safety concerns it learned during the course of discovery, including that the carts require that golf clubs be mounted in front of the driver's face or chest, which, according to Marriott, could potentially obstruct the driver's view and also pose a risk that the clubs be propelled back into the driver's face or body. Hurley Decl., Exh. R.

Plaintiffs respond that Marriott's safety concerns are bogus. They argue that the direct threat exception is inapplicable here because Marriott's concerns are merely speculative. Specifically, plaintiffs contend that the absence of ANSI standards governing accessible carts does not mean that the carts are unsafe. They note that ANSI standards are voluntary, the product of negotiation, and that, indeed, one model of an accessible cart, the Solorider, has been tested against and passed applicable ANSI standards. Pretekin Decl., ¶ 3; Thesing Decl., ¶¶

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

6-10.

**\*16** Plaintiffs further contend that accessible carts are no more dangerous than standard carts, and note that standard carts utilized by Marriott have been recalled for much more serious problems than the accessible cart recall cited by Marriott. Knestrick Oppos. Decl ., Exh. K. Plaintiffs also note that there has never been a report of any significant personal injury connected with the use of an accessible cart throughout their twenty years of use. McGovern Decl. ¶ 20. They argue that there is no reason to believe that a first-time user of an accessible cart is any less experienced with that cart than the first-time driver of a standard cart is with his/her standard cart.

Finally, plaintiffs suggest that Marriott's safety concerns are not genuine given the fact that Marriott expressly allows disabled golfers to bring their own accessible carts to all of its courses.

A "direct threat," is defined as "a significant risk to the health or safety *of others* that cannot be eliminated by a modification of policies, practices, or procedures, or by the provision of auxiliary aids or services." 42 U.S.C. § 12182(b)(3) (emphasis added). The controlling regulations provide that:

In determining whether an individual poses a direct threat to the health or safety of others, a public accommodation must make an individualized assessment, based on reasonable judgment that relies on current medical knowledge or on the best available objective evidence, to ascertain: the nature, duration, and severity of the risk; the probability that the potential injury will actually occur; and whether reasonable modifications of policies, practices, or procedures will mitigate the risk.

28 C.F.R. § 36.208(c).

The entity asserting a "direct threat" as a basis for excluding an individual bears a heavy burden of demonstrating that the individual poses a significant risk to the health and safety of others. *Lockett v. Catalina Channel Exp., Inc.* 496 F.3d 1061, 1066

(9th Cir.2007). A good faith belief that a risk exists is not sufficient. *Bragdon v. Abbott,* 524 U.S. 624, 649, 118 S.Ct. 2196, 141 L.Ed.2d 540 (1998). The person making the relevant decision not to provide the service must base his decision on the objective information available to him. *See id.* For example, in *Bragdon,* a case in which a dentist declined to see an HIV-positive patient because he claimed she would pose a health risk to others, the Supreme Court elaborated on the "direct threat" standard:

The existence, or nonexistence, of a significant risk must be determined from the standpoint of the person who refuses the treatment or accommodation, and the risk assessment must be based on medical or other objective evidence. As a health care professional, petitioner had the duty to assess the risk of infection based on the objective, scientific information available to him and others in his profession. His belief that a significant risk existed, even if maintained in good faith, would not relieve him from liability. To use the words of the question presented, petitioner receives no special deference simply because he is a health care professional.

**\*17** *Id.*

Marriott conceded on the record at the hearing on the parties' motions that it is only alleging that the accessible carts pose a direct threat to the safety of the golfer himself or herself, and *not* to "others." December 12, 2007 Transcript at 32-33 ("the direct threat in this context would be limited to the individual using the cart" and "it would be specious ... to claim that there [would] be a direct threat to third parties because of a single-rider cart"). Accordingly, Marriott's direct threat defense requires that this court interpret 42 U.S.C. § 12182(b)(3) to include a threat to the disabled individual himself or herself.

In its papers, Marriott cited to the United States Supreme Court's decision in *Chevron v. Echazabal,* 536 U.S. 73, 78-79, 122 S.Ct. 2045, 153 L.Ed.2d 82 (2002), in support of such an interpretation. *Chevron,* however, was an employment case, and in-

volved Title I of the ADA--*not* Title III at issue here. Under Title I of the ADA, an employer is prohibited from using qualification standards "that screen out or tend to screen out an individual with a disability." 42 U.S.C. § 12112(b)(6). However, an employer has an affirmative defense to discrimination under Title I where employment of the individual would "pose a direct threat to the health or safety of other individuals in the workplace." *Id.* at § 12113(b). Subsequently, the Equal Employment Opportunity Commission ("EEOC") issued regulations that interpreted § 12113(b) to apply to circumstances where the employment would pose a direct threat to the health and safety of the individual as well. *See* 29 C.F.R. § 1630.15(b)(2) (providing that "[t]he term 'qualification standard' may include a requirement that an individual shall not pose a direct threat to the health or safety *of the individual* or others in the workplace").

In *Chevron,* an oil refinery refused to hire an applicant who had a severe liver condition that would be exacerbated by exposure to toxins, contending that it could refuse the applicant employment based on his condition because employment posed a safety risk to the applicant himself. The applicant brought a discrimination claim against Chevron under Title I of the ADA. The Ninth Circuit subsequently held that the EEOC regulation on point, as set forth above, violated the ADA because the ADA's direct threat defense only applied where there was a risk to *others.* 213 F.3d 1098, 1102 (9th Cir.2000). The Supreme Court, however, reversed the Ninth Circuit, and held that the EEOC regulation, which allowed employers to screen out a disabled worker whose *own* health and safety was at risk, was a permissible expansion of the direct threat language in Title I of the ADA. 536 U.S. at 78.

This case is different than *Chevron,* though. Significantly, there is not an implementing regulation for Title III equivalent to the EEOC regulation in *Chevron* that would support interpreting 42 U.S.C. § 12182(b)(3) to include a direct threat to the

covered individual himself or herself. Moreover, Marriott was unable to cite to any authority extending the *Chevron* Court's holding regarding Title I to Title III of the ADA. Given these factors, the court declines to interpret the statute at issue here, which expressly defines a "direct threat" as "a significant risk to the health or safety *of others,"* 42 U.S.C. § 12182(b)(3), to apply where the threat is only to the covered individual himself or herself.

**\*18** Accordingly, because Marriott has conceded that the accessible carts do not pose a direct threat to the health or safety of *others,* the court DENIES Marriott's motion for summary judgment on this basis.

**iv. Conclusion**

In sum, the court concludes that plaintiffs have established a prima facie case for discrimination under the ADA's general anti-discrimination provisions based on Marriott's failure to make reasonable accommodations. *See, e.g., PGA Tour,* 532 U.S. at 683 n. 38. First, there is no dispute that plaintiffs are disabled as that term is defined by the ADA. Second, there is no dispute that Marriott is a private entity that owns, leases, and/or operates numerous golf courses nationwide, which are all places of public accommodation. Third, for the reasons set forth above, the court concludes that Marriott's policy, by which it refuses to provide accessible carts to disabled golfers, discriminates against plaintiffs, mobility-impaired golfers. Fourth, although Marriott is currently testing a "pilot program" at the four golf courses it owns, it has nevertheless refused to implement the same type of modification accommodating plaintiffs at the courses it operates, and has conceded that the pilot program is of a temporary nature.

Moreover, the court finds that the provision of accessible golf cart(s) at Marriott's courses, is both reasonable and necessary to accommodate the plaintiffs' disabilities in this case. There is overwhelming evidence that plaintiffs require this accommodation in order to golf on Marriott courses,

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

and that the accommodation is therefore "necessary." Additionally, there is also sufficient evidence that the accommodation is "reasonable," in so far as the evidence suggests that there have been no significant injuries involving the use of accessible carts during the past twenty years, and Marriott itself concedes that the financial costs of such a modification are minimal. Finally, the court finds that Marriott has not met its heavy burden in establishing that provision of the accessible carts at its courses would pose a direct threat to the health and safety of others.

As noted above, plaintiffs' ADA claim is based on three theories of discrimination, including (1) Marriott's failure to make reasonable accommodations under 42 U.S.C. § 12182(b)(2)(A)(ii); (2) Marriott's failure to remove barriers under 42 U.S.C. § 12182(b) (2)(A)(iv); and (3) Marriott's failure to provide auxiliary aids and services under 42 U.S.C. § 12182(b)(2)(A)(iv). Because the court concludes that plaintiffs are entitled to summary judgment based on Marriott's failure to make reasonable accommodations, it declines to reach the other two grounds, including Marriott's failure to remove barriers and to provide auxiliary aids, since judgment in favor of plaintiffs on the first ground entitles them to declaratory and injunctive relief.

**v. Evidentiary Objections**

Both parties filed numerous evidentiary objections. The court declines to rule individually on each of plaintiffs' objections, and notes that in concluding that plaintiffs are entitled to summary judgment on their ADA claim, the court has considered *all* evidence and declarations submitted by Marriott in support of its motion for summary judgment and in opposition to plaintiffs' motion for summary judgment, including the evidence objected to by plaintiff.

**\*19** Turning to Marriott's objections, the court notes that Marriott filed some of its objections as separate motions and/or documents, and others were contained within its motion papers. Some that

are in its briefs are duplicative of the separately-filed documents, and others are not. The court has attempted below to comprehensively cull and compile Marriott's various objections from all of its documents.

Marriott filed objections in three different places to exhibits attached to the Knestrick Declaration, filed in support of plaintiffs' motion for summary judgment. These exhibits include the DOJ settlement and DOI and DOD letters/reports at Exh. O, AA, and BB to the Knestrick Declaration. Marriott's objections are found in: (1) its opposition brief at 9-12; (2) a separately-filed motion to strike the Knestrick declaration; and (3) another separately-filed document entitled "evidentiary objections."

Plaintiffs submitted this evidence to further their argument that the DOJ, via its pending rulemaking, is going to require accessible golf carts. However, as this court noted above at pages 17-18 of this order, because it declines to "guess" the outcome of the DOJ rulemaking, the court has not considered the above evidence submitted by plaintiffs, and objected to by Marriott.

Marriott also filed objections to evidence plaintiffs submitted in support of their opposition to Marriott's motion for summary judgment in two different places. In its reply brief, Marriott filed objections to plaintiffs' McGovern and Thesing declarations. Marriott also filed a separate document containing evidentiary objections to the McGovern and Thesing declarations, and also to the Hikel, Pretekin, and Knestrick declarations filed in support of plaintiffs' opposition brief.

*McGovern Oppos. Declaration*

McGovern is one of plaintiffs' experts, and a chair of the National Alliance for Accessible Golf (NAAG) Single Rider Car Task Force. He advises local unit governments and privately owned golf courses regarding the acquisition of accessible golf carts, and opines in his declaration regarding the safety of accessible carts.

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

As noted, both Marriott's reply brief and its separately-filed evidentiary objections contained objections to McGovern's declaration. Unfortunately, the two are not consistent. The court has utilized Marriott's separately-filed evidentiary objections because those were more comprehensive.

Marriott seeks to strike several paragraphs from McGovern's declaration, including ¶¶ 10, 11, 13, 14, 16, 17, 21, and 22. The court OVERRULES Marriott's objections to ¶¶ 10, 13, 17, 21, and 22, and SUSTAINS Marriott's objections to ¶¶ 11, 14, and 16.

*Hikel Oppos. Declaration*

John Hikel is a general partner with ParaBase, and the exclusive distributor of one brand of accessible carts, the Paramobile. Marriott seeks to strike ¶ 4 of Hikel's declaration as hearsay. The court SUSTAINS Marriott's objection.

*Thesing Oppos. Declaration*

**\*20** Thesing is one of the plaintiffs. Marriott seeks to strike several paragraphs from Thesing's declaration, including ¶¶ 5, 7, 8, 9, 12, 13, 14, 15, 16, 17, 18, 19, 20, and 21.

The court OVERRULES Marriott's objections to ¶¶ 5 at page 2 ll. 26-28, 3 ll. 1-6; ¶ 7; ¶ 9 at ll. 9-11, 13-16; ¶ 12; ¶ 13; 15 ll. 9-14; ¶ 16 ll. 18-21; ¶ 18; and ¶ 19; and SUSTAINS Marriott's objections to ¶ 5 ll. 8-9; ¶ 8; ¶ 9 ll. 11-12; ¶ 14; ¶ 15 ll. 15-17; ¶ 16 ll. 22-25; ¶ 17; and ¶ 20.

*Pretekin Oppos. Declaration*

Pretekin is the president of Solorider, which manufactures and distributes the Solorider accessible cart. Marriott seeks to strike several paragraphs from Pretekin's declaration, including ¶¶ 4, 8, 9, and 10. The court SUSTAINS Marriott's objections to all four paragraphs.

*Knestrick Oppos. Declaration*

Knestrick is plaintiffs' attorney. Marriott seeks to strike several paragraphs from Pretekin's declaration, including ¶¶ 3, 4, 5, and 6. The court OVERRULES Marriott's objections to all four paragraphs

**c. State Law Claims**

Because the court concludes that plaintiffs are entitled to summary judgment on their ADA claim based on Marriott's failure to make reasonable accommodations, it also concludes that plaintiffs are entitled to summary judgment on their CDPA and Unruh Act claims as well. *See Pickern,* 194 F.Supp.2d at 1130; Cal. Civ.Code §§ 51(f), 54(c).

**d. Specificity of Injunctive Relief**

Marriott argues that the court cannot possibly enter injunctive relief that is clear and enforceable under Federal Rule of Civil Procedure 65 because plaintiffs themselves cannot even agree what constitutes an "accessible cart," and because there are many differences in the carts' features and in the brands of accessible carts. Marriott claims the court would need to address the following specific features in any order granting injunctive relief: (1) roll-over protection; (2) stand-up seats; (3) sun canopies; (4) score card holders; and (5) baskets. Marriott further contends that the court will need to determine how and when the accessible carts should be used, including when and where on the course, who may use them, and the training that a user should receive.

In reply, plaintiffs assert this case is not about which cart Marriott should buy or lease or how many carts should be made available, but is about Marriott's failure to make any effort to accommodate disabled golfers who desire, and are entitled, to golf at its courses. They argue that they are not asking the court to make any engineering, architectural, or policy determinations as to which particular design features are feasible and desirable. They note that their "omission of evidence regarding the comparative merits of the single rider carts currently on the market is not an oversight, but a re-

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

flection of the fact that they are asking the court to adjudicate and declare Marriott's *legal responsibility* to accommodate plaintiffs' disabilities."

*21 Federal Rule of Civil Procedure 65(d) provides in pertinent part:

(1) Contents. Every order granting an injunction and every restraining order must:

(A) state the reasons why it issued;

(B) state its terms specifically; and

(C) describe in reasonable detail--and not by referring to the complaint or other document--the act or acts restrained or required.

" '[O]ne basic principle built into Rule 65 is that those against whom an injunction is issued should receive fair and precisely drawn notice of what the injunction actually prohibits.' " *Fortyune,* 364 F.3d at 1086 (quoting *Union Pac. R.R. v. Mower,* 219 F.3d 1069, 1077 (9th Cir.2000)).

In *Fortyune,* the Ninth Circuit rejected an argument very similar to the one made by Marriott in this case. In that case, the district court granted the plaintiff injunctive relief under Title III of the ADA, and issued an injunction ordering the defendant movie theater to "modify its policies regarding companion seating to ensure that a companion of a wheelchair-bound patron be given priority in the use of companion seats ... [up until] ten (10) minutes prior to show time." 364 F.3d at 1086-87. On appeal, the Ninth Circuit rejected the defendant's argument that the district court was required in the injunction to elucidate *how* it should comply with the injunction. The court held that Rule 65(d) did not require that of the district court, but rather required the court to "describe in reasonable detail ... the act or acts sought to be restrained." *Id.* It found that the district court's injunction did so, and was not in violation of Rule 65(d), even though it declined to provide the movie theater with explicit instructions on the appropriate means to accomplish this directive. *Id.* (citing *Independent Living,* 1 F.Supp.2d at 1173 n. 16 (leaving "logistical matters" concerning the implementation of an injunction "in the capable hands of the [defendants]")).

The *Fortyune* court ultimately concluded that the injunction was sufficiently specific under Rule 65(d) because it provided "fair and precisely drawn notice of *what* the injunction actually prohibits." *Id.* It further noted that despite the district court injunction's failure to specify how to comply with its terms, the court was "confident that [the movie theater] is capable of devising such means, particularly in light of the numerous workable suggestions articulated at oral argument." *Id.*

Based on *Fortyuna,* the parties' papers, and the parties' arguments at the December 12, 2007 hearing, the court rejects Marriott's argument that injunctive relief is impossible under Rule 65. However, the court declines to enter injunctive relief at this time, and by separate order, will set a settlement conference at which the parties will be required to discuss and attempt to resolve the specific contours of the injunction to be entered in this case. The court nevertheless notes, as it did on the record at the hearing, that it is disinclined to reach all of the features and precise parameters advanced Marriott, e.g., the existence of a sun canopy, in any injunction that is entered.

## CONCLUSION

*22 For the above reasons, the court GRANTS IN PART plaintiffs' motion for summary judgment as to liability on their: (1) ADA claim based on Marriott's failure to make reasonable accommodations; (2) CDPA claim; and (3) Unruh Act claim. The court DENIES Marriott's motion for summary judgment.

The court declares that Marriott violated the ADA, and for those courses which Marriott owns and operates in California, the CDPA and the Unruh Act as well, by failing to provide accessible golf carts as a reasonable accommodation for plaintiffs' mobility impairments.

The court, however, declines to enter injunctive relief at this time, but under separate order, will set a settlement conference to permit the parties to address the scope of such relief. Following the settle-

Slip Copy                                                                                                    Page 19
Slip Copy, 2008 WL 239306 (N.D.Cal.), 36 NDLR P 86
**(Cite as: 2008 WL 239306 (N.D.Cal.))**

ment conference, a case management conference will be held to determine if further briefing or argument is necessary before the court determines the injunctive relief to which plaintiffs are entitled.

The upcoming pretrial and trial dates are VACATED.

Plaintiffs' motion to seal the supplemental Knestrick declaration is DENIED based on the court's prior ruling that Marriott's management agreements should be filed in the public record.

**IT IS SO ORDERED.**

Slip Copy, 2008 WL 239306 (N.D.Cal.), 36 NDLR P 86

END OF DOCUMENT

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

**EXHIBIT 3**
**Part D**

Westlaw.

Not Reported in F.Supp.                                                        Page 1
Not Reported in F.Supp., 1992 WL 236891 (E.D.Pa.)
**(Cite as: Not Reported in F.Supp.)**

C

Gillis v. McDonald's Corp.
E.D.Pa.,1992.
Only the Westlaw citation is currently available.
United States District Court, E.D. Pennsylvania.
Lesha GILLIS and Randy GILLIS, Plaintiffs
v.
MCDONALD'S CORPORATION, Defendant.
**Civ. A. No. 91-7202.**

Sept. 10, 1992.

Joseph F. Roda, Joseph F. Roda, P.C., Ronald C.
Messmann, Joseph F. Roda, P.C., Lancaster, Pa.,
for plaintiffs.
Michael W. Babic, Kevin M. French, Hartman, Un-
derhill & Brubaker, Lancaster, Pa., for defendant.

MEMORANDUM AND ORDER

GAWTHROP, District Judge.
*1 The plaintiffs have sued McDonald's for injuries
resulting from a slip and fall. McDonald's has
moved to dismiss for failure to join an indispens-
able party, namely the franchisees, Robert and
Catherine Snyder. The plaintiffs argue that the fran-
chisees are not indispensable and that either Mc-
Donald's can implead them as third-party defend-
ants under Fed.R.Civ.P. 14(a), or the franchisees
can intervene under Fed.R.Civ.P. 24. They further
argue that McDonald's is not prejudiced by the ab-
sence of their franchisees since nothing procedur-
ally precludes McDonald's from establishing their
liability as a defense at trial. *See Clements v. Holi-
day Inns, Inc.,* 105 F.R.D. 467, 471 (E.D.Pa.1984),
citing *Campbell v. Triangle Corp.,* 56 F.R.D. 480
(E.D.Pa.1972). The issue presented is whether the
franchisees are indispensable parties under
Fed.R.Civ.P. 19 in a business invitee's negligence
suit for injuries sustained on the premises.

On November 24, 1989, Lesha Gillis allegedly
slipped and fell from an unreasonable accumulation
of snow and ice on the premises of the McDonald's

restaurant located on Route 501, Lititz, Warwick
Township, Lancaster County, Pennsylvania. She
and her husband, alleging diversity, sued McDon-
ald's in this court but omitted its franchisees. The
Gillises later filed a complaint in state court against
both McDonald's and the Snyders for the same in-
cident. McDonald's has moved to dismiss the feder-
al court proceeding arguing that the Snyders are in-
dispensable parties. I agree.

1. Are the Franchisees Necessary?

Fed.R.Civ.P. 19(a) states that a person is a neces-
sary party if any of three factors is met:
(1) in his absence complete relief cannot be accor-
ded among those already parties, *or* (2) he claims
an interest relating to the subject of the action and
is so situated that the disposition of the action in his
absence may (i) as a practical matter impair or im-
pede his ability to protect that interest *or* (ii) leave
any of the persons already parties subject to a sub-
stantial risk of incurring double, multiple or other-
wise inconsistent obligations by reason of his
claimed interest. (emphasis supplied)

The Snyders qualify as necessary parties in two
ways. First, under Fed.R.Civ.P. 19(a)(1), the
plaintiffs may not be able to obtain "complete re-
lief," or any relief for that matter, from McDon-
ald's, the current defendant. *See Crompton v. South-
land Corp.,* 1987 WL 8537 (E.D.Pa.1987). I per-
ceive five relationships between McDonald's and
the Snyders: (1) owner-possessor, (2) lessor-lessee,
(3) licensor-licensee, (4) principal-agent, and (5)
franchisor-franchisee. Under any of these, however,
I find it highly unlikely that the plaintiffs could suc-
cessfully hold McDonald's liable for the injuries. I
treat them in turn.

(1) *Owner-possessor.* McDonald's cannot be held
liable as the title owner of the property because
Pennsylvania law imposes liability upon the pos-
sessor of land for physical harm to invitees caused

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.
Not Reported in F.Supp., 1992 WL 236891 (E.D.Pa.)
**(Cite as: Not Reported in F.Supp.)**

by the possessor's failure to exercise reasonable care. *Bloom v. Waste Management, Inc.,* 615 F.Supp. 1002, 1015 (E.D.Pa.1985), *aff'd,*800 F.2d 1131 (1986), citing *Giannone v. U.S. Steel Corp.,* 238 F.2d 544 (3d Cir.1956) and *Mathis v. Lukens Steel Co.,* 415 Pa. 262, 203 A.2d 482 (1964). Title ownership is not a sufficient basis for liability; the possessor bears responsibility for hazardous conditions on the premises. *Bloom v. Waste Management, Inc.,* 615 F.Supp. 1002, 1015 (E.D.Pa.1985), *aff'd,*800 F.2d 1131 (1986), citing *Bagley v. Philadelphia,* 148 Pa.Super. 318, 326, 25 A.2d 579, 582 (1942) and *Whitaker v. Hills,* 430 F.Supp. 1389, 1390-91 (E.D.Pa.1977).

**\*2** (2) *Lessor-lessee.* Similarly, it is doubtful that the lessor-lessee relationship would provide a basis for liability because the lease imposes responsibility upon the lessees for daily maintenance. Operator's Lease ¶ 2.08 & 4.02 [All references are to the three-year franchisee agreement of 12/28/87, the agreement in effect at the time of plaintiff's accident]. *See also Dorsey v. Continental Assoc.,* 404 Pa.Super. 525, 591 A.2d 716, 718-19 (1991) (discussing general rule that a landlord out of possession is not responsible for injuries sustained by third parties on the premises and listing exceptions which appear not applicable to the present case).

(3) *Licensor-licensee.* The Snyders, as franchisees, are also licensees of the restaurant system that McDonald's developed. License Agreement, ¶ A. However, McDonald's, as the licensor, is not liable for the alleged negligent removal of ice and snow because the license agreement explicitly provides that maintenance of the parking area is the responsibility of the licensees. License Agreement, ¶ 12(a) and (e).

(4) *Principal-agent.* The agency theory of recovery also fails, because the contract specifically negates any principal-agent relationship, express or implied, between McDonald's and the Snyders. Operator's Lease, ¶ 8.01 & License Agreement ¶ 16. This fact sufficiently distinguishes this case from the result reached in *Clements v. Holiday Inns, Inc.,*

105 F.R.D. 467, 469 (E.D.Pa.1984), which was based on an agency rationale.

(5) *Franchisor-franchisee.* Finally, resort to the franchisor-franchisee relationship is unavailing, because the franchise letter agreement incorporates by reference both the lease and license agreement which, as discussed above, make the franchisees responsible for day-to-day maintenance of the premises. Franchise Letter Agreement, ¶ 1.

The second way in which the franchisees are necessary parties is under Fed.R.Civ.P. 19(a)(2)(i) because resolution of this action without them may severely "impair or impede" their ability to protect against incurring financial responsibility for the plaintiff's injuries. Notwithstanding my liability discussion, should McDonald's, perchance, lose on the merits, it will likely seek indemnification from the Snyders pursuant to the indemnity clause of the franchisee agreement. License Agreement, ¶ 24 & Operator's Lease, ¶ 7.02, incorporated into the franchisee agreement through ¶ 1 of the franchise letter agreement dated 12/28/87. Thus, the franchisees are necessary parties under both Fed.R.Civ.P. 19(a)(1) and (a)(2)(i).

2. Are the Franchisees Indispensable?

Not only are the Snyders necessary parties, but their joinder would destroy diversity because the Gillises and the Snyders are citizens of Pennsylvania. (This, obviously, is the reason their names do not grace the nether end of the caption in the federal suit.) As a result, I must decide whether they are indispensable parties, in which case the court must, in "equity and good conscience," dismiss the action. The factors to consider are:

**\*3** first, to what extent a judgment rendered in the person's absence might be prejudicial to him or those already parties; second, the extent to which, by protective provisions in the judgment, by the shaping of relief, or other measures, the prejudice can be lessened or avoided; third, whether a judgment rendered in the person's absence will be ad-

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp., 1992 WL 236891 (E.D.Pa.)
**(Cite as: Not Reported in F.Supp.)**

equate; fourth, whether the plaintiff will have an adequate remedy if the action is dismissed for non-joinder.

*Fed.R.Civ.P. 19(b).*

The Supreme Court has interpreted these four factors as (1) the plaintiff's interest in having a forum; (2) the defendant's interest in avoiding multiple litigation or sole responsibility for a shared liability; (3) the extent to which the judgment may hinder the outsider's ability to protect his interest in the subject matter; and (4) the court's and the public's interest in complete, consistent and efficient settlement of controversies. *Provident Tradesmen's Bank & Trust Co. v. Patterson,* 390 U.S. 102, 109-111 (1968).

Here, three of these four interests weigh in favor of dismissal. Plaintiffs have an alternative forum, namely state court, in which to litigate the dispute; the public's interest is best satisfied by dismissal because the dispute can be settled in its entirety in state court; and McDonald's understandably seeks to avoid multiple litigation. *See 123 S. Broad Street Corp. v. Cushman & Wakefield,* 121 F.R.D. 42 (E.D.Pa.1988). Furthermore, "there is a very real chance that any judgment obtained in the absence of the franchisees may be inadequate because the plaintiffs may be unable to obtain any relief at all in this federal action because of the franchisee agreement." *Crompton v. Southland Corp.,* 1987 WL 8537 (E.D.Pa.1987). It would appear that, rather than full recovery, at most, they could only get a quarter pound of flesh.

The plaintiffs cite *Bank of America v. Hotel Rittenhouse Assoc.,* 844 F.2d 1050, 1054 (3d Cir.1988), for the proposition that even if the Snyders were necessary parties, the Third Circuit has held that an absent, non-diverse joint tortfeasor is not indispensable. However, this statement assumes that McDonald's and the Snyders are joint tortfeasors and, thus, jointly and severally liable for the same injury. *See, e.g., Gold v. Johns-Manville Sales Corp.,* 723 F.2d 1068, 1076 (3d Cir.1983) (debtors are potential

joint tortfeasors) and *Bank of American v. Hotel Rittenhouse Associates,* 844 F.2d 1050 (3d Cir.1988) (joint obligors). This court is not willing to make such an assumption, which would appear to fly in the face of fact and law. McDonald's is not a tortfeasor, let alone a joint tortfeasor, unless it was negligent. And notably, because of the franchisee agreement, McDonald's is most likely not legally responsible for the alleged accumulation of snow and ice on its parking lot, even though it is the record owner of the premises.

An order follows.

ORDER

AND NOW this 26th day of August, 1992, upon consideration of the defendant's Motion to Dismiss Pursuant to *Fed.R.Civ.P. 12(b)(7)* and the Opposition filed thereto,

**\*4** IT IS HEREBY ORDERED that Defendant's Motion to Dismiss is GRANTED, the case is dismissed.

E.D.Pa.,1992.
Gillis v. McDonald's Corp.
Not Reported in F.Supp., 1992 WL 236891 (E.D.Pa.)

END OF DOCUMENT

**EXHIBIT 3**
**Part E**

Not Reported in F.Supp.2d                                                                 Page 1
Not Reported in F.Supp.2d, 2003 WL 22928805 (E.D.La.)
**(Cite as: Not Reported in F.Supp.2d, 2003 WL 22928805)**

**C**
Gregory v. Melrose Group, LLC
E.D.La.,2003.
Only the Westlaw citation is currently available.
United States District Court,E.D. Louisiana.
Steve GREGORY and Access Now, Inc., a Florida
not for profit corporation
v.
THE MELROSE GROUP, LLC d/b/a Hotel Ste.
Helene
**No. Civ.A. 03-2414.**

Dec. 8, 2003.

Victor Roma Farrugia, Victor R. Farrugia, PLC,
New Orleans, LA, Edward I. Zwilling, Schwartz
Zweben & Associates, LLP, Birmingham, AL, for
Plaintiff.

E. John Litchfield, Berrigan, Litchfield, Schonekas,
Mann, Traina & Thompson, LLC, Harry
Rosenberg, Phelps Dunbar, LLP, New Orleans, LA,
for Defendant.

PORTEOUS, J.

**\*1** The defendant, The Melrose Group, LLC d/b/a
Hotel Ste. Helene ("The Melrose Group"), filed a
Motion to Dismiss pursuant to FRCP 12(b)(6) and
FRCP 12(b)(1), which came before the Court for
hearing on December 3, 2003. Oral argument was
waived by the parties and the matter was taken un-
der submission on the briefs only. The Court, hav-
ing reviewed the arguments of counsel, the Court
record, the law and applicable jurisprudence, is
fully advised in the premises and ready to rule.

*ORDER AND REASONS*

I. BACKGROUND

Access Now, Inc. ("Access Now") is a Florida, not
for profit corporation engaged in seeking compli-
ance with the ADA which represents its members to
assure that public spaces and commercial premises
are accessible to its members and that its members

are not discriminated against. Steve Gregory
("Gregory"), the plaintiff, is a resident of Alabama
and a member of Access Now. He maintains that he
is a "qualified individual with disability under the
ADA" and asserts that he visited the Hotel Ste.
Helene but was denied full and safe access to the
hotel. He alleges 12 architectural barriers, and con-
tends that removal of these barriers is "readily
achievable." In addition, Plaintiff maintains that
there are other "current violations of the ADA," but
identification of these barriers would require a "full
inspection." Plaintiff seeks reasonable attorney's
fees and payment of all cost associated with these
proceedings and declaratory and injunctive relief.

II. ARGUMENTS OF DEFENDANT IN SUP-
PORT OF MOTION TO DISMISS

1. Access Now lacks standing and should be dis-
missed.

Defendants argue that an organization has standing
to sue on behalf of its members when (1) its mem-
bers would otherwise have standing to sue in their
own right; (2) the interests it seeks to protect are
germane to the organization's purpose; and (3)
neither the claim asserted nor the relief requested
requires the participation of individual members in
the lawsuit.[FN1] Further, an individual plaintiff
bringing an ADA claim to remove barriers to access
has standing to challenge only those violations af-
fecting their particular disabilities.[FN2]

> FN1.*Disabled In Action of Metro. N.Y. v.
> Trump Int'l Hotel & Tower,* 2003 WL
> 1751785 at*10.

> FN2.*Id* at *9.

Although Mr. Gregory has provided no information
with respect to his alleged disability, defendants
contend that he will be a participating plaintiff and
if anyone can legitimately file a claim under the
ADA, he is juridically viewed to be the more ap-

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

propriate plaintiff.[FN3] Therefore, defendants contend that Access Now lacks standing to pursue the instant claim and there is no need for an organization to assert Gregory's rights. To support their contention, defendants rely on *Access 123, Inc. v. Markey's Lobster Pool, Inc.,* in which the Court held that when an organization's claim merely repeats the claims of the individual plaintiff, and seeks the same relief as the individual plaintiff, the organization lacks standing.[FN4] Plaintiffs contend that Access Now has asserted identical claims and has joined with Mr. Gregory in seeking the identical relief and therefore, their claims should be dismissed pursuant to Rule 12(b)(1) and/or Rule 12(b)(6).

> FN3.*Id* at 10.

> FN4.*Access 123, Inc. v. Markey's Lobster Pool. Inc.,* 2001 WL 920051 at *4 (D.N.H. Aug.14, 2001))

2. Plaintiffs failed to state a claim with respect to "other current violations."

**\*2** Plaintiffs contend that there are "other current violations" of the ADA at the hotel operated by The Melrose Group, however, identification of those violations must await a "full inspection" of the hotel. The Fifth Circuit, in *Fernandez-Montes v. Allied Pilot's Ass'n,* held that when considering a motion to dismiss, the court is limited to a consideration of the factual allegations in the complaint.[FN5] They acknowledge that while the pleading standard in federal court is a liberal one, "conclusory allegations or legal conclusions masquerading as factual conclusions will not suffice to prevent a motion to dismiss."[FN6] Therefore, although Rule 8(2) merely requires that a defendant be put on "fair notice" of what plaintiff's claim is, a complaint that contains no factual assertion regarding what components of a facility violate the ADA must be dismissed.[FN7] In the instant case, defendants argue that the allegation that "other current violations" exist fails to put them on proper notice of what "other" violations are. Therefore, plaintiffs claim regarding other violations at the hotel should be dismissed

> FN5.*Fernandez-Montes v. Allied Pilot's Ass'n,* 987 F.2d 278, 284 (5th Cir.1993).

> FN6.Id.

> FN7.*Disabled In Action,* 2003 WL 1751785 at*14.

## III. ARGUMENTS OF PLAINTIFFS IN OPPOSITION TO MOTION TO DISMISS

1. Access Now has associational standing to assert its Title III ADA claim.

In *Hunt v. Washington State Apple Advertising Comm'n,* the U.S. Supreme Court addressed associational standing and set forth the "*Hunt* test" to determine whether an association has standing to bring suit on behalf of its members. The test states:

[A]n association has standing to bring suit on behalf of its members when: (a) its members would otherwise have standing to sue in their own right; (b) the interests it seeks to protect are germane to the organization's purpose; and (c) neither the claim asserted nor the relief requested requires the participation of individual members in the lawsuit.[FN8]

> FN8.*Hunt v. Washington State Apple Advertising Comm'n,* 432 U.S. 333, 97 S.Ct. 2434, 53 L.Ed.2d 383 (1997)

The plaintiffs contend that in the instant case, the *Hunt* Test is satisfied. Access Now meets the first prong of the *Hunt* test to the extent that Gregory, a member of Access Now, has standing to sue, and in fact has sued, in his own right. The second prong of the *Hunt* test is satisfied to the extent that the suit seeks to remove barriers to the access of Access Now's membership to defendant's premises and to bring those premises into compliance with the ADA, which is Access Now's purpose for existing. The Court does not need to consider whether Access Now has satisfied the third prong in light of *United Food Commercial Worker's Union Local 751 v. Brown Group, Inc.,* which held that "once an

Not Reported in F.Supp.2d, 2003 WL 22928805 (E.D.La.)
**(Cite as: Not Reported in F.Supp.2d, 2003 WL 22928805)**

association has satisfied *Hunt's* first and second prongs assuring adversarial vigor in pursuing a claim for which member Article III standing exists, it is difficult to see a constitutional necessity for anything more.[FN9] However, plaintiffs argue that neither the claim asserted nor the relief requested by Access Now requires the participation of individual members in this lawsuit, as many violations of the ADA raised in the Complaint are structural and are expressly listed in the ADA guidelines and are subject to objective, non-individualized proof.

FN9.*United Food & Commercial Worker's Union Local 751 v. Brown Group. Inc.,* 517 U.S. 544, 116 S.Ct. 1529, 134 L.Ed.2d 758 (1996)

**\*3** Plaintiffs rely on *Doe v. Stincer* to support their contention that an organization has standing to sue to redress injuries suffered by its members without a showing of injury to the association itself and without a statute explicitly permitting associational standing.[FN10]

FN10.*Doe v. Stincer,* 175 F.3d 879 (11th Cir.1999)

Further, plaintiffs argue that the cases relied on by the defendant are distinguishable from the instant case. Both involved motions for summary judgment, to the extent that some discovery had been taken or materials extrinsic to the complaint were considered by the Court. In this case, the only evidence before the Court is the plaintiff's Complaint. There is no evidence before the Court that Gregory is the only member of Access Now who has visited or desires to return to the defendant's premises. Plaintiffs argue that the issue is premature to the extent that no discovery has been performed by either party and the Complaint, on its face, indicates that Access Now does have standing.

2. Plaintiff's complaint effectively states a claim for relief pursuant to Title III of the ADA. To require Plaintiffs to specifically enumerate each and every

barrier to access would be to ignore the plain meaning of the notice pleading and would require the Plaintiffs to engage in a futile gesture which would ignore the regulations enacted as part of the ADA.

Rule 8(a)(2) only requires that a Complaint contain a "short and plain statement of the claim showing that the pleader is entitled to relief." The U.S. Supreme Court in *Leatherman v. Tarrant County Narcotics Intelligence and Coordination Unit,* held that the Federal Rules of Civil Procedure do not require a claimant to set out in detail the facts upon which he bases his claim.[FN11] To the contrary, all the Rules require is a "short and plain statement of the claim" that will give the defendant fair notice of what the plaintiff's claim is and the grounds upon which it rests.[FN12]

FN11.*Leatherman v. Tarrant County Narcotics Intelligence and Coordination Unit* 507 U.S. 163, 168, 113 S.Ct. 1160, 122 L.Ed.2d 517 (1993).

FN12.*Id.*

Plaintiffs submit that they are not required to state a claim under Title III of the ADA with particularly. They contend that their inclusion of several (12) specific barriers to access in their Complaint in no way limits the scope of this case to those specifically enumerated barriers. Further, plaintiffs argue that they are not required to engage in a futile gesture by virtue of 28 C.F.R. § 36.501 which provides:

Nothing in this section shall require a person with a disability to engage in a futile gesture if the person has actual notice that a person or organization covered by Title III of the Act or this part does not intend to comply with its provisions.

Plaintiffs cite *Parr v. L & L Drive-In Restaurant,* in which the defendant sought to limit the plaintiff's standing with regard to barriers not specifically encountered by the plaintiff contending that an "injury in fact" was lacking.[FN13] The Court de-

Not Reported in F.Supp.2d, 2003 WL 22928805 (E.D.La.)
**(Cite as: Not Reported in F.Supp.2d, 2003 WL 22928805)**

termined that the plaintiff did have standing and held that although the plaintiff did not encounter a lack of access due to certain barriers, he had "actual notice" that the defendant didn't intend to comply with the ADA and should be allowed to sue for the violations he did not encounter.[FN14]

> FN13. *Parr v. L & L Drive-In Restaurant,* 96 F.Supp.2d (D. Hawaii 2000).

> FN14. *Id.* at 1081.

**\*4** Plaintiffs contend that in this case, itemizing every barrier would be a futile gesture. After encountering the 12 enumerated barriers listed in their Complaint, they were on notice that the defendant didn't intend to comply with Title III of the ADA. To dismiss their claim as to the "other current violations" would be to require piecemeal litigation concerning additional barriers, encountered after the defendant has effectively addressed the specifically enumerated barriers which would not serve public policy or judicial economy.

### III. LAW AND ANALYSIS

A. Law on Motion to Dismiss pursuant to Rule 12(b)(1)

Rule 12 of the Federal Rules of Civil Procedure governs the manner in which defenses and objections to the pleadings are to be brought by defendants in federal civil actions.

Every defense, in law or in fact, to a claim for relief in any pleading, whether a claim, counterclaim, cross-claim, or third-party claim, shall be asserted in the responsive pleading thereto if one is required, except that the following defenses may at the option of the pleader be made by motion: (1) lack of jurisdiction over the subject matter, ...Fed.R.Civ.P. 12(b)(1).

Rule 12(b)(1) requires that a defendant file a Motion to Dismiss the action if the court lacks jurisdiction. Without jurisdiction over the subject matter,

the nature of the case, and the relief sought, a court is powerless to render a ruling on the conduct of persons or the status of the proceeding.

B. Law on Motion to Dismiss pursuant to Rule 12(b)(6)

In considering a motion to dismiss for failure to state a claim pursuant to Rule 12(b)(6), the complaint must be liberally construed in favor of the plaintiff, and all facts pleaded in the original complaint must be taken as true.[FN15] A district court may not dismiss a complaint under FRCP 12(b)(6)"unless it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief."[FN16] The Fifth Circuit defines this strict standard as, "The question therefore is whether in the light most favorable to the plaintiff and with every doubt resolved in his behalf, the complaint states any valid claim for relief."[FN17]

> FN15. *Campbell v. Wells Fargo Bank,* 781 F.2d 440, 442 (5th Cir.1980).

> FN16. *Conley v. Gibson,* 355 U.S. 41, 45-46, 78 S.Ct. 99, 101-102, 2 L.Ed.2d 80 (1957); *Blackburn v. Marshall,* 42 F.3d 925, 931 (5th Cir.1995).

> FN17. *Lowrey v. Texas A & M University System,* 117 F.3d 242 (5th Cir.1997), citing 5 Charles A. Wright & Arthur R. Miller, Federal Practice and Procedure, § 1357, at 601 (1969).

C. Analysis of the Court

This Court finds that the plaintiffs have satisfied the test set forth in *Hunt v. Washington State Apple Advertising Comm'n* and established that Access Now has associational standing to assert its Title III ADA claim. Furthermore, the Court finds that the issue is premature, as this is a motion to dismiss and not a motion for summary judgment, and no discovery has been performed. On its face, the

Not Reported in F.Supp.2d, 2003 WL 22928805 (E.D.La.)
**(Cite as: Not Reported in F.Supp.2d, 2003 WL 22928805)**

plaintiff's Complaint indicates that Access Now does have standing to pursue their claims.

Plaintiffs allege "other current violations," to be identified after an complete inspection of the defendant's property. This Court finds that this allegation, along with the twelve specific barriers listed in the plaintiffs Complaint, serve to place the defendant on notice of plaintiff's claims, comporting with FRCP 8(a)(2).*Disabled in Action,* supra, cited by defendant's for the proposition that plaintiff's allegations regarding "other current violations" should be dismissed, is distinguishable to the case at bar.FN18 In *Disabled in Action,* a specific allegation of discrimination regarding wheelchair lifts was made in plaintiff's Complaint. In their memorandum in opposition to defendant's motion to dismiss, plaintiffs later describe other violations that they claim exist or may exist. The Court dismissed plaintiff's inexact allegations, holding that "bald assertions and conclusions of law do not suffice to defeat a motion to dismiss."FN19However, in *Disabled in Action,* unlike the instant case, some discovery had been taken or materials extrinsic to the complaint were considered by the court. In the present case, no extrinsic evidence to the plaintiff's Complaint is before the Court. This Court finds that requiring the plaintiff to enumerate each barrier to access present on the subject premises would be to ignore the plain meaning of the notice pleading provisions of the Federal Rules of Civil Procedure. Therefore, this Court finds that plaintiffs' Complaint effectively puts the defendant on notice of plaintiffs' claims and that the plaintiffs have stated claims which would entitle them to relief.

> FN18.*Disabled In Action,* 2003 WL 1751785 at*14.

> FN19.*Id.*

**\*5** Accordingly,

IT IS ORDERED that the Motion to Dismiss filed on behalf of the defendants, The Melrose Group, be and the same is hereby DENIED.

E.D.La.,2003.
Gregory v. Melrose Group, LLC
Not Reported in F.Supp.2d, 2003 WL 22928805 (E.D.La.)

END OF DOCUMENT

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

**EXHIBIT 3**
**Part F**

Not Reported in F.Supp.2d                                                                                    Page 1
Not Reported in F.Supp.2d, 2007 WL 1438489 (D.D.C.)
**(Cite as: 2007 WL 1438489 (D.D.C.))**

C

Only the Westlaw citation is currently available.

United States District Court,
District of Columbia.
Russell HOLT, Plaintiff,
v.
AMERICAN CITY DINER, INC., Defendant.
**No. 05-1745 (CKK).**

May 15, 2007.

Gene R. Zweben, Schwartz Zweben & Slingbaum, LLP, Stuart, FL, Jason E. Miles, Schwartz,Zweben & Slingbaum, LLP, Baltimore, MD, for Plaintiff.

Jay Stephan Weiss, Washington, DC, for Defendant.

**MEMORANDUM OPINION**

COLLEEN KOLLAR-KOTELLY, United States District Judge.

**\*1** Plaintiff Russell Holt filed a Complaint on August 31, 2005, against Defendant, American City Diner, Inc. (hereinafter, "American City Diner"), alleging that Defendant's restaurant (also named the American City Diner, hereinafter "the Restaurant") violated Title III of the Americans with Disabilities Act (ADA), 42 U.S.C. § 12101 *et seq.,* by discriminating against Plaintiff by "denying access to, and safe, full and equal enjoyment of the goods, services, facilities, privileges, advantages and/or accommodations" at the Restaurant. Pl.'s Compl. ¶¶ 1, 3, 7, 9. Presently pending before the Court is Defendant's [25] Motion for Summary Judgment, filed on October 25, 2006, arguing that Plaintiff lacks standing to bring the instant suit. On November 13, 2006, Plaintiff filed an Opposition. No Reply was filed. Also pending before the Court is Plaintiff's [24] Motion for Summary Judgment on the merits, to which no Opposition was filed. As the Court concludes that Plaintiff does not have standing to bring this suit based the filings and the relevant statutes and case law, the Court shall GRANT De-

fendant's [25] Motion for Summary Judgment and accordingly DENY AS MOOT Plaintiff's [24] Motion for Summary Judgment.

**I. BACKGROUND**

The Court notes as an initial matter that neither party, in filing its summary judgment motion, complied with Local Civil Rule 7(h). According to Local Rule 7(h), the moving party to a summary judgment motion is required to separately provide "a statement of material facts as to which the moving party contends there is no genuine issue, which shall include references to the parts of the record relied on to support the statement." LCvR 7(h). Neither party explicitly complied with this mandate; both include such statements in their memoranda.

The Parties' deviation from the intent of this Local Civil Rule undermines the purpose of the Rule, which is to assist the Court in quickly determining if any facts are actually in dispute. *See Jackson v. Finnegan, Henderson, Farabow, Garrett & Dunner,* 101 F.3d 145, 153 (D.C.Cir.1996) ("[R]epeatedly blending factual assertions with legal argument, the 'relevant facts' section does not satisfy the purposes of a [Rule 7(h) ] statement."); *Robertson v. Am. Airlines,* 239 F.Supp.2d 5 (D.D.C.2002) (striking defendant's motion for summary judgment for noncompliance with the Local Civil Rules because the "statement of material facts not in genuine dispute" included no citations to the record and improperly mixed factual allegations with argument). While the purpose of Rule 7(h) is to "plac[e] the burden on the parties and their counsel, who are most familiar with the litigation and the record, to crystallize for the district court the material facts and relevant portions of the record," *Finnegan,* 101 F.3d at 151, the Court shall accept the additional burden placed on it in this instance by both Parties. Since the Court shall first address Defendant's [25] Motion for Summary Judgment, as the sole issue raised therein is whether Plaintiff has standing to bring the instant case, the Court shall

© 2008 Thomson/West. No Claim to Orig. US Gov. Works.

compare the facts as set forth in Defendant's [25] Memorandum with those proffered by Plaintiff in his Opposition. In so doing, the Court concludes that no genuine issues of material fact exist, as both Parties rely on Plaintiff's affidavit and interrogatory answers in drawing their factual conclusions.

**\*2** Plaintiff is a resident of Boyds, Maryland, who is diagnosed with paraplegia and uses a wheelchair full time. Def.'s Mot. for Summ. J. ¶ 1; Pl.'s Opp'n at 1; Compl. at 1. Plaintiff is the Executive Director of Access Information, Inc. and works from home. [FN1] Def.'s Mot. for Summ. J. ¶ 4(a); Pl.'s Opp'n, Ex. B at 3. Plaintiff has brought at least 17 other ADA actions, largely in the United States District Court for the District of Columbia and the United States District Court for the District of Maryland. Def.'s Mot. for Summ. J. ¶ 4(c) & (d); Pl.'s Opp'n, Ex. B (PACER Attachments to Interrog. Answers).

> FN1. While Plaintiff's Complaint states that "Mr. Holt works in Washington, DC," Compl. ¶ 3, Plaintiff's Interrogatory Answers clarify that his employment address is the same as his home address in Boyds, Maryland. Pl.'s Opp'n, Ex. B (Interrog.Answers) at 3.

Some time in August of 2004, Plaintiff visited the Restaurant, located at 5532 Connecticut Ave., NW, Washington, DC, 20015, at approximately 1:30 p.m. Def.'s Mot. for Summ. J. ¶ 2; Pl.'s Opp'n at 2, Ex. B at 3 (Plaintiff's Answers to Interrogatories ("Interrog .Answers")). Plaintiff's residence is located approximately 26 miles away from the Restaurant. Def.'s Mot. for Summ. J. ¶ 4(a) & n. 1, Ex. 1; Pl.'s Opp'n at 10. The Restaurant is not part of a larger chain of businesses. Def.'s Mot. for Summ. J. ¶ 4(c). On the unspecified date in question, Plaintiff:

> had time prior to a meeting and was hungry and wanted to have lunch. Plaintiff further stated that he parked on the street in front of the restaurant to go inside and have some food and prepare for his meeting. He wheeled up toward the restaurant and saw how difficult and dangerous it was to ac-

cess the main entrance due to his disability and use of a wheelchair. He looked to see if there was a way he could ask for help to gain access, but he couldn't even get close enough to the entrance to get anyone's attention from the restaurant for help so he left.

Pl.'s Opp'n at 2 (citing Ex. B (Interrog.Answers) ¶ 4).

On August 31, 2005, at least one year after Plaintiff visited the Restaurant, Plaintiff filed a Complaint alleging nine violations of the ADA and 28 C.F.R. § 36.302, *et. seq.* Compl. ¶ 12. Plaintiff's Complaint states that Defendant is discriminating against the Plaintiff via the following barriers to access:

> i. The threshold at the ramp outside the entrance to the restaurant is too high;
> ii. There is no level landing provided outside the entry door to the restaurant;
> iii. There is insufficient clear floor space provided outside the entry door to the restaurant;
> iv. There is insufficient knee clearance provided at the common use lavatory;
> v. The door to the toilet room contains hardware that requires tight grasping, pinching and twisting of the wrist;
> vi. The lavatory contains hardware that requires tight grasping, pinching and twisting of the wrist;
> vii. The "accessible" toilet stall is too narrow;
> viii. The "accessible" toilet stall lacks adequate and compliant grab bars;
> ix. There is an insufficient number of "accessible" seating positions provided in the RESTAURANT.

Compl. ¶ 12. While in Plaintiff's Affidavit, Plaintiff indicates that during his "visits" to the Restaurant, Plaintiff himself "encountered barriers to access associated with the accessible parking, accessible route to the accessible restaurant entrance, accessible entrance doors, the toilet room and accessible dining room seating," Pl.'s Opp'n, Ex. A (Holt Affidavit) ¶ 3, Plaintiff admits in his Opposition that he did not actually enter the restaurant. Def.'s Mot. for Summ. J. ¶¶ 3, 6; Pl.'s Opp'n at 2 ("Plaintiff acknowledges not being served within the American

© 2008 Thomson/West. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2007 WL 1438489 (D.D.C.)
**(Cite as: 2007 WL 1438489 (D.D.C.))**

City Diner. He further stated that he 'failed to enter the restaurant because it was too difficult and dangerous to do so and he believed that it was likely he would have been physically injured .' " (quoting Interrog. Answers 7, 14) (internal citations omitted)). Accordingly, a number of the "barriers to access" listed by Plaintiff were not observed by Plaintiff himself. Def.'s Mot. for Summ. J. ¶ 3; Pl.'s Opp'n at 2-3 (indicating that Plaintiff's prior counsel visited the restaurant prior to the filing of suit and informed Plaintiff of the other barriers to access). Plaintiff further admits that he did not return to the restaurant after this one "visit" prior to filing the Complaint. Def.'s Mot. for Summ. J. ¶ 4(b); Pl.'s Opp'n at 2, 10-11.

**\*3** In Plaintiff's Complaint, Plaintiff states that he "continues to desire to and intends visit [sic] the Defendant's premises in the future, but continues to be denied full, safe and equal access due to the violations which continue to exist." Compl. ¶ 3. In his Opposition to Defendant's Motion for Summary Judgment, Plaintiff states that he "intends to go back to the restaurant once these barriers are removed." Pl.'s Opp'n at 8. Plaintiff states without further specification that "[h]e travels to this area approximately three times per week." Pl.'s Opp'n at 1. *See also id.,* Ex. B (Interrog.Answers) at 4 ("I frequently go to the area where this restaurant is located. I am in that area approximately three times per week."). Plaintiff requests injunctive and declaratory relief, in addition to reasonable attorney's fees. Compl. at 5-6. Defendant states and Plaintiff does not refute that "during that entire one year period [prior to Plaintiff filing suit], the Plaintiff never communicated personally or through counsel to the Defendant or anyone on behalf of the Defendant any concerns about accessibility to the restaurant for individuals with disabilities such as that from which [Plaintiff] suffers." Def.'s Mot. for Summ. J. ¶ 4.

On October 25, 2006, Defendant filed Defendant's [25] Motion for Summary Judgment, arguing that Plaintiff lacks standing to bring the instant suit. On

November 13, 2006, Plaintiff filed an Opposition. No Reply was filed.

### II. LEGAL STANDARD

A party is entitled to summary judgment if the pleadings, depositions, and affidavits demonstrate that there is no genuine issue of material fact in dispute and that the moving party is entitled to judgment as a matter of law. *See* Fed.R.Civ.P. 56(c); *Tao v. Freeh,* 27 F.3d 635, 638 (D.C.Cir.1994). Under the summary judgment standard, Defendant, as the moving party, "bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of 'the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any' which it believes demonstrate the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett,* 477 U.S. 317, 323, 106 S.Ct. 2548, 2553, 91 L.Ed.2d 265 (1986). Plaintiff, in response to Defendant's motion, must "go beyond the pleadings and by [his] own affidavits, or by the 'depositions, answers to interrogatories, and admissions on file,' designate 'specific facts showing that there is a genuine issue for trial.' " *Id.* at 324, 106 S.Ct. 2548.

Although a court should draw all inferences from the supporting records submitted by the nonmoving party, the mere existence of a factual dispute, by itself, is not sufficient to bar summary judgment. *See Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 247-48, 106 S.Ct. 2505, 2510, 91 L.Ed.2d 202 (1986). To be material, the factual assertion must be capable of affecting the substantive outcome of the litigation; to be genuine, the issue must be supported by sufficient admissible evidence that a reasonable trier-of-fact could find for the nonmoving party. *Laningham v. U.S. Navy,* 813 F.2d 1236, 1242-43 (D.C.Cir.1987); *Liberty Lobby,* 477 U.S. at 251-52, 106 S.Ct. 2505 (the court must determine "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law"). "If the evidence is merely colorable, or is not sufficiently probative, summary

© 2008 Thomson/West. No Claim to Orig. US Gov. Works.

judgment may be granted." *Liberty Lobby,* 477 U.S. at 249-50, 106 S.Ct. 2505 (internal citations omitted). "Mere allegations or denials of the adverse party's pleading are not enough to prevent the issuance of summary judgment." *Williams v. Callaghan,* 938 F.Supp. 46, 49 (D.D.C.1996). The adverse party "must do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 586, 106 S.Ct. 1348, 1356, 89 L.Ed.2d 538 (1986). Instead, while the movant bears the initial responsibility of identifying those portions of the record that demonstrate the absence of a genuine issue of material fact, the burden shifts to the non-movant to "come forward with 'specific facts showing that there is a *genuine issue for trial.*' " *Id.* at 587, 106 S.Ct. 1348 (citing Fed.R.Civ.P. 56(e)) (emphasis in original).

### III. DISCUSSION

**\*4** Pursuant to 42 U.S.C. § 12182, "No individual shall be discriminated against on the basis of disability in the full and equal enjoyment of the goods, services, facilities, privileges, advantages, or accommodations of any place of public accommodation by any person who owns, leases (or leases to), or operates a place of public accommodation." 42 U.S.C. § 12182(a). Discrimination under Title III includes both "a failure to remove architectural barriers, and communication barriers that are structural in nature, in existing facilities ... where such removal is readily achievable," and "where an entity can demonstrate that the removal of a barrier under clause (iv) is not readily achievable, a failure to make such goods, services, facilities, privileges, advantages, or accommodations available through alternative methods if such methods are readily achievable." 42 U.S.C. § 12182(b)(2)(A)(iv) & (v). Pursuant to 28 C.F.R. § 36.104, "readily achievable" means "easily accomplishable and able to be carried out without much difficulty or expense." 28 C.F.R. § 36.104. Plaintiff's Complaint alleges violations of the aforementioned statute and regulation.

However, as an Article III court, this Court's judi-

cial power is limited to adjudicating actual "cases" and "controversies." *Allen v. Wright,* 468 U.S. 737, 750, 104 S.Ct. 3315, 82 L.Ed.2d 556 (1984). "In an attempt to give meaning to Article III's case-or-controversy requirement, the courts have developed a series of principles termed 'justiciability doctrines,' among which are standing[,] ripeness, mootness, and the political question doctrine." *Nat'l Treasury Employees Union v. United States,* 101 F.3d 1423, 1427 (D.C.Cir.1996) (citing *Allen,* 468 U.S. at 750, 104 S.Ct. 3315). These doctrines incorporate both the prudential elements, which "Congress is free to override," *id.* (quoting *Fair Employment Council of Greater Wash., Inc. v. BMC Mktg. Corp.,* 28 F.3d 1268, 1278 (D.C.Cir.1994)) (internal quotations omitted), and "core component[s]" which are "essential and unchanging part[s] of the case-or-controversy requirement of Article III," *id.* (quoting *Lujan v. Defenders of Wildlife,* 504 U.S. 555, 560, 112 S.Ct. 2130, 119 L.Ed.2d 351 (1992) (internal quotations omitted)). In order to satisfy the constitutional standing requirements, a plaintiff must establish (1) that he or she has suffered an injury in fact, which is the invasion of a legally protected interest which is (a) concrete and particularized and (b) actual or imminent, not conjectural or hypothetical; (2) that there is a causal connection between the injury and the conduct at issue, such that the injury is fairly traceable to the challenged act; and (3) that it is likely as opposed to speculative that the injury will be redressed by a favorable decision. *Lujan,* 504 U.S. at 560-61, 112 S.Ct. 2130.

Furthermore, in an action requesting injunctive or declaratory relief, a demonstration of imminent, future injury is required to demonstrate standing. "In actions for injunctive relief, harm in the past--as the district court correctly held--is not enough to establish a present controversy, or in terms of standing, an injury in fact." *Am. Soc'y for the Prevention of Cruelty to Animals v. Ringling Bros. & Barnum & Bailey Circus,* 317 F.3d 334, 336 (D.C.Cir.2003). "Past exposure to illegal conduct does not in itself show a present case of controversy regarding in-

© 2008 Thomson/West. No Claim to Orig. US Gov. Works.

Case 1:07-cv-01528-JR    Document 25-11    Filed 06/06/2008    Page 6 of 10

junctive relief, however, if unaccompanied by any continuing, present adverse effects." *O'Shea v. Littleton,* 414 U.S. 488, 495, 94 S.Ct. 669, 676, 38 L.Ed.2d 674 (1974). In a claim for injunctive relief, a plaintiff "must allege a likelihood of future *violations* of [his] rights ..., not simply future *effects* from past violations." *Fair Employment Council of Greater Wash., Inc. v. BMC Marketing Corp.,* 28 F.3d 1268, 1273 (D.C.Cir.1994). " 'Because injunctions regulate future conduct, a party has standing to seek injunctive relief only if the party alleges, and ultimately proves, a real and immediate--as opposed to merely conjectural or hypothetical--threat of future injury.' " *Natural Resources Defense Counsel v. Pena,* 147 F.3d 1012, 1022 (D.C.Cir.1998) (quoting *Church v. City of Huntsville,* 30 F.3d 1332, 1337 (11th Cir.1994)). *See also City of Los Angeles v. Lyons,* 461 U.S. 95, 105, 103 S.Ct. 1660, 1667, 75 L.Ed.2d 675 (1983) ("Lyons' standing to seek the injunction requested depended on whether he was likely to suffer future injury....").

**\*5** Plaintiff in the instant case bears the burden of demonstrating that he has standing to bring suit. *See Lujan,* 504 U.S. at 561, 112 S.Ct. 2130 ("The party invoking federal jurisdiction bears the burden of establishing [the] elements [of standing]."). The Court further notes that in the context of a motion for summary judgment on the issue of standing, Plaintiff faces a higher burden in meeting the elements of standing than when faced with a motion to dismiss:

Since [the elements of standing] are not mere pleading requirements but rather an indispensable part of the plaintiff's case, each element must be supported in the same way as any other matter on which the plaintiff bears the burden of proof, *i.e.,* with the manner and degree of evidence required at the successive stages of the litigation. At the pleading stage, general factual allegations of injury resulting from the defendant's conduct may suffice, for on a motion to dismiss we presume that general allegations embrace those specific facts that are necessary to support the claim. In

response to a summary judgment motion, however, the plaintiff can no longer rest on such "mere allegations," but must "set forth" by affidavit or other evidence "specific facts," Fed. Rule Civ. Proc. 56(e), which for purposes of the summary judgment motion will be taken to be true.

*Id.* at 561 (internal citations and quotations omitted).

In the instant case, Plaintiff simply has not met his burden of demonstrating any intent to return to the Restaurant beyond his abstract statement that he desires to do so at some unspecified point in the future. Under existing Supreme Court and D.C. Circuit precedent, albeit in a slightly different context, an abstract statement of intent to return to a site where an alleged future injury will occur is not enough to demonstrate "imminent" future injury required for a plaintiff to have standing to seek injunctive relief:

The [affidavits allegedly demonstrating standing] plainly contain no facts, however, showing how damage to the species will produce "imminent" injury to [the affiants]. That the women "had visited" the areas of the projects before the projects commenced proves nothing. As we have said in a related context, " 'Past exposure to illegal conduct does not in itself show a present case or controversy regarding injunctive relief ... if unaccompanied by any continuing, present adverse effects.' " *Lyons,* 461 U.S. at 102, 103 S.Ct. at 1665 (quoting *O'Shea v. Littleton,* 414 U.S. 488, 495-496, 94 S.Ct. 669, 676, 38 L.Ed.2d 674 (1974)). And the affiants' profession of an "inten[t]" to return to the places they had visited before--where they will presumably, this time, be deprived of the opportunity to observe animals of the endangered species--is simply not enough. Such "some day" intentions--without any description of concrete plans, or indeed even any specification of *when* the some day will be-- do not support a finding of the "actual or imminent" injury that our cases require.

**\*6** *Lujan,* 504 U.S. at 564, 112 S.Ct. 2130. In *Fair Employment Council,* the instant circuit concluded

that tester plaintiffs bringing suit against an employment agency for violations of Title VII and § 1981 lacked standing to seek injunctive or declaratory relief, "for they have not made sufficient allegations that they are threatened with any future illegality." *Fair Employment Council,* 28 F.3d at 1272. Because said tester plaintiffs used fake credentials, they could not reasonably hope to be considered for employment referrals on the basis of said credentials; nor did they allege that they would return to that employment agency to seek referrals in the reasonably near future. *Id.* at 1273. Indeed, while the D.C. Circuit noted in *Animal Legal Defense Fund v. Epsy* that an individual formerly working as a psychobiologist who alleged that a regulation's failure to define mice and rats as animals affected her ability to conduct research made "a marginally more impressive [claim] than that advanced by the affiants in *Lujan* ... because *Lujan* contrasts vague intentions with 'a description of concrete plans,' "

> the central question is the immediacy rather than the specificity of the plan, for the underlying purpose of the imminence requirement is to ensure that the court in which suit is brought does not render an advisory opinion in a case in which no injury would have occurred at all.

*Animal Legal Defense Fund., Inc. v. Epsy,* 23 F.3d 496, 500 (D.C.Cir.1994) (internal quotations and citations omitted).

Plaintiff in this case has neither a concrete nor specific nor imminent plan to return to the Restaurant based on the statements set forth in Plaintiff's Opposition and the documents attached thereto. In Plaintiff's Complaint, Plaintiff states that he "continues to desire to and intends visit [sic] the Defendant's premises in the future, but continues to be denied full, safe and equal access due to the violations which continue to exist." Compl. ¶ 3. In his Opposition, Plaintiff states that he "intends to go back to the restaurant once these barriers are removed." Pl.'s Opp'n at 8. Plaintiff states without further specification that "[h]e travels to this area approximately three times per week." Pl.'s Opp'n at 1. *See also id.,* Ex. B (Interrog.Answers) at 4 ("I

frequently go to the area where this restaurant is located. I am in that area approximately three times per week."). These statements comprise the entirety of Plaintiff's "intention" to return to the Restaurant, and as such, do not meet Plaintiff's burden of setting forth specific facts to refute Defendant's Motion for Summary Judgment on standing grounds. In a case where the D.C. Circuit found that a plaintiff had standing to pursue injunctive relief, the plaintiff had demonstrated a factual predicate supporting his intent to return. On a motion to dismiss rather than a motion for summary judgment, the D.C. Circuit concluded that a former elephant handler for a particular circus, "[b]ased upon his desire to visit the elephants (which we must assume might include attending a performance of the circus), his experience with the elephants, his alleged ability to recognize the effects of mistreatment, and what an injunction would accomplish," had proffered allegations "sufficient to withstand a motion to dismiss for lack of standing." *Ringling Bros.,* 317 F.3d at 338. In contrast, Plaintiff in this action does not give the Court any reason why he desires to return to the Restaurant. For example, Plaintiff does not claim to enjoy diner food. Nor does Plaintiff substantiate his statement that he is in the "area" three times per week with any definition of what comprises the "area" he invokes, be it Washington, D.C. in general, Northwest Washington, D.C., Upper Northwest Washington, D.C., or Connecticut Avenue in particular. In Plaintiff's Exhibit C (Affidavit of Steven Mason, Tchernenshoff Consulting (specialist in barrier removal under the ADA)), the restaurant "Arucola" is listed as located "adjacent" to the American City Diner Restaurant. Pl.'s Opp'n, Ex. C at 22. In fact, a number of restaurants are located on Connecticut Avenue within a few blocks of the American City Diner, including Mandarin Palace, sued by Plaintiff in this court in Civil Action No. 05-1744, located across the street from the American City Diner Restaurant at 5540 Connecticut Avenue, NW. Plaintiff does not distinguish the American City Diner Restaurant or explain in any way why he wishes to return to that Restaurant in particular as opposed to the numerous

© 2008 Thomson/West. No Claim to Orig. US Gov. Works.

other restaurants within a few-block vicinity or the multiplicity of restaurants in a larger area or in Washington, D.C. in its entirety. Finally, Plaintiff effectively admits that "during that entire one year period [prior to Plaintiff filing suit], [he] never communicated personally or through counsel to the Defendant or anyone on behalf of the Defendant any concerns about accessibility to the restaurant for individuals with disabilities such as that from which [Plaintiff] suffers," Def.'s Mot. for Summ. J. ¶ 4, which further undercuts any genuine desire to visit the Restaurant with any immediacy.

*7 The Court notes that while the instant circuit has not considered standing in a manner directly applicable to the Title III ADA claim at issue in this case, a number of district court cases from the Ninth and Eleventh Circuits, invoking *Lujan*, apply a four-factor test in determining whether or not a Title III ADA plaintiff has sufficiently shown future injury warranting the injunctive relief requested. While this Court does not rely on such cases nor on this four-factor analysis in drawing its conclusion that Plaintiff does not have standing to pursue the instant case (instead relying on the standing requirements for injunctive relief set forth in Supreme Court and D.C. Circuit precedent) and acknowledges that the holdings of these district court cases do not reflect a uniform application of the tenets of this four-factor standard, the Court will briefly address this analysis herein.

As set forth by a court in the United States District Court for the Central District of California,

In evaluating whether an ADA plaintiff has established a likelihood of future injury, courts have looked to such factors as: (1) the proximity of the place of public accommodation to plaintiff's residence, (2) plaintiff's past patronage of defendant's business, (3) the definitiveness of plaintiff's plans to return, and (4) the plaintiff's frequency of travel near defendant.

*Molski v. Mandarin Touch Restaurant,* 385 F.Supp.2d 1042 (C.D . Cal.2005) (granting defendant's motion for summary judgment for lack of

standing). *See also Harris v. Del Taco, Inc.,* 396 F.Supp.2d 1107, 1113 (C.D.Cal.2005) (same). Factor three, "the definitiveness of plaintiff's plans to return," is clearly undercut by Plaintiff's vague statement that he would like to return to the Restaurant absent any reason why (given that Plaintiff has never eaten at the Restaurant, and that the Restaurant is not part of a larger chain, [FN2] both of which are considered under Factor two) or when Plaintiff would like to do so. [FN3]

FN2. *See Pickern v. Holiday Quality Foods Inc.,* 293 F.3d 1133, 1138 (9th Cir.2002) ("[Plaintiff] has visited Holiday's Paradise store in the past and states that he has actual knowledge of the barriers to access at that store. [Plaintiff] also states that he prefers to shop at Holiday markets and that he would shop at the Paradise market if it were accessible. This is sufficient to establish actual or imminent injury for purposes of standing.").

FN3. While Plaintiff cites to *Organization for the Advancement of Minorities with Disabilities Suing on Behalf of Its Members v. Brick Oven Restaurant,* 406 F.Supp.2d 1120, 1126 (S.D.Cal.2005), wherein the court found that plaintiff's declaration of an intent to return to the restaurant in the immediate future as he frequently visited the area was sufficient in demonstrating actual or imminent injury, the court's ruling was in the context of a pending motion to dismiss rather than a motion for summary judgment.

Relying on one of the cases employing this standard, Plaintiff implies that definite plans to return are not necessary, arguing that "where a plaintiff lacks 'concrete plans to return,' the Court must satisfy itself that the plaintiff's professed intent to return is sincere and supported by the factual circumstances of the case." Pl.'s Opp'n at 11 (quoting *Parr v. L & L Drive-Inn Restaurant,* 96 F.Supp.2d 1065, 1079-80 (D.Haw.2000)). [FN4] However, even tak-

Not Reported in F.Supp.2d                                                                                    Page 8
Not Reported in F.Supp.2d, 2007 WL 1438489 (D.D.C.)
**(Cite as: 2007 WL 1438489 (D.D.C.))**

ing Plaintiff's argument at face value, Plaintiff has not demonstrated an intent to return that is sincere and supported by the factual circumstances of the case, nor does *Parr* provide support for Plaintiff's argument in this case.

> FN4. Plaintiff, in the same paragraph, also argues that "Defendant's statements regarding other lawsuits are unprofessional, irrelevant, scandalous, and should be stricken as immaterial pursuant to Fed.R.Civ.P. 12(f)." Pl.'s Opp'n at 11. The Court rejects Plaintiff's request to strike Defendant's statements, which note that Plaintiff "has been involved in no less than 17 lawsuits filed in the Washington metropolitan area from 2001 through 2006," Def.'s Mot. for Summ. J. ¶ 8, and which do not state that Plaintiff is engaging in abusive litigation. Rather, while the Court shall not do so in the present case, numerous courts have considered a plaintiff's litigation history in other Title III suits in assessing standing. *See, e.g., Mandarin* Touch, 385 F.Supp.2d at 1046; *Brother v. Tiger Partner, LLC,* 331 F.Supp.2d 1368, 1373 (M.D.Fla.2004).

Standing to bring claims for injunctive relief for an ADA claim is established if a plaintiff can show a plausible intention or desire to return to the place of the injury but for the barriers to access. In contrast, the failure to allege an intention or desire to return to the place where a plaintiff encountered an ADA violation or merely alleging an intention to return "some day" merits dismissal.

**\*8** *Access 4 All, Inc. v. Trump Intern. Hotel and Tower Condominium,* 458 F.Supp.2d 160, 168 (S.D.N.Y.2006) (internal quotations and citations omitted) (holding that Plaintiff demonstrated an intent to return to a hotel by indicating that he conducts business in New York City, had visited the building in which the hotel was located prior to his stay at the hotel, and would specifically like to dine at a world-famous restaurant (Jean Georges) in the

same building). As stated above, Plaintiff in this case does not indicate why he would like to return to the American City Diner Restaurant, what distinguishes the Restaurant from other nearby restaurants, or what constitutes the "area" that Plaintiff alleges to frequent three times a week. Furthermore, in *Parr,* a court in the United States District Court for the District of Hawaii, noting that "[r]easonable courts could reach different results," held that a plaintiff who had visited a particular restaurant once but had visited other restaurants in the same chain and professed a distinct taste for that chain's food demonstrated a future injury sufficient to support standing. *Parr,* 96 F.Supp.2d at 1079. While the instant Court does not base its decision on Plaintiff's not having "visited" the Restaurant more than once or ever having been inside the Restaurant, Plaintiff must at very least profess some specific interest in the American City Diner Restaurant in order to support his claim that he desires to patronize it in the imminent future.

### IV. CONCLUSION

If the Court were to conclude that Plaintiff in the instant case had met his burden of demonstrating standing in his Opposition to Defendant's Motion for Summary Judgment based on Plaintiff's statements that he intends to return to the Restaurant and frequents the "area" of the Restaurant approximately three times a week, with nothing further, the Court would in essence have to conclude that any disabled individual who had visited a restaurant one time and passed through the area with some regularity could properly bring suit against that public accommodation on the basis of such general declarations. The Court finds that such a conclusion would stretch the definition of Article III standing beyond its limits and turn *Lujan* on its face. Accordingly, based on the reasoning set forth in this Opinion, the Court shall GRANT Defendant's [25] Motion for Summary Judgment and DENY AS MOOT Plaintiff's [24] Motion for Summary Judgment. An Order accompanies this Memorandum Opinion.

© 2008 Thomson/West. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d                                                    Page 9
Not Reported in F.Supp.2d, 2007 WL 1438489 (D.D.C.)
**(Cite as: 2007 WL 1438489 (D.D.C.))**

Not Reported in F.Supp.2d, 2007 WL 1438489
(D.D.C.)

END OF DOCUMENT

© 2008 Thomson/West. No Claim to Orig. US Gov. Works.

**EXHIBIT 3**
**Part G**

Not Reported in F.Supp.2d                                    Page 1
Not Reported in F.Supp.2d, 2007 WL 2023497 (N.D.Cal.)
(Cite as: 2007 WL 2023497 (N.D.Cal.))

H

Only the Westlaw citation is currently available.

United States District Court,
N.D. California.
Robert S. KOSLOFF, Plaintiff,
v.
WASHINGTON SQUARE ASSOCIATES, LLC;
Mahmoud I. Dabbas, Defendants.
No. C 06-05060 SI.

July 12, 2007.

Sidney J. Cohen, Sidney J. Cohen Professional Corporation, Oakland, CA, for Plaintiff.

David Frederick Faustman, Fox Rothschild LLP, San Francisco, CA, for Defendant.

Mahmound I. Abbas, Petaluma, CA, pro se.

### ORDER AWARDING ATTORNEY'S FEES AND COSTS

SUSAN ILLSTON, United States District Judge.

**\*1** Plaintiff's motion for attorney's fees and costs is currently scheduled for hearing on July 13, 2007. Pursuant to Civil Local Rule 7-1(b), the Court determines that the matter is appropriate for resolution without oral argument, and hereby VACATES the hearing. Having carefully considered the arguments of counsel and the papers submitted, the Court GRANTS IN PART plaintiff's motion and awards fees and costs as set forth below.

### BACKGROUND

According to the complaint, plaintiff Robert S. Kosloff is physically disabled and requires the use of a wheelchair. Plaintiff visited Essa's Restaurant (owned at the time by defendant Mahmoud I. Abbas) in the Washington Square Shopping Center in Petaluma, California in July of 2005. On December 27, 2005, plaintiff wrote a letter to defendants detailing alleged disability access barriers in the restaurant and surrounding parking lot. Defendants responded to the letter, stating that they were in the process of making site improvements to ensure compliance with the ADA. Plaintiff returned to the Restaurant and Shopping Center on August 19, 2006. Plaintiff was not satisfied by the disability access provided by defendants and the lack of progress. Consequently, plaintiff filed suit in this Court, on August 22, 2006, alleging violations of the Americans with Disabilities Act and various California codes. Plaintiff requested injunctive relief, damages, and fees and costs.

The parties conducted unofficial discovery and light settlement negotiations. No dispositive motions were filed by the parties. After a single mediation session on May 10, 2007, Washington Square entered into a settlement agreement with plaintiff; accordingly, the Court dismissed the injunctive relief and damages aspects of the complaint against Washington Square on June 6, 2007. Plaintiff now moves for attorneys' fees and costs under both federal and state law. Plaintiff requests an award of fees in the amount $88,699 and costs of $4,199. Plaintiff also requests a 1.2 multiplier be applied to the lodestar amount, creating a total requested award for attorneys' fees and costs of $110,637.

### LEGAL STANDARD

The authority to award attorneys' fees is derived in part from Section 505 of the ADA, which provides that "in any action or administrative proceeding commenced pursuant to [the ADA], the court or agency, in its discretion, may allow the prevailing party ... a reasonable attorney's fee, including litigation expenses, and costs." 42 U.S.C. § 12205. Plaintiffs are entitled to fees under the ADA and similar state statutes using the "lodestar" measure of fees, which is obtained by multiplying the number of hours reasonably expended on litigation by a reasonable hourly rate. *See Jordan v. Multnomah County,* 815 F.2d 1258, 1262 (9th Cir.1987) (citing *Hensley v. Eckerhart,* 461 U.S. 424, 103 S.Ct. 1933, 76 L.Ed.2d 40 (1983)). In evaluating what is a reasonable number of hours, the Court must review detailed time records to determine whether the

hours claimed by the applicant were unnecessary, duplicative or excessive. *Chalmers v. City of Los Angeles,* 796 F.2d 1205, 1210 (9th Cir.1986), *reh'g denied, amended on other grounds,* 808 F.2d 1373 (9th Cir.1987). It is the fee applicant who "bears the burden of establishing entitlement to an award and documenting the appropriate hours expended and hourly rates. The applicant should exercise 'billing judgment' with respect to hours worked ... and should maintain billing time records in a manner that will enable a reviewing court to identify distinct claims." *Hensley,* 461 U.S. at 437 (1983).

**\*2** In calculating the lodestar, the Court should consider any of the factors listed in *Kerr v. Screen Extras Guild, Inc.,* 526 F.2d 67 (9th Cir.1975), cert. denied, 425 U.S. 951, 96 S.Ct. 1726, 48 L.Ed.2d 195 (1976), that are relevant. *See Jordan,* 815 F.2d at 1264 n. 11 (noting that the Ninth Circuit no longer requires that the district court address every factor listed in Kerr). In *Kerr,* which was decided before the lodestar approach was adopted by the Supreme Court as the starting point for determining reasonable fees in *Hensley v. Eckerhart,* 461 U.S. 424, 433, 103 S.Ct. 1933, 76 L.Ed.2d 40 (1983), the Ninth Circuit adopted the 12-factor test articulated in *Johnson v. Georgia Highway Express, Inc.,* 488 F.2d 714 (5th Cir.1974). This analysis looked to the following factors for determining reasonable fees: (1) the time and labor required; (2) the novelty and difficulty of the questions involved; (3) the skill requisite to perform the legal service properly; (4) the preclusion of other employment by the attorney due to acceptance of the case; (5) the customary fee; (6) whether the fee is fixed or contingent; (7) time limitations imposed by the client or the circumstances; (8) the amount involved and the results obtained; (9) the experience, reputation, and ability of the attorneys; (10) the "undesirability" of the case; (11) the nature and length of the professional relationship with the client; and (12) awards in similar cases.

To the extent that the *Kerr* factors are not addressed in the calculation of the lodestar, they may be con-

sidered in determining whether the fee award should be adjusted upward or downward, once the lodestar has been calculated. *Chalmers,* 796 F.2d at 1212. However, there is a strong presumption that the lodestar figure represents a reasonable fee. *Jordan,* 815 F.2d at 1262. An upward adjustment of the lodestar is appropriate only in extraordinary cases, such as when the attorneys faced exceptional risks of not prevailing or not recovering any fees. *Chalmers,* 796 F.2d at 1212.

Under California law also, the "prevailing party" is entitled to attorney's fees. Under California Code of Civil Procedure § 1021 .5, a plaintiff is entitled to attorneys' fees for enforcing "an important right affecting the public interest," if a "significant benefit ... has been conferred on the general public or a large class of persons." Providing access to disabled individuals constitutes an important right affecting the public interest. California Government Code § 19230. State law also establishes the lodestar method as the proper method of calculation. *Crommie v. State of California,* 840 F.Supp. 719, 724-25 (N.D.Cal.1994).

## DISCUSSION

### I. Attorney's fees

### A. Plaintiff is entitled to attorney's fees as the prevailing party

Defendants dispute plaintiff's entitlement to attorneys' fees under the ADA and the California "private attorney general" statute. Defendant first argues that plaintiff's claim was unsuccessful because there was no judgment on the merits, and no material alteration of the legal relationship between the parties. Oppo. at 3 (citing *Farrar v. Hobby,* 506 U.S. 103, 111-12, 113 S.Ct. 566, 121 L.Ed.2d 494 (1992)). The Supreme Court held in *Farrar* that "to qualify as a prevailing party, a civil rights plaintiff must obtain at least some relief on the merits of the claim. The plaintiff must obtain an enforceable judgment against the defendant from whom fees are sought, or comparable relief through a consent decree or settlement." *Id.* at 111 (citations omitted).

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d    Page 3
Not Reported in F.Supp.2d, 2007 WL 2023497 (N.D.Cal.)
**(Cite as: 2007 WL 2023497 (N.D.Cal.))**

The right to enforce the terms of a settlement agreement is a material alteration of the legal relationship between the parties. *Id.* at 113. "Under applicable Ninth Circuit law, a plaintiff 'prevails' when he or she enters into a legally enforceable settlement agreement against the defendant." *Barrios v. California Interscholastic Federation,* 277 F.3d 1128, 1134 (9th Cir.2002). Here, plaintiff entered into a legally enforceable settlement agreement against defendant, including injunctive relief and $14,000 in compensatory damages. This is sufficient to establish plaintiff as the prevailing party under federal law. *Id.* at 1135; *see also Richard S. v. Dep't. of Developmental Servs.,* 317 F.3d 1080, 1087 (9th Cir.2003).

**B. Joint and Several Liability**

**\*3** Defendant next argues that attorney's fees should be allocated between both defendants, either equally or equitably. Defendant claims it should not be held accountable for counsel's work on claims against the other defendant, Dabbas. Oppo. at 14:2-3. Defendant offers no authority for this desired reduction. The express terms of the ADA hold both landlord and tenant liable to third parties for noncompliance, regardless of allocation of liability as between themselves. *See Botosan v. Paul McNally Realty,* 216 F.3d 827, 832 (9th Cir.2000). The Ninth Circuit elaborated on this rule by quoting from the DOJ's interpretation of the ADA:

> **Both the landlord and the tenant are public accommodations and have full responsibility for complying with all ADA title III requirements applicable to that place of public accommodation. The title III regulation permits the landlord and the tenant to allocate responsibility, in the lease, for complying with particular provisions of the regulation. However, any allocation made in a lease or other contract is only effective as between the parties, and both landlord and tenant remain fully liable for compliance with all provisions of the ADA relating to that place of public accommodation.**

*Id.* (citations omitted). Therefore, defendants

Washington Square and Dabbas are joint and severally liable for all compensation to plaintiff under the ADA, including federally authorized attorney's fees.

**C. Hourly rate**

Plaintiff requests attorney's fees for Sidney Cohen at an hourly rate of $420 for 2005, and $450 for 2006-2007. Plaintiff submits substantial evidence that the claimed fees are reasonable given the education, skill and experience of counsel, the amount he normally charges for his legal services and the market rate for attorneys of comparable skill and experience. *See* Motion at 11-13, and evidence cited therein. Defendants present no evidence that counsel's rates are unreasonable. Therefore, the Court finds that the hourly rates are reasonable.

**D. Reasonable hours expended**

Plaintiff requests an award compensating counsel for over 197 hours of attorney time reasonably spent on litigation. Defendant argues the results could have been achieved with significantly less work and requests a reduction in the number of hours factored into the lodestar. Additionally, defendant argues that Mr. Cohen has claimed hours for secretarial and clerical tasks. This Court finds that the fees requested are, in certain instances, excessive and must therefore be reduced.

In support of his motion, plaintiff attaches the handwritten time sheets compiled by Mr. Cohen during the course of the litigation, which the Court has reviewed. *See* Cohen Decl., Ex. 4; Cohen Reply Decl., Ex. 8. As an initial observation, the Court notes that the handwritten time sheets are virtually illegible, and that his calculations were unreliable. [FN1] As a result, the Court independently calculated Mr. Cohen's hours based on the handwritten time sheets, and determines that Mr. Cohen's records apparently reflect a total time of 134 hours and 45 minutes on the date he filed the motion. [FN2]

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

FN1. Mr. Cohen's records do not include any tally of total hours by month or year, except that in the motion plaintiff claims 36 hours and 35 minutes for 2007, at $450 per hour, for a claimed total of $37,162. At Mr. Cohen's established rate of $450 per hour, it would take 82 hours and 45 minutes to total that amount. The records provided to not establish or support a finding of over 82 hours time.

FN2. 7 hours and 35 minutes in 2005, 53 hours and 35 minutes in 2006, and 73 hours and 35 minutes prior to June 7, 2007. It appears to the Court that counsel has recorded hours and minutes on his time sheets, and these figures have been calculated accordingly.

**\*4** Defendant argues that the time spent on this case was excessive. Defendant requests a 10% reduction in the hours billed for research to identify the names of defendants, drafting and revising of the complaint, and preparing plaintiff's initial disclosures. The Court agrees with defendant that this case was a typical ADA case that did not involve unique factual or legal issues. This is demonstrated by the fact that the parties did not file a single substantive motion with the Court. Furthermore, plaintiff's Complaint is identical in all substantive respects to complaints used in other ADA lawsuits, including several other cases Mr. Cohen has brought on behalf of Mr. Kosloff. *See* Oppo., Exh. 14. The time sheets reflect, scattered over various entries, that Mr. Cohen spent some 6 hours 5 minutes drafting, and amending the complaint and identifying the parties. The Court does not accept that it reasonably took this much time. [FN3] There are only three paragraphs in the complaint that are at all unique to this case. The Court therefore awards 1.0 hour for this task.

FN3. Mr. Cohen had the burden of clearly and legibly identifying how many hours were spent on which task, in order to facilitate review by the court. *See Hensley,* 461

U.S. at 437 (1983). Where time spent on the complaint is blocked with other tasks, the court has included this in the calculation of time spent on the complaint and reduced the total time accordingly.

Defendant argues that the time Mr. Cohen spent with plaintiff's expert witness, Mr. Margen, should be stricken as irrelevant and unnecessary. The Court finds this argument unfounded.

Defendant requests a reduction in Mr. Cohen's billable time for secretarial and clerical time he performed. Defendant points to numerous specific instances of time billed by Mr. Cohen that it claims were for secretarial or clerical tasks. *See* Oppo. at 15-16. These entries, where legible, include time spent making and scheduling appointments, leaving messages, preparing billing statements, calculating fees, faxing, mailing, and e-filing documents. The Court determines that these tasks could easily have been carried out by persons with less expensive skills than Mr. Cohen, and accordingly should have been billed at appropriate paralegal or secretarial rates. The Court finds that the following time should have been billed, at most, at a paralegal rate: 15 minutes in 2005, 4 hours and 15 minutes in 2006, and 4 hours and 15 minutes in 2007. The Court awards $110 per hour for the paralegal work.

The next problematic request is Mr. Cohen's claim for over 22 hours for preparing this motion for attorney's fees. Mr. Cohen has prepared dozens of similar motions in his career as an ADA attorney, and this motion raised no new legal issues. The Court finds this time excessive, and reduces the total time for this motion to 16 hours. Mr. Cohen also claims to have spent 53 hours, almost a third of the total time he claims to have invested in this case over the course of two years, since June 6, 2007. In addition to being barely legible, Mr. Cohen's time sheets for this most recent period consist almost exclusively of block entries from which the Court cannot determine how much time was spent on any particular task. *See* Cohen Reply Decl., Ex. 8. Furthermore, the Court finds 53 hours excessive for

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2007 WL 2023497 (N.D.Cal.)
**(Cite as: 2007 WL 2023497 (N.D.Cal.))**

preparing a reply brief to a relatively straightforward motion for attorney's fees, and accordingly reduces the time for work done since June 7, 2007 to 10 hours.

## II. Multiplier

**\*5** Plaintiff also requests that the Court apply a multiplier of 1.2 to the lodestar amount in light of the results obtained, the importance of the case, and the contingent nature of plaintiff's fees. The Court finds that an enhancement to the lodestar amount is not appropriate in this instance. As described above, this was a straightforward disability case that did not require exceptional work on the part of plaintiff's counsel to obtain the Settlement Agreement reached by the parties. Liability was not in question in this case. [FN4] Plaintiff and his counsel are well-versed in disability law and are repeat players in disability litigation. There were no substantive motions filed, nor were there any novel legal issues involved. Therefore, the Court finds that plaintiff should not receive an enhancement on the lodestar amount.

> FN4. Plaintiff does not identify any contingent risk involved in the case, aside from stating that "[a]ll cases, no matter how strong on the merits, run the risk of losing." Mot. at 16. The Court finds that this is not sufficient to warrant an enhancement.

## III. Costs

Plaintiff requests an award of $ 4,199 for costs incurred by attorney Cohen during litigation. *See* Reply at 15. Defendant does not contest plaintiff's costs, and the Court therefore awards the requested costs.

## CONCLUSION

For the foregoing reasons and for good cause shown, the Court hereby GRANTS IN PART plaintiff's motion for attorneys' fees and costs, as follows:

1) Attorneys' Fees for Sidney Cohen in the amount of:
. 2005: 7 hours, 20 minutes. x $420/hour = $3,080
. 2006: 44 hours, 15 minutes. x $450/hour = $19,912.50
. 2007: 68 hours, 5 minutes. x $450/hour = $30,637.50
3) Paralegal Fees in the amount of:
. 2005-2007: 8 hours, 45 minutes x $110/hour = $962.50
4) Costs in the amount of $4,199.

The total award for attorney's fees and costs against Washington Square Associates, LLC is $58,791.50. The hours and costs awarded in this order represent the total amount of compensable attorney's fees in this case to date. If plaintiff is the prevailing party on his remaining claims against defendant Dabbas, only attorney's fees for time expended after this date, if any, will be compensable. [Doc. 22].

**IT IS SO ORDERED.**

Not Reported in F.Supp.2d, 2007 WL 2023497 (N.D.Cal.)

END OF DOCUMENT

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

**EXHIBIT 3**
**Part H**

Westlaw.

Not Reported in F.Supp.2d                                                                                          Page 1

Not Reported in F.Supp.2d, 2005 WL 2644996 (E.D.Pa.), 17 A.D. Cases 954, 31 NDLR P 117
**(Cite as: 2005 WL 2644996 (E.D.Pa.))**

C

United States District Court,
E.D. Pennsylvania.
KRATZER, et al., Plaintiff
v.
GAMMA MANAGEMENT GROUP, INC. Defendants.
**No. Civ.A.04-6031.**

Oct. 12, 2005.

Joel R. Zuckerman, Schwartz Zweben & Associates, LLP, Rockville, MD, for Plaintiff.

Randall Luke Wenger, Leonard G. Brown, III, Clymer & Musser, P.C., Lancaster, PA, for Defendants.

Memorandum and Order
PRATTER, J.

**\*1** Gamma Management Group ("Gamma"), the sole defendant in this action brought pursuant to the Americans with Disabilities Act, moves for the entry of summary judgment in its favor. For the reasons discussed below, the motion will be denied.

FACTS AND PROCEDURAL BACKGROUND

Plaintiffs in this case are Jaclyn Kratzer, William Ross and Ralph Trainer, three persons who each claim to be qualified individuals with disabilities pursuant to the Americans with Disabilities Act ("ADA"). [FN1] Gamma is a Pennsylvania corporation which is the current operator of the Ramada Inn & Conference Center located in Reading, Pennsylvania.

> FN1. Ms. Kratzer has cerebral palsy and requires the use of a motorized wheelchair at all times for mobility. *Kratzer Affidavit* at ¶ 2. Mr. Trainer has muscular dystrophy and requires the use of a motorized wheelchair at all times for mobility. *Trainer Affidavit* at ¶ 2. The nature of Mr. Ross's disability was not disclosed.

Plaintiffs each allege that they have personally visit the Ramada Inn & Conference Center (the "Center") and were denied "full, safe and equal access" to it "due to barriers which exist and the Defendant's lack of compliance with the ADA." *Complaint* at ¶¶ 3-5. In the one-count complaint, [FN2] Plaintiffs set forth numerous and fairly detailed allegations with respect to the ways in which the Center does not meet with ADA requirements, including assessments of the parking lot/main entrance, lobby/common area, lobby toilet rooms and guest rooms. *Complaint* at ¶ 14. Plaintiffs seek relief pursuant to 42 U.S.C. § 12188 of the ADA, including declaratory relief, an order directing Gamma to alter its facilities to make them accessible to disabled individuals and to evaluate and neutralize its policies, practices and procedures toward persons with disabilities, and an award of reasonable attorney's fees, costs and other expenses of suit.

> FN2. The complaint in question is the Amended Complaint. Plaintiffs amended the defendant named in the complaint from Spiral Realty to Gamma Management Group.

Before the close of discovery in the case, Gamma filed the present Motion for Summary Judgment. [FN3] In its Motion for Summary Judgment, Gamma argues that Plaintiffs do not have standing to bring the Amended Complaint because they have never attempted to stay at the hotel and have no current plans to hold a conference at the hotel. [FN4] Thus, Gamma argues that any harm asserted by Plaintiffs is speculative, thereby demonstrating that they have no imminent injury, a requirement for standing to bring a claim.

> FN3. An initial pretrial conference with the parties was held on July 5, 2005, approximately one week after Gamma filed its Motion for Summary Judgment. According to the Scheduling Order that was issued

Not Reported in F.Supp.2d                                                                                    Page 2
Not Reported in F.Supp.2d, 2005 WL 2644996 (E.D.Pa.), 17 A.D. Cases 954, 31 NDLR P 117
**(Cite as: 2005 WL 2644996 (E.D.Pa.))**

after the conference, discovery is to be completed on or before December 30, 2005. In their opposition to the Motion for Summary Judgment, Plaintiffs repeatedly assert that no discovery has taken place, thus many of the facts asserted by Gamma are disputed. *Plaintiffs' Response to Defendant's Statement of Facts* at ¶¶ 2, 4, 9. Given these circumstances, the Court observes that perhaps the Motion would have been more appropriately captioned as a motion for judgment on the pleadings.

FN4. Gamma additionally states that the fact that Plaintiffs have brought approximately 54 similar actions against various public accommodations is a material fact with respect to this case. *Motion for Summary Judgment* at ¶ 8. Plaintiffs do not deny this fact. *Opposition to Motion for Summary Judgment* at 3. While this fact, standing alone and absent any other allegations that Plaintiffs ever visited or intended to visit the Center, may warrant some scrutiny, that is not the case here. Thus, the Court does not consider this to be a fact relevant for consideration in the present motion.

DISCUSSION

A. Standard of Review

Summary judgment is appropriate "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c). An issue is "genuine" if the evidence is such that a reasonable jury could return a verdict for the non-moving party. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). A factual dispute is "material" if it might affect the outcome of the case under governing law. *Id.*

A party seeking summary judgment always bears the initial responsibility for informing the district court of the basis for its motion and identifying those portions of the record that it believes demonstrate the absence of a genuine issue of material fact. *Celotex Corp. v. Catrett,* 477 U.S. 317, 322, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). Where the non-moving party bears the burden of proof on a particular issue at trial, the moving party's initial burden can be met simply by "pointing out to the district court that there is an absence of evidence to support the non-moving party's case." *Id.* at 325. After the moving party has met its initial burden, "the adverse party's response, by affidavits or as otherwise provided in this rule, must set forth specific facts showing that there is a genuine issue for trial." Fed. R. Civ. P. 56(e). Summary judgment is appropriate if the non-moving party fails to rebut by making a factual showing "sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex,* 477 U.S. at 322. Under Rule 56, the Court must view the evidence presented on the motion in the light most favorable to the opposing party. *Anderson,* 477 U.S. at 255.

B. Standing of Plaintiffs

*2 The concept of standing involves both constitutional limitations on the jurisdiction of federal courts and prudential limitations [FN5] on the exercise of federal jurisdiction. *Warth v. Seldin,* 422 U.S. 490, 498, 95 S.Ct. 2197, 45 L.Ed.2d 343 (1975). The Supreme Court has instructed that to establish the "irreducible constitutional minimum" of standing, a plaintiff must demonstrate the following elements: (1) an "injury in fact," such as "an invasion of a legally protected interest which is (a) concrete and particularized and (b) actual or imminent, no 'conjectural' or 'hypothetical' "; (2) a causal connection between the injury and the conduct complained of; and (3) a "likely" as opposed to "speculative" injury that would be redressed by a favorable decision. *Lujan v. Defenders of Wildlife,* 504 U.S. 555, 561, 112 S.Ct. 2130, 119 L.Ed.2d

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

351 (1992). When standing is challenged on the basis of the pleadings in a case, a court must "accept as true all material allegations of the complaint, and ... construe the complaint in favor of the complaining party." *Sammon v. New Jersey Board of Medical Examiners,* 66 F.3d 639, 643 (3d Cir.1995) (quoting *Pennell v. San Jose,* 485 U.S. 1, 7, 108 S.Ct. 849, 99 L.Ed.2d 1 (1988)). Where a plaintiff asserts an injury as a result of a statutory violation, an analysis of the plaintiff's standing must focus on whether the plaintiff suffered an actual injury, and not whether the statute was violated. *Doe v. Nat'l Board of Medical Examiners,* 199 F.3d 146, 153 (3d Cir.1999).

> FN5. Under the prudential rules of standing, a court must consider whether a plaintiff is the proper party to invoke judicial resolution of a particular dispute. *Mariana v. Fisher,* 338 F.3d 189, 204 (3d Cir.2003). In this case, the question of constitutional standing is implicated, and prudential standing need not be addressed.

In this case, Gamma argues that Plaintiffs have not demonstrated an injury in fact because they have not actually visited the Center and, therefore, any purported injury is speculative and hypothetical . [FN6] Plaintiffs disagree, arguing that their prior visits to the facility provide actual knowledge of the facility shortfalls at the Center, making any effort to schedule a conference there a futile effort.

> FN6. In both its motion and its reply brief, Gamma insists that Plaintiffs can assert no injury against because (1) Plaintiffs' prior use of the Center predated Gamma's operation and (2) the prior use was on behalf of Plaintiffs' employer, Abilities in Motion, and the discontinuance of use was because of "others who are not named as plaintiffs." *Memorandum in Support of Summary Judgment Motion* at 9; *Reply Memorandum* at 4. Both of these arguments ring rather hollow. As to the first argument, Gamma has not presented any

evidence that it has modified the facility since having taken over as its operator. As to the second argument, Gamma appears to ignore the fact that each of the Plaintiffs alleges that they are qualified individuals as that term is defined under the ADA and that each Plaintiff has, in fact, visited the Center.

The remedies available under the ADA are available "to any person who is being subjected to discrimination on the basis of disability in violation of this subchapter or who has reasonable grounds for believing that such person is about to be subjected to discrimination in violation of Section 12183 [FN7] of this title. 42 U.S.C. § 12188(a)(1). This provision also states that "[n]othing in this section shall require a person with a disability to engage in a futile gesture if such person has actual notice that a person or organization covered by this subchapter does not intend to comply with its provisions." *Id.*

> FN7. Section 12183 addresses new construction and alteration in public accommodations and commercial facilities. 42 U.S.C. § 12183.

Neither the Court of Appeals for the Third Circuit nor any other court of appeals appears to have addressed the precise issue presented here--whether a plaintiff who has visited a facility and identified alleged compliance problems may, after a new operator has taken over, assert a claim alleging ADA violations that are grounded on a plaintiff's intended future use of the newly operated facility. However, the Court of Appeals for the Eighth Circuit has concluded that the "futility provision" of the ADA allows a plaintiff to file suit as long as the plaintiff establishes knowledge of the barriers accompanied by an assertion that they would visit a facility but for the existence of the barriers. *See, e.g, Steger v. Franco, Inc.,* 228 F.3d 889, 891 (8th Cir.2000). Additionally, the Court of Appeals for the First and Ninth Circuits have found that a plaintiff who is deterred from patronizing a public accommodation because of a defendant's failure to comply with the

Not Reported in F.Supp.2d, 2005 WL 2644996 (E.D.Pa.), 17 A.D. Cases 954, 31 NDLR P 117
**(Cite as: 2005 WL 2644996 (E.D.Pa.))**

ADA may be considered to have suffered an "actual" or "imminent" injury. *See, e.g., Disabled Americans for Equal Access, Inc. v. Ferries Del Caribe, Inc.,* 405 F.3d 60, 64-65 (1st Cir.2005) (finding plaintiff who had not actually traveled aboard ferry boat suffered actual injury because various barriers precluded his ability to board); *Pickern v. Holiday Quality Foods, Inc.,* 293 F.3d 1133, 1138 (9th Cir.2002) (holding that "a disabled individual who is currently deterred from patronizing a public accommodation due to a defendant's failure to comply with the ADA has suffered an 'actual injury' ").

**\*3** District courts have followed this reasoning, finding that as long as a plaintiff can establish actual knowledge of barriers and a reasonable likelihood that but for the barriers the plaintiff would utilize the facility, he or she has standing to bring a claim. *See, e.g., Small v. General Nutrition Cos., Inc.,* No. 03-1872, 2005 WL 887020, at \*6 (E.D.N.Y. Feb.25, 2005) (finding that complaint supported standing only for store which plaintiff alleged to have actual knowledge of physical barriers); *Clark v. Burger King Corp.,* 255 F.Supp.2d 334, 343 (D.N.J.2003) (finding that past patronage at certain restaurants, combined with intent to return to these restaurants, demonstrated a real and immediate threat of future injury); *Clark v. McDonald's Corp.,* 213 F.R.D. 198, 229 (D.N.J.2003) (finding that plaintiff suffered "actual injury" where he was "**currently deterred from patronizing a public accommodation due to a defendant's failure to comply with the ADA**"); *cf. Resnick v. Magical Cruise Co., Ltd.,* 148 F.Supp.2d 1298, 1301-02 (M.D.Fla.2001) (finding no standing where plaintiff's allegations were based solely on review of defendant's website and an attempt to take a cruise on one of defendant's ships "at some unspecified time in the future" did not constitute a concrete, particularized injury).

In the instant case, each of the Plaintiffs alleges that they have personally visited the Center and continues to desire to visit the Center in the future. *Complaint* at ¶¶ 3-5. Additionally, Plaintiffs Kratzer and

Trainer have, by affidavit, attested that they have attended conferences and experienced barriers at the Center, and that due to its location, size and affordability, the Center is a desirable facility to hold future conferences. [FN8] *Kratzer Aff.* at ¶¶ 7-8; *Trainer Aff.* at ¶¶ 4, 7. Plaintiffs additionally allege very specific violations of the ADA in the common areas and the main facility of the Center, including assertions that there are insufficient accessible parking spaces and no level landing outside the front entrance doors of the hotel, the ramps leading from the lobby to the hallway are too steep and lack adequate handrails; the public telephone is too high and does not have a volume control; the thresholds at the doors leading from the pool area into the main lobby are too high. *Complaint* at ¶ 14. Considering these allegations as true, as the Court must, the Court finds that Plaintiffs have stated a sufficient claim for an actual and imminent injury under the ADA. [FN9]

> FN8. Gamma relies on the absence of the submission of an affidavit from Mr. Ross to support its argument that there has been no actual injury. However, the lack of an affidavit from Mr. Ross does not negate the allegation in the Complaint that Mr. Ross had, in fact, visited the Center and intends to do so but continues to be denied safe and equal access. *Complaint* at ¶ 4.

> FN9. Gamma vigorously argues that the Center does comply with the ADA and that the factual allegations in the Complaint are inaccurate. It supports this argument with a portfolio of photographs of the exterior and interior of the Center. It is, however, virtually impossible for the Court to discern from the photographs whether the precise allegations made by Plaintiffs have merit. Moreover, despite the fact that the present motion is one for summary judgment, the Court notes that discovery in this case has not yet been completed. Therefore, the Court reserves judgment with re-

Not Reported in F.Supp.2d                                                    Page 5
Not Reported in F.Supp.2d, 2005 WL 2644996 (E.D.Pa.), 17 A.D. Cases 954, 31 NDLR P 117
**(Cite as: 2005 WL 2644996 (E.D.Pa.))**

spect to actual compliance with the ADA for a later date at which such compliance can be fairly assessed on a more complete record.

CONCLUSION

In summary, upon review of the Motion for Summary Judgment filed by Gamma Management Group, Inc., after considering Plaintiffs' allegations and attestations by affidavit that they have visited the facility and remain unable to hold conferences there due to existing barriers, and noting that discovery with respect to this case has not yet been completed and that many facts asserted by Gamma remain disputed by the parties, the Court concludes that the allegations in the Complaint are sufficient to support an allegation that Plaintiffs have suffered an actual injury and that future injuries are, assuming the allegations in the Amended Complaint to be true, imminent. Therefore, Gamma's Motion for Summary Judgment will be denied. An appropriate Order follows.

ORDER

**\*4** AND NOW, this 12th day of October, 2005, upon consideration of the Motion for Summary Judgment filed by Gamma Management Group, Inc. (Docket Nos. 10, 11), the response thereto (Docket No. 15) and the Reply Brief (Docket No. 16), it is ORDERED that the motion is DENIED.

Not Reported in F.Supp.2d, 2005 WL 2644996 (E.D.Pa.), 17 A.D. Cases 954, 31 NDLR P 117

END OF DOCUMENT

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

**EXHIBIT 3**
**Part I**

Not Reported in F.3d                                                                                     Page 1
Not Reported in F.3d, 1998 WL 938717 (C.A.D.C.)
**(Cite as: Not Reported in F.3d)**

Maydak v. F.C.C.
C.A.D.C.,1998.
Only the Westlaw citation is currently available.
United States Court of Appeals, District of
Columbia Circuit.
Keith MAYDAK, Appellant
v.
FEDERAL COMMUNICATIONS COMMISSION,
Appellee
AMERICAN TELEPHONE AND TELEGRAPH
COMPANY, Intervenor
**No. 98-1383.**

Dec. 9, 1998.

Before: WILLIAMS, GINSBURG, and ROGERS,
Circuit Judges.

ORDER

PER CURIAM.
**\*1** Upon consideration of the motion to dismiss, the
response thereto, and the reply; the motion for
leave to expand the record; the motion for summary
reversal, the responses thereto, and the reply; and
the motion to take judicial notice and the response
thereto, it is

ORDERED that the motion for leave to expand the
record be granted. It is

FURTHER ORDERED that the motion to dismiss
be granted. Appellant's participation before the
agency is insufficient to confer judicial standing.
See *California Assoc. of the Physically Handi-
capped v. FCC,* 778 F.2d 823, 826 n. 8
(D.C.Cir.1985). Nor is the FCC estopped from
challenging jurisdiction by failing to raise it below.
See *Natural Resources Defense Council v. Pena,*
147 F.3d 1012, 1021 n. 3 (D.C.Cir.1998). Appellant
lacks standing under Article III to appeal the Com-
mission's decision because he has not alleged a per-
sonal injury-in-fact that is fairly traceable to the

FCC's decision and redressable by the relief reques-
ted. See *Steel Co. v. Citizens for a Better Environ-
ment,* 118 S.Ct. 1003, 1012 (1998). Appellant's al-
leged injuries "in his capacity as a consumer" are
hypothetical and conjectural, not the concrete and
actual or imminent injury that Article III requires.
See *Steel Co.,* 118 S.Ct. at 1016-17;*United States v.
Western Electric Co .,* 900 F.2d 283, 310
(D.C.Cir.1990) (unparticularized consumer argu-
ment is too broad to confer standing). The allega-
tions of harm to appellant's financial interests are
vague and conclusory. Furthermore, appellant has
not shown a fairly traceable connection between the
injury and the FCC's decision because the injury
depends on the choices of third parties not before
the court. See *Florida Audubon Soc'y v. Bentsen,* 94
F.3d 658, 663 (D.C.Cir.1996) (en banc). Redress-
ability is also lacking because it is not likely that the
relief sought, assuming the court chooses to grant
it, will alleviate the injury appellant alleges. See *id.
at 663-64.*It is

FURTHER ORDERED that the motions for sum-
mary reversal and for judicial notice be dismissed
as moot.

The Clerk is directed to withhold issuance of the
mandate herein until seven days after disposition of
any timely petition for rehearing or petition for re-
hearing *en banc. See*D.C.Cir. Rule 41.

C.A.D.C.,1998.
Maydak v. F.C.C.
Not Reported in F.3d, 1998 WL 938717 (C.A.D.C.)

END OF DOCUMENT

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

**EXHIBIT 3**
**Part J**

Slip Copy                                                                                          Page 1
Slip Copy, 1998 WL 35177067 (N.D.Fla.)
**(Cite as: Slip Copy)**

H

Thompson v. Sand Cliffs Owners Ass'n, Inc.
N.D.Fla.,1998.
Only the Westlaw citation is currently available.
United States District Court, N.D. Florida,
Pensacola Division.
John THOMPSON, Plaintiff,
v.
SAND CLIFFS OWNERS ASSOCIATION, INC.,
Defendant.
**No. 3:96cv270/RV.**

March 30, 1998.

Joel Steven Carter, Henry Buchanan Hudson etc.,
Tallahassee, FL, for Plaintiff.
Ralph Alan Peterson, Beggs & Lane, Pensacola,
FL, for Defendant.

***ORDER***

ROGER VINSON, Chief United States District
Judge.
**\*1** Pending is defendant Sand Cliffs Owners Association, Inc.'s ("Association") motion for summary judgment. (doc. 76) Also before the Court is John Thompson's cross-motion for partial summary judgment on the issue of whether Sand Cliffs Condominiums is a place of public accommodation. (doc. 70)

**I. BACKGROUND**

The following factual allegations are all contained in the plaintiff's second amended complaint. This action was brought by the plaintiff pursuant to Title III of the Americans with Disabilities Act of 1990 ("ADA") [Title 42, United States Code, Sections 12101-12201],[FN1] and the Florida Civil Rights Act of 1992 [Section 760.01 et seq.]. Both the ADA and the Florida Civil Rights Act prohibit private entities from discriminating on the basis of disability in places of public accommodation. In addition, Title III of the ADA also requires that recently altered places of public accommodation or commercial facilities be readily accessible to, and useable by, individuals with disabilities.

> FN1. The ADA is comprised of three separate titles: Title I regulates employment activities; Title II regulates public services; and Title III regulates private entities that meet the characteristics of a public accommodation as specified in 42 U.S.C. § 12181(7).

Thompson is the owner of Unit 110 of the Sand Cliffs Condominiums, located in Panama City Beach, Florida. The parties agree that the plaintiff is physically disabled or handicapped within the meaning of the ADA. He suffers from a condition known as peripheral neuropathy, which makes it difficult for him to walk without braces on his legs. The defendant Association maintains the commons areas of the Sand Cliffs Condominiums and administers a rental program whereby the individual unit owners can rent their condominiums to the public on a weekly or monthly basis. The Association sets the rental rates to be charged and handles the administrative duties related to the program, including advertising, booking, and collecting rent. As compensation, the Association receives a percentage of the gross rental from each renting owner. Under the rental program, 15 units (approximately 20 percent of the total units) are rented from time to time to the public. In order to run the program, the State of Florida requires the Association to maintain a public lodging license issued by the Department of Professional and Business Regulation.

The plaintiff contends that Sand Cliffs is a place of public accommodation. The plaintiff also contends that the since the Association operates a rental program at Sand Cliffs, it is subject to the accessibility requirements of the ADA. On October 4, 1995, the Sand Cliffs Condominiums were damaged by Hurricane Opal. The Association contracted with Phoenix Coatings, Inc. ("Phoenix") to repair the

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

damage caused by the hurricane, and to make other repairs unrelated to the storm. The contract price for the repairs totaled $1.2 million dollars. The plaintiff claims that pursuant to the ADA, the Association was required to make the Condominium's facilities handicap accessible at the same time that it completed the renovations and repairs mentioned above. Specifically, the plaintiff contends that the defendant was required to make the common area restrooms, game room entrance, and beach access steps accessible to physically disabled persons. The plaintiff also claims that the defendant was required to add disabled parking spaces to the Condominium's parking lot. The plaintiff seeks injunctive and declaratory relief requiring the defendant to make the above mentioned facilities handicap accessible, as well as damages, attorney's fees, and costs.

## II. *ANALYSIS*

### A. Summary Judgment Standard

**\*2** A motion for summary judgment should be granted when "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Rule 56(c), Fed.R.Civ.P. "[T]he plain language of Rule 56(c) mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex Corp. v. Catrett,* 477 U.S. 317, 322, 106 S.Ct. 2548, 2552, 91 L.Ed.2d 265, 273 (1986); *see also Everett v. Napper,* 833 F.2d 1507, 1510 (11th Cir.1987).

However, summary judgment is improper "[i]f a reasonable fact finder could draw more than one inference from the facts, and that inference creates a genuine issue of material fact." *Cornelius v. Highland Lake,* 880 F.2d 348, 351 (11th Cir.1989).*cert.*

*denied,* 494 U.S. 1066, 110 S.Ct. 1784, 108 L.Ed.2d 785 (1990). An issue of fact is "material" if it might affect the outcome of the case under the governing law. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248, 106 S.Ct. 2505, 2510, 91 L.Ed.2d 202, 211 (1986). It is "genuine" if the record taken as a whole could lead a rational trier of fact to find for the non-moving party. *Id.; see also Matsushita Electric Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 586, 106 S.Ct. 1348, 1356, 89 L.Ed.2d 538, 552 (1986).

Conclusory allegations based on speculation, subjective beliefs, or bald assertions based upon unsubstantiated hearsay are insufficient to create a "genuine issue of material fact." *Carter v. Miami,* 870 F.2d 578, 585 (11th Cir.1989); *Ramsey v. Leath,* 706 F.2d 1166, 1170 (11th Cir.1983). On the other hand, if the record taken as a whole could lead a rational trier of fact to find for the nonmoving party, then the issue of fact is genuine.*Matsushita Elec. Industrial Co. Ltd. v. Zenith Radio Corp.,* 475 U.S. 574, 586, 106 S.Ct. 1348, 1356, 89 L.Ed.2d 538, 552 (1986). On a summary judgment motion, the record and all reasonable inferences that can be drawn from it must be viewed in the light most favorable to the non-moving party. *McCabe v. Sharett,* 12 F.3d 1558, 1560 (11th Cir.1994).

### B. *Discussion*

### (1) Failure to Join Indispensable Parties

Initially, I will address the defendant's contention that this action should be dismissed because the plaintiff has failed to join the individual owners of the condominiums as indispensable parties pursuant to Rule 19, Federal Rules of Civil Procedure. I dismissed the plaintiff's original complaint on this ground because I found that if the plaintiff succeeded, the individual condominium owners would be required to make substantial additional renovations to their units, at their own expense, in order to make them accessible. In his second amended com-

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

plaint, the plaintiff dropped his claim for relief seeking to have the individual condominiums modified so that they could accommodate individuals with disabilities. Apparently, the plaintiff believed that if he limited his relief to Sand Cliffs' common areas, he would not be required to join the individual unit owners. However, the defendant contends that the owners of each rental condominium must still be joined because they will be required to pay for the renovations to the common areas, and because they will also be required to renovate their condominiums to make them accessible if I determine that Sand Cliffs is a place of public accommodation. On the other hand, the plaintiff responds that the defendant never raised the joinder of indispensable parties issue in its motion for summary judgment. Therefore, he was not provided a full and fair opportunity to meet this proposition. Accordingly, the plaintiff contends that I should not consider the defendant's argument.

**\*3** Once again, I must agree with the defendant on this issue. The amended complaint continues to seek the removal of architectural barriers, which are the responsibility of the individual condominium owners. There is no impediment to joinder of the individual owners, and it is apparent that Rule 19(a) requires their joinder. Although the defendant did not raise this issue in its motion for summary judgment, it pled it as an affirmative defense, and it also raised it pursuant to my order notifying the parties to submit any additional documents they would like me to consider when taking their motions for summary judgment under advisement. Therefore, I find that the joinder issue is properly before me, and that the plaintiff's action is subject to dismissal for failure to comply with Rule 19, Federal Rules of Civil Procedure.

Although it is not necessary for me to now reach the merits of the plaintiff's claims because the action is subject to dismissal, I will do so for completeness of the record and to give the parties some idea of how this Court construes the applicable statutes under the facts of this case.

**(2) Does the Association Own, Lease, or Operate a Place of Public Accommodation Under the ADA.**[FN2]

> FN2. Both parties raised this issue in their motions for summary judgment. In fact, this is the only issue raised by the plaintiff in his cross-motion for partial summary judgment. For simplicity and clarity, I will combine both parties' contentions here and address this issue only once.

Whether the condominium is a place of public accommodation is the first major issue. Title III of the ADA provides in pertinent part:
No individual shall be discriminated against on the basis of disability in the full and equal enjoyment of the goods, services, facilities, privileges, advantages, or accommodations of any place of public accommodation by any person who owns, leases (or leases to), or operates a place of public accommodation.

42 U.S.C. § 12182(a) (1995). The plaintiff contends that the Association owns, leases, or operates a place of public accommodation, and, therefore, must comply with the requirements of Title III of the ADA. *See* 42 U.S.C. § 12182(a) (1995). Title III and the regulations promulgated to implement it define "place of public accommodation" as a "facility, operated by a private entity, whose operations affect commerce and fall within at least one" of twelve specified categories. The twelve categories are listed in Title 42, United States Code, Section 12181(7)(A)-(L) and in 28, Code of Federal Regulations, Section 36.104.[FN3] The plaintiff alleges that since the Association administers a rental program, Sand Cliffs qualifies as a "place of lodging" under the first category of Section 12181(7):

> FN3. The United States Department of Justice ("DOJ") is charged by statute with the implementation of Title III of the ADA. The DOJ has promulgated conventional regulations and published literature

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

interpreting the regulations. The literature includes "accessibility guidelines," entitled Americans with Disabilities Act Accessibility Guidelines ("ADAAG"), found in 28 C.F.R. Pt. 36, App. A (1997), and commentary on the regulations, entitled Preamble to Regulation on Nondiscrimination on the Basis of Disability by Public Accommodations and in Commercial Facilities, found in 28 C.F.R. Pt. 36, App. B (1997).

(A) an inn, hotel, motel, or other place of lodging, except for an establishment located within a building that contains not more than five rooms for rent or hire and that is actually occupied by the proprietor of such establishment as the residence of such proprietor ...

42 U.S.C. § 12181(7)(A) (1995); 28 C.F.R. § 36.104 (1997).

The ADA only regulates non-residential facilities. H.R. Resp. No. 101-485(II), 101st Cong., 2d Sess. 383 (1990), *reprinted in* U.S.Code Cong. & Admin. News 1990, at p. 267; *see also* 28 C.F.R. Pt. 36, App. B, § 36.104, p. 614 (1997). The plaintiff contends that since approximately 15 out of the 70 unit owners at Sand Cliffs rent their condominiums, the condominium complex is no longer residential in nature. Furthermore, the plaintiff contends that because the Association acts as a rental agent for the unit owners that want to make their condominiums available for rental, it operates a place of public accommodation. I disagree. The fact that approximately 15 owners have decided to rent their condominiums on occasion does not change the residential nature of the Sand Cliffs Condominiums. Sand Cliffs' declaration of condominium provides that "[e]ach of the units shall be occupied or rented as a residence and for no other purpose;...." At least one court has held that residential condominiums do not constitute public accommodations within the meaning of the ADA. *See Independent Housing Services of San Francisco v. Fillmore Center Associates,* 840 F.Supp. 1328, 1344, n. 14

(N.D.Cal.1993) (holding that the portion of a mixed rent housing project containing condominiums was residential in nature and did not fall within the bounds of the ADA). I have found no decision from the Eleventh Circuit recognizing that these kinds of condominiums are within the ADA. Sand Cliffs' residential nature does not change simply because some of the owners have decided to rent their units. Each owner is still free to use his condominium at anytime, and he may also decide not to rent it out at all. Furthermore, when the units are not being rented, there is no question that they remain the owners' residences.

**\*4** According to the commentary related to the regulations, the difference between a residential facility and a non-residential "place of lodging" is the length of the occupant's stay. "The nature of a place of lodging contemplates the use of the facility for short-term stays." *See* 28 C.F.R.App. B, § 36.104, p. 614-15 (1997). When one facility contains both residential and non-residential accommodations, the ADA only covers the non-residential portion of the facility.

For example, in a large hotel that has a separate residential apartment wing, the residential wing would not be covered by the ADA because of the nature of the occupancy of that part of the facility. This residential wing would, however, be covered by the Fair Housing Act. The separate nonresidential accommodations in the rest of the hotel would be a place of lodging, and thus a public accommodation subject to the requirements of this final rule. If a hotel allows both residential and short-term stays, but does not allocate space for these different uses in separate, discrete units, both the ADA and the Fair Housing Act may apply to the facility.

28 C.F.R.App. B, § 36.104, p. 614 (1997). Neither the ADA nor its corresponding regulations define what qualifies as a "short-term stay." The plaintiff relies on two policy letters from the Department of Justice for the proposition that short-term rentals under the ADA would include any rental for a period of one week or less. Although the letters do not

constitute regulations that are binding on this Court, and the Department of Justice does not view them as binding on it, I will discuss some of the issues that they raise. One of the letters states that whether a given facility can be classified as an "other place of lodging" depends, in part, on the extent to which the facility does or does not share characteristics with the examples of "places of lodging" listed in the statute.

Sand Cliffs does not share characteristics with inns, hotels, or motels. The units are owned by separate individuals, not by one individual or entity. Furthermore, unlike the rooms in hotels and motels, the Sand Cliffs units retain their residential character when they are not being rented. In fact, each unit is furnished by the individual owner with his own personal property. Each unit owner is totally responsible for the unit's maintenance and repair. Also, the Association does not provide maid service for the rented units. Rental units are cleaned before and after each stay, but the renter is responsible for the unit's upkeep during his stay. Based on the totality of the circumstances, Sand Cliffs cannot be considered an "other place of lodging."

Next, the plaintiff cites two cases brought pursuant to the Civil Rights Act of 1964, which also prohibits discrimination in public accommodations. *See United States v. Young Men's Christ. Ass'n of Columbia, S.C.,* 310 F.Supp. 79 (D.S.C.1970); *United States v. Beach Associates, Inc.* 286 F.Supp. 801, 808 (D.C.Md.1968). Section 2000a(b)(1) of the Act listed the establishments subject to that Act as "any inn, hotel, motel, or other establishment which provides lodging to transient guests."In both of the above cases, the courts were faced with defining the term "transient guests." The courts determined that transient guests were guests that stayed for a period of one week or less. The plaintiff contends that, based on those cases, the one week rentals at Sand Cliffs constitute short-term stays.

**\*5** I do not find these cases to be controlling or even persuasive on the issues before me. Congress

left the term transient guest out of the definition of a place of public accommodation under the ADA. The issue here is whether the property in question is residential or nonresidential in nature. Although the commentary to the regulations suggests that short-term stays would be indicative of the nonresidential nature of the property, the one week and longer stays at Sand Cliffs are unlike the normal length of stay at hotels, motels, or inns. In fact, the record indicates that the units at Sand Cliffs are often rented out for periods of time that exceed one month. More importantly, most of the units are not rented at all, and of those that are rented, it appears that the rental periods total less time each year than the periods when the owners utilized their units for their own residential purposes.

I find that the Sand Cliffs Condominiums are residential in nature despite the fact that they are occasionally rented for one week periods.[FN4] I also find that, in this case, the condominiums do not share sufficient similar characteristics with the other facilities listed in the statute to justify labeling them as other places of lodging. Accordingly, I find that the Association is not a public accommodation that is subject to the ADA.

> FN4. I note that using a specific amount of time like one week as the standard for determining whether a facility is residential or non-residential in nature is extremely arbitrary. Certainly, staying an eighth day by no means makes the facility any more or any less residential in nature.

**(3) Removal of Barriers**

Next, the plaintiff contends that the ADA requires the defendant to remove any existing architectural barriers to access including, *inter alia,* installing ramps, widening doors, installing grab bars in the restrooms, rearranging toilet partitions, and creating designated accessible parking spaces. It is true that Title III requires places of public accommodation to remove architectural barriers to access, where such removal is "readily achievable." 42 U.S.C. §

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

12182(b)(2)(A)(iv)(1995). However, since the Association does not own, lease, or operate a place of public accommodation, the statute does not apply to the defendant, and it is entitled to summary judgment on this claim. Other provisions may also exempt the Association from these ADA requirements, but I need not address them now.

### (4) Alterations

Next, the plaintiff contends that the repairs the Association did to the condominiums constitute "alterations", as that term is defined in Title III. Accordingly, the plaintiff contends that the defendant was required to make those alterations and the areas they affect accessible to individuals with disabilities. The ADA requires anyone making an alteration to a place of public accommodation or a commercial facility, after January 26, 1992, to do so in such a manner that the altered portions of the facility are readily accessible to, and useable by, individuals with disabilities. The applicable provision, Section 12183, provides, in pertinent part:

Except as provided in subsection (b) of this section, as applied to public accommodations and commercial facilities, discrimination for purposes of section 12182(a) of this title includes-

\* \* \*

**\*6** (2) with respect to a facility or part thereof that is altered by, on behalf of, or for the use of an establishment in a manner that affects or could affect the usability of the facility or part thereof, a failure to make alterations in such a manner that, to the maximum extent feasible, the altered portions of the facility are readily accessible to and usable by individuals with disabilities, including individuals who use wheelchairs. Where the entity is undertaking an alteration that affects or could affect usability of or access to an area of the facility containing a primary function, the entity shall also make the alterations in such a manner that, to the maximum extent feasible, the path of travel to the altered area

and the bathrooms, telephones, and drinking fountains serving the altered area, are readily accessible to and usable by individuals with disabilities where such alterations to the path of travel or the bathrooms, telephones, and drinking fountains serving the altered area are not disproportionate to the overall alterations in terms of cost and scope (as determined under criteria established by the Attorney General).

Since I have already determined that Sand Cliffs is not a place of public accommodation, the only way that the Association could be required to make the repairs so that they are accessible to individuals with disabilities is if Sand Cliffs qualifies as a commercial facility under the statute. Under the regulations, "commercial facilities" are "facilities-(1) Whose operations will affect commerce; (2) That are intended for nonresidential use by a private entity; and (3) That are not-(i) Facilities that are covered or expressly exempted from coverage under the Fair Housing Act of 1968, as amended (42 U.S.C. §§ 3601-3631)...."28 C.F.R. § 36.104 (1997)."The term 'commercial facilities' is not intended to be defined by dictionary or common industry definitions. Included in this category are factories, warehouses, office buildings, and other buildings in which employment may occur." 28 C.F.R. Pt. 36, App. B, § 36.104, p. 609 (1997)."The statute's definition of 'commercial facilities' specifically includes only facilities 'that are intended for nonresidential use'...."*Id* .Sand Cliffs is not a commercial facility as that term is defined under the ADA. It was most certainly intended for residential use, not for "nonresidential use." It does not fall within the categories specifically mentioned in the regulations [i.e., factories, warehouses, office buildings, and other buildings in which employment may occur]. Since Sand Cliffs does not qualify under the ADA as either a "place of public accommodation" or a "commercial facility," the repairs the Association made to the facility do not have to comply with the ADA's accessibility requirements.

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

I note that even if I determined that Sand Cliffs was a commercial facility or a place of public accommodation, the repairs made to the facility do not appear to be alterations under the ADA. The corresponding regulations to Section 12183 define what constitutes an alteration, and set forth some examples of conduct that would be considered an alteration. *See* 28 C.F.R. § 36.402(b) (1997).Section 36.402 provides, in pertinent part:

**\*7** (a) General.

(1) Any alteration to a place of public accommodation or a commercial facility, after January 26, 1992, shall be made so as to ensure that, to the maximum extent feasible, **the altered portions of the facility are readily accessible to and usable by individuals with disabilities,** including individuals who use wheelchairs.

(b) Alteration. For the purposes of this part, an alteration is a change to a place of public accommodation or a commercial facility that affects or could affect the usability of the building or facility or any part thereof.

(1) Alterations include, but are not limited to, remodeling, renovation, rehabilitation, reconstruction, historic restoration, changes or rearrangement in structural parts or elements, and changes or rearrangement in the plan configuration of walls and full-height partitions. **Normal maintenance, reroofing, painting or wallpapering, asbestos removal, or changes to mechanical and electrical systems are not alterations unless they affect the usabilityofthe building or facility.**

(2) **If** existing elements, spaces, or common areas are altered, **then each such altered element, space, or area shall comply with the applicable provisions of appendix A to this part.**

28 C.F.R. § 36.402 (1997) (emphasis added).

In August, 1995, the Association entered into a contract with Taylor Architects, Inc. ("Taylor Architects"), to accomplish the following tasks: (1) replace the courtyard and ocean front windows; (2) replace the cedar siding and investigate the possibility of modifying the balconies; (3) replace the

roofing and modify the present roof slopes as required to eliminate the pooling of water; and (4) waterproof the exterior of the building. After the hurricane hit, the Association entered into a new contract with Phoenix Coatings, Inc., as contractor, to repair the damages from the hurricane and complete the work originally contemplated in the contract with Taylor Architects. The Association's contract with Phoenix provided that Phoenix would rework the balconies and the handrails, and replace the windows. The contract also provided that Phoenix would waterproof and paint the building, and replace the roof covering and joint sealants. All of the work outlined in the contract with Taylor Architects was made a part of the contract with Phoenix. The only additional work that was not contemplated in the contract with Taylor Architects, was the rebuilding of the beach steps, which were destroyed by the hurricane. The cost of the work on Sand Cliffs condominium totaled $1.2 million. The insurance company paid about $184,000, and the balance was divided among the individual owners.[FN5]

> [FN5]. An assessment of approximately $16,000 was made to each owner.

The regulations specifically exclude "[n]ormal maintenance, reroofing, painting, or wallpapering."It appears that most of the work done on Sand Cliffs falls under these categories. Additionally, the applicable statute and regulations only require individuals to make the altered portions of their facilities accessible to, and usable by, individuals with disabilities. Therefore, the plaintiff's contention that the Association must make all areas of the facility accessible because it made a few repairs is misplaced. For example, the plaintiff contends that the Association is required to add handicap parking spaces to Sand Cliffs' parking lot. However, the plaintiff admits that the Association has not made any alterations or repairs to the parking lot since the hurricane hit. Even if I were to find that the repairs to the facility [i.e., replacing the windows and opening up the balconies to provide more viewing

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

area] constitute alterations, there is no way that the Association could make those alterations, or the surrounding areas, accessible to individuals with disabilities.[FN6] The only work done to the facility that could have been accomplished to make it accessible to individuals with disabilities would have been the repairs to the beach access stairs. However, those repairs do not seem to qualify as an alteration under the ADA.

> FN6. The commentary to Section 36.402 notes that "some commenters concluded that any alteration to a facility, even a minor alteration such as relocating an electrical outlet, would trigger an extensive obligation to provide access throughout an entire facility. That result was never contemplated." 28 C.F.R. Pt. 36, App. B., § 36.402, p. 654 (1997).

**\*8** An alteration is a change to a place of public accommodation or a commercial facility that affects or could affect the usability of the building or facility or any part thereof. There has been no change to the facility in this case. The Association simply rebuilt the stairs that were destroyed by the hurricane. The plaintiff points out that the stairs now have showers at the bottom instead of at the top. However, except for that cosmetic change, the stairs, and the rest of the facility for that matter, are the same as when the plaintiff purchased his condominium ten years ago.[FN7] Since there have been no alterations to the condominium that would trigger the ADA in this case, the defendant is entitled to summary judgment on this claim.

> FN7. The Association also contends that if rebuilding the stairs constitutes an alteration, the cost of the alteration would be disproportionate to the cost of the repairs. Therefore, it would not be required to make the stairs accessible under the ADA. The defendant would be correct if some other alteration was made to the facility and if the beach stairs were part of the path of travel to that area of alteration. In this

case, the plaintiff is contending that the stairs themselves are the alteration. Therefore, the disproportional cost exception does not apply. I also note that any claim on the part of the plaintiff that the beach is one of the defendant's primary facilities is specious. The commentary to 28 C.F.R. § 36.104 provides that the definition of facility only includes the site over which the private entity may exercise control or on which a place of public accommodation or a commercial facility is located. It does not include, for example, adjacent roads or walks controlled by a public entity that is not subject to this part. 28 C.F.R. Pt. 36, App. B., § 36.104, p. 613 (1997). The pubic beach adjacent to Sand Cliffs would certainly fall within this exclusion.

**(5) The Plaintiff's State Law Discrimination Claims**

At this point, I note that the only remaining claims are the plaintiff's state-law causes of action.[FN8] Title 28, United States Code, Section 1367(c)(3) provides that district courts may decline to exercise supplemental jurisdiction over state-law claims when the court has dismissed all claims over which it had original jurisdiction. *See Carnegie-Mellon University v. Cohill,* 484 U.S. 343, 350 n. 7, 108 S.Ct. 614, 98 L.Ed.2d 720 (1988) ("[I]n the usual case in which all federal-law claims are eliminated before trial, the balance of factors to be considered under the pendent jurisdiction [now supplemental jurisdiction] doctrine-judicial economy, convenience, fairness, and comity-will point toward declining to exercise jurisdiction over the remaining state-law claims."); *Eubanks v. Gerwen,* 40 F.3d 1157, 1161 (11th Cir.1994). Since there is a lack of Florida precedent with respect to a majority of issues raised by the plaintiff's state-law claims, I find that it is appropriate under the circumstances to dismiss them, rather than to address the merits of these novel non-federal causes of action. *UMW v. Gibbs,* 383 U.S. 715, 726, 86 S.Ct. 1130, 1139, 16

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Slip Copy, 1998 WL 35177067 (N.D.Fla.)
**(Cite as: Slip Copy)**

L.Ed.2d 218 (1966); *Clifton Terrace Assocs. v. United Technologies Corp.,* 929 F.2d 714, 723 (D.C.Cir.1991); *Buethe v. Britt Airlines, Inc.,* 749 F.2d 1235, 1240-41 (7th Cir.1984). Therefore, the plaintiff's state-law claims are DISMISSED, without prejudice to pursue them in a Florida state court.

> FN8. The majority of the plaintiff's state-law claims were brought pursuant to Section 760.07 of the Florida Statutes. (1997). Section 760.07 was specifically designed to prohibit and protect against discrimination, including discrimination based on handicap. Section 760.07 contains a catch-all provision providing, in pertinent part:

Any violation of any Florida statute making unlawful discrimination because of ... handicap, ... in the areas of ... public accommodations gives rise to a cause of action for all relief and damages described in § 760.11(5), unless greater damages are expressly provided for.

§ 760.07, Fla. Stat. (1997).

Thus, any Florida statute that outlaws discrimination based on handicap in the area of public accommodations also gives rise to a private cause of action for damages pursuant to Section 760.07. The plaintiff points to three Florida statutes-Section 509.092, Sections 553.501-553.513, and 413.08(1)(a)-which he contends outlaw discrimination against disabled individuals, thus giving him a cause of action through Section 760.07. The plaintiff also alleges that the defendant has discriminated against him in violation of the Florida Fair Housing Act, Section 760.23(8), Florida Statutes.

**III.** *CONCLUSION*

For all of the above reasons, Sand Cliffs Owners Association, Inc.'s motion for summary judgment on the plaintiff's ADA claim is GRANTED. John Thompson's cross-motion for partial summary judgment is DENIED. The Clerk is directed to enter judgment for the defendant and against the plaintiff on that claim, together with taxable costs. The plaintiff's remaining state-law claims are DIS-

MISSED, without prejudice to plaintiff's right to pursue them in state court.

DONE AND ORDERED.

N.D.Fla.,1998.
Thompson v. Sand Cliffs Owners Ass'n, Inc.
Slip Copy, 1998 WL 35177067 (N.D.Fla.)

END OF DOCUMENT

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.